# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br><br>       *Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>       *Defendants.* | No. 1:25-cv-12162<br><br>LEAVE TO FILE UNDER A PSEUDONYM GRANTED ON DECEMBER 19, 2025 |

### DECLARATION OF PLAINTIFF STATE PROVIDER #4

  I, Plaintiff State Provider #4, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

  1. I am a provider of gender affirming care at my institution. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with my colleagues at our state public institution, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

  2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Background**

  3. I graduated from an accredited medical school and subsequently graduated from an accredited residency both in the United States and now am licensed to practice medicine and do so at a public institution in a plaintiff state.

  4. As a primary care physician, I have been trained to care for people of all ages in the outpatient setting and have been providing gender affirming care for almost 10 years. As part of that work, I have also worked with families and their children under 19 to diagnose and

treat the diagnosis of gender dysphoria or gender incongruence just as I have been trained to diagnose and treat common diagnoses such as depression, anxiety, diabetes, hypertension, etc. When working with children under 19, it is vital to have parental engagement with the process of understanding any diagnosis that a child has and making a patient and family-centered decision to use medical intervention or not, and which options to choose.  The healthcare that I have been trained to provide, including gender affirming care, is evidence-based, has documented benefits and is explained to the patient and the family for them to make an informed decision with full awareness and consent to the potential risks and benefits.  In our work, our job is to inform patients about what we know from our evidence-based understanding so that they can make the decision for their own bodies, lives, and health with as much information as possible.  If a patient has a medical indication to get a colonoscopy, for example, it is their decision to go forward with that based on their own experience and the information that I have given them about the potential risks and benefits.  The same thing is true for gender affirming care.  Sometimes families come to our clinic ready to start a medical intervention after seeing their child struggle with depression, anxiety and even suicidal attempt and sometimes, even if their child has expressed similar signs and symptoms that can be related to untreated gender dysphoria, the family and I may meet for years before any treatment is started.  And sometimes the families decide that treatment is not the right decision for them at the time.  Gender affirming care is simply a part of primary care and families should have the right to decide on medical interventions with the assistance of a trusted medical provider, but without interference from any political entity.  Stopping gender affirming care for youth would be similar to stopping access to insulin for diabetic children in terms of the negative health impacts and in how much evidence we have that it is helpful to avoid expensive and deadly complications.

5. I practice at a public plaintiff state institution. Our clinic is located in one of the many outpatient clinics associated with the hospital. It is a primary care clinic that, like our larger institution, focuses on increasing access to care for multiple under-resourced communities. We have a combination of types of providers at our gender affirming care clinic including nurses, pharmacists, endocrinologists, medical learners and primary care clinicians although a large predominance of the people providing gender affirming medical care (i.e., pubertal suppression and hormone therapy) in our institution are primary care providers.

6. We have a few clinics that provide gender affirming care at our institution, and some of them focus on youth, and others focus more on adults. They all started at different times within the past 15 years. The clinics that provide gender affirming care have medical assistants, nurses, behavioral health providers, primary care clinicians and pharmacists who have expertise and interest in providing affirming care to everyone and particularly in gender affirmation. We all understand the data related to poor health outcomes related to the discrimination that gender expansive people face (for example, one study of 93,000 gender expansive people demonstrates a 40% risk of suicide attempt compared to 4.6% chance for those in the general population). As we are an institution that prioritizes those with higher risk and fewer resources, people who do this work recognize the value of the work that gender affirming care can offer. Our institution has about 1500 gender expansive people who receive care, across the age spectrum from youth to elders. About 900 of our 1500 gender expansive patients are under 19. "Affirming care" doesn't have to mean hormone therapy or pubertal suppression, although it can, it just means that people are honored for who they know themselves to be. Use of accurate names and pronouns has been shown to have remarkable effects on depression and even a 56% reduction in suicide attempts in gender expansive youth. At our institution we teach our medical learners and staff this data so

that we can all participate in life-saving gender affirming care even if someone doesn't prescribe medication. For those under 19, we provide care that is indicated based on currently available data. If a child presents to our clinic and is in early pubertal development as defined by the Tanner Stages at Tanner Stage I, no medication is indicated. If they have gender dysphoria as they develop further, when they reach Tanner stage II and the patient and family are interested, we discuss pubertal suppression which is in the form of various gonadotropin releasing hormone agonists. If they are Tanner stage IV or V, we discuss the option of hormone therapy (either testosterone or a combination of bio-identical estradiol and the anti-androgen spironolactone). In terms of surgical options at our institution, we follow the long-standing guidelines that any gender confirming surgeries are only for those patients who meet the above criteria and are 18 or above. The structure of our gender affirming clinics is designed to maximize access and education for people working in medical system and so we have pre-medical students along with medical students, residents and even advanced clinicians who see patients during a single clinic session.

7. I and all the providers at our public plaintiff state institution offer patient-focused medical care in accordance with state and federal laws, established clinical practice guidelines, and medical ethics rules.

8. Consistent with state law, our practice requires that patients (or where applicable, their legal guardians) must provide informed consent for gender-affirming care. State law provides that individuals above age 18 are, in most cases, adults with legal capacity to consent to medical care. In our state, it is legal to provide certain types of care to people who are 14 or older without parental consent. However, in the case of gender affirming care we never provide medical intervention in the forms of pubertal suppression or hormone therapy to people under 18

4

without deep parental engagement as these interventions could cause a patient increased harm at home including being assaulted or kicked out by their family, as reflected by the National Transgender Discrimination Survey from 2022.  Our policy is to always have parental involvement to both start and change gender affirming care medications for people under 18 for this reason.  Our consent practice is based on the Endocrine Society and the World Professional Association of Transgender Health for all patients and includes confirming diagnostic criteria for gender incongruence, assessment of support, pre-existing conditions, family health, discussion of risks and benefits of the possible medications, engagement in behavioral health care and gender affirming care goals.  And again, for anyone under 18, this initial visit and consent process has to involve at least one legal guardian and preferably all legal guardians.

9. I have been providing gender affirming care for many years and have probably had more than 2000 patients in that time.  About 6 of the people I've worked with have de-transitioned for different reasons - family not accepting them in their true gender, one person was happy with the changes that testosterone gave them and just didn't want to take it anymore and one youth who had been on pubertal suppression and hormone therapy just felt happy with their natal gender and stopped the medications (they are doing wonderfully now in school and in life). The rest of the nearly 2000 people describe things like finally being able to look at themselves in the mirror without disgust, feeling like they knew they thought they were supposed to feel, needing less anti-depressants, using less substances or even stopping them entirely and parents say frequently "I was worried about this decision to start hormones but I have my kid back now and I'm so glad we did this."  We don't keep data on health outcomes, but the things that people experience, the level of self-acceptance and even love are humbling and astounding on a daily basis.  It is a privilege to hear their stories, and it always makes me think that if anyone who was

against this care could hear even one of these stories, they'd see how healing and restoring gender affirming care is for youth and their families.

10. In accordance with state antidiscrimination laws, our policy prohibits its staff from denying services or treating a person less well than others based on their protected characteristics, including sex, gender identity, gender expression, and transgender status.

**Federal Actions Targeting Providers of Gender-Affirming Care**

11. I am aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order") which announced that the federal government planned to restrict gender-affirming care for adolescents and penalize medical professionals who provide it.

12. Since the Executive Order was issued, the federal government has taken steps to implement it that appear intended to target and intimidate providers of gender-affirming care and restrict adolescents' access to such care.

13. On April 22, 2025, U.S. Attorney General Bondi issued a memorandum to all U.S. Department of Justice ("DOJ") employees ("Bondi Directive") to criminally and civilly prosecute "to the fullest extent possible" health care providers who provide medically necessary gender-affirming care to adolescent patients under the federal Female Genital Mutilation statute, 18 U.S.C. § 116 ("FGM"), the Food, Drug & Cosmetics Act, 21 U.S.C. Chapter 9 § 301 *et seq.* ("FDCA"), and the False Claims Act, 31 U.S.C. § 3729 ("FCA").

14. On June 11, 2025, U.S. Assistant Attorney General Brett Shumate issued a memorandum ("Shumate Directive") to all DOJ employees laying out the "Civil Division Enforcement Priorities" and directing the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals," and other health care entities to pursue alleged

6

violations of the FDCA in connection with the medications often used in gender-affirming care. It also orders the Civil Division to "aggressively pursue" FCA claims against providers that bill the federal government for gender-affirming care in circumstances where such care would not lawfully be covered.

15.     I understand that the Bondi and Shumate Directives (collectively, "DOJ Directives") announced new enforcement priorities under the FGM, FDCA, and FCA statutes targeting providers of gender-affirming care like me.

16.     I closely follow the almost daily attacks on gender expansive kids and healthcare because it affects me, my work and my patients and friends.  I understand that there is an FBI tipline that people can call to alert the FBI about gender affirming care providers who are following the current evidence.  I am aware of the voluminous HHS report that attempts to achieve objectivity while critiquing the current guidelines, and that there was a conference that involved the Federal Trade Commission in this care.  All of which targets an already vulnerable 1% of the population and none of which is evidence based.  My patients and their families are terrified and many of them have left the country to flee to hopefully safer places.

17.     I and others at our institution have generally understood that "marketing" a drug does not include keeping the drug at a hospital pharmacy or dispensing it to patients as part of an office visit. Indeed, these activities are indispensable to my medical practice. In my experience, it would be unprecedented to view these acts as "marketing" under the FDCA.

18.     It has long been my understanding that I may share my clinical experience or research related to off-label uses in an academic or research setting, or discuss an off-label use as a potential treatment with a patient, and that this is not considered "marketing" an off-label use of a drug.  I share that the bio-identical testosterone and estradiol, as well as the GnRH agonists

7

and spironolactone, are FDA approved for certain uses but are not FDA approved for gender dysphoria during the informed consent process with all patients and families.

19. My institution and its providers also have extremely robust risk-management measures in place to ensure that we are complying with all federal laws, including the FDCA, the FCA, and other federal statutes. My institution requires me and other providers to comply with policies related to pharmaceutical marketing, including not accepting meals or gifts from pharmaceutical representatives and receiving preapproval for all consulting arrangements.

**Consequences of Federal Actions on our Institution and Its Patients**

20. These federal actions have had devastating consequences for transgender young people under age 19 and the healthcare providers who care for them.

21. The Executive Order, DOJ Directives, and accompanying federal actions suggest that the administration is laying the groundwork to investigate or prosecute providers like me if we continue to provide medically necessary gender-affirming care to patients under 19.

22. I am terrified that that merely providing medically necessary gender-affirming care in accordance with applicable evidence-based clinical practice guidelines will be deemed unlawful under the DOJ Directives as a violation of the FGM, FDCA, and/or FCA statutes and that I may face prosecution, exorbitant fines, or even incarceration simply for doing my job and providing lawful, medically necessary care.  In addition to feeling terrified, I'm angry.  Providing gender affirming care in this country is a constant battle.  If on top of providing healthcare in this under-resourced healthcare system I will now have to either turn my back on those in need of life-saving evidence-based care, it makes more sense for me to take my hard-earned and expensive education elsewhere.  I have acquired a medical license in another country and am ready to move there if this continues apace.

23. I am also afraid that the federal government may apply the DOJ Directives' interpretation of the FGM, FDCA, and/or FCA statutes retroactively and subject me to criminal and/or civil liability for care that was provided months or years ago. I have already acquired legal assistance given the DOJ-based threat of felony charges for those who provide gender affirming care. Adding the threat of imprisonment to the additional and substantial barriers to providing gender affirming care supports a move out of this country. Physicians should have the freedom to follow our professional oath to provide evidence-based and life-saving care. So if our government is not only going to stop gender affirming care, but is also going to threaten people who do provide it, it makes more sense to consider moving to and providing gender affirming care in other countries as our country and its healthcare system are becoming more irrational by the day. I love the work I do and the state institution that I work at and don't want to leave my job or my patients, but if gender affirming care for youth becomes illegal or unsupported by insurance companies, it would no longer be worth staying in this country to continue providing any kind of care.

24. My colleagues at my institution who provide gender-affirming care to patients under 19 also fear that they will be unjustly targeted by criminal or civil investigations or prosecutions merely for doing their jobs and providing medically necessary gender-affirming care in accordance with state law.

25. The shrinking number of providers offering gender-affirming care to patients under 19 across the country has had an enormous impact on my practice. Our institution has absorbed many patients who were turned away by their previous gender-affirming care providers after the Executive Order and DOJ Directives. Our wait times for new patients have gone from 2

months to about 5 months and other practices are reticent to continue or start this kind of care because of the current federal attacks on gender affirming care for those under 19.

26. These federal actions have caused grave harm to my transgender patients and will likely cause further damage. Even patients who are still in care are terrified, they are facing increased bullying at school by students and even teachers without recourse, they are having increased nightmares and kids that were healing from the trauma of being excluded are now spiraling back into deeper depression and anxiety that is affecting their performance at school.

27. As a result of these federal actions, my institution is considering ceasing this kind of care. And as stated in earlier points, primary care is already facing so many structural barriers based on deep and intentional under-resourcing of the primary care system, which is absolutely irrational based on the evidence of the impact of primary care. Providing this life-saving care is an important part of why I am at my institution. If I still want to provide gender affirming health care ethically and without government interference that will most certainly lead to increased avoidable deaths of vulnerable children, which will result from making gender affirming care for youth impossible, it makes more sense to practice medicine in a different country.

28. We have also been forced to devote significant resources and staff time to analyzing the unclear and changing federal regulation of gender-affirming care, and explaining its implications to staff, patients, and patients' loved ones. This too diverts significant resources away from general patient care in the wider primary care system.

29. Complying with the DOJ Directives would force me to violate my institution's antidiscrimination policy and state antidiscrimination laws. This exposes me and my employer to increased risk of patient litigation.

30. Complying with the DOJ Directives and denying adolescents medically necessary gender-affirming care would violate my ethical obligations as a healthcare provider and cause moral injury. My job already causes burnout and moral injury; adding to the daily stress that already exists having to fear for my own safety, to have to fear getting charged with a felony for helping children who otherwise are already at massively increased risk of committing suicide is asinine. That these threats would come from my own government who my tax dollars support is unacceptable. I would have no reason to continue to devote any resources to this country - be they professional, personal, monetary or otherwise.

31. My colleagues and our institution remain steadfast in our commitment to provide transgender adolescents with medically necessary, evidence-based gender-affirming care, and wishes and intends to continue doing so for as long as it is able. However, this currently places the institution and its providers at significant legal risk due to the mounting threats presented by the DOJ Directives and accompanying federal actions. These Directives strongly imply that the administration views the mere provision of this form of health care as unlawful and state explicitly that the administration intends to prosecute aggressively wherever possible, it also implies that this administration is in callous disregard of human life, particularly those at most risk; in addition to being ignorantly dismissive of science and the medical world in general. There is unfortunately a very real possibility that the risk level will soon reach a point where our institution can no longer tolerate it. Should my institution be forced to change its policy, providers throughout the system, including me, will have no choice but to stop providing this care, which will lead to our consideration of leaving our jobs and the country. Such a decision would not result from any concerns about the medical evidence, clinical practice standards, or the wellbeing of our patients. Rather, it is the multiple irrational, non-evidence-based legal

threats posed by the DOJ Directives and other federal actions which would make it too risky to continue providing gender-affirming care. And then, as many of us already have planned, we will likely give serious consideration to taking our professional skills to countries other than the United States that will allow us to use those skills to help people, rather than being stopped by our own government to do the very thing that brought us into medicine in the first place.

Dated: December 18, 2025

                                                         */s/ Plaintiff State Provider #4*
                                                        Plaintiff State Provider #4