# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>*Defendants.* | No. 1:25-cv-12162 |

**DECLARATION OF DR. NATASHA BAGDASARIAN,
CHIEF MEDICAL EXECUTIVE FOR THE STATE OF MICHIGAN**

I, Natasha Bagdasarian, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Chief Medical Executive for the State of Michigan. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Departmental staff, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Professional Background**

3. I completed medical school at Wayne State University; I completed an internal medicine residency and an infectious diseases fellowship at the University of Michigan; and I received a Master of Public Health (MPH) degree from the University of Michigan School of Public Health.

1

4. I was appointed by the Director of the Michigan Department of Health and Human Services (the Department) pursuant to Mich. Comp. Laws § 333.2202(2). This statute renders me responsible to the Director for the medical content of the Department's policies and programs. As Chief Medical Executive, I am a member of Governor Gretchen Whitmer's Cabinet.

5. Currently, in addition to my role as Chief Medical Executive, I serve as adjunct faculty at the University of Michigan School of Public Health. And I chair Michigan's Public Health Advisory Council, which "represent[s] consumers and providers of health care representative of the population as to sex, race, and ethnicity," Mich. Comp. Laws § 333.2208(2). I also chair Michigan's Childhood Lead Elimination Commission and its Opioid Task Force.

6. I am familiar with the allegations set forth in this lawsuit, as well as the clinical and other treatments relevant thereto.

**The Department's Programs and Services**

7. The Department is responsible for continually and diligently preventing disease, prolonging life, and promoting the public health for all state residents, which includes ensuring access to necessary medical services. Mich. Comp. Laws § 333.2221. Relevant here, this duty comprises the health care of particularly vulnerable population groups; development of health care facilities and agencies and health services delivery systems; and the regulation of health care facilities and agencies and health services delivery systems to the extent provided by law. *Id.*

8. The Department is responsible for Michigan's foster care and juvenile justice systems, both of which are custodial systems involving youth under age 19. As of October 31, 2025, there were a total of 10,131 youth in foster care, 7,000 of whom are age 5 or older. As of

October 31, 2025, there were a total of 283 youth in residence at residential/child-caring facilities, all of whom are over the age of 5. There are currently 123 youth residing in juvenile-justice facilities, all of whom are age 5 or older.

9. Many of the youth in the Department's custody are transgender. The Department estimates that as many as 700 youth in foster care aged 5 to 18 identify with diverse gender expression or identity. At eleven percent, this group is significantly overrepresented in the child welfare system as compared to their presence in the general population.

**The Department Must Provide Access to Adequate Medical Care, Including Gender-Affirming Care**

10. The Department has a legal obligation to provide adequate/appropriate medical care to all youth in its custody. In Michigan, Departmental policy acknowledges that all children in foster care are entitled to health care services. MDHHS Policy FOM 801, *Health Services for Children in Foster Care* (Feb. 1, 2021). Federal law requires Michigan to ensure a coordinated strategy to identify and respond to the health care needs of children in foster care placements. 42 U.S.C. § 622(b)(15). Michigan Compiled Laws § 712A.13a(16) entitles the Department to a child's medical records for purposes of continuing care, and Michigan Compiled Laws § 722.124a provides the specifics for consent to routine, non-surgical medical care, as well as emergency medical and surgical treatment, for children in foster care. Finally, the Foster Care and Adoption Services Act, Mich. Comp. Laws § 722.954c, requires that children's medical providers remain constant during their time under Departmental custody, and it requires the development of a "medical passport" for each child to ensure continuity of care. *See also* MDHHS Policy FOM 801-01, *Health Requirements* (May 1, 2022).

11. For youth placed in residential intervention for juvenile justice, Michigan regulations require the provision of high-quality health care. Michigan Compiled Laws § 803.303(3) assigns the agency the responsibility for providing the youth's medical and treatment needs. Michigan Administrative Code, Rule 400.4142(1)(a)-(g), requires the establishment of policies and procedures that comprehensively address the effective provision of medical, dental, and behavioral health care. Within 24 hours of a youth's admission to a juvenile-justice facility, Rule 400.4144 requires a health screening "to assure proper medical care," and these youths likewise receive a "medical passport" for effective continuity of care. MDHHS Policy JRM 300, *Health Services Delivery* (Oct. 1, 2021).

12. Michigan's antidiscrimination/public accommodation laws prohibit discrimination based on gender identity or expression. Mich. Comp. Laws § 37.2102(1).

13. Under the laws and policies described above, the Department may not discriminate against transgender youth and must treat an adolescent seeking medical care for gender dysphoria in the same way it would treat an adolescent seeking medical care for any other diagnosis.

**The Department's Policies and Practices Comport With These Requirements**

14. The Department must comply with these state laws. Accordingly, the Department operates its foster care and juvenile justice programs in a manner consistent with its legal obligations to ensure individuals under its charge/in custody can access medically necessary healthcare, and to treat all such individuals equally regardless of sex, gender identity, or gender expression.

15. Again, in Michigan, Departmental policy acknowledges that all children in foster care are entitled to health care services. MDHHS Policy FOM 801, *Health Services for Children*

4

*in Foster Care* (Feb. 1, 2021).  The same is true of youth in residential juvenile-justice facilities.  MDHHS Policy JRM 300, *Health Services Delivery* (Oct. 1, 2021).  Both groups of youths are entitled to express their own wishes, medical or otherwise, which the Department must address promptly.  *E.g.*, MDHHS Policy FOM 722-06J, *Rights of Children in Foster Care* (Aug. 1, 2021); MDHHS Policy JRM 314, *Request for Medical Services* (Feb. 1, 2021).

16. The Department's policy prohibits discrimination against the young people in its custody or whom it serves on the basis of sex, gender identity, or gender expression.  See *Non-Discrimination Statement*, MDHHS, available at https://www.michigan.gov/mdhhs/inside-mdhhs/legal/nondiscrimination (accessed Nov. 18, 2025).  The Department further requires all sub-contracting agencies to adopt policies that prohibit discrimination on the basis of sex, gender identity, or gender expression by their staff in provision of the contracted services to the youth and families they serve.  *E.g.*, MDHHS Policy APX 680, *Compliance with Section 1557 of the Affordable Care Act* (Dec. 1, 2022) (citing 45 C.F.R. Part 92).

17. I am aware that medical professionals often prescribe forms of gender-affirming care as medically necessary treatments for adolescents with gender dysphoria because such care can alleviate gender dysphoria and improve the mental health and overall wellbeing of transgender individuals.

18. Accordingly, the Department's obligation to provide adequate medical care includes affording individuals access to medically necessary gender-affirming care as prescribed by treating clinicians.

19. In Michigan, access to gender-affirming care is determined and arranged at the local/county/regional levels of MDHHS Children's Services Administration.  If parental rights have not been terminated, the parent(s) or legal guardian(s) of youth in foster care must be

engaged in all decisions related to medical care, including gender-affirming care, and the request to explore access to gender-affirming care must come directly from the youth themselves. MDHHS Policy FOM 801-04, *Consent for Health Treatment & Care* (May 1, 2022). Thereafter, medical services are provided only with the consent of the parent(s) or legal guardian(s).

20.    Michigan's Age of Majority Act establishes that an individual who turns 18 years old "is an adult of legal age for all purposes whatsoever." Mich. Comp. Laws § 722.52(1). In accordance with that law, the Department considers individuals under the age of 18 to be legal minors, and those 18 and above to be adults with legal capacity to consent to medical care (absent other factors impacting their capacity, such as intellectual or developmental disability).

21.    Consistent with state law, for youth in State custody in the juvenile-justice system, the facility's director or designee is the youth's guardian delegate and must provide consent for routine nonsurgical medical care. MDHHS Policy JRM 301, *Consent for Medical Treatment*, (Feb. 1, 2020).

22.    The Department may not consent to non-emergency elective surgery unless parental rights have been terminated. MDHHS Policy FOM 801-04, *Consent for Health Treatment & Care* (May 1, 2022). In those rare cases where parental rights have been terminated as to a child in custody of the State, consent from the Michigan Children's Institute ("MCI") Superintendent must be sought. Before issuing consent, the MCI Superintendent requires a written request from the physician that explains the treatment, including its benefits and risks, an explanation of the need for the surgery, and the expected outcome and consequences if the surgery is not performed. For youth under age 18 in residential juvenile-justice facilities, the consent of a parent or legal guardian is required for non-emergency elective surgery. MDHHS Policy JRM 301, *Consent for Medical Treatment* (Feb. 1, 2020).

23. Medical consents must be signed by young adults regardless of their legal status in foster care. If the young adult is mentally incapacitated or otherwise unable to make their own health decisions, a court can appoint a guardian *ad litem* or guardian to assist with consents and decision-making. MDHHS Policy FOM 801-4, *Consent for Health Treatment & Care* (May 1, 2022).

**Federal Actions Targeting Providers of Gender-Affirming Care**

24. I am aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

25. I am aware that, since late January 2025, the federal government has taken actions to implement the Executive Order, target providers of gender-affirming care, and restrict access to such care for patients under age 19. These federal actions include the memorandum issued by Attorney General Pam Bondi on April 22, 2025 and the memorandum issued by Assistant Attorney General Brett Shumate on June 11, 2025 (collectively, "DOJ Directives") targeting the provision of gender-affirming care to patients under age 19.

26. The Executive Order and DOJ Directives have interfered with the Department's ability to comply with its obligations under state law and provide access to appropriate care to transgender youth in its custody or under its care.

27. These federal actions have had a chilling effect on providers who offer gender-affirming care in Michigan to patients under age 19. They have caused providers in this state to halt or significantly reduce the provision of gender-affirming care to people under the age of 19. The Department is concerned that this chilling effect will continue to intensify and more providers will cease providing gender-affirming care to adolescents and people under the age of 19 as a result of these federal actions.

28. Because of these federal actions, it has become difficult to find providers who can meet the medical needs of transgender adolescents in the Department's custody. In fact, some youth in the State's custody who were receiving gender-affirming care are now unable to continue such care. If the pool of providers continues to shrink, it will become increasingly difficult and may ultimately become impossible to find providers who can provide appropriate medical care to transgender adolescents. The University of Michigan and Corewell Health were two of the primary providers of gender-affirming care in the State of Michigan, but each has decided to stop providing such care to minors. Smaller clinics have attempted to fill this gap, but this solution is far from ideal. Doctors qualified to provide gender-affirming care are putting in longer hours, and other physicians are being retrained in an attempt to meet demand. Additionally, smaller clinics lack the facilities required to provide certain forms of care, such as hormonal implants (a surgical procedure). Concerned about threats to their licenses, some pharmacies in Michigan are not readily filling prescriptions for drugs used in gender-affirming care. And, at the same time that the supply of physicians is being taxed, patients' appointment times are growing longer because of providers' need to address the trauma caused by fragmented care, and institutions are reluctant to provide patient records to other care providers.

29. Smaller facilities (and their patients) have been targeted by intimidation efforts by those who oppose gender-affirming care, such as picketing. Numerous providers of gender-affirming care have reached out to me to express that they are afraid for both their and their family members' safety in the current landscape.

30. For youth in Michigan's rural areas—who could live as far as a nine hours' drive from providers in Metro Detroit—this has resulted in disruptions in ongoing care, difficulty finding providers, and long wait times if providers are identified.

31. These federal actions have caused grave harm to the transgender adolescents the Department serves. Like youth generally, youth in State custody who wish to begin gender-affirming care cannot do so without serious apprehension that the care may be discontinued at any point in time. This matters, because there are significant concerns regarding the physical and behavioral health impacts of stopping and restarting care on an unplanned timeline. This uncertainty makes it nearly impossible to determine, with any degree of certainty, what path is in the best interests of children. Therefore, youth in this position are left in limbo, leaving them under extreme distress, which may manifest as engaging in self-harm, escalating behavior cycles, and severe depression.

32. The rise in psychological distress among transgender youth in the Department's custody has increased the demand for mental health services and other support services. Each of the youths referenced above, whose ongoing gender-affirming care was halted due to major providers exiting the market, are experiencing negative mental-health effects attributed to the stoppage in care. One of these individuals began acting out and became aggressive after learning of this tragic development, which resulted in an emotional-disturbance diagnosis. This strains agency resources. It also results in longer wait times for all young people who rely on these services—not just those who are transgender.

33. If the Executive Order and DOJ Directives are enforced, the Department will be unable to fulfill its mission or its legal obligations because the Department will be unable to ensure transgender adolescents and people under 19 in its custody can obtain this form of medically necessary healthcare.

34. The Department wishes to comply with state law and ensure that transgender youth in custody can access the medical care they need, including medically necessary gender-

affirming care. However, these federal actions have interfered with the Department's ability to do so and may ultimately make it impossible.

Dated: 12/15/2025

                                                                                             _____
                                                                                              Dr. Natasha Bagdasarian

                                                                                             Chief Medical Executive
                                                                                             Michigan Department of Health & Human Services