# EXHIBIT 13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

*Plaintiffs,*

v.

DONALD J. TRUMP, et al.,

*Defendants.*

No. 1:25-cv-12162

## <u>DECLARATION OF HANNAH C. WENGER, M.D.</u>

I, Hannah C. Wenger, M.D., declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am a board-certified internal medicine physician at a state-related healthcare institution within the Commonwealth of Pennsylvania. I am also an assistant professor of medicine at a medical school within the Commonwealth. Finally, I am a clinician scholar in areas of transgender and Indigenous health, and I maintain a clinical practice in Pennsylvania for transgender and genderqueer patients aged 18 years and older. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with my colleagues at healthcare institutions across the Commonwealth, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

2.      I submit this declaration as an individual and private citizen. I do not speak as a representative of my employers, past or present, or on behalf of the Commonwealth of Pennsylvania or any of its agencies, entities, or officials.

1

3.      I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

## I.    **Background**

4.      I was born and raised in central Pennsylvania. After receiving my bachelor's degree in 2010 from the University of Notre Dame (Notre Dame, IN, USA), I completed my medical schooling in 2015 and internal medicine residency training in 2018, both at the University of Chicago (Chicago, IL, USA). I also completed advanced fellowship training in clinical medical ethics in 2018 and rural and Indigenous health in 2020 at the University of Chicago and Massachusetts General Hospital ("MGH"; Boston, MA, USA), respectively. From 2020 to 2022, I was an Assistant in Medicine at MGH and a Clinical Instructor at Harvard Medical School. Subsequently, I joined the faculty of a medical school and healthcare institution within the Commonwealth of Pennsylvania, with the explicit aim of growing a clinical and scholarly footprint in transgender health within the institution.

5.      Outside of academic medicine, I also apply my expertise in both Indigenous health and medical care for transgender individuals as a clinical contractor: (1) with Tribal and federal healthcare and public health entities serving American Indian/Alaska Native communities nationwide; and (2) for a handful of private healthcare entities serving transgender communities likewise across the United States.

6.      My specialization within academic medicine is clinical innovations and health policy, specifically as regards healthcare for transgender and intersex populations in America and across Indian Country.[1] My scholarship focuses on clinical, ethical, and legal aspects of this care,

---

[1] Indian Country is a colloquial term for all Indigenous spaces and places in the United States.

and I have published widely in top journals on issues at their intersection, including recent works in *JAMA Health Forum*, *American Journal of Bioethics*, and *AMA Journal of Ethics*.

7.     In February 2023, I opened a medical practice at an internal medicine clinic within a healthcare institution in the Commonwealth to provide medical care exclusively for transgender and genderqueer individuals aged 18 years and older; in other words, my practice (i.e., my patient panel) comprises entirely transgender adults. In 2024, I expanded my practice to two other clinic sites within the geography of my institution's healthcare enterprise, with the aim of ensuring access for transgender adults who cannot travel to the institution's flagship location and/or who prefer to see me in person rather than through telehealth visits. I provide what is colloquially and clinically termed "gender-affirming medical care" or "GAMC;"[2] I will hereafter interchangeably use the term "gender-related care."

8.     Since establishing my practice in 2023, a high volume of transgender adult patients has specifically entered the healthcare system to receive both primary care and gender-related care from me. My current panel size (i.e., the total number of patients for whom I actively provide primary care and/or gender-related care at any given time) is approximately 400 individuals, including approximately 50 patients aged 18-19 years, inclusive, of which approximately ten patients are aged 18 years at any given time. That is, I regularly see 18-year-old patients in my practice. For approximately half of my panel, I serve as their primary care physician; for the other half, I serve as their specialist or consultant for gender-related care only. While I regularly prescribe estrogen- and testosterone-based therapies for my patients, I do not

---

[2] Gender-affirming medical care is "health care that seeks to bring a person's physical embodiment and behavior into felt alignment with their gender identity, or to resolve felt discrepancies (which may be highly distressing) between the same." It most commonly describes hormonal and surgical treatments for transgender individuals to support their capacity to live as a woman, a man, a nonbinary person, or an individual of another gender. (Mar et al. 2025, *JAMA Health Forum*, doi: 10.1001/jamahealthforum.2025.4157)

prescribe or oversee any medication regimens for pubertal suspension, which is not a clinically relevant aspect of GAMC for my patients because they have already undergone a puberty and developed secondary sex characteristics. I see many rural-facing patients who live within a five-hour driving radius of my clinics, often in communities that have no queer-friendly or knowledgeable clinicians. I also see patients who travel into Pennsylvania but reside in nearby states, including Maryland and New Jersey, and patients who have permanently relocated to the Commonwealth from other states like Missouri and Florida, due to policy restrictions affecting the healthcare and other social rights of transgender citizens of all ages within these jurisdictions.

9.      My primary care services may include, but are not limited to: (1) the management of bread-and-butter acute and chronic medical issues like upper respiratory infections, diabetes mellitus, and hypertension; (2) the provision of preventive health care like routine vaccinations and cancer screenings; and (3) the referral to medical and surgical specialty care services for needs beyond my scope of expertise or practice. My gender-related care services may include, but are not limited to: (1) the provision of estrogen- or testosterone-based hormone therapies for the treatment of gender incongruence;[3] (2) the management of reproductive and sexual health needs like dysmenorrhea, contraception, and sexual dysfunction; (3) the referral to mental healthcare services for gender exploration as well as the treatment of mood disorders that, importantly, are common to those encountered within the general/non-transgender population; and/or (4) the referral to various surgical and other specialty care services for the treatment of gender incongruence. I also provide services for the diagnosis, treatment, and prevention of HIV

---

[3] Gender incongruence is a clinical term that refers to the persistent difference between an individual's gender identity (i.e., being a woman, a man, a nonbinary person, or another gender) and their sex designation at birth, in the absence of confounding mental disorders. In my clinical experience in the care of transgender adults, I have not encountered a confounding mental disorder that has excluded the diagnosis of gender incongruence.

and other sexually transmitted infections. Finally, I engage with patients on their fertility and family building needs and, as appropriate, provide referrals for such services.

10.     In summary, I offer comprehensive healthcare services to transgender and genderqueer adults within my practice. Within my division, I have no other practice partners who likewise provide high-volume care to transgender and genderqueer adults. However, I collaborate frequently with my faculty peers as well as resident trainees as: (1) a gender specialist who sees these other clinicians' primary care patients who are transgender for their gender-related care needs, and (2) a primary care physician myself who relies on these other clinicians to see my primary care patients for their acute care needs.

11.     At the time of my hiring, I joined a complement of clinicians serving:  (1) transgender adolescents and young adults within a high-volume multidisciplinary specialty program at my institution's children's hospital (hereafter called "The Adolescent and Young Adult (or AYA) Program"), which was formally established in 2019 for patients aged 10 years to 24 years who have healthcare needs related to gender, sexuality, and/or sexual development; and (2) a smattering of other healthcare professionals across various disciplines within my institution who provide clinically appropriate, but lower-volume medical, surgical, and mental health care to transgender patients across the lifespan. In The AYA Program, this numbered approximately 250 patients aged younger than 19 years and 300 patients aged 19-24 years, inclusive, at least until August 1, 2025. I have knowledge of a handful of transgender patients who have historically received gender-related care services from other clinicians within my institution, but I cannot estimate the true number beyond those seen at The AYA Program and within my own practice.

12.     Like all clinicians at my institution, I offer patient-focused medical care in accordance with state and federal laws, established clinical practice guidelines, and clinical medical ethics rules.

13.     Consistent with Pennsylvania's antidiscrimination law,[4] I understand that staff at my institution are prohibited from denying services or treating a person less well than others because of their sex, which includes their gender identity, presentation, and expression.

14.     In accordance with Pennsylvania state law,[5] my practice requires that patients (or where applicable, their legal guardians) provide informed consent for both primary care as well as gender-related care services like estrogen- and testosterone-based hormone therapies. Pennsylvania law provides that individuals above age 18 years, inclusive, are (in most cases) adults with legal capacity to consent to medical care. Individuals below age 18 years are legal minors whose parent or legal guardian must give informed consent to medical care. All patients who enter my practice for the initiation and management of estrogen- or testosterone-based hormone therapy for the treatment of gender incongruence engage with me in an informed consent process that is consistent with the informed consent required for the provision of any acute care service or any routine primary care service that might not be considered GAMC. This informed consent process follows a consistent and routine structure:

   a.   A complete health history, including confirmation of the treating diagnosis or medical indication (in this case, gender incongruence);

   b.   A thorough review of the effects and side effects of the proposed hormone regimen, including its impact on fertility/reproduction and options for fertility

---

[4] 43 P.S. § 951 et seq.; 16 Pa. Code § 41.206.
[5] *E.g.*, 35 P.S. § 10101; 23 Pa. C.S. § 5101; 1 Pa. C.S. § 1991.

preservation and optimization (as appropriate based on patient preferences and needs);

c.  A comprehensive discussion of the pharmacotherapy in relation to the treating diagnosis, the patient's health history, and their desired goals for the physical and mental effects that align with the patient's gender (i.e., being a woman, a man, or another gender);

d.  Consideration of other relevant medical and non-medical interventions to achieve these goals;

e.  A review of the required monitoring parameters, visit frequency, and insurance considerations for the proposed hormone regimen;

f.  The patient's stated consent to proceed with a chosen hormone regimen on a timeline that suits their readiness to initiate said medication(s) under my clinical supervision.

On average, such informed consent processes take 45-60 minutes from start to end for patients newly starting these hormone regimens, and most patients elect to initiate medication(s) at the time of this first visit – again, as individuals who have achieved the legal age of majority within the Commonwealth and who have the clinical, ethical, and legal authority to elect for, or against, GAMC (or any other healthcare service). For patients who are transferring their GAMC to me from another provider, the informed consent is also consistent with the aforementioned.

15.    In summary, I maintain a high-volume transgender adult practice within a healthcare institution in the Commonwealth, in which I follow the legal and ethical mandates of various Pennsylvania state laws that regulate my practice of medicine within its jurisdiction. I am among a handful of clinicians serving the transgender community in central Pennsylvania and

across the greater Commonwealth. I am regarded as an expert clinician and scholar in the field of transgender health within my institution, within the Commonwealth, and nationally. Having grown up in Pennsylvania, I am honored to practice medicine for queer adults in my home state.

## II. Federal Actions Targeting the Healthcare Institutions and Healthcare Professionals of Transgender Individuals in the Commonwealth of Pennsylvania

16.     I am aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order") and issued on January 28, 2025, announcing the federal government's plan to restrict gender-related care for transgender individuals younger than age 19 years and to investigate healthcare professionals who provide such care.

17.     To comply with the Executive Order, my institution established a prohibition on April 14, 2025, on surgical and pharmacological interventions within its hospitals and facilities if such interventions were provided for patients younger than age 19 years and were used to treat gender incongruence and to align secondary sex characteristics more closely to the individual's gender in a manner contrary to their birth-designated sex. This institutional mandate excluded patients who were actively receiving such care until a transfer of care could be made to another institution or the healthcare service could be appropriately discontinued from a medical standpoint. I understood that the institution's prohibition was specific to GAMC for transgender patients.

18.     Once the institutional prohibition was in effect, I understood that in order to maintain my clinical practice at my institution and, likewise, for my colleagues at The AYA Program:

a.  We could no longer start puberty-suspending medications for transgender adolescents new to The AYA Program.

b.  We could no longer start estrogen- or testosterone-based hormone therapies for transgender patients new to our practices until they are 19 years old.

c.  We did not need to stop puberty-suspending medications and hormone therapies already being prescribed to existing patients younger than age 19 years in our practices, because there was no medically appropriate discontinuation process for our patients' care.

d.  We could refer 18-year-old transgender patients to other institutions for gender-related surgeries, but this type of surgical care could not be performed within my institution until transgender patients are 19 years old.

19.     Since the Executive Order was issued, the federal government has taken steps to implement this executive communication in a manner that appears intended to target and intimidate providers of GAMC and to restrict access to said care for transgender adolescents and young adults aged 18 years.

20.     On April 22, 2025, U.S. Attorney General Bondi issued a memorandum to all U.S. Department of Justice ("DOJ") employees ("Bondi Directive") to criminally and civilly prosecute "to the fullest extent possible" healthcare professionals who provide GAMC to adolescents and young adults aged 18 years under the federal Female Genital Mutilation statute, 18 U.S.C. § 116 ("FGM"), the Food, Drug & Cosmetics Act, 21 U.S.C. Chapter 9 § 301 *et seq.* ("FDCA"), and the False Claims Act, 31 U.S.C. § 3729 ("FCA").

21.     On May 26, 2025, my institution revised its prohibition on GAMC for adolescents and 18-year-old adults to further align with both the Executive Order and the subsequent Bondi

Directive. This revision removed the institution's exception for active patients younger than age 19 years, whose GAMC – including any medication administration and insurance prior authorizations for such care services – must cease as of August 1, 2025.  This amended restriction applied even in instances in which patients could not transfer their care successfully by the effective date in August 2025, or whose medications did not require discontinuation for any medical reason. As had occurred in April 2025, it was clear to me that the institution's prohibition was specific to GAMC for transgender patients only.

22.     On June 11, 2025, U.S. Assistant Attorney General Brett Shumate issued a memorandum ("Shumate Directive") to all DOJ employees laying out the "Civil Division Enforcement Priorities" and directing the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals," and other healthcare entities to pursue alleged violations of the FDCA in connection with the medications often used for GAMC. It also orders the Civil Division to "aggressively pursue" FCA claims against healthcare professionals that bill the federal government for GAMC in circumstances wherein such care would not lawfully be covered.

23.     I understand that the Bondi and Shumate Directives (collectively, "DOJ Directives") announced new enforcement priorities under the FGM, FDCA, and FCA statutes that target healthcare professionals of transgender adolescents and young adults, including me.

24.     I am aware that, as acknowledged by Pennsylvania Governor Josh Shapiro, the provision of GAMC for transgender individuals is legal within the Commonwealth of Pennsylvania.

25.     I am aware that multiple institutions across the Commonwealth, namely, those serving high volumes of transgender patients under age 19 years within multispecialty programs

explicitly for these patients, have received a subpoena from the DOJ investigating the provision of GAMC to transgender adolescents and 18-year-old adults. It is public knowledge that the Children's Hospital of Philadelphia ("CHOP") and the University of Pittsburgh Medical Center ("UPMC") received this subpoena.

26.     I and my peers at healthcare institutions across the Commonwealth understand that the FDCA prohibits off-label marketing, but it does not prohibit medical professionals from prescribing drugs for "off-label" uses.

27.     I and others at healthcare institutions across the Commonwealth have generally understood that "marketing" a drug does not include keeping the drug at a hospital pharmacy or dispensing it to patients as part of an outpatient visit. Rather, these activities are indispensable to my and others' medical practices. In my experience, it would be unprecedented to view these acts as "marketing" under the FDCA.

28.     It has long been my understanding that I may share my clinical experience or research related to off-label uses in academic and/or research settings, and that I may discuss an off-label use as a potential treatment with a patient in a clinical encounter. It has long been my understanding that this is not considered "marketing" an off-label use of a drug.

29.     To my knowledge, my institution has extremely robust risk management measures in place to ensure that they are complying with all federal laws, including the FDCA, the FCA, and other federal statutes. My institution requires me and other providers to comply with standards related to pharmaceutical marketing, including not accepting cash, equipment, or merchandise from pharmaceutical representatives or suppliers.

III.    **Consequences of Federal Actions on Pennsylvania's Transgender Community and the Healthcare Institutions and Healthcare Professionals Upon Whom They Depend**

30.    The Executive Order and DOJ Directives have had devastating consequences for transgender adolescents and young adults aged 18 years within the Commonwealth and nationwide, as well as for the healthcare institutions and healthcare professionals who care for them.

A.    **Harms to Me and Other Healthcare Professionals**

31.    The Executive Order and DOJ Directives suggest that the federal administration is laying the groundwork to investigate or prosecute healthcare professionals like me in the Commonwealth if we continue to provide legal and medically indicated GAMC to patients under age 19 years.

32.    I fear that merely providing GAMC in accordance with applicable evidence-based clinical practice guidelines will be deemed unlawful under the DOJ Directives as a violation of the FGM, FDCA, and/or FCA statutes.

33.    I fear that I may face prosecution, civil fines, or even incarceration for simply doing my job and for providing lawful, medically indicated care to 18-year-old legal adults in my practice.

34.    I fear that the federal government may apply the DOJ Directives' interpretation of the FGM, FDCA, and/or FCA statutes retroactively and subject me to criminal and/or civil liability for care that was provided months or years ago to then-18-year-old patients in my practice.

35.    I fear for my personal safety and that of my family and loved ones. To protect myself from doxxing, harassment, and physical harm, I limit my public footprint in both digital

and real-world spaces. I subscribe to a privacy service that limits data brokers from sharing my personal information. Finally, I retain a personal lawyer for legal advisement and consultation.

36.    I understand that my colleagues at other healthcare institutions across the Commonwealth share these fears and have proceeded with similar steps to support their personal safety.

37.    I understand that colleagues at my and other healthcare institutions across the Commonwealth who provide GAMC to patients under age 19 years also fear that they will be unjustly targeted by criminal or civil investigations or prosecutions for doing their jobs and providing medically indicated GAMC in accordance with Pennsylvania state law. I understand that, like me, numerous providers have felt compelled to hire their own legal representation to provide counsel regarding employment and civil and criminal liabilities associated with the usual duties of their professional roles at their healthcare institutions. For some of them (myself included), this has required personally identifying and financing such legal representation.

38.    I fear that complying with the Executive Order and DOJ Directives and denying medically indicated GAMC to legal adults who are age 18 years is a violation of my ethical obligations as a healthcare professional. The forced discontinuation and withholding of clinically impactful healthcare services to transgender patients has caused (and continues to cause) me severe moral injury. I have been placed in an impossible position: to place the legal and financial needs of my institution above the legitimate medical needs of my patients. This is an unprecedented situation in my clinical career that directly undermines the ethical and moral tenets of the doctor-patient relationship and directly damages the longitudinal relationships I maintain with legal adult patients. My doctor-patient relationships are grounded in trust, transparency, and fairness, wherein I strive to promote my patients' capacity to make informed

choices about their health and wellbeing. The Executive Order and DOJ Directives create unfair and unequal opportunity for transgender patients versus non-transgender patients (and, in the case of minors, their parents or legal guardians) to exercise choice about their health and wellbeing. And so, I am now in a position wherein federal actions prevent me from supporting equal and fair healthcare decision-making for transgender patients in my practice because of their status as such. Though I believe my transgender patients still trust me to be transparent and fair, I fear they no longer trust my institution, and I know they do not trust the U.S. federal government to respect and promote their right to bodily autonomy.

## B.  Harms to My and Others' Transgender Patients

39.    Since the Executive Order and DOJ Directives were issued, many healthcare professionals in the Commonwealth (and nationwide) who once provided GAMC to adolescents and 18-year-old adults have ceased offering this care to patients under age 19 years, or have significantly limited services that were previously provided. In most cases, this occurred due to institutional restrictions that mandated these practice changes as requisite for the providers' ongoing employment. As stated above, I am aware that cessation or limitations in GAMC have occurred at hospitals and facilities across the Commonwealth, including my institution (a state-related institution that includes several acute care, specialty, and children's hospitals and almost 200 outpatient locations), UPMC (a state-related institution that includes more than 40 hospitals and more than 700 outpatient locations), and Penn Medicine (for gender-related surgical services only; a private institution that includes several acute care hospitals and hundreds of outpatient locations).

40.    Within my institution, this prohibition has required that patients admitted into its acute care hospitals, including the children's hospital and the psychiatric hospital, stop their

puberty-suspending medications or hormone therapy while admitted, even if these medications are prescribed and otherwise managed outside of the institution. For example, if a transgender patient under age 19 years requires hospitalization for appendicitis, the patient will not be permitted to continue their medically indicated puberty-suspending medication or hormone therapy while admitted in the hospital. These circumstances put patients, patients' families, and healthcare professionals in an impossible position of choosing between GAMC and other medically necessary health care during both short (often days-long) and extended (several weeks- or months-long) hospitalizations within my institution's healthcare enterprise.

41.     The Executive Order and DOJ Directives have caused grave harm to my patients and those of my peers across the Commonwealth and are likely to cause further damage. Because their GAMC has been forcibly discontinued, delayed, or otherwise deferred due to the Executive Order and the DOJ Directives, patients have presented with serious medical issues, such as:

a.  Suffering from medical consequences as a result of having their GAMC abruptly interrupted or terminated, such as onset or progression of a natal puberty that is inconsistent with their desired hormonal puberty; undesired hair growth; undesired voice changes; undesired muscle mass changes; dysmenorrhea and other menstrual issues; sexual function changes; hot flashes; irritability; and loss of desired positive physical and mental effects from their chosen hormone regimens;

b.  Suffering from psychological distress at having their GAMC abruptly interrupted or terminated, such as development of acute anxiety, panic, and/or trauma symptoms; onset of generalized mood disorders like anxiety, depression, and/or PTSD, or exacerbation of pre-existing mood disorders, including with associated

symptoms of anhedonia, insomnia, and suicidal ideation with or without intent and plan; hypervigilance and fear of external threat, such as physical and social harm to self and loved ones by federal entities and agents; decisions to discontinue chosen hormone regimens to "pass" as the gender associated with their birth-recorded sex and expected gender presentation in order to protect themselves from being harmed by federal entities and agents; and regular contemplation to emigrate from the United States;

c. More acute symptoms of gender incongruence than usual, which could have been avoided with earlier or consistent treatment, including frustration, confusion, disappointment, and undermanaged mood symptoms among 18-year-old adult patients in my practice who cannot access desired healthcare services (like hormone therapies) with their ethical and lawful consent;

d. More expensive care needs that could have been treated earlier for less money, including emergency room visits, inpatient admissions, and outpatient mental health visits for onset or exacerbations of mood disorders with or without suicidal ideation and sequelae of attempted suicide;

e. Loss of trust or confidence in myself and my peers and/or the healthcare institutions in which we practice, which leads to avoidance of care for primary care and chronic disease management;

f. Social dysfunction within educational, work, and family environments, including the impact of abruptly interrupted or terminated GAMC on the patients' family units, educational journeys, and employment responsibilities.

42.     As described in paragraphs 17, 18, and 21, the Executive Order and DOJ Directives have also caused me and my colleagues to change the way we provide GAMC at my institution, including:

a.   My colleagues and I were forced to cease providing all forms of GAMC to new patients aged younger than 19 years;

b.   My colleagues and I were forced to abruptly suspend administering GAMC to existing patients aged younger than 19 years as of August 1, 2025; and

c.   My colleagues and I were forced to cancel previously scheduled treatments, including costly puberty-suspending medications that were already delivered to The AYA Program for administration to adolescent patients, and hormonal and surgical interventions that were planned for 18-year-old patients.

43.     Because of the Executive Order and DOJ Directives, I was required to discontinue estrogen- and testosterone-based hormone therapies for approximately ten 18-year-old adults in my practice who had already been receiving these therapies. Patients had varying knowledge of the new practices adopted by my institution because of the Executive Order and DOJ Directives, ranging from entirely unaware to having received a direct communication from me or my institution. During my direct communications with these patients, I shared that:

a.   I can no longer prescribe or monitor hormone therapy (plus other gender-related healthcare services) for individuals aged 18 years for the treatment of gender incongruence.

b.   This prohibition is based on federal actions beginning with the Executive Order from January 2025.

17

     c.    This prohibition is not based in my medical recommendations, my understanding of Pennsylvania state law, or clinical best-practice standards for GAMC.

     d.    My role is to maximally facilitate the patient's healthcare goals, in balance with my personal needs to follow my institution's prohibition and maintain my employment, through which I provide care to approximately 400 transgender adults.

     e.    As of August 1, 2025, I can continue to see the patient for any other medical need that falls within the routine purview of clinical medicine beyond those related to gender incongruence, until the patient's 19th birthday.

44.    All of my existing 18-year-old patients received a notification of their GAMC-related care discontinuation from my institution. Of the existing 18-year-old patients whom I was able to contact directly or see in clinic after my institution's total prohibition, all conveyed significant distress regarding the federal government's actions, and none desired to discontinue their hormone therapies.

45.    These circumstances are unprecedented in my clinical career. Within the context of my almost twenty years of formal schooling and subsequent employment within preeminent universities and academic health systems in the United States, I am not aware of any clinical or ethical training that educates clinicians like me in the forced discontinuation of medically indicated, voluntarily sought, consent-driven medical care. That is because the forced discontinuation of such care is contrary to bioethical principles of beneficence, nonmaleficence, patient autonomy, and justice.

46.    All of my existing 18-year-old patients came to what I can best call an informed understanding that I could not continue their active care plans until their 19th birthday, and we

both acknowledged that these circumstances were: (1) inimical to their health and wellbeing; (2) threatening to my ability to provide medical care to my 400-transgender-person panel at my institution; and (3) expressly contrary to ethical-legal concepts tied to consent and bodily autonomy; equality, nondiscrimination, and justice; and duty to care, beneficence, and nonmaleficence. I offered suggestions on alternate (albeit limited) practice locations outside my institution at which they could reestablish their gender-related care, though all such options presented issues of prolonged wait times, out-of-pocket expenses, or travel requirements. To each of these patients, I expressed my deepest apologies and sadness for what they were experiencing and my role in it. All patients kindly replied in a manner conveying that they did not feel this was my fault and that I had helped them as much as I could.

47.     Of the patients whose care with me I was forced to discontinue because of the Executive Order and DOJ Directives, all who have reached their 19th birthday have re-established care with me and resumed their chosen hormone therapies under my clinical supervision.

48.     I have been unable to initiate medically indicated, voluntarily sought, consent-driven estrogen- and testosterone-based hormone therapies for approximately fifteen 18-year-old adults who have established care in my practice since the effective date of my institution's initial GAMC prohibition in April 2025. Similarly to the circumstances described in paragraph 43, patients new to my practice have varying knowledge of my institution's GAMC restrictions, ranging from entirely unaware to being a previous patient of The AYA Program or another institution that has already discontinued their GAMC. During this initial visit, which is the patient's first encounter with and impression of me as a clinician (and sometimes of my institution's healthcare enterprise), I describe the limitations in hormone therapies and other

GAMC-related care that can be provided before their 19th birthday, as already summarized in paragraph 43.

49.     Of the patients whose desired GAMC could not be initiated, all conveyed significant distress regarding the federal government's actions, and none desired to delay initiation of their chosen hormone therapies. Similarly to the circumstances described in paragraph 46, I reached an informed understanding with these patients wherein I notified them that their desired, clinically indicated GAMC was legal but could not be initiated within my practice. We acknowledged the harms of federal actions on their health and my capacity to provide medical care to them and my other transgender patients. I offered the limited alternative practice locations outside my institution for accessing their desired care and conveyed my apologies and sadness for their experiences.

50.     Of the patients whose care with me I was forced to delay due to the Executive Order and DOJ Directives, all have resumed gender-related care with me as of their 19th birthday, and some continued to follow with me for non-GAMC-related primary care before their 19th birthday.

51.     I am gravely concerned about the impact that the Executive Order and DOJ Directives have already had and will continue to have on the health and wellbeing of my transgender patients. In usual times, I bear witness to the incredibly positive impact of gender-related care on the physical, mental, and emotional health of my patients. For example, patients who initiate hormone therapy under my clinical supervision manifest a growing sense of authenticity and wellness over the arc of our clinic visits as they experience the physical and mental effects of their chosen hormone regimen or varying surgical interventions. Stated plainly, they routinely feel happier in their bodies, minds, and hearts over time and, from my vantage

point, become more capable of flourishing and navigating the realities of being a human that are common to all of us, regardless of our gender or sex. Such longitudinal relationships also support these patients in receiving routine primary care and chronic disease management from trusted healthcare professionals like me, which undoubtedly enhances their health, the mission of my healthcare institution, and the wellbeing of the Commonwealth and its citizens.

### C. <u>Harms to My Clinical Practice and My Institution</u>

52.     The Executive Order and DOJ Directives have caused incalculable damage to my practice. Since the spring of 2025, I have poured considerable time – out of proportion to the usual responsibilities and commitments of my hiring and current faculty position, including as compared to my faculty peers – into discussions with my division chief, my department chair, my institution's corporate and clinical leadership, my clinical and administrative staff across three practice sites, and my patients themselves regarding the specifics and implementation of the institution-level sequelae of federal actions intending to end access to medically, legally, and ethically sound GAMC.

53.     I understand that my institution is aware of the DOJ subpoenas issued to CHOP and UPMC, and I fear that my institution, or I and my colleagues at The AYA Program, will receive civil and criminal subpoenas in relation to our provision of health care to transgender patients younger than age 19 years.

54.     I and my staff have faced waves of patient portal messages in which my patients – in various states of panic and fear – seek advisement from me in order to understand both federal and institutional actions and their effects on the patients' care with me. This includes messages conveying terror that I will no longer be able to see the patient at my institution, appeals for my

opinion on whether the patient should immigrate to Canada or another country,[6] and requests that a patient's diagnosis of gender incongruence be scrubbed from their chart for fear of targeted federal actions involving their private health information.[7] I have received an average of one to two messages per week regarding the aforementioned situations and often schedule visits for patients to ask me questions that cannot be managed via the patient portal. Responding to my patients' legitimate fears takes me and my staff away from providing medical care to other patients in my panel. My colleagues at The AYA Program have likewise faced these challenges and have expended undue time and resources therein.

55.    Further, my institution and I face the challenges of managing our compliance with the Executive Order and DOJ Directives. The unclear and changing federal actions intending to end GAMC have demanded significant institution- and staff-level time and resources related to both analyzing and explaining their implications to staff, patients, and patients' families. My involvement in compliance processes related to my institution's GAMC prohibition has exceeded the parameters of (to my knowledge) any legal requirements of healthcare compliance set forth by the Commonwealth. Likewise the parameters of any quality improvement, population health management, or other systems-level oversight of the professional activities of clinicians across my institution. These circumstances divert significant resources away from patient care for all-comers (that is, any patient accessing healthcare services within my institution). There is a now chronic drain on various staff across all sectors of my healthcare

---

[6] To my knowledge, at least one of my patients has permanently moved from the United States and at least two others are preparing to emigrate, in all cases due to federal actions that include the Executive Order and DOJ Directives.

[7] For clarity, in this last circumstance, I counsel the patient that I am unable to redact or otherwise remove historical and otherwise clinically relevant information from their chart.

institution as they endeavor to implement restrictions while providing appropriate medical care to transgender and non-transgender patients of all ages.

56.     In short, amid my institution's valid attempts to understand federal directives and comply with said understanding, I have been placed in an incomparable, highly burdensome, and (at various times) completely overwhelming position of navigating unprecedented restrictions on legal care for legal adults in my practice, on top of practicing medicine in a contemporary American healthcare system, which itself is a herculean task that already requires significant commitment of my life and my person in usual times.

57.     As a result of the Executive Order and DOJ Directives, I have also witnessed their immeasurably negative impact on The AYA Program's staff, including both mental health and adolescent medicine specialists.

58.     While I was required to discontinue active care plans for a small number of 18-year-old adults in my practice against their express wishes, my colleagues at The AYA Program did so for approximately 250 adolescents and 18-year-old adult patients and their families, the majority of whom were not nearing their 19th birthdays like my patients or were receiving medically indicated, time sensitive regimens that supported the patients' desired pubertal development and their associated adolescent flourishing consistent with their gender. I understand based on my experience and interaction with my colleagues in The AYA Program that this has caused significant harm to their personal and professional lives and to that of their patients.

59.     As a result of the Executive Order and DOJ Directives, the five-member clinical team at The AYA Program has lost three vital staff members to resignations and one more to an extended leave of absence. The remaining 300 young adult patients aged 19-24 years in The

AYA Program are also experiencing overt challenges with timely access to care as their usual provider is out of office or no longer employed at the program. Moreover, other non-transgender adolescents and young adults receiving care for eating disorders, obesity, substance use, reproduction, and other adolescent medicine needs are also not receiving timely medical care because the clinical staff in The AYA Program provides care in these areas, too.

60.    Losing these highly trained, clinically exceptional healthcare professionals at The AYA Program negatively impacts the tenuous balance of clinical staffing and resource strain within my institution, wherein remaining staff members in the small adolescent medicine division must absorb the responsibilities of those staff members that have left. The clinicians at The AYA Program are also educators and researchers who are indispensable to my institution's mission. Their clinical, scholarly, and educational work directly enhances the health and wellbeing of adolescents and young adults of all genders within central Pennsylvania and across the Commonwealth. And so, the loss of these healthcare professionals has immense ripple effects within my institution and the Commonwealth at large.

D. __My Summative Fears and Concerns about the Executive Order and DOJ Directives__

61.    Along with my fears described in section III.A, as a further result of the Executive Order and DOJ Directives, I fathom that submission of this declaration itself may have severely negative consequences for me as a person and a professional, up to and including obstacles and limitations to whether, where, and how I am able to practice medicine as well as targeted investigation and harm by the U.S. federal government.

62.    I am concerned that complying with the Executive Order and DOJ Directives has forced me to violate my institution's antidiscrimination standards and Pennsylvania's antidiscrimination law. This exposes me and my institution to increased risk of patient litigation.

This has already occurred at UPMC, where a complaint with the Pennsylvania Human Relations Commission against UPMC Children's Hospital has been filed for the unlawful denial of GAMC to transgender patients younger than age 19 years.[8] I fear that a similar complaint will be filed against my institution, me, and/or my colleagues at The AYA Program.

63.    I am deeply concerned about how the Executive Order and DOJ Directives create inconsistencies in healthcare access and delivery based on gender and sex, and I understand these federal actions clearly discriminate against transgender people based solely on their status as such.

64.    The Executive Order and DOJ Directives place healthcare professionals like me and institutions across the Commonwealth in an impossible position. But for the threats presented by the Executive Order and DOJ Directives, I, my peers, and institutions across the Commonwealth would still be providing GAMC to patients under age 19 years. My peers and I intend to resume previous practices if these federal directives were not in effect. My peers and I are aware that our institutions' decisions to restrict GAMC for transgender patients under age 19 years has not resulted from any concerns about the medical evidence, clinical practice standards, or the health and wellbeing of our patients. Rather, it is the multiple legal threats posed by the Executive Order and DOJ Directives that have made it too risky for our institutions to continue providing GAMC to transgender adolescents and 18-year-old adults.

65.    I cannot overstate how injurious and unwarranted the aforementioned has been to my personal and professional life, that of my colleagues at The AYA Program, and that of my peers at other healthcare institutions across the Commonwealth. Likewise, to my and other institutions and their mission to serve all Pennsylvanians. I fear for the health and wellbeing of

---

[8] https://www.womenslawproject.org/wp-content/uploads/2025/09/UPMC-Complaint-PR-9-23-25-B.pdf

my patients and that of all transgender Pennsylvanians. I fear for my life and my livelihood. I share these fears commonly with my peers across the Commonwealth.

66.     In summary, rather than applying our professional time, expertise, and passion to excel in our fields of inquiry, advance our institutions' missions, and serve the transgender community within the Commonwealth, my peers and I have spent (and continue to spend) an incredible amount of our personal and professional time and resources navigating the harms of the unjust Executive Order and DOJ Directives. We do so because we are committed to providing both GAMC- and non-GAMC-related medical care to transgender Pennsylvanians, who rightly deserve good health care from good clinicians like us. In the process, we bear witness on a daily basis to the injurious consequences of the Executive Order and DOJ Directives on our transgender patients and their families, who are ultimately the intended targets of these unnecessary federal actions.

Dated: December 20, 2025

_____
Hannah C. Wenger, M.D.

26