# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 1:25-cv-12162<br><br>**LEAVE TO FILE UNDER A PSEUDONYM GRANTED ON DECEMBER 19, 2025** |

## DECLARATION OF PLAINTIFF STATE PROVIDER #2

Pursuant to 28 U.S.C. § 1746, I, Plaintiff State Provider #2, hereby declare that the foregoing is true and correct:

1. I submit this declaration on behalf of the medical practice where I am employed. Our practice consists of a group of medical doctors and nurse practitioners at a medical practice that offers gender affirming care in one of the Plaintiff States. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with our colleagues, or documents that have been provided to and reviewed by us. I could testify competently to these facts if called as a witness.

2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Background**

3. Our practice's professional experience includes combined decades of medical training and experience treating trans and gender diverse adolescents and adults.

We have trained in internal medicine, family medicine, pediatrics, and psychiatry. We are entrusted to share our knowledge with NP students, medical students, pediatrics and internal medicine residents and infectious disease fellows from several area institutions. All of our providers are actively engaged in staying up to date on the latest evidence and best practices for this population through networking, bi-monthly national continuing education virtual updates, monitoring the latest literature, and attending conferences.

4. As a group of medical providers, we provide medical, mental health, and social work care for adolescents. We assess transgender youth and determine psychosocial and physical fitness for medical treatment in conjunction with the parent or legal guardian, then prescribe and monitor appropriately; we assess mental health, social connectedness, school performance and legal stress and refer to a comprehensive network of specialists, attorneys and support groups across our region as needed.

5. We work at a practice that offers gender-affirming care (GAC) in one of the Plaintiff States. Our practice focuses on LGBTQ healthcare across the lifespan through a holistic lens using a multi-disciplinary team.

    a. The GAC program engages in all aspects of care utilizing board-certified pediatricians, internists, nurse practitioners, mental health providers, social workers/case managers, pharmacists and a patient navigator.

    b. We have treated hundreds of transgender and gender diverse patients in their adolescence as well as thousands of adults at our practice. We have spoken with prepubertal youth and provided treatment as appropriate to early adolescents; no gender-affirming medications are prescribed prior to the initiation of puberty.

    c. The gender-affirming care provided in our practice includes, but is not limited to: anticipatory guidance to patients and their families; social work consultation to address bullying, documentation changes, referrals to support groups and referrals to specialized mental health therapists; puberty blockers; hormone therapy; primary care; psychiatric care, and other supportive care services.

    d. Our practice sees patients who obtained care from other providers that shut down since the Executive Order and DOJ Directives were issued.

    e. Our practice sees patients who moved to this region from out of state because of restrictions on gender-affirming care in the state where they lived previously.

    f. Our practice sees patients who reside in other states and travel to this practice to obtain gender-affirming care.

6. We have in-house social workers, psychiatrists, case managers, and nurses. We also work collaboratively with an extensive network of independent therapists, support groups, and community groups across our region. We collaborate with academic-based programs in our region as well as other independent practices who provide similar care.

7. The providers at our practice offer patient-focused medical care in accordance with state and federal laws, established clinical practice guidelines, and medical ethics rules.

8. Consistent with state law, our practice requires that patients (or where applicable, their legal guardians) must provide informed consent for gender-affirming care. State law provides that individuals above age 18 are, in most cases, adults with legal capacity

to consent to medical care. Individuals below age 18 are legal minors whose parent or legal guardian must give informed consent to medical care. Our practice requires up to three separate consent documents to be executed by a legal guardian when the patient is under the age of 18. The first required document is the General Patient Consent Form, which must be duly signed prior to any patient receiving services from any provider. The second document, when applicable, is the Puberty Blockers Consent Form. Finally, we require a Gender-Affirming Hormone Therapy ("GAHT") Consent Form for minors to be signed by a medical-legal guardian before they may begin hormone therapy. Adults 18 years old and above are of the age of majority and may make medical decisions independently in accordance with state law.

9.   We have dozens of examples of youth who were struggling with deep-seated dysphoria and depression who then blossomed into well-adjusted, bright, and future-oriented young people after receiving gender-affirming care because they finally felt their lives were worth living.

10.   One perfect example of this is a patient "Owen" (name changed to protect privacy). One of us first began seeing Owen—then 14 years old—the day after he was discharged from his second lengthy psychiatric hospitalization. This was also on the heels of multiple intensive outpatient and partial-hospitalization programs for eating disorder and mental illness. We were able to provide period suppression with a progestin-only birth control to immediately bring relief to the dysphoria he was experiencing. He then received GnRH agonist-based puberty blockade and later gender-affirming testosterone. Fast forward four years, he has never been psychiatrically hospitalized since and is now off all psychotropic medications, just graduated high school and is thriving in freshman year at

college. Owen's is but one of dozens of similar cases.

11. Another is "Miriam" (name changed to protect privacy), who engaged in care here at age She initially presented with selective mutism, severe depression and avoidant-restrictive food intake disorder. With help from our pediatrician, social worker, psychiatric nurse practitioner and case manager she was able to access mental health counseling, legal services, inpatient eating disorder treatment, psychiatric medications, puberty blockers and later estradiol. She recently graduated from her technical high school and was seen for an annual physical prior to moving out of state to start a new career.

12. In accordance with state and federal antidiscrimination laws, our policy prohibits its staff from denying services or treating a person less well than others based on their protected characteristics, including: race, color, national origin, sex, gender identity or expression, affectional or sexual orientation, age, disability, religion or belief, marital status, veteran status, English language proficiency, HIV status, or any other status protected under law.

**Federal Actions Targeting Providers of Gender-Affirming Care**

13. We are aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order") which announced that the federal government planned to restrict gender-affirming care for adolescents and penalize medical professionals who provide it.

14. Since the Executive Order was issued, the federal government has taken steps that appear intended to target and intimidate providers of gender-affim1ing care and restrict adolescents' access to such care.

5

15.     On April 22, 2025, U.S. Attorney General Bondi issued a memorandum to all U.S. Department of Justice ("DOJ") employees ("Bondi Directive") to criminally and civilly prosecute "to the fullest extent possible" health care providers who provide medically necessary gender-affirming care to adolescent patients under the federal Female Genital Mutilation statute, 18 U.S.C. § 116 ("FGM"), the Food, Drug & Cosmetics Act, 21 U.S.C. Chapter 9 § 301 *et seq.* ("FDCA"), and the False Claims Act, 31 U.S.C. § 3729 ("FCA").

16.     On June 11, 2025, U.S. Assistant Attorney General Brett Shumate issued a memorandum ("Shumate Directive") to all DOJ employees laying out the "Civil Division Enforcement Priorities" and directing the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals," and other health care entities to pursue alleged violations of the FDCA in connection with the medications often used in gender-affirming care. It also orders the Civil Division to "aggressively pursue" FCA claims against providers that bill the federal government for gender-affirming care in circumstances where such care would not lawfully be covered.

17.     We understand that the Bondi and Shumate Directives (collectively, "DOJ Directives") announced new enforcement priorities under the FGM, FDCA, and FCA statutes targeting providers of gender-affirming care like me.

18.     Our practice is aware that multiple other providers who offer gender-affirming care to patients under 19 have received subpoenas from the DOJ investigating the provision of gender-affirming care to patients under age 19.

19.     At our practice, we understand that the FDCA prohibits off-label marketing but does not prohibit medical professionals from prescribing drugs for "off-label" uses.

6

20. At our practice, we have generally understood that "marketing" a drug does not include keeping the drug at a hospital pharmacy, in outpatient clinic inventory or dispensing it to patients as part of an office visit. Indeed, these activities are indispensable to our medical practice. In our experience, it would be unprecedented to view these acts as "marketing" under the FDCA.

21. It has long been our understanding that we may share our clinical experience or research related to off-label uses in an academic or research setting, or discuss an off-label use as a potential treatment with a patient, and that this is not considered "marketing" an off-label use of a drug.

22. Our practice and its providers also have extremely robust risk-management measures-including a full-time Compliance Officer-in place to ensure that we are complying with all federal laws, including the FDCA, the FCA, and other federal statutes. Our practice requires us to comply with policies related to pharmaceutical marketing, including not accepting meals or gifts from pharmaceutical representatives and receiving preapproval for all consulting arrangements. We are also required to complete mandatory annual training about federal anti- kickback law; combatting waste, fraud, and abuse in Medicare; HIPAA; the Deficit Reduction Act; the False Claims Act; and the Employee Protection Act, among others. Our billing and coding are audited semiannually by an external auditor to ensure compliance with state and federal laws and regulations.

**Consequences of Federal Actions on Institution and Its Patients**

23. These federal actions have had devastating consequences for transgender young people under age 19 and the healthcare providers who care for them.

24. The Executive Order, DOJ Directives, and accompanying federal actions suggest that the administration is laying the groundwork to investigate or prosecute providers like us if we continue to provide medically necessary gender-affirming care to patients under age 19.

25. We are terrified that that merely providing medically necessary gender-affirming care in accordance with applicable evidence-based clinical practice guidelines will be deemed unlawful under the DOJ Directives as a violation of the FGM, FDCA, and/or FCA statutes and that we may face prosecution, exorbitant fines, or even incarceration simply for doing our jobs and providing lawful, medically necessary care.

26. We are also afraid that the federal government may apply the DOJ Directives' interpretation of the FGM, FDCA, and/or FCA statutes retroactively and subject us to criminal and/or civil liability for care that was provided months or years ago.

27. Those of us at our practice who provide gender-affirming care to patients under age 19 also fear that we will be unjustly targeted by criminal or civil investigations or prosecutions merely for doing our jobs and providing medically necessary, evidence-based gender-affirming care in accordance with state law. We have fears about our own safety and the safety of our families' members as our colleagues in the region have faced personal death threats, clinic- specific bomb threats, and doxxing of personal information online. We fear vigilante attacks from the public, as well.

28. Since the Executive Order and DOJ Directives were issued, many healthcare providers in our region who once provided gender-affirming care to adolescents have stopped offering this care to patients under age 19 or significantly limited services that were previously provided. Some of the largest programs in our region stopped providing care to

trans adolescents. As a result, we have accepted almost 200 new patients to our adolescent gender-affirming care program in the last six months, a 400% increase from Fall of 2024. Local federally qualified health centers also stopped providing gender-affirming care to <u>adult</u> patients and several others continue care but have stripped their websites of information about such care, bottle-necking care to practices like ours. We have spoken to regional surgeons who are no longer allowed to perform gender- affirming surgery on patients of any age at their institution due to policy changes made as a result of federal actions. We have therefore seen longer wait times for surgery and adult patients have been traveling farther to receive the surgical care they seek. The neediest adult patients often have the least resources to travel to the few remaining surgery programs.

29. The shrinking number of providers offering gender-affirming care to patients under age 19-and adults, as well-has had an enormous impact on our practice. Our practice has absorbed many patients who were turned away by their previous gender-affirming care providers after the Executive Order and DOJ Directives. This uptick in patients has contributed to the need for increased staff, including the hiring of a new medical provider, a new mental health provider, and a dedicated patient navigator to help in the intake process. Providers have to schedule patients outside of regular clinic hours to prevent adolescents from falling out of care or running out of medications. Our finances have been stretched in the process of expanding our space and staff to be able to handle the increased demand.

30. These federal actions have already caused great harm to our transgender patients and will likely cause further damage. Patients who have come to our practice after being turned away by their previous providers have presented with serious harms, such as:

   a. The symptoms of patient abandonment, the results of having their medical

9

    care abruptly terminated, such as gaps in medication administration or consistency, or rationing medication at a lower-than-prescribed dose to stretch their supply to the new appointment.

b. Symptoms of psychological distress, the result of lacking medical care. One teenager ended up in the emergency department with acute suicidal ideation after learning that he would no longer be able to get healthcare at his prior practice; he felt abandoned and that nobody cared about him. Another received a letter that his prior program was shutting down and, in despair, cut his wrists as a result. Our nurses and providers have devoted dozens of additional person-hours to answer messages and phone calls with panicked questions from concerned parents who are worried that their kids won't be able to get the care that they need, or who worry that their kids' wellbeing will backslide after finally making progress since starting gender-affirming care. All of this work has taken a toll on our team: our Program Manager has taken personal time away from their family to attend parent support group meetings on the weekends; our providers have spent untold additional hours in the evenings and weekends responding to patient messages and calls, answering prior authorization requests and coordinating with providers from clinics that are closing; all members of the team-many of whom have lived experience themselves-have had to absorb the traumatic stories of these patients while trying to maintain their own mental health.

c. More acute symptoms of gender dysphoria than usual which could have been avoided with earlier or consistent treatment. One provider had three different

10

       teenagers who were planned to start hormone therapy at a different practice but were unable to get the medication/prescription before the program shut down. All of them had worsening dysphoria and mental health; one of whom needed to start an intensive outpatient psychiatric program to cope with this setback.

    d. More expensive care needs that could have been treated earlier for less money (e.g., early treatment with puberty blockers and gender-affirming hormone therapy often prevents a teenager from needing/pursuing breast/chest surgeries in adulthood); and

    e. We have also had several families who have made plans to leave the country because of this climate. Some have already left.

31. As a further result of these federal actions, we have removed provider biographies from our website out of fear of rogue actors or targeted retaliation from the federal government. Our providers have similarly moved to scrub their personal data from the internet and make their social media presence private or non-existent for the same reasons; our practice is getting quotes on digital safety and security programs to do this work more comprehensively for us-yet another unforeseen cost of these federal actions.

32. We have applied for state nonprofit security grants to protect both our providers and other employees, and patients.

33. We are gravely concerned about the impact that these federal actions have already had and will have on the mental and physical wellbeing of all our transgender patients—particularly our vulnerable adolescent patients. We have spent increasing time in our appointments with adolescents and their families discussing the sociopolitical climate,

the risk to gender-affirming care, and how they can keep themselves safe in the face of increasingly targeted and hostile actions from the federal government. We worry that patients are being driven out of traditional care settings in favor of buying medicines directly from overseas and forgoing monitoring in an attempt to protect their privacy and shore up access to medication. We fear that this will further erode trust in the medical system and worsen general health outcomes in affected communities, who are already at higher risk of drug use, heart disease, and late-stage cancer diagnoses.

34. We have also been forced to devote significant resources and staff time to analyzing the unclear and changing federal policies related to gender-affirming care, and explaining their implications to staff, patients, and patients loved ones. This too diverts significant resources away from patient care, as we have spent tens of thousands of dollars on legal consultation fees thus far that we could otherwise have invested in subsidizing patient care for the un-/underinsured or capital upgrades.

35. Complying with the DOJ Directives would force us to violate our practice's antidiscrimination policy and state antidiscrimination laws. This exposes us and our employer to increased risk of patient litigation.

36. Complying with the DOJ Directives and denying adolescents medically necessary gender-affirming care would violate our ethical obligations as healthcare providers and cause us moral injury. It would also run us afoul of state law prohibiting patient abandonment, further increasing our risk of litigation.

37. The Executive Order, DOJ Directives, and other federal actions place providers like us and institutions like our practice in an impossible position. Our moral, ethical, and legal obligation to provide medically sound and lifesaving care to transgender

adolescents in an increasingly hostile environment is putting undue strain on our ability to see other patients for routine healthcare needs as the actions of the federal government add complexity and cost to the provision of this care.

38.     Our practice remains steadfast in its commitment to provide transgender adolescents with medically necessary, evidence-based gender-affirming care, and wishes and intends to continue doing so for as long as it is able. However, this currently places the institution and its providers at significant legal risk due to the mounting threats presented by the DOJ Directives and accompanying federal actions. These Directives strongly imply that the administration views the mere provision of this form of health care as unlawful and state explicitly that the administration intends to prosecute aggressively wherever possible. There is unfortunately a very real possibility that the risk level will soon reach a point where our practice will be forced to change its policy and stop providing this care. Such a decision would not be the result of any concerns about the medical evidence, clinical practice standards, or the wellbeing of our patients. Rather, it would be due to the multiple legal threats posed by the DOJ Directives and other federal actions making it too risky to continue providing gender-affirming care. This would have disastrous consequences for our adolescent patients who we have seen thrive when given access to medical care they need.

Dated: 12/15/2025

                                                        /s/ Plaintiff State Provider #2
                                                        PLAINTIFF STATE PROVIDER #2