# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> *Defendants.* | No. 1:25-cv-12162 <br><br> **LEAVE TO FILE UNDER A PSEUDONYM GRANTED ON DECEMBER 19, 2025** |

## DECLARATION OF D.C. PROVIDER #1

1.      I am a Board-certified OB-GYN at a private hospital in Washington, DC. I have personal knowledge of the information in the statements set forth below.

2.      I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Background**

3.      I received my medical degree from a highly-ranked medical school and completed my residency in obstetrics and gynecology. I have worked as a physician at this private hospital since completing my residency in 2022.

4.      My hospital is an academic and research institution. I practice at a healthcare clinic within the hospital that provides a range of services, including care related to gender and reproductive health. My work is grounded in research and evidence-based medicine, and I provide medically necessary healthcare to transgender patients as part of the clinic's comprehensive services.

1

5.      I provide routine gynecological care and hormone therapy, as appropriate, to all patients. In addition, I provide medically necessary care to transgender patients, including prescribing and managing hormone therapy, referring patients for mental health support or other specialized medical needs, or performing hysterectomies for adults or referring adult patients for other surgical interventions.

6.      I see patients who reside in DC and patients who reside in other states and travel to my hospital to obtain transgender healthcare.

7.      Approximately 30 percent of my patients are transgender, ranging in age from 16 to over 70. These patients may require hormone therapy, and adult patients may require a hysterectomy or gynecological care related to a surgically-constructed vagina.

8.      I currently have two transgender patients who are under 19 years old. These patients were transferred to my care from other providers who were no longer able to treat them, and they require continuity of care to avoid adverse health outcomes.

9.      I offer medical care in accordance with state and federal laws, established clinical practice guidelines, including WPATH Standards of Care 8, and medical ethics rules.

10.     It is deeply offensive—and frankly, unfathomable—for the federal government to imply that any licensed healthcare provider would ever participate in or condone female genital mutilation. This practice is a brutal and traumatic violation inflicted on girls and women without their consent, and it bears no relation whatsoever to legitimate medical care. To be absolutely clear, I have never performed or been involved in female genital mutilation in any capacity.

11.     Consistent with DC law, I require my patients (or if applicable, their legal guardians) to provide informed consent for transgender healthcare. DC law provides that individuals above age 18 are, in most cases, adults with legal capacity to consent to medical care.

2

Individuals below 18 are legal minors whose parent or legal guardian must give informed consent to medical care.

12.    In accordance with DC antidiscrimination laws, my hospital's policy prohibits staff from denying services or treating any person differently based on their protected characteristics, including sex, gender identity, or gender expression.

**Federal Actions Targeting Providers of Transgender Healthcare**

13.    I am aware of Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order") which announced that the federal government planned to restrict transgender healthcare for adolescents and penalize medical professionals who provide it.

14.    Since the Executive Order was issued, the federal government has taken steps to implement it that appear intended to target and intimidate providers of transgender healthcare. These actions include issuing subpoenas to hospitals that provide transgender healthcare, which has created a chilling effect on providers in my region.

15.    I understand that although the FDCA prohibits off-label marketing, it does not prohibit medical professionals from prescribing drugs for "off-label" uses, which is a common and necessary part of medical practice. My understanding, consistent with standard medical practice, is that "marketing" does not include discussing off-label uses with a patient, sharing clinical experience in an academic setting, or dispensing a drug from the hospital pharmacy. These activities are indispensable to providing appropriate patient care.

16.    My institution has extremely robust risk-management measures in place to ensure compliance with all federal laws, including the FDCA and FCA. I am required to comply with stringent policies related to pharmaceutical marketing, such as prohibitions on accepting gifts

3

from pharmaceutical representatives and requirements for preapproval of all consulting

arrangements. I also undergo regular training on these and any other risk-management protocols.

**Consequences of Federal Actions on My Practice and My Patients**

17.    The Executive Order and DOJ Directives have had devastating consequences for

transgender young people under age 19 and the healthcare providers who care for them.

18.    The Executive Order and DOJ Directives suggest that the administration is laying

the groundwork to investigate or prosecute providers like me if we continue to provide medically

necessary transgender healthcare to patients under 19.

19.    The Executive Order and DOJ Directives create an overwhelming sense of fear

and uncertainty. I am terrified that merely providing medically necessary transgender healthcare

in accordance with applicable evidence-based clinical practice guidelines will be deemed

unlawful under the FGM, FDCA, or FCA statute and that I may face prosecution, exorbitant

fines, loss of my medical license, or even incarceration simply for doing my job and providing

lawful, medically necessary care as required by DC law.

20.    I am also afraid that the federal government may apply its interpretation of the

FGM, FDCA, or FCA retroactively and subject me to criminal or civil liability for care that was

provided months or years ago.

21.    I also fear for my physical safety. Following the issuance of the Executive Order

and DOJ Directives, my clinic received a threatening letter because of the medically necessary

healthcare we provide to our transgender patients. As a result, we installed a new lock to our

clinic door to limit access. For the two weeks immediately following receipt of the letter, I was

required to use a separate side entrance and was escorted by security while at work, which was a

constant and stressful reminder of the danger.

4

22.     I have contemplated relocating and seeking licensure in another country to escape these uncertainties caused by the Executive Order and the DOJ Directives.

23.     Since the Executive Order and the DOJ Directives were issued, many healthcare providers in my region who once provided transgender healthcare to adolescents have stopped offering this care to patients under 19 or significantly limited services. For example, Children's National Hospital stopped prescribing medications necessary for transgender healthcare for youth patients.

24.     The shrinking number of providers offering transgender healthcare to patients under 19 has had an enormous impact on my practice. For example, many of the patients being treated by another provider were referred to my hospital for care. My hospital's call center was overwhelmed by the number of referrals, so our clinic set up a direct referral pipeline. Due to the surge in referrals following the federal actions, my clinic is now booked out for the next four months; prior to these actions, my schedule was typically filled only three weeks in advance and rarely beyond that. In addition, after the Executive Order and the DOJ Directives, some patients have been referred to me by some private providers who refuse to continue providing even routine gynecological care to transgender individuals because of uncertainty about which types of care could be provided following the vague federal actions.

25.     The Executive Order and the DOJ Directives have caused grave harm to my transgender patients and will likely cause further damage. Although the federal actions focus on transgender patients under 19 years old, they have had significant repercussions for all of my patients. Because of the Executive Order and the DOJ Directives threat of prosecution against providers and DOJ's issuance of subpoenas to providers, some patients are worried about the information disclosed in their medical records. Some patients, especially those who are federal

5

employees, are worried about the possibility of discrimination against them by their employer if their records are disclosed. Others are concerned about submitting claims for transgender healthcare to their insurance companies and are paying for their care out of pocket. For example, one patient, a former federal employee, had to choose between paying for medical care and buying groceries.

26.    Because of concerns about privacy and potential disclosure of medical records after the Executive Order and DOJ Directives, some patients are purchasing hormones outside of the regulated pharmaceutical industry from compounding pharmacies or overseas. These hormones can be unsafe and dispensed in incorrect dosages, causing serious health risks, including blood clots, stroke, and other life-threatening conditions.

27.    As a result of the Executive Order and DOJ Directives, many of my transgender patients are seeking additional mental healthcare. I hospitalized one transgender patient for suicidal ideation who specifically referred to Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Jan. 20, 2025). Executive Order 14168 specifies that it is the policy of the United States that "sexes are not changeable and are grounded in fundamental and incontrovertible reality." My patient stated this Executive Order was evidence that the federal government believes they no longer exist.

28.    Ceasing to provide transgender healthcare to my patients would not only cause distress resulting in exacerbation of gender dysphoria symptoms but abruptly stopping hormone therapy also put them at risk of physical symptoms such as bone density loss, hot flashes, night sweats, interrupted sleep, and decreased cognitive function, all of which could disrupt the

6

patient's ability to attend school, maintain gainful employment, and engage in routine activities of daily living.

29.    Ceasing to provide puberty blockers to my patients under 19 would result in the irreversible development of secondary sex characteristics, such as breast growth, deepening of the voice, penile and testicular enlargement, and facial and body hair growth. Adolescent patients who do not have access to puberty blockers will be unable to undo some of these pubertal developments or to achieve the same outcomes from hormone therapy alone even if they are able to access hormone therapy later in their lives.

30.    Ceasing to provide transgender healthcare would violate my ethical obligations as a doctor, causing me moral injury. Stopping hormone therapy has serious physical repercussions and would violate my obligation to serve my patients and to do no harm.

31.    Ceasing to provide transgender healthcare would violate my hospital's antidiscrimination policy and DC law. This exposes me and my employer to increased risk of patient litigation.

32.    The Executive Order and DOJ Directives place providers like me in an impossible position by mischaracterizing the medically necessary care I provide as part of a radical or extremist agenda. It is deeply distressing to be portrayed in this manner by the federal government when my sole intention is to help my patients.

33.    I remain steadfast in my commitment to provide transgender patients with medically necessary, evidence-based transgender healthcare, and intend to continue doing so for as long as I am able. However, the Executive Order and DOJ Directives place me and my employer at significant legal risk. The federal government may leave me no choice but to stop providing transgender healthcare to my patients. This decision would be based solely on the legal

risk created by the federal government, not on medical evidence, clinical standards, or the well-

being of my patients.

Dated: December 15, 2025

/s/ D.C. Provider # 1

_____

D.C. PROVIDER #1