# EXHIBIT 32

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> *Defendants.* | No. 1:25-cv-12162 |

**DECLARATION OF WILLIAM HALSEY**

I, William Halsey, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Medicaid Director at the Connecticut Department of Social Services ("DSS"). I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DSS staff, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Professional Background**

3. I have worked at DSS since 2011. I have held various leadership roles at DSS, including Director of Behavioral Health, Deputy Medicaid Director, and Interim Medicaid Director. I have a master's degree in social work from Columbia University and I am a licensed clinical social worker in Connecticut. Additionally, I have a master's degree in business administration from the University of Hartford.

1

4.  As Connecticut's State Medicaid Director, I am responsible, in part, for executive level oversight and administration of the Medicaid program, which provides almost one million Connecticut residents with integrated physical and behavioral health services.

**DSS Programs and Services**

5.  Medicaid is the joint federal-state medical assistance program established under Title XIX of the Social Security Act. The program operates as a state and federal partnership and states are entitled to federal reimbursement for a share of their program costs determined by the federal medical assistance percentage ("FMAP"). Under federal statute the minimum FMAP is 50 percent, but Connecticut receives up to 90 percent reimbursement for certain categories of participants and services. In Connecticut, Medicaid and other medical assistance programs are collectively called "HUSKY Health" or simply "HUSKY." HUSKY provides comprehensive health care coverage to State residents, including preventative care, inpatient and outpatient services, behavioral health services, dental care and many other health care services.

6.  As Connecticut's single state Medicaid agency DSS annually provides health care coverage for over 1 million state residents through HUSKY. As the only state Medicaid agency, DSS is one of the largest health care coverage providers in Connecticut. In this role, DSS seeks to ensure that Connecticut residents have access to high-quality, affordable health care, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Connecticut.

1.  DSS determines the medical necessity of covered services for HUSKY beneficiaries. Conn. Gen. Stat. § 17b-259b. The definition of medically necessary and medical necessity are part of Connecticut's "State Plan" required by Medicaid. *See* 42 CFR 440.230(d); Conn. Gen. Stat. §17b-259b. In Connecticut's State Plan, medically necessary and medical

necessity are defined as: "health services required to prevent, identify, diagnose, treat, rehabilitate or ameliorate an individual's medical condition, including mental illness, or its effects, in order to attain or maintain the individual's achievable health and independent functioning provided such services are: (1) Consistent with generally-accepted standards of medical practice that are defined as standards that are based on (A) credible scientific evidence published in peer-reviewed medical literature that is generally recognized by the relevant medical community, (B) recommendations of a physician-specialty society, (C) the views of physicians practicing in relevant clinical areas, and (D) any other relevant factors; (2) clinically appropriate in terms of type, frequency, timing, site, extent and duration and considered effective for the individual's illness, injury or disease; (3) not primarily for the convenience of the individual, the individual's health care provider or other health care providers; (4) not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the individual's illness, injury or disease; and (5) based on an assessment of the individual and his or her medical condition." Conn. Gen. Stat. § 17b-259b(a).

2. In 2015, Connecticut amended its regulations and its State Plan to cover gender affirming care. Previously, several provisions in DSS's regulations had excluded coverage for gender affirming care. The Centers for Medicare & Medicaid Services ("CMS") approved Connecticut's State Plan amendment in April of 2015.

3. Various state laws prohibit discrimination on the basis of sex, gender identity, or gender expression. State antidiscrimination/public accommodation laws prohibit discrimination based on gender identity or expression, including in the provision of medical care and insurance coverage. See Conn. Gen. Stat. § 46a-64; Conn. Insurance Dept. Bulletin IC-34. Connecticut also

prohibits discrimination on the basis of gender identity in the provision of medical care. See P.A. 25-154, Sec. 1.

4. Under the laws and policies described above, DSS must evaluate claims for medical care of a transgender adolescent seeking medical care in the same way it would evaluate claims for medical care of a non-transgender adolescent.

5. DSS must comply with these state laws. Accordingly, DSS operates its state Medicaid Plan in a manner consistent with its legal obligations to treat all such individuals equally regardless of sex, gender identity, or gender expression.

6. I am aware that medical professionals often prescribe forms of gender-affirming care as medically necessary treatments for adolescents with gender dysphoria because such care can alleviate gender dysphoria and improve the mental health and overall wellbeing of transgender individuals.

7. There are HUSKY patients under the age of 19 who receive gender affirming care. DSS data reflects that in the calendar year ending in December 2023, Connecticut paid roughly $1.2 million to cover gender affirming health care services for 208 individuals under the age of 19. In addition to Connecticut's share of the cost, the federal government paid roughly $1.2 million through Medicaid toward the total cost ($2.4 million). In the calendar year ending in December 2024, Connecticut paid roughly $1.6 million to cover gender affirming health care services for 177 individuals under the age of 19. In addition to Connecticut's share of the cost, the federal government paid roughly $1.7 million through Medicaid toward the total cost ($3.3 million).

**Federal Actions Targeting Providers of Gender-Affirming Care**

8. I am aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

9. I am aware that, since late January 2025, the federal government has taken actions to implement the Executive Order, target providers of gender-affirming care, and restrict access to such care for patients under age 19. These federal actions include the memorandum issued by Attorney General Pam Bondi on April 22, 2025 and the memorandum issued by Assistant Attorney General Brett Shumate on June 11, 2025 (collectively, "DOJ Directives") targeting the provision of gender-affirming care to patients under age 19.

10. These federal actions have had a chilling effect on providers who offer gender-affirming care in Connecticut to patients under age 19. They have caused providers in this state to halt or significantly reduce the provision of gender-affirming care to people under the age of 19, including providers in the state who participate in HUSKY.[1] DSS is concerned that this chilling effect will continue to intensify, and more providers will cease providing gender-affirming care to adolescents and people under the age of 19 as a result of these federal actions.

11. Because of these federal actions, it has become difficult to find providers who can meet the medical needs of transgender adolescents in Connecticut. If the pool of providers continues to shrink, it will become increasingly difficult and may ultimately become impossible for patients, including HUSKY participants, to find providers who can provide appropriate medical care to transgender adolescents.

12. It is reasonably foreseeable that if the federal government threatens providers because they provide gender affirming care services to individuals under 19, accessibility to quality

---

[1] See, e.g., *Youth gender-affirming care decision from CT hospitals has families scrambling for help* https://www.ctinsider.com/connecticut/article/trans-care-at-risk-ct-parents-react-20785997.php.

5

and affordable health care in Connecticut will suffer. Connecticut needs more providers willing to participate in HUSKY and care for our most vulnerable citizens, not fewer.

13. DSS wishes to comply with state law and ensure that transgender youth can access the medical care they need, including medically necessary gender-affirming care. However, these federal actions have interfered with DSS's ability to do so and may ultimately make it impossible.

Dated: December 12, 2025

*William Halsey*

_____
William Halsey
Medicaid Director
Connecticut Department of Social Services