# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____


In Re: Administrative Subpoena          No. 25-MC-91324-MJJ
No. 25-1431-019

                                        August 27, 2025


_____




BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210




JAMIE K. HALPIN, CRR, RMR, RPR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA  02210
jkhhalpin@gmail.com

APPEARANCES:

FOR THE PETITIONER:

Joshua S. Levy
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
617-951-7000
Email: Joshua.levy@ropesgray.com

Amanda M. Strachan
WilmerHale LLP
60 State Street
Boston, MA 02109
617-526-6000
Email: Amanda.masselamstrachan@wilmerhale.com

FOR THE RESPONDENT:

ROSS S. GOLDSTEIN
        &
PATRICK R. RUNKLE
U.S. Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
Tel: (202) 353-4218
Ross.goldstein@usdoj.gov

P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  All rise.

(The Honorable Court Entered)

THE CLERK:  Today is August 27, 2025.  We're on the record in the matter of *Administrative Subpoena Number 25-1431-019, regarding The Children's Hospital Corporation v. United States Department of Justice*.  Case Number for this case is *25-MC-91324*.  Will counsel please identify themselves for the record.

MS. STRACHAN:  Good morning, your Honor.  Amanda Masselam Strachan for Boston Children's Hospital.

THE COURT:  Good morning.

MR. LEVY:  Good morning, your Honor.  Joshua Levy for Boston Children's Hospital.

THE COURT:  Good morning.

MR. RUNKLE:  Good morning, your Honor.  Patrick Runkle for the government.

MR. GOLDSTEIN:  Good morning, your Honor.  Ross Goldstein also for the government.

THE COURT:  Good morning.  So, welcome, everyone. I've read all of the submissions.  I don't have any preference. Where do you want to start first?

MR. LEVY:  Our preference is to start with the motion to quash which I think will provide an overview for some of the reasons why we want this matter sealed, your Honor.  May we

start?

THE COURT: Whenever you're ready.

MR. LEVY: Thank you, your Honor, and before I begin, I just note that we're joined in the courtroom with additional lawyers who were working on this case and helped us get ready for this, several representatives from Boston Children's Hospital, including General Counsel, Mr. Chris Viney.

Your Honor, the Court should quash the subpoena that was issued to Boston Children's Hospital because the factual record is compelling and clear that this subpoena was issued for an improper purpose. That improper purpose is, namely, to bring an end to gender-affirming care for minors. This is not a purpose that Congress has authorized the Department of Justice or the executive branch to pursue, and as I will review, the Department of Justice has offered no evidence to this Court to substantiate that there is a proper purpose.

As a result, given the evidence of the improper purpose and the lack of any evidence on the other side, the government has failed to satisfy the *Powell* test in the Supreme Court in 1964. I would a hundred percent agree with the government that their latitude to investigate is wide but it is not unchecked, your Honor, especially when they're wading into an area that has been expressly delegated to the states, the practice of medicine, by both the Supreme Court and Congress in numerous statutes. There is a critical role for this Court to

play in ensuring that the government satisfies the *Powell* test and the government issues a subpoena for a proper purpose authorized by Congress.

The Supreme Court has said the role of the District Court in this context is not a rubber stamp, it's not minor or ministerial.  It is a check to make sure when you have an unusual case like we have here, where the improper purpose underlying the subpoena is crystal clear, that court action is necessary to prevent abuse of the subpoena process.

And in getting ready for this argument, your Honor, I went back to the first principles in Webster's dictionary.  I looked up the word "purpose."  It is what is the objective, what is the goal to be pursued, and I'd like to review four buckets of information and evidence that we think unmistakably shows that the true purpose of this subpoena served on Boston Children's Hospital is to bring an end to gender-affirming care in the United States.  It's designed to intimidate the hospitals, the people who run the hospitals, the clinicians who provide the care and the patients, intimidate them into ending gender-affirming care, and as I will get to in a few minutes your Honor, it's working because hospitals around the country are ending their practice of gender-affirming care.

What are the four buckets?  It's official statements by the administration, including President Trump and Attorney General Bondi.  The second bucket is the content of the

subpoena itself, the overbreadth and intrusiveness of the subpoena demonstrates the intent underlying the case, underlying the investigation. The government's own characterization in their papers of what they're trying to achieve here further substantiates that there is an improper purpose. And, lastly, your Honor, very importantly, the actions of the administration since the subpoena was issued in June corroborate that the true purpose here is to bring an end to gender-affirming care.

So I am going to get to those in a moment. Your Honor, please interrupt with any questions that you have, but before I tackle those four categories, I think it's important to make clear what the Court does not need to decide here. This Court, we're not asking this Court and the Court does not need to decide whether the United States Constitution or the Equal Protection Clause or other provisions provide a constitutional right to gender-affirming care. The Supreme Court took care of that in June the *Skrmetti* case when they decided that the people of Tennessee have a right under our system of federalism to make a policy decision for the people of Tennessee that they're going to ban gender-affirming care for minors. So that issue has been resolved about the constitutional right to gender-affirming care, but the second issue that this Court does not need to decide is whether gender-affirming care is appropriate, whether the vast medical

literature that supports gender-affirming care reaches a better outcome than the questions that have been raised about the treatment guidelines, that's not an issue this Court needs to decide.  Why is that?  Because in the *Skrmetti* case the Supreme Court reviewed what the people of Tennessee had done and the court ruled that under our system of federalism, an area of police powers, the regulated practice of medicine is delegated to the states.  The quote from Justice Roberts is particularly important.  Justice Roberts wrote that the Supreme Court "affords wide discretion to the states to pass legislation in areas where there is medical and scientific uncertainty," and he cited numerous Supreme Court cases of other situations where absent express authority from Congress to regulate a certain area, the federal government is not empowered to regulate the practice of medicine.

That principle that the Supreme Court was articulating in *Skrmetti* is reflected in numerous statutes as well.  The Medicare Act which is the statute that enabled the Medicare and the Medicaid Program, 42 U.S.C. 1395 says, "nothing in this chapter shall be construed to authorize any federal officer to exercise any supervision or control over the practice of medicine."

Like the debate about physician-assisted suicide that was decided by the Supreme Court in 2006, the regulation of practice of medicine is an issue that is delegated to the

states.  The scientific and policy judgment is left to the people of the states.  And just as Tennessee was permitted to make its own judgment, about a mile from here, the people of Massachusetts spoke through the legislature, and in 2022 Governor Baker signed into law a statute that provided that access to gender-affirming care is a right under Massachusetts law and under the Massachusetts constitution; and just this month, your Honor, Governor Healey signed a second law strengthening those protections.  The people of Massachusetts have spoken.  They've made their policy decisions about the regulation of the practice of medicine in this space, and the Attorney General of Massachusetts, Andrea Campbell, has also spoken on behalf of the people.  She has led a seventeen-state coalition to file a lawsuit in this court seeking injunctive and declaratory relief to stop the executive branch's effort to bring an end to gender-affirming care.

So if the rule of law means anything, it must mean that the Supreme Court case applies with equal force in Massachusetts as it does in Tennessee.

So the question of who gets to decide what's the appropriate care for minors who have gender dysphoria, the question of who gets to decide has been resolved, it's the people.  The question of what the right treatment is is left to the people of the states, not to the federal government.

So it's against this legal landscape, your Honor,

empowering the states to regulate the practice of medicine, that I think is helpful context for what the Court's analysis needs to be under the 1964 *Powell* test, and that's been briefed, and I don't think the parties disagree.

First and foremost, was the subpoena issued for a congressionally authorized purpose?  That's the key factor, and there is no need to read the crystal ball here about what's really going on.  As I noted about those four categories, the administration has been very clear of what their objectives are here.

I will start with Bucket Number One, your Honor, the statements by the administration leading up to the issuance of this subpoena in June of 2025.  On January 28, 2025, President Trump issued Executive Order 14187 and it was about ending gender-affirming care.  The President characterized gender-affirming care for minors as a "stain on our Nation's history" and "it must end," and he directed his administration to rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures, and he ordered his Attorney General, Attorney General Bondi, to take action.

Attorney General Bondi issued a memo on April 22, 2025, and the title of that memo is Preventing Mutilation of American Children, and your Honor, the Attorney General is free to use whatever words she wants to use to characterize what's happening here.  We strongly disagree with the characterization

of mutilation.  This is medical practice that's been affirmed by numerous medical societies, but again, that's not the issue in front of this court, but I think it is a window into how strongly this administration feels and that they're willing to do whatever it takes to bring this practice to an end, and they don't have the right to regulate the practice of medicine even if they believe it's wrong.  They need to go to Congress.  They need to get a law passed in order to pursue what they're pursuing.

Let's look at what Attorney General Bondi said, and I think her real goal in that memo is in her own words.  Page 6 of that memo, her conclusion, I am quoting from Attorney General Bondi, your Honor.  "Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind gender-affirming care.  Under my leadership, DOJ will bring these practices to an end."  DOJ will bring gender-affirming care to an end, that's what the purpose is behind this investigation.  So that's what leads up to it.

Then we have the June 11 subpoena that's served on Children's Hospital and it's one of -- based on the press releases by the government -- it's one of twenty or so subpoenas that have been issued to hospitals that provide gender-affirming care across the country, and the one we have been able to see in Philadelphia which was unsealed by the

court there, it's an identical subpoena.

So what is the message behind these subpoenas?  There is 15 requests.  Request Number 1, we're coming after your people.  Request Number 1 asks for the complete personnel files for every person, current or former employee of Children's Hospital, who is involved in the management of the hospital, who directs the operations of the hospital, who sits on the board of the hospital, who provides any clinical services at the hospital, who has rights to prescribe any drug.  Not just gender-affirming care, all 2,000 people who are currently in that bucket, the government wants their personnel file, their names, their addresses, their Social Security numbers, names of their dependents, their personnel reviews.  That has nothing to do with billing fraud or off-label promotion.  That is designed to intimidate and harass, your Honor.  It has no nexus for the purported justification for this investigation.

What else does the subpoena say?  Requests 11 and 12, we're coming after your patients.  We want the names, the addresses, the dates of birth, the full medical records of any patient who has received gender-affirming care at Children's Hospital.  They want to go out and talk to minors, to kids, who are going through whatever they're going through in their lives that led them to seek medical care at Boston Children's Hospital.  That sends a chill through every clinician, every patient, every parent, every guardian, and the request also

App.55

requests information on parents and guardians.

And the burden of the subpoena is also designed to send this message of chill and intimidation. They use the broadest possible definitions. Employee includes contractors, agents, volunteers, people who show up a couple hours a week to push people around in wheelchairs to help the hospital with this mission. Everybody is included in this subpoena, and it is a very broad definition of what Boston Children's Hospital is, to include in any joint ventures, any predecessors. It is designed to send a message that the government is going to look in every file cabinet, in every folder and every electronic message, every text as part of this investigation.

And then we turn to what the government has said in this litigation, your Honor, about what their purpose is, and I think it's really telling. First, DOJ fundamentally misunderstands the holding in *Skrmetti*. On Page 9 of their opposition, the Department of Justice states to the Court that if the states are permitted to ban gender-affirming care for minors, then the executive branch is obviously permitted to pursue the same policy. That is 180 degrees wrong. The federal government is not allowed to pursue that policy. At a minimum, Congress would have to pass laws to authorize it at the executive branch, but the *Skrmetti* holding is about the police power that's delegated to the states in areas of debated medical science. So they're fundamentally wrong about the fact

that they can pursue regulation of the practice of medicine because the states can.

The second thing in the papers, your Honor, that I think is telling, on Page 5 of their opposition, the Department of Justice advises the court that this incredibly broad subpoena was issued "at the actual direction of Attorney General Bondi" in her April 2 memo.  They are carrying through on the memo that I referenced earlier where Pam Bondi states -- Attorney General Bondi, excuse me, states that the objective is to bring this care to an end.

And third, your Honor, I made a reference, Children's Hospital of Philadelphia, this is a public record now, has received a subpoena from the Department of Justice, and similarly, the Department of Justice has filed pleadings in that case and there they justify their need for access to medical records of minors by saying, and I quote, "The Department of Justice investigation relates to potential misconduct committed against vulnerable children leaving lifelong mental and physical side effects and consequences." That's the heart of this investigation, and the law does not permit the Department of Justice to investigate this area.

And, your Honor, the fourth bucket, and maybe the most important one, is what's happened since these subpoenas were issued.  On July 9, 2025, Attorney General Bondi issued a press release announcing that there were twenty hospitals that have

received subpoenas because those hospitals provide gender-affirming care to minors.

It's really unprecedented for the Department of Justice to announce an investigation. I ran this office, as you know, your Honor, upstairs and we never commented or confirmed investigations. We spoke through our court papers. We spoke through our charging instruments and our pleadings in court. Why would you announce the issuance of twenty subpoenas? Again, it's to drive home the message DOJ is coming after the people who provide this care to minors. It's not their role; but second, your Honor, it's more than just announcing the message that they're looking into it. Attorney General Bondi respectfully prejudged the outcome. Before even one piece paper had been provided to the Department of Justice in this investigation, forget about looking into the facts or looking at the law and reaching decisions based on the policies of federal prosecution, Attorney General Bondi revealed the true purpose behind these subpoenas. In her words, "we're going to hold accountable the health care providers and hospitals that mutilate children in this service of a warped ideology." Again, I find the reference to mutilation despicable but that's not what this is about. This is about the authority of the Depart of Justice to even investigate the practice of medicine. The subpoenas, your Honor, are a vehicle in this effort to intimidate hospitals.

Same day, July 9, 2025.  Jordan Campbell, who is now the Deputy Assistant Attorney General who supervises the Consumer Protection Branch.  He is the individual in the chain of reporting for Mr. Runkle and Mr. Goldstein, and he spoke at an FTC conference on July 9 that was entitled "The Dangers of Gender-Affirming Care," and on the panel, one of the panelists made a comment, it was a doctor who said "the Department of Justice's investigation into gender-affirming care could cause the blue states, his words, to cease providing gender-affirming care."  Jordan Campbell's response was, and I quote, "We're working on it."

And I'm sorry to say, your Honor, that their efforts are working.  They're working because hospitals are shutting down and stopped providing this care and families are being turned away, but, your Honor, you don't need to take my word for it.  We heard it directly from the President of the United States.  On July 25, 2025, the President issued a press release on gender-affirming care.  There is not one word in there about billing fraud.  There is not one word in there about promotional practices of pharmaceutical companies.  The headline was "President Trump Promised to End Sexual Child Mutilation and He Delivered."

The President takes credit for being the only quote-unquote "politician," again policymaking, who actually delivered on ending what he calls the barbaric pseudoscientific

practice of gender-affirming care.  The White House then proceeds to lists twenty different hospitals that it claims in response to the President's executive action have either stopped or curbed the provision of gender-affirming care.

Just yesterday the University of Michigan put out a press release and said that their hospital "In light of the DOJ investigation and the escalating external threats will no longer provide gender-affirming care to minors."  That's the record before the court showing an improper purpose.

So what do we have on the other side?  What's on the other side of the scale?  In the face of the substantial questions that have been raised about the evidence -- by the evidence of the true purpose behind the subpoena, what has DOJ offered the court to counteract that or counterweight that?  Candidly, it's very little.  The Department of Justice has a section in their brief on their opposition here that there is "no free-standing bad faith exception;" except that's not what the Supreme Court said in *Powell*.  The Supreme Court said in *Powell* that a court is authorized to examine whether there is an improper purpose and whether an improper purpose is present because the subpoena either is intended to harass, number one they say; number two, it's designed to pressure to settle a collateral dispute; or number three, the court is entitled to look for any other purpose reflecting on the good faith of the particular investigation.  That's the Supreme Court's words on

page 58 of the *Powell* opinion.

In the First Circuit cases that we cite and that the government cites and in *Powell* itself, the government came forward with affidavits. When the purpose of the investigation was challenged, they submitted affidavits to the court to explain why they were looking into the particular issue. The *Comley* case out of the First Circuit that was cited by the government, it says, "affidavits of government officials have been deemed sufficient to make a prima facie showing that the *Powell* factors are satisfied." In that case, it was an affidavit from an Administrative Law Judge for the Nuclear Regulatory Commission that justified the information the government was seeking in that case. The *United States v. Lawn Builders* in the First Circuit also speaks about affidavits being submitted when a subpoena is challenged. The *Powell* case, same thing.

We haven't seen any affidavits in this case, your Honor, nothing from the Assistant Attorney General who issued the subpoena, nothing from any official at the Food and Drug Administration which is the agency responsible for enforcing the Food, Drug and Cosmetic Act, nothing from anyone at the Center for Medicaid Services, Medicaid and Medicare Services, which may shed light on potential anomalies to the billing for these services, that maybe arise to suspicion of billing fraud. The Court has been presented with no information to counteract

those four buckets of evidence I put before the Court.

The one data point the government cites to in their papers to justify the predication actually supports our position. The government cites to, in a section about the basis for the investigation -- excuse me, the section on Page 10 that says that the investigation's basis is legitimate, they cite to Justice Thomas' concurrence it *Skrmetti,* the June 2025 case. A side note, Justice Thomas forcefully supported the Supreme Court's outcome that this an issue for the states to decide, but more importantly, what Justice Thomas wrote about, what the government cites to, is Justice Thomas' concerns that international treatment guidelines about gender-affirming care were based on insufficient evidence and political influence. That's what they cite to as a basis for supporting this investigation. That, your Honor, goes to whether gender-affirming care is appropriate or not. It's not a proper basis for this investigation, and it's going to a policy, Judge, that's the exact type of authority that's been delegated to our states.

And one last comment about that data point and the purpose underlying the subpoena, they cite to this court the treatment guidelines as one of the reasons supporting this investigation. None of the 15 requests ask anything about treatment guidelines. It's not mentioned once in the subpoena. I would submit, your Honor, this is a post hoc justification

for a subpoena that's been issued for an improper purpose.

The government has fallen woefully short for providing this Court with any credible information rebutting the clear evidence of an improper purpose, and I direct the Court to look at the *Powell* case because the Supreme Court held in that case that the government is required to make a showing of its proper purpose for suspecting misconducted in an investigation once the party challenging the subpoena "raises a substantial question that the subpoena is improper."  That's the Supreme Court telling all of us what the test is, and we have put forward all of this evidence in the papers, which I've recited for the Court today, that shows it's an improper purpose.  The Supreme Court said it's their turn.  They have to rebut that and show what the proper purpose is, and they have given this Court nothing it can rely on.

Your Honor, we don't come here lightly asking for this relief for a motion to quash, but reviewing the entire record, we think it's critical that this Court play its role as a check on the subpoena process and the investigative process and stop an investigation that's being driven by an improper purpose.

Happy to take any questions the Court has.

THE COURT:  I don't really have any questions other than if I understand the totality of your argument, even if there is theoretically a basis for requesting some information under the subpoena, if there is an improper purpose, and I have

App.63

to make that finding explicitly and that there was a pretext, then I have to quash?

MR. LEVY:  That is our position, your Honor.  I think that's exactly right, and I think any abuse of subpoena could be dressed up with a legitimate request that's sound in prior cases, but if the true purpose of -- if there is an improper purpose underlying the investigation, which we have clearly demonstrated, we think the subpoena needs to be quashed in its entirety.

THE COURT:  But would you agree with me that this would be an extraordinary sort of relief or, excuse me, to put it another way, grounds for quashing a subpoena?

MR. LEVY:  I think it's absolute grounds for quashing the subpoena.  I think there is several cases that have held that a subpoena has been issued improperly and I think there is numerous cases where the court has gone through just the balancing act that you're forecasting and decided based on the weight of the evidence in that case that the administrative subpoena was properly considered.  So it's routine for a court to undertake this analysis.  I would grant you it's more unusual for the court to find that the subpoena was issued for an improper purpose but it's happened in numerous cases and this is that case.

THE COURT:  And so, in your view, what is sort of the standard for finding improper purpose or is it simply just a

weighing?

MR. LEVY:  I would go back to the *Powell* test.  Is it designed to harass, settle a collateral dispute, stop providing gender-affirming care to minors, or anything else reflecting on the good faith of the investigation?  All the things that I've reviewed, your Honor, I think go directly to the fact that this is not a good-faith investigation, it's not authorized by Congress, it's not authorized by law, and they are pursuing this investigation to bring gender-affirming care to minors to a halt, and our system, our constitutional system, does not give the executive branch that power.

THE COURT:  So in weighing this, your position is, look, we presented a facially reasonable allegation of improper purpose.  They haven't responded after the burden has shifted and so it's clear at least from your position?

MR. LEVY:  Yes.  I will go more than reasonable, but yes, we think it's very clear under these facts, your Honor, and we have a different situation.  If this subpoena just came out of the blue without all these statements before and after about the true purpose, it would be a different situation, but the administration has made very clear what they're trying to achieve here, and we need court relief to prevent this abuse of the subpoena process.

THE COURT:  Thank you.

MR. LEVY:  Thank you, your Honor.

MR. RUNKLE:  Thank you, your Honor.  I appreciate the opportunity to argue.  With respect, I think that the test that you just had a colloquy about, I think that the hospital has gotten that test backwards.  The *Powell* test, first of all, I just want to handle a few points first that are fresh in my mind.  The *Powell* test, I believe, a closer reading of *Powell* reveals that there is a statute actually that prohibits, still on the books today, that prohibits the IRS from using administrative subpoenas in quote-unquote, "unnecessary ways as taxpayers," and I believe the *Powell* tests indicates a bunch of special types of tests in the IRS context, and so I think it's important to look at the binding First Circuit case law that actually says that a subpoena, a procedurally sound administrative subpoena, must be enforced unless the assertion of authority is, quote-unquote, "apocryphal."

And while I've heard a lot of disagreements today about the policy choices of the executive branch, I haven't heard anything questioning the authority of the Attorney General to issue such a subpoena in pursuance of a federal health care offense against a large regulated hospital which Boston Children's Hospital is.

THE COURT:  I think Mr. Levy's point was that you had no authority to issue that subpoena for this purpose.

MR. RUNKLE:  Right, and I am getting to that, your Honor.  I appreciate the point, but obviously, I respectfully

App.66

disagree.  So this is a statute.  It's not about the CMS.  It's not about the HHS.  It's not about the FDA.  This is a statute that gives the Attorney General the ability to issue an administrative subpoena in the furtherance of an investigation of a federal health care offense, and so here the Attorney General, we don't need an affidavit here because the movant put in the basis for the investigation as evidence, and he referred to it many times, which is that the Attorney General directed a quote-unquote, "appropriate investigation" by my office, it's my office that's named in the memo, to investigate the off-label use of powerful drugs in this context and that's exactly what this subpoena is, and so what the larger purposes are, I am not here today to deny anything that the President or the Attorney General said.  They obviously have their policy positions about this practice which they strongly disagree with and that's the position of the executive branch, but this is a statute that Congress did authorize, the Department of Justice, not FDA, not HHS, to seek information about federal health care offenses, and I will go into exactly, you know, what those are and I'll go through the subpoena in a moment, but, again, and I think this keys on something your Honor said, is I think the hospital is the one who is asking for very unprecedented relief here.  You know, we're not here on the merits of the dispute.  We're not here on an enforcement action.  We're here on an administrative subpoena matter and an administrative subpoena,

as I said, you can read the cases, I think we've cited some of the same cases, but there is no free-standing test for the Court to weigh what it thinks the purpose is and decide whether oh, the fact that General Bondi said that she wants this care eliminated is the actual purpose of the investigation and it's not to actually, you know, get documents from this hospital, review the documents and figure out whether federal health care offenses were, you know, committed, and that's actually what's going on here, is that there are veteran Department of Justice attorneys who are experienced in these case, FDCA violations, Federal Food Drug and Cosmetic Act violations, who are attempting to obtain documents from the hospital to evaluate whether the hospital, it might be a witness, it might be a subject, it might be a target, whether federal health care offenses have taken place, and that's what the Attorney General ordered us to do.  She said a lot of other things in that memo, and I am not here to question anything the Attorney General said, but the Attorney General is the person who I answer to and she has ordered this investigation to take place and that is what has happened.  The Attorney General also has the power from Congress to issue these types of administrative subpoenas and she's delegated that authority to the Assistant Attorney General for the Civil Division and that's the person who signed the subpoenas.  So that's the basis of our position. Obviously, our papers say what they say and I'd like to rely on

on them.

Also, I think Mr. Levy gets the holding of -- he's trying to limit the holding of *Skrmetti* because *Skrmetti* was a loss. Obviously, *Skrmetti* sought to establish a constitutional right to this type of care and *Skrmetti* held the opposite, and so I think that goes to the improper purpose test that the hospital is asking you to implement. So the hospital is saying that it's an improper purpose for the executive branch to have this as a policy. You know, the policy is that the executive branch wants to reduce or eliminate gender-related care to minors, especially the medicalized gender-related care to minors that this investigation is about, but *Skrmetti* essentially says that there is no such constitutional right, and in addition to that, it says that it is a rational governmental objective or purpose to eliminate the medicalized gender-affirming care of minors and that's exactly what this investigation is about, and so, you know, I take the point that there are a lot of other things and lot of other statements made by the President and the Attorney General, but if we go into the realm where we're going to not only provide defenses to a potential enforcement action in the future because of things that the President said but we're going to allow the hospital not to produce a single scrap of paper on a Congressionally authorized subpoena issued by the Attorney General because they don't agree with or like things that the

Attorney General and President said in its statements, I think that would be a breathtaking expansion of administrative subpoena law, especially the way the First Circuit has annunciated.

THE COURT:  So let me ask you, before we get to the contents of the subpoena and what's been requested, do you agree with Attorney Levy's argument that once it has raised a credible allegation or reasonable allegation of improper purpose, that somehow the burden shifts a little bit at least to the government to justify why it's not an improper purpose to prove with some evidence that this is a legitimate inquiry?

MR. RUNKLE:  I disagree with that, your Honor, here. I agree that in a case where there is an agency that's not the Department of Justice, that has issued the subpoena, that there must be some factual matter presented to show the existence of the investigation, but I don't believe, as we said in our papers, that there is some sort of free-standing test that if the movant demonstrates that they don't like the basis of the investigation or that the politicians have said something they don't like about the investigation that somehow the department has some heightened burden to justify it factually.  I don't think the law says that.

THE COURT:  I am not sure that's being completely fair to the movants here.  That's simply to suggest that, you know, they can just make allegations without any sort of evidence or

any sort of backing.  Here, they have more than that, right?  I mean, and I think to some degree the government concedes that it was at least why the subpoenas were sent, and so just rationally thinking this through, it would seem to make sense then that the government ought to counter some of that allegation to say, look, this is -- there is a legitimate basis here, despite all of this craziness in terms of what's going on outside these walls, that there is a legitimate basis here, don't you have to show something?

MR. RUNKLE:  So I believe that we have shown that as a matter of law here for two reasons.  One is that the memo that they put in directs -- this is an investigation of -- that is only a very small part of the memo that Attorney General Bondi wrote.  So this investigation, she ordered an appropriate investigation into off-label use of these powerful drugs that are given to minors.  So that's one -- you know, that's the factual basis for it.  So the Court or the movant may disagree with some of the other statements that were made in there, but I don't believe that they've made a showing at all that the investigation is somehow illegitimate because they disagree, because the President or the Attorney General disagree, you know, fundamentally with this practice.  You know, this is an attempt to get documents to look at a factual matter.  It's not -- I don't believe that the government, I don't think the case law bears out the idea, again, that even if the executive

App.71

branch has a policy priority with which the movants disagree that that somehow itself raises a factual dispute over pretext.

I think, you know, I have issued many subpoenas in my career, your Honor. Nobody has ever really wanted to get one, and in many instances, the issues that we deal with in my office are, you know, politically charged or are notable. There were numerous off-label cases tried in this very courthouse, you know, a decade ago and before that.

THE COURT: This is more than that. It's not simply, look, this is a controversial topic, and, again, the movants have put forward various public statements that were made by the administration through various individuals about not only how they feel about or how they think about these issues but a clear directive to the DOJ and to your department to pursue these investigations, and I don't think that's in dispute, right?

MR. RUNKLE: The investigation exists because of the Attorney General's memorandum. That's her prerogative to issue such memorandum, yes.

THE COURT: Right. So as the guy who is going to be sort of deciding it, I think it would be helpful if, for example, the government had proffered something along the lines of, look, we've looked at our data and there appears to be X amount of numbers of billing codes under this code for this particular drug and that is raising an eyebrow or we see sort

of whatever through affidavits of different individuals who are more familiar with this on the ground, something along the lines of we understand that there is this promotion of a use of a particular drug for this purpose which was not approved by the FDA, something, right, but what I am hearing from you is, and let me know if I have it wrong, feel free to push back, but what I am hearing is despite everything that the movants have put forward here in their briefs, we have no obligation to explain anything, we can simply issue it and the Court must enforce it.  That's what I am hearing.

MR. RUNKLE:  And that's not my argument, your Honor. So this investigation is being conducted by Department of Justice attorneys.  I signed the brief that's before your Honor and it contains assertions of facts about the investigation which we haven't talked about yet but I can talk to you about them.  So, as I said, unlike an investigation that would be conducted by the Nuclear Regulatory Commission or the IRS, this is an investigation being conducted by the Department of Justice, and so we absolutely do need to show the existence of a lawful investigation in order to enforce the subpoena and I believe we have done so here through our papers.  I don't think affidavits discussing, you know, non-public investigative materials are necessary in an administrative subpoena enforcement matter and I think that there is quite a bit of law on this topic.  I think that the affidavits that Mr. Levy was

talking about essentially talked about the fact that the investigation exists and a general description of what the investigation is looking into.  I think that the sort of test that your Honor is positing would be in stark contention with the *Morton Salt* case where the Supreme Court held that an agency consented in an administrative subpoena just to equip itself of the idea that the law wasn't violated, right, it does not need probable cause.  It's not even articulable suspicion that those things have happened, but I am getting to why there is that here also but I don't think we need to do that.  I am not telling you we don't need to justify the subpoena in any way, we just can issue it and they have to respond.

THE COURT:  I don't want to conflate the issues here about -- and there is some overlap, but I think as the first step, before we can get to the second, is whether this is a pretext, whether this is a legitimate inquiry, right?

MR. RUNKLE:  So on that, I am just going to have to disagree with my friend across the aisle that I don't believe that the policy position of the President or the Attorney General to decrease or eliminate gender-related care to minors is -- that that is a pretext.  I think in many investigations, the executive has policy priorities.  That's the consequences of elections and confirmations of officials, and so the President and the Attorney General have policy priorities and those are carried out in a number of ways and one of the ways

those can be carried out is looking into conduct and issuing subpoenas to determine whether federal law was violated.  I don't consider that to be pretext and so that's something that we may just need to disagree on but it's not a pretext.  In fact, as I said, this is -- and if you take the factual assertions about the investigation that are in the brief that I signed as factual assertions of what the investigation is looking into, and this is the point I was going to make a few minutes ago, I apologize, th hospital -- so I fundamentally disagree also with my friend across the aisle about the nature of the use of drugs in this context, right, of pharmaceuticals that are regulated by the federal government.  So the practice of medicine, of course, is a matter of state law but it's not exclusively a matter of state law in any way, shape or form. Here, the hospital in its papers has admitted to using these powerful drugs on minors off-label.  As I said, that's a topic that has been -- you know, it's been a topic of legal controversy for many years.

There is a statute.  Mr. Levy asked what statute we're looking at here.  There is a statute that actually allows the federal government to look into these practices and it's 21 U.S.C. 355 which is about new drugs, and so FDA has to approve a new drug for a specific purpose and distributing that new drug in violation of Section 355 is a prohibited act under 21 U.S.C. 331(d), and so here a lot of things flow from their

admission that it's a fundamental basis of their practice of, you know, of the practice that they use -- practices that they do at the Gender Clinic at Boston Children's.

THE COURT:  So what do you make of the FDA's own sort of view that once a drug is approved that a doctor using it for some other purpose off-label, they're not concerned about?

MR. RUNKLE:  Right.  So the FDA -- that's absolutely correct in some instances.  So I would view it as an exception or it's really a judicially-created exception because it's not in the statute at all.  There is a statutory exception for devices that are used off-label, but under longstanding practice, the FDA does not enforce against specific doctors who write prescriptions, and again, there is a difference between writing prescriptions and dispensing medicine, but the FDA does not enforce against doctors who write -- the bare act of writing an off-label prescription is correct, that is not something FDA enforces.

THE COURT:  Because that is a practice of law.

MR. RUNKLE:  No because it's an exception to a prohibition against distributing unapproved new drugs, but I could give your Honor examples of a series of cases I did in Georgia in 2022 and 2023 that were exactly, if you strip all of the invective away from this case, it's exactly the same pattern.  There is a drug that is approved for an FDA-approved purpose called hCG.  It's called human chorionic gonadotropin

or something like that.  It is often marketed as a weight loss drug off-label and doctors would be allowed to prescribe it off-label but we have -- because it was a policy priority of a prior administration or a prior official, we pursued actions against doctors who were selling hCG or prescribing hCG, most of them were dispensing it themselves which also takes it out of the exception that I just talked about, for the purpose of weight loss, because in addition to other things, it was potentially harmful, it was off-label and so it was illegal and many of the drugs, we determined after the investigation, were being imported illegally from China and, you know, were mislabeled and made in unregistered facilities and things like that.  And so, to me, this investigation is a normal investigation being conducted by experienced attorneys who have experience in these fields, and so to the idea that Boston Children's gets a pass because there is controversy over this topic, I think is unprecedented.

THE COURT:  I'm just looking at the time, just for efficiency, can we get to maybe the substance of the subpoena?

MR. RUNKLE:  Yes, absolutely, your Honor.  The first thing I would mention about the substance of the subpoena was that the -- sorry.

THE COURT:  And I will tell you where I might find argument helpful.  Off-label promotion came across clearly. The sort of billing practices, the false billing, that came

across.  I wasn't completely sure what other basis you were pursuing.  Is misbranding part of it or not?

MR. RUNKLE:  Yes.  So I believe that -- so one other important factor to talk about here is that the distribution of these drugs in conjunction with a false or misleading statement could itself be independently illegal.  So under, you know, controlling case law, an FDCA felony violation can be committed not by just lying to a patient about the effects of a medicine or lying to the person who is receiving the medicine but also to the government or an insurance company and so that's how that all fits in; but first of all, we never got to the point where we were negotiating over scope with the movant and so we would be happy to negotiate over scope of some of the broader requests for the movant.

I would point out that I think, you know, most of the experienced lawyers in this courtroom are familiar with very broad discovery requests and subpoena requests, and I do take a lot of concern with the allegations that somehow the idea that we would want personnel files of people involved in this care or the patient files are somehow an attempt to intimidate or to harass those people, I think that's a very typical discovery request in this field, but what I could say about that is that we would be willing to negotiate scope with them but we never got to that point.  We'd be willing to negotiate over those things.

App.78

The other point that I would make which I think short circuits some of the allegation or the assertions that my friend was making, is that this statute and these subpoenas are actually more protective of patient materials than any other way the government could get these materials.  So there is statutory prohibition on using any of the patient material.  There is an asterisk in the statute but we'll skip that.  There is a statutory prohibition against using these materials against patients basically in any way and so that would not apply to a grand jury subpoena.  It wouldn't apply to a search warrant.  It wouldn't apply to a Rule 17 subpoena or something like that.

THE COURT:  So I got all of that in your papers.  So on the one hand, you spell out at clearly the off-label use and the false claims and then you make the argument that, look, these records are -- look, there is protections.  We don't have to be worried about HIPAA.  So you have these things but don't you have to connect the dots about how these records are relevant to these things?

MR. RUNKLE:  Well, I don't think that we have the burden of -- I can -- the standard of relevance under an administrative subpoena is extraordinarily broad under the case law and so obviously these -- so, for example, the patient records are commonly sought in any type of health care fraud investigation to determine which patients were given the

medications, under what circumstances, what were they told, how many patients out of the total population were provided off-label treatments, when in the process, you know, did the hospital follow its own policies in prescribing these drugs off-label, that's -- these are -- as I said, the cases that have been done by my office all have those types of records involved in them and this subpoena power was passed as part of the HIPAA statute.  Congress anticipated that the government would get these types of records in these types investigations and be able evaluate the federal health care offense under investigation whether it's miscoding, whether it's health care fraud, whether it's FDCA violations.  The FDCA violations under -- investigations of federal health care offense do relate to billing records and so it's very difficult to investigate how health care was delivered and, you know, how these drugs were distributed and delivered if we don't have the records of how the drugs were delivered and distributed to patients.  It seems like a very logical -- it doesn't seem like the relevance inquiry is -- has a gap in it in my mind and so I apologize if your Honor doesn't believe that we made that showing but that's what the patient records are in there for.

We'd be willing to limit the personnel files to people who actually prescribe medicines as well as their superiors and people who are involved with decisions about, you know, off-label prescribing and billing at the gender clinic, but as

I said, we never got there because we never got to negotiate the scope of the subpoena.

THE COURT:  And this might be just a little bit off topic but just for my own understanding when we talk about billing codes, so there is no billing code for gender-affirming care?

MR. RUNKLE:  There is.  It's F64.  I am not an expert on billing codes because really the primary focus of our investigation is the FDCA stuff, but yes, there are billing codes for gender dysphoria.  There are allegations in this field, again, I am not aware of specific ones because we don't have any documents from Boston but there are allegations that visits are miscoded, you know, in order to have insurance companies pay for them.  So there are also multiple billing codes associated with each visit and so --

THE COURT:  Are you saying doctors are using some other code besides the gender-affirming care code?

MR. RUNKLE:  Yes, that has been a persistent allegation.

THE COURT:  In Massachusetts?

MR. RUNKLE:  There is nothing specific because we don't have the documents, your Honor.

THE COURT:  Right, but I am just logically thinking through.  I mean, I don't need to know now but a constitutional right, at least under our state declaration of rights, why

App.81

would a doctor use some other code?

MR. RUNKLE:  I think the national insurance companies are the short answer to that question or the most obvious answer is that insurance companies have policies about what they'll pay for in the gender care space and what they won't pay for and that's the short answer to your Honor's question.

If your Honor doesn't have any more questions, we could move on to the sealing motion.

THE COURT:  Sure.

MR. LEVY:  Your Honor, sixty seconds?

THE COURT:  Sure.

MR. LEVY:  Thank you.  Your Honor, a couple of points.  They talk about *Powell* and it is an IRS tax case.  It's been cited repeatedly across numerous administrative subpoenas, and you mentioned *Morton Salt*.  *Morton Salt*, we misread *Powell*, because Morton Salt gives the government the right to make sure that no crime has been committed.  *Powell* cites *Morton Salt*.  *Powell* comes after *Morton Salt* and reviews that principle and says yes, but there is a check on the ability to investigate.  It has to be done for a proper purpose.

Second, your Honor, we said in our papers, and this was not responded to by the government, there have been no allegations regarding billing or any other fraud at Boston Children's Hospital.  You just heard it.  They don't have any allegations that anything went wrong at Boston Children's.  The

reason there is no affidavits is because they don't have anything justifying the investigation.

Third, *Buckman*, Supreme Court case from 2001, clearly states that it is legal for physicians to prescribe drugs for off-label use.  So the doctors at Children's Hospital who use products off-label and most drugs in the pediatric space are not on-label because there aren't clinical studies done on kids.  So the vast majority of therapeutic treatment at a Children's Hospital is off-label.  That is clearly allowed under the Supreme Court principles.

So, your Honor, the last thing I'd say is we are not asking this Court, obviously, to decide what the executive branch's policy can be on gender-affirming care.  That's way above our mutual pay grades, but the administration, elections have consequences, they can pursue whatever policies they want to pursue.  They have to do them legally, and they're using an improper purpose here to pursue the policy of ending gender-affirming care to minors.  That's the crux of this motion.

THE COURT:  Do you want to address your other motion?

MS. STRACHAN:  Yes.  I would love to, your Honor, thank you.  Thank you, your Honor.

Sealing these proceedings is justified under the good cause standard for sealing and is consistent with Section 3486 which is the authorizing statute under which this subpoena was

issued which is both for an administrative subpoena and a criminal one as well and it is consistent with longstanding, deeply entrenched practice of conducting criminal investigations outside of public view.

Now, there is no dispute here that DOJ issued the subpoena as part of an ongoing criminal investigation of and involving Boston Children's, and because the subpoena is part of a criminal investigation, there is no presumption of public access to either the subpoena or to these proceedings.

The Administration's choice to enlist DOJ and its criminal subpoena authority to pursue its policy goal of ending gender-affirming care does not change the fact of having chosen to play on this playing field, they must abide by its rules, and yet the government comes before you today without citing a single case for the proposition that litigation over a criminal subpoena should be conducted publicly.

THE COURT: So is it your position that as a default rule that all administrative subpoena cases should be sealed?

MS. STRACHAN: Your Honor, I am not here to advocate for a default rule, but in this matter, where this subpoena is issued to conduct a criminal investigation, as DOJ has acknowledged, and there is, as we set forth, good cause to show under the good cause standard that there is both reputational and potential physical harm to Boston Children's that these proceedings should be sealed, and it is a fact that there is

longstanding, as veteran health care fraud prosecutors know, there is a longstanding practice of sealing and conducting criminal and civil health care fraud investigations outside of public view.

The Department of Justice comes before judges in this courthouse every day seeking for extensions in False Claims Act cases and begging this court, and I know because I used to be on the other side of this, to be able to conduct their investigations under seal, in criminal investigations seeking non-disclosure orders, in civil False Claims Act matters seeking extensions of the seal claiming that they need to be able to conduct their investigations --

THE COURT:  So in those cases or grand jury proceedings, I mean, there are statutes and rules specific for those which is why I am asking.  It's not like it's a secret. On the one hand, as Attorney Levy mentioned earlier, the Attorney General publicly announced that twenty of these subpoenas have been served on hospitals across the country.  I mean, that's public information.  The hospital here touts their gender-affirming care in their hospital and that's not a secret.  So I am just trying to understand why there is good cause.  I just don't see it.  On this issue, I think maybe the government has a better argument.  So I am just pushing back a little bit here.

MS. STRACHAN:  I appreciate that, your Honor.  Let me

App.85

address that in a couple ways.

First of all, we have the statute itself.  Under 3486, under Section 6 of that -- Subsection 6 of that statutory cite talks about the ability of the government to come in and seek a non-disclosure order on the subpoena.  Section 5 talks about the recipient of that subpoena being able to fight any NDO that is issued, and I suggest to you the fact that the statute contemplates the government moving for an NDO and the recipient having the ability to dispute it if certain factors are met, and we put them in our papers, they include two that are applicable here which involve the endangerment to the life or physical safety of any person and intimidation of potential witnesses.  Those are the two criteria that are met here.

I suggest, your Honor, that the reason that Congress gave the government the ability to seek an NDO and the recipient the ability to dispute it is because that is the norm.  That is how things normally work and it goes to show what an Alice in Wonderland world we have found ourselves in, that the government is coming before you without a single case cite saying that there is a public right of access to health care fraud investigation that's ongoing and non-public.

The fact that the Attorney General issues a press release, which is contrary to longstanding department practice, it is contrary to Justice Manual Section 17.40, DOJ generally will not confirm the existence of or otherwise comment about

ongoing investigations, it's contrary to the model Rule of Professional Conduct 3.8(f) that refers to a prosecutor's special responsibilities, the fact that they have come in here and they argue that the cat is out of the bag but they are the ones that opened the bag and they are not supposed to have done that, your Honor, and Boston Children's has rights and that's why they have come before us, and there is both Supreme Court and First Circuit precedent that I think is instructive for the Court that contemplates that in a pre-charge investigation, sealing is appropriate here and it is, I think, quite analogous to Rule 6(e), privacy, the reputational harm that can be suffered as a result of being named as a recipient of a subpoena is very real, whether it's a grand jury investigation or whether it's a HIPAA subpoena.

And so if I could just point your Honor not only, obviously, as I said, the Supreme Court, we cite this in our papers, we talk about the *Douglas Oil* decision and Justice Powell talking about the reputational harm that can be inflicted upon a recipient of subpoena pre-charge, they're entitled to have the government conduct those investigations outside of public view.

And we also have the *United States v. Kravetz*, which is a First Circuit decision here in which we have the court addressing a Rule 17(c) subpoena served in a criminal prosecution, and in that decision we have the First Circuit

holding, this is Judge Howard, that there is no presumptive right of public access to a subpoena or any related materials issued in connection with an underlying criminal prosecution, your Honor, and so I direct the Court to that as well.

And I think the reputational harm that can befall a hospital, and despite the fact that we do have DOJ's press release, there are news articles, we have a press secretary re-tweet, but there has been no official confirmation by DOJ that there is a subpoena that has been issued to Boston Children's, and so I think that's very important, it's very important to Children's.

In addition to the reputational harm that the court talks about, and we have that and we talk about in the First Circuit *In Re Gitto Global Corporation,* which is cited in our papers, courts routinely exercise their discretion in civil matters to abrogate the right of public access where doing so is necessary to prevent judicial records from being used to gratify private spite or promote public scandal which I suggest is exactly what is happening here, your Honor.  We also have the *Douglas Oil* decision of the Supreme Court which talks about the public ridicule for a potentially innocent party.

But here we have a second independent basis for sealing that is more acute and in many ways more real to Boston Children's and that is the threat to the personal safety of the hospital, its providers and its patients.  There is -- we set

forth in our papers that there is just a torrent of online attacks that have seen an uptick since recent announcement of DOJ's investigation into this care.  We cite some in our papers.

I just would like to point your Honor to a few more. We have just on August 8 a user who posted videos of Boston Children's providers discussing gender-affirming care.  There were hundreds of adverse or threatening comments made in response including a GIF "kill them all."  Another user comments, "Dude needs a bullet to the face and the doctors." Another user replied to the comment, "Public hangings need to be a thing once more."  On July 28, a user tags Boston Children's and states The hospital is "mutilating children," that Boston Children's is "lucky that @agpambondi is going to take care of you so I dont.  You F-ing Godless perverts."  The same day another user writes, "Hope Pam brings these evil ass mother F-ers down.  How about we just issue legal kill orders to special forces and take care of this F-ing problem once and for all.  These are our children, our future."  We have posts calling for the bombing of Children's Hospital, the fact that gender-affirming care should be punishable by death.  "End it or get ended."  "Burn it down."

In addition, we don't just have words, your Honor.  We have criminal prosecution that was brought by the U.S. Attorney's Office last year in this district against a woman

who called in a bomb threat to Boston Children's which the government, I would suggest, makes light of because she didn't actually bomb the hospital and she was prosecuted in this district.  It caused a shutdown in the hospital, and I do not think that it could be overstated the fear that it causes for the hospital, its doctors, the people that work there, the patients, and all whom Boston Children's serve; and the fact that the government now -- you know, the U.S. Attorney's office is not here in this courtroom, but were they to be, I wonder what they would think about the fact --

THE COURT:  So, Ms. Strachan, I am just going to interrupt you a little bit here because I do understand the concern and I empathize with the sort of fear and other feelings that these comments from the public create, but it's not like we're foreign to this.  You know, as participants in this system, we get these threats for advocating a certain position or a case involves some controversial topic and it creates -- and I do agree with you to some degree that given the current climate things do seem wretched and it's no secret that -- I will just use something closer to home which is I think every judge in this district and most judges across the country get a lot of these similar comments and not only in public forums but sent directly to them and their family members, right, but does that mean that we issue our decisions without a name, with just the court?  Do we -- how far do we go

in terms of -- I mean, the rule is that, absent exceptions, that we operate in the light, we don't operate in the dark, and so it has to be more than an exception rather than -- there is some merit to the government's argument that if this is enough to not just -- and by the way, there are other tools and mechanisms available to protect and address some of these concerns, but if I seal entire cases, and if this is enough for me to do that, then the exception somehow swallows the rule, right?

MS. STRACHAN:  I understand your perspective, your Honor.  I respectfully disagree that this is the rule in an ongoing criminal investigation.  I think that the case law that we are all thinking about and that is being cited is civil, it is in civil cases.  I think that there is a heightened protection and need for secrecy in criminal investigations which is why the U.S. Attorney's office seeks the NDOs in this courthouse that it does.  It's why they ask for sealing in matters that are ongoing investigations.  It is both to protect their investigations but also to protect the innocent.

In addition, your Honor, and I understand and I am very cognizant of the fact of my signature on this brief, and you know, should this brief become public, I thought very deeply about the fact that my name will be out there and will be included in this.  I understand it, your Honor, but it's not just words.  It's not just social media posts.  It is a bomb

threat called into the hospital that warranted a criminal prosecution.  It is packages that have been sent to physicians' homes.  It is a man who stood in the lobby on Inauguration Day screaming and threatening hospital staff, and we can provide further information about these things to the Court if this is the linchpin for your decision, but I believe the statutory text of 3486 contemplates this exactly, this precise situation when it talks about the endangerment to the life or physical safety of any person or the intimidation of any witnesses.

As we've set forth, your Honor, I believe there is good cause here.  Not every matter -- I agree that this court needs to conduct its business in the light of day and I understand that, but there is good cause, we believe the record demonstrates, and we will provide further information if the Court requests it that there is good cause for sealing this matter and the fact that DOJ has flipped its arguments on its head about the fact that it now claims that ongoing criminal investigations, there is a public right of accesses to litigation about, and I think it would be interesting to see them if they had to live with that position in all the other times they've come before this court and asked for secrecy in criminal cases, and make no mistake, this is a criminal subpoena.  I worked upstairs for eighteen years and the entire eighteen years I was there, I either was in the health care fraud unit or I supervised it, and I have signed countless

HIPAA subpoenas.  They are criminal subpoenas, and in every case, we seek secrecy in our ongoing criminal investigations before they are charged.

The fact that the argument has been completely flipped on its head goes to show that the purpose here of this investigation is intimidation.  The purpose is to threaten Boston Children's and other providers of gender-affirming care and to threaten them to stop a provision of care to fulfill a campaign promise to end a type of medical care that this administration disfavors.

They've thrown a match at the hospital.  They now want to throw kerosene on the fire because Boston Children's is standing up for its right to treat all of its patients; and for that reason, your Honor, we urge the Court not to countenance this on its watch.  I am happy to answer any other questions if you have any.

THE COURT:  I am all set.  Thank you.

MR. RUNKLE:  Thank you, your Honor, just briefly.  I'd like to mostly rely on the papers here.  I do think that I really do want to respond to some of the tone that I just heard which I am concerned about because what happened here was that they asked to seal this.  We went and looked at the controlling law and the fact that there are numerous HIPAA subpoenas that are litigated in public including many of the ones that are cited in the papers in this case and we feel like it just

doesn't meet the standard, and the standard is actually given by the judicial conference about sealed cases. They didn't ask to proceed under a pseudonym. They didn't ask to redact sensitive materials in the documents they filed, which there aren't any. There is no sensitive, you know, information there about patients or anything like that which we would happily agree under proper circumstances to seal.

What they asked to do is to litigate entirely in secret which there is a special standard for which is that sealing the entire case file is required by statute or rule or is justified by showing of extraordinary circumstances, and the absence of narrower, feasible and effective alternatives such as sealing discrete documents or redacting information, and they didn't ask to do any of that and so that's -- we just felt like they didn't meet the standard and that's why we're here opposing the motion. It's not to intimidate them. It is not to carry out some improper purpose. It is because we don't feel like they meet the standard, and I think that your Honor's comments are on target on those topics.

If there is something that we need to seal, we can seal it, but I don't believe that the entire case file should be sealed. Thank you.

THE COURT: All right, thank you very much. I will take it under advisement.

(A-D-J-O-U-R-N-E-D)

App.94

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Jamie K. Halpin_____        August 31, 2025____
Jamie K. Halpin, CRR, RMR, RPR          Date
Official Court Reporter