# EXHIBIT 19

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| **WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 26-532 (JEB)** |
| **FEDERAL TRADE COMMISSION**, *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This case involves another nonprofit organization — the World Professional Association for Transgender Health (WPATH) — working in the field of transgender health and medicine that has been the target of a Federal Trade Commission investigation and has received a Civil Investigative Demand for records. As the Court has already considered the issues presented in this case in its Opinion (also released today) granting preliminary relief to the Endocrine Society, <u>Endocrine Soc'y v. FTC</u>, No. 26-512, ECF No. 38 (Endocrine PI Op.) (D.D.C. May 7, 2026), it will incorporate those conclusions and thus need not repeat its full analysis here. Like the Endocrine Society, WPATH has shown it is likely to succeed on its First Amendment retaliation claim against the FTC. As the other preliminary-injunction factors also favor Plaintiff, the Court will award the same relief as the Endocrine Society obtained — namely, it will preliminarily enjoin the FTC from implementing its CID against WPATH.

1

## I.   Background

WPATH is a nonprofit organization "dedicated to promoting science-based medical care, education, research, and public policy in transgender health."  ECF No. 3-2 (Leo Lewis Declaration), ¶ 3.  As part of its educational and academic activities, it publishes and updates the Standards of Care, which "articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people."  Id., ¶ 9.  Those Standards, including the most recent version, rest on the premise that there exist "people with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth."  ECF No. 32-1 (SOC8) at 55.  That premise underlies WPATH's educational, research, and advocacy efforts, including the symposia it hosts, mentorship programs it offers, and public statements or amicus briefs it files relating to transgender health.  See Lewis Decl., ¶ 18.

The Trump Administration, and the heads of certain agencies within the Executive Branch, take the contrary view and disclaim the existence of gender identities that diverge from a person's sex assigned at birth and the suitability of treatment of such divergence.  See, e.g., Protecting Children from Chemical and Surgical Mutilation, Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (Feb. 3, 2025) (lamenting "dangerous trend" of medical treatments premised on "radical and false claim that adults can change a child's sex through a series of irreversible medical interventions").  This Court's Opinion in the parallel suit brought by the Endocrine Society details the range and depth of animus displayed by the President and agency leadership toward gender-affirming care.  See Endocrine PI Op. at 3–7.  The Administration has singled out WPATH as an organization that "lacks scientific integrity" and "spur[s]" "blatant harm done to children."  90 Fed. Reg. at 8771.

2

The FTC has joined the rhetorical campaign against proponents of the view that some individuals are transgender and require medical treatment for that condition. The Court refers again to the evidence catalogued in its prior Opinion, including hostile denunciations of "being transgender" as contrary to "biological truth" at an FTC workshop on gender-affirming care for minors. See Endocrine PI Op. at 7 (quoting Endocrine Soc'y, No. 26-512, ECF No. 9-22 (FTC Workshop Tr.) at 30, 61 (D.D.C. Feb. 24, 2026)).

In January 2026, the FTC issued Civil Investigative Demands to WPATH and two other nonprofit proponents of gender-affirming care — the Endocrine Society and the American Academy of Pediatrics. See ECF No. 1 (Compl.), ¶¶ 113, 130. The CIDs each sought to determine whether the target organization "ha[s] made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment" and demanded a swath of documents reflecting internal and external communications from the recipients. See ECF No. 3-8 (CID) at ECF p. 4; see also Endocrine Soc'y, No. 26-512, ECF No. 9-25 (Endocrine CID) at ECF p. 6 (D.D.C. Feb. 24, 2026); Am. Acad. of Pediatrics v. FTC (AAP), 26-508, ECF No. 1-1 (AAP CID) at ECF p. 6 (D.D.C. Feb. 17, 2026). All three CID recipients brought actions in this district and sought preliminary relief in part on the ground that the FTC was retaliating against each organization for its protected speech in support of gender-affirming care. See ECF No. 3-1 (PI Mot.); Endocrine Soc'y, No. 26-512, ECF No. 9-1 (Endocrine PI Mot.) (D.D.C. Feb. 24, 2026); AAP, 26-508, ECF No. 6 (AAP PI Mot.) (Feb. 20, 2026). The AAP case was assigned to Judge Christopher R. Cooper and the other two to this Court. This Court held a hearing on April 7, 2026, on both the instant Motion and the Endocrine Society's parallel request for a preliminary

injunction barring the FTC from implementing or enforcing its CID.  See Minute Entry of April 7, 2026.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. NRDC, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20).  "[I]f the government is the opposing party," the latter two factors "merge."  Glob. Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025).

"The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted."  Hosp. Staffing Sols., LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).  A court "may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or a likelihood of success on the merits," making those two factors "particularly crucial."  Luokung Tech. Corp. v. Dep't of Def., 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (emphasis in original) (quotation marks omitted).

## III.    Analysis

Little distinguishes the key legal and factual features of WPATH's claim from the Endocrine Society's.  The Court will nonetheless discuss the relevant differences and their impact on its analysis of the preliminary-injunction factors while referring to its reasoning in the

parallel case Endocrine Society v. FTC where overlap exists.  As in its prior Opinion, the Court finds that preliminary relief is warranted on WPATH's First Amendment retaliation claim alone and thus does not consider its other claims.  See Endocrine PI Op. at 11.

      A.      Likelihood of Success on Merits

To start, the FTC's contentions that WPATH is unlikely to succeed on the merits of its claim because the Court lacks jurisdiction and WPATH has no cause of action fail for the same reasons the Court discussed in its Opinion in Endocrine Society v. FTC.  There, the FTC raised nearly identical arguments to those in this case.  Compare ECF No. 32 (Gov. Opp.) at 17–23, with Endocrine Soc'y, No. 26-512, ECF No. 30 (Endocrine Gov. Opp.) at 14–21.  The Court reaffirms that when a plaintiff alleges "existing and continuing First Amendment harms" caused by the FTC's investigative actions, including the issuance of a CID, the FTC Act does not deprive district courts of jurisdiction.  Media Matters for Am. v. FTC, 2025 WL 2988966, at *4 (D.C. Cir. Oct. 23, 2025); see also Endocrine PI Op. at 14.  A plaintiff may, moreover, sue to enjoin executive officers from maintaining such unconstitutional actions, Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015); see also Endocrine PI Op. at 18, and the FTC Act has not foreclosed that ability here.  See Endocrine PI Op. at 19.

WPATH has demonstrated that its leadership second-guesses whether to make statements or undertake activities in light of the CID and that it has ceased "certain educational and certification programs" for fear of Government targeting or infringement on members' privacy.  See ECF No. 3-4 (Asa Radix Declaration), ¶¶ 21, 24.  As these ongoing harms stem from the FTC's own investigative actions, they place WPATH's claim in the same category as other First Amendment claims against the FTC that courts in this district — not to mention the D.C. Circuit

5

— have reasoned may go forward. Media Matters, 2025 WL 2988966, at *4; Endocrine PI Op. at 17.

WPATH also presents similar evidence supporting its likelihood of success on its First Amendment claim as the Endocrine Society did. To refresh, WPATH must show that 1) it "engaged in conduct protected under the First Amendment"; 2) the Government's alleged retaliatory action was "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and 3) there exists "a causal link between" the protected speech and the retaliatory action. Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted). As it did in its briefing on the Endocrine Society's Motion, the FTC concedes that WPATH "engages in some protected First Amendment conduct," leaving only the latter two elements at issue. See Gov. Opp. at 24; see also Endocrine Gov. Opp. at 21.

WPATH has demonstrated the CID's chilling effect on its protected speech. Its declarations describe an undercurrent of fear among staff and members following the CID: fear that "statements . . . will be misrepresented and distorted . . . if WPATH is forced to disclose internal discussions and information to the FTC," fear that specific members will become targets, and fear that academic professionals will not openly discuss their ideas given the possibility of turnover. See ECF No. 3-6 (Scott Leibowitz Declaration), ¶¶ 38, 41; see also Radix Decl., ¶¶ 18–19 (detailing longstanding importance of confidentiality in member communications). That fear is not extrapolation to some future action: the CID demands "all Documents reflecting or constituting Communications with other organizations, institutions, or individuals regarding the development and publication of SOC 8," and all documents "including tests, reports, studies, scientific literature, and written opinions" that WPATH relied upon to assert that pediatric-gender-dysphoria treatment is safe and effective. See CID at ECF pp. 5–6. Those two items

6

alone encompass a vast swath of academic or research discussion in which WPATH engages. Where an agency "demands" a nonprofit's "private member" information, it "encourage[s] groups and individuals to cease or modify protected First Amendment [activity] the government disfavors." First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. ___, 2026 WL 1153029, at *8 (2026). The threat is all the greater when the agency seeks the substance of member communications and, in so doing, predictably stifles future speech. What is more, the CID seeks WPATH's future communications, making the chilling effect readily discernible. See CID at ECF p. 4. WPATH is likely to succeed on this element.

Plaintiff has also demonstrated that it is likely to succeed on establishing a causal link between the FTC's retaliatory motive and its decision to issue a CID. As the Court explained in Endocrine Society, WPATH must show that such retaliatory motive was the but-for cause of the FTC's action. See Endocrine PI Op. at 23–24 (citing Nieves v. Bartlett, 587 U.S. 391, 399 (2019)). The circumstantial evidence of animus towards WPATH overlaps significantly with the record in the Endocrine Society's case, as most of it concerns the "pattern of litigation and information demands," along with articulated hostility towards proponents of gender-affirming care. Id. at 30 (quoting Media Matters, 2025 WL 2988966, at *6); see also id. at 24. WPATH has been explicitly identified as one of those targeted proponents. See, e.g., 90 Fed. Reg. at 8771 (discussing WPATH); FTC Workshop Tr. at 20–21 (discussing WPATH's "activist agenda" and "fraud" committed "against the American public). The Court finds that, in line with its reasoning in Endocrine Society, WPATH has presented circumstantial evidence sufficient to establish that retaliation for its protected speech motivated the FTC's issuance of a CID. While the FTC could show later on that it would have issued the CID regardless of its retaliatory motive, it has not done so on this preliminary record.

The FTC's attempted demonstration of a legitimate purpose sounds in the same register as its arguments opposing the Endocrine Society's motion and falls similarly flat. The Commission correctly states that it is not limited to "requesting information from potential wrongdoers only," and it asserts that it is investigating unfair trade practices by WPATH or a third party. See Gov. Opp. at 28. It has not, however, articulated "a plausible connection between the CID and the suspected violations that concern the FTC." Endocrine PI Op. at 27. As with its purported investigation of the Endocrine Society, the FTC has failed to offer a logical justification connecting WPATH to commercial representations and the supposed violators. Id. at 28. There is thus little circumstantial evidence providing a basis for the Court to conclude that the FTC would have issued the CID absent a retaliatory motive.

The FTC contends that "WPATH, in particular, may have information relevant to the Commission's investigation." Gov. Opp. at 26. It points to documents that it argues "suggest that WPATH at times acted . . . to preserve insurance coverage and avoid regulatory scrutiny" of pediatric-gender-dysphoria treatment, and that it "attempt[ed] to suppress" adverse research. Id. The existence of hidden research or intentional mischaracterizations could indeed offer a logical basis for an investigative demand. The Commission, however, points to no record evidence supporting either rationale. Id. at 26 (citing only id. at 14–15). It did submit two communication threads released as part of discovery in unrelated cases in different districts. Id. at 8. The first is an exchange of edits and emails between academics regarding a WPATH statement on the medical necessity of gender-affirming care. See ECF No. 32-2 (Edits Email). They discuss the concept of medical necessity as a threshold requirement for various programs in the United States, including insurance coverage and prison medical care, and the need to include "medical necessity" in the statement. Id. at 43. The other document is an email exchange about ongoing

8

research; in the midst of the discussion, one participant references "having issues with this sponsor [WPATH] trying to restrict our ability to publish."  ECF No. 32-3 (Research Email) at ECF p. 3.

Neither document transforms the FTC's investigative actions into logical ones evincing a legitimate purpose.  The first concerns drafts of language WPATH later adopted; the second, an unspecified frustration with Plaintiff.  The FTC has provided no context or logical link connecting this evidence to concerns about "fabricat[ion]" or "untoward influence" that would justify a CID "that seeks extensive internal and external communications."  Endocrine PI Op. at 30.  And, as the Court previously reasoned, concerns about verifying WPATH's public statements can be addressed by consulting the lengthy bibliography accompanying its Standards of Care.  Id.; see also SOC8 at S178–246.  The Court's concern about the mismatch between the FTC's stated investigatory aims and its tenuous path to uncovering violations remains unabated.  On this preliminary record, with extensive evidence of animus and wafer-thin justifications lacking evidentiary support, it finds that WPATH is likely to demonstrate a causal link between its protected speech and the FTC's issuance of the CID.  Plaintiff thus prevails on this first "crucial" factor.  Luokung, 538 F. Supp. 3d at 182.

B.     Other Factors

As to irreparable harm, the declarations submitted by WPATH describe interruptions to its "educational programs," "mentorship programs," and the closing of an online meeting for discussion of transgender-health topics.  See Lewis Decl., ¶ 3; Radix Decl., ¶ 24.  Members of WPATH's Board of Directors describe hesitancy in their communications given the possibility of turnover to the FTC.  See ECF No. 3-5 (Loran Schechter Declaration), ¶¶ 17–20; Leibowitz Decl., ¶¶ 38–41.  Contrary to the FTC's assertion that such harms "stem[] from WPATH's own

choices or speculation about the actions of third parties," Gov. Opp. at 44, disruption of First Amendment activity is an "inevitabl[e]" effect of government scrutiny. First Choice, 2026 WL 1153029, at *6 (quoting Buckley v. Valeo, 424 U.S. 1, 65 (1976)). Because WPATH has made it "'apparent'" that its "'constitutional rights are violated,'" it has "easily clear[ed] the irreparable-harm requirement to warrant preliminary relief." Endocrine PI Op. at 31 (quoting Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).

The remaining factors also militate in Plaintiff's favor. As it did when considering the Endocrine Society's Motion, the Court analyzes the balance of equities and public-interest factors together because they "merge if the government is the opposing party." Media Matters for Am. v. Paxton, 138 F.4th 563, 585 (D.C. Cir. 2025). WPATH's interest in "vindicating the right to be free of retaliation for its protected speech" is similarly compelling, and the public interest in the exercise of free-speech rights supports an injunction. See Endocrine PI Op. at 32. The Government's interest in enforcing the law cannot overcome those interests, especially because it remains free to deploy other investigative tools and because this relief is not permanent. Id. at 33. With all factors counseling in favor of relief, the Court will grant WPATH's Motion to preliminarily enjoin operation of the CID. As with the Endocrine Society, it will deny WPATH's request to issue a broader injunction barring the FTC from "taking further unlawful action interfering with or retaliating against WPATH[]." ECF No. 3 (PI Mot. Mem.)

Finally, the Court will require WPATH to post a $1.00 bond, in keeping with Federal Rule of Civil Procedure 65(c)'s requirement and the recognition that most costs stemming from the ultimate enforcement of the CID will fall on WPATH. See Endocrine PI Op. at 33. The Court will also deny the Government's request to stay its preliminary injunction pending appeal,

<u>see</u> Gov. Opp. at 45, because its injunction requires no action from either party and only enjoins the FTC from further action regarding the CID.  <u>See</u> Endocrine PI Op. at 34.

**IV.  Conclusion**

The Court will grant WPATH's Motion in large part and preliminarily enjoin the FTC from implementing or enforcing its issued CID.  It will deny the Motion to the extent it seeks further relief.  An Order so stating will issue this day.

/s/ <u>*James E. Boasberg*</u>
JAMES E. BOASBERG
Chief Judge

Date:  <u>May 7, 2026</u>

11