## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF CONNECTICUT; STATE OF ILLINOIS; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF RHODE ISLAND; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-CV-12162-AK |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA JO BONDI, in her official capacity as United States Attorney General; and the UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM AND ORDER
## ON MOTION TO DISMISS

**ANGEL KELLEY, D.J.**

Fifteen states, the Governor of Pennsylvania, and the District of Columbia ("Plaintiffs" or

"Plaintiff States") brought this action against President Donald J. Trump, Attorney General

Pamela Jo Bondi, and the United States Department of Justice ("DOJ," collectively

"Defendants") challenging the President's Executive Order 14,187, and two DOJ memorandums.

1

[Dkt. 1]. Plaintiff States sue under the Administrative Procedure Act ("APA") alleging the Attorney General and DOJ's actions were arbitrary and capricious; contrary to law and in excess of statutory authority; and contrary to constitutional right, power, privilege or immunity under the Tenth Amendment. Plaintiff States further allege that Defendants' actions violate the Tenth Amendment and seek declaratory judgment under 28 U.S.C. § 2201. Defendants filed a Motion to Dismiss [Dkt. 81] arguing that Plaintiffs lack standing, the memorandums are not final agency actions and announce policies that are committed to agency discretion by law, and Plaintiffs fail to state a claim under the Tenth Amendment. For the following reasons, Defendants' Motion to Dismiss [Dkt. 81] is **DENIED**.

## I.     BACKGROUND

Defendants do not contest Plaintiffs' factual allegations in the Complaint, [Dkt. 1], or Plaintiffs' exhibits, [Dkt. 87], which were submitted along with Plaintiffs' Opposition to Defendants' Motion to Dismiss, [Dkt. 86]. As Defendants present only legal challenges to Plaintiffs' claims, the following facts are taken from the Complaint or Plaintiffs' exhibits and accepted as true for the purposes of this Motion.

### A.     Gender Identity and the Provision of Gender-Affirming Care

We start by defining terms. Transgender individuals are people whose gender identity[1] differs from their sex[2] assigned at birth. Non-binary individuals have a gender identity that does not fit within the binary construction of either "male" or "female." Intersex individuals have reproductive or sexual anatomy that does not fit into an exclusively male or female (binary) sex

---

[1] Gender identity is someone's internal sense of belonging to a particular gender. Gender is the characteristics of women, men, girls and boys that are socially constructed. This includes norms, behaviors, and roles associated with being a woman, man, girl, or boy.

[2] Sex is based on anatomical and physiological traits that include external genitalia, secondary sex characteristics, gonads, chromosomes, and hormones.

classification.  Approximately 1.3 million adults in the United States (about 0.5% of the population) identify as transgender.  Approximately 300,000 youth between the ages of thirteen and seventeen identify as transgender (about 1.4% of that age group).  There are hundreds of thousands of intersex people in the United States.

Like everyone else, transgender, nonbinary, and intersex ("TGNBI") people's health and well-being depend upon their ability to live in a manner consistent with their gender identity. For some TGNBI people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress, recognized as "gender dysphoria" by the American Psychiatric Association's *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition, Text Revision.  To be diagnosed with gender dysphoria, the incongruence must persist for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.  Treatment for gender dysphoria aims to resolve the distress associated with the incongruence between a person's sex assigned at birth and their gender identity and is medically necessary care.

Treatment for gender dysphoria comes in a number of forms.  For example, social transitioning is the process by which TGNBI people begin to live in a manner consistent with their gender identity.  This can include using a new name and pronoun that corresponds to their gender identity, and adopting dress, hair, or cosmetic styles that more authentically reflect their gender identity.  Social transitioning is typically the first, and sometimes the only, step a TGNBI adolescent takes in assuming their gender identity.

Individuals may also seek medical intervention to address their gender dysphoria. Medical intervention for adolescents comes after an extensive assessment process by a licensed physician and licensed mental health provider to ensure that any such intervention is medically

necessary for the patient, and that the patient and their family are adequately informed of any risks that accompany such treatment.  Medical intervention to address gender dysphoria may include puberty-delaying medication, hormone treatment, and surgery.  The Court will use the term "gender-affirming care" to refer to the medical interventions used to treat gender dysphoria that support and affirm an individual's gender identity.  These interventions include puberty-delaying medication, hormone treatment, and surgery.  These treatments are also prescribed to treat patients with diagnoses other than gender dysphoria.  For example, puberty-delaying medications are used to treat precocious puberty, testosterone is prescribed for hypergonadism, and masculinizing chest surgeries are a treatment for gynecomastia (enlarged breast tissue in males).

Untreated gender dysphoria can substantially affect one's quality of life, including causing symptoms of depression and anxiety, substance use disorders, a negative sense of well-being, poor self-esteem, and an increased risk of self-harm and suicidality.  Delaying gender-affirming care until a patient is nineteen years old can cause significant harm.  Not only are they denied medical treatment that could alleviate their anxiety, depression, and other symptoms of their gender dysphoria, but it is medically recognized that their distress is also likely to worsen while they wait.  Without treatment, adolescents diagnosed with gender dysphoria will undergo puberty and the associated physiological changes typical of those with their sex assigned at birth, which do not correspond to their gender.  That experience may amplify their gender dysphoria, cause permanent, unwanted changes to their bodies, and may increase the costs and complications associated with obtaining such healthcare after they turn nineteen.

Medical decisions about healthcare services for adolescents with gender dysphoria are made in concert with medical professionals, who consult with individual patients and their

families or caregivers, where required, and recommend an appropriate course of treatment. Patients' consent is always required to receive gender-affirming care.  Treatment for individuals under the age of eighteen must comply with state law, which generally requires that treatment decisions occur only with the consent and participation of parents or legal guardians.  In all Plaintiff States, residents who are eighteen years old are legal adults who have legal authority to make medical decisions for themselves.

Many major medical organizations, relying on extensive clinical experience and research findings, have recognized the benefits of providing gender-affirming medical care (including puberty-delaying medications, hormone replacement, and, in rare instances, surgery) when appropriate to improve the symptoms of gender dysphoria in adolescents.  In Plaintiff States, healthcare providers in hospitals and other medical facilities follow and continue to use evidence-based, well-researched clinical practices and medical guidelines to assess, diagnose, and treat patients with gender dysphoria.  Healthcare providers in Plaintiff States have an ethical and legal obligation to provide competent healthcare to their patients, including adolescents diagnosed with gender dysphoria.

### B.    Plaintiff States' Laws and Regulations

The vast majority of Plaintiff States have enacted laws, policies, and protections for TGNBI residents, including those under nineteen years of age.  These protections are wide-ranging.  For instance, Massachusetts, New York, and Illinois provide the right to access medically necessary healthcare regardless of gender identity.[3]  Meanwhile, at least ten Plaintiff States provide protections from discrimination on the basis of either gender identity or medical

---

[3] See e.g., Mass. Gen. Laws c. 272, §§ 92A, 98; Mass. Div. of Ins. Bulls. 2021-11, 2014-03; N.Y. Comp. Civ. R. Regs. tit. 9, § 466.13, tit. 10, §§ 405.7(b)(2), (c)(2), 505.2(l)(2); 410 Ill. Comp. Stat 50/3(a); 735 Ill. Comp. Stat 40/28-10; 215 Ill. Comp. Stat 5/356z.60(a); 50 Ill. Admin. Code § 2603.35(a).

diagnosis (e.g., gender dysphoria) when receiving healthcare.[4]  Many Plaintiff States have

mandated insurance coverage for gender-affirming care,[5] and some have even enacted "shield

laws" that protect patients and providers who provide or access gender-affirming care within

Plaintiff States from criminal and civil liability in an out-of-state jurisdiction.[6]  Last, but

certainly not least, many Plaintiff States have either regulations or laws that require transgender

and gender diverse individuals in state custody to have access to medically necessary care.[7]

For instance, in California, healthcare is a right secured by state law. Cal. Civ. Code §

1798.301.  California law also prohibits discrimination on the basis of gender identity, gender

expression, transgender status, gender dysphoria diagnosis, or intersex status in the provision of

healthcare services. Cal. Civ. Code § 51; Cal. Gov't Code §§ 11135, 12926; Cal. Code Regs. tit.

2, §§ 14000 et seq.  In California, gender-affirming care is "medically necessary health care that

---

[4] See e.g., MICH. COMP. LAWS ANN. § 37.2302; N.J. STAT. ANN. §10:5-5(rr); N.J. STAT. ANN. §10:5-12(f); N.M. STAT. ANN. 1978 § 24-34-3(A) (West 2023); N.M. STAT. ANN. 1978 § 24-34-3(B) (West 2023); 43 PA. STAT. AND CONS. STAT. ANN. § 952, 954 (West 2022); 16 PA. CODE § 41.204, 41.206 (2023); 28 PA. CODE § 51.11-51.13 (1998); WIS. STAT. ANN. § 106.52 (West 2026); N.Y. CONST., art. I, § 11(a); N.Y. Exec. Law § 296 et. seq. (McKinney 2025); N.Y. COMP. CODES R. REGS. Tit. 10, §§ 405.7(b)(2), (c)(2); N.Y. COMP. CODES R. REGS. Tit. 9, § 466.13; N.Y. PUB. HEALTH LAW § 2803(1)(g) (McKinney 2024); CONN. GEN. STAT. ANN. § 46a-59a. (West 2025); 775 ILL. COMP. STAT. ANN. 5/1-102 (West 2018); 775 ILL. COMP. STAT. ANN. 5/1-103(O), (O-1) (West 2018); 775 ILL. COMP. STAT. ANN. 5/5-101(A)(6) (West 2018); Del. Gender Identity Nondiscrimination Act of 2013 (SB 97); D.C. CODE ANN. § 2-1402.31 (West 2022); D.C. CODE ANN. § 2-1401.02(24) (West 2022); ME. REV. STAT. ANN. Tit. 5, § 4552 et seq. (2021); ME. REV. STAT. ANN. Tit. 22, § 1508 (2023).

[5] See e.g., N.J. STAT. ANN. § 17B:26-2.1ii (West 2017); N.J. STAT. ANN. § 17:48A-7ll (West 2017); N.J. Dep't of Banking & Ins., Bull. No. 23-05 (2023); Pa. Ins. Dep't Notice Regarding Nondiscrimination, 46 Pa.B. 2251 (Apr. 30, 2016); WIS. ADMIN. CODE Ins. § 6.55 (2026); 215 ILL. COMP. STAT. ANN. 5/356z.60(a); 50 ILL. ADMIN. CODE 2603.20, 2603.35(a), 2603.40; 410 ILL. COMP. STAT. ANN. 50/3(a); DEL. CODE ANN. Tit. 18, § 3571N (West 2013); DEL. CODE ANN. Tit. 18, § 7207 (West 2013); ME. REV. STAT. ANN. Tit. 22, § 3174-MMM (2023).

[6] See e.g., 735 ILCS 40/28-5, et seq.; Mass. Gen. Laws c. 12, § 11 I 1/2(c); Conn. Gen. Stat. §§ 19a-17e, 52-146w, 52-571m, 54-82i, 52-155a, 54-155a, and 54-162; House Bill 205, 153rd Del. Gen. Assembly (2025); 14 MRS §9001 (Maine); N.J. Exec. Order No. 326 (Apr. 4, 2023).

[7] See e.g., Mass. Dep't of Child. & Fams. Pol'y 2021-01: Gender-affirming Medication Consent Policy, Mass. Dep't Youth Servs. Pol'y on the Prohibition of Harassment and Discrimination Against Youth, Mass. Dep't Youth Servs. Guidelines for Practices with LGBTQI and GNC Youth (Massachusetts); Ill. Dep't Child. & Fam. Servs. Procedures 302, Appendix K, P.T. 2023.07 (Illinois); N.J. Dep't of Child. & Fams., LGBTQI Pol'y, Pol'y Manual, Child Prot. & Permanency, Vol. I, ch. A (rev. Sept. 3, 2024) (New Jersey).

respects the gender identity of the patient, as experienced and defined by the patient." Cal. Welf. and Inst. Code § 16010.2(b)(3); Cal. Civ. Code § 1798.300(c).

In Maryland, state-regulated health insurance carriers are barred from discriminating against individuals on the basis of their sex or gender identity. Md. Code Ann., Ins. § 15-1A-22. This includes prohibitions on refusing, withholding, or denying coverage because of the individual's sex or gender identity. Id. § 15-1A-22(d).  Maryland's Medical Assistance Program, a state public health program for eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities, is required by state law to cover all medically necessary gender-affirming treatment prescribed to a Program recipient in accordance with current clinical standards of care. Md. Code Ann., Health-Gen, § 15-151.

Meanwhile, Rhode Island prohibits discrimination on the basis of sex, gender identity, or gender expression in the provision of healthcare.  State-licensed healthcare facilities are thus prohibited from denying care on the basis of sex, gender identity, or gender expression. R.I. Gen. Laws § 23-17-19.1.  Rhode Island further prohibits discrimination on the basis of gender identity, expression, or gender dysphoria diagnosis in the provision of health insurance regulated by the state. Rhode Island Office of the Health Insurance Commissioner, "Health Insurance Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression," (November 23, 2015).

Plaintiff States have also regulated the medical field in various ways, including by defining the scope of medical practice, requiring medical licenses for practitioners, overseeing and regulating licensed practitioners, and disciplining noncompliant practitioners.  Each state has its own standards and regulations in place to ensure patients receive care consistent with evidence-based medicine.  As just one example, the Delaware Board of Licensure and Discipline

is the state government body that is responsible for licensing and disciplining physicians in

Delaware.  The Board develops standards for professional competency and ensures that

physicians licensed to practice in Delaware provide care within the scope of their practice and

the acceptable standard of care. 24 Del. C. §1700.  The Board may take disciplinary actions

against a physician who, among other things, performs unnecessary medical procedures,

fraudulently bills for medical services, or willfully fails to treat a person under their care. 24 Del.

C. § 1731(b)(3).

### C.    The Federal Government's Actions

Eight days after the start of his current term, on January 28, 2025, President Trump issued

Executive Order No. 14,187, Protecting Children From Chemical and Surgical Mutilation, 90

Fed. Reg. 8,771 (Jan. 28, 2025), ("the EO").

Section 1 of the EO states, inter alia:

> Across the country today, medical professionals are maiming and sterilizing
> a growing number of impressionable children under the radical and false
> claim that adults can change a child's sex through a series of irreversible
> medical interventions. This dangerous trend will be a stain on our Nation's
> history, and it must end. . . .  Accordingly, it is the policy of the United States
> that it will not fund, sponsor, promote, assist, or support the so-called
> "transition" of a child from one sex to another, and it will rigorously enforce
> all laws that prohibit or limit these destructive and life-altering procedures.

Section 2 of the EO, sets out the following definitions:

> (a) The term "child" or "children" means an individual or individuals under
> 19 years of age[;]
> (b) The term "pediatric" means relating to the medical care of a child[; and]
> (c) The phrase "chemical and surgical mutilation" means the use of puberty
> blockers, including GnRH [gonadotropin-releasing hormone] agonists and
> other interventions, to delay the onset or progression of normally timed
> puberty in an individual who does not identify as his or her sex; the use of
> sex hormones, such as androgen blockers, estrogen, progesterone, or
> testosterone, to align an individual's physical appearance with an identity that
> differs from his or her sex; and surgical procedures that attempt to transform
> an individual's physical appearance to align with an identity that differs from
> his or her sex or that attempt to alter or remove an individual's sexual organs

to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

Section 8 of the EO, which is titled "Directives to the Department of Justice," states in part:

> The Attorney General shall:
> (a) review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation;
> (b) convene States' Attorneys General and other law enforcement officers to coordinate the enforcement of laws against female genital mutilation across all American States and Territories; [and]
> (c) prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation[.]

Pursuant to the EO, the Attorney General issued a Memorandum to all DOJ employees, on April 22, 2025, entitled "Preventing the Mutilation of American Children" ("Bondi Memo"). [Dkt. 1-6].  The Bondi Memo's introduction states, in part:

> Gender ideology, masked as science, teaches that children should process adolescent stress and confusion as a case of mistaken identity and that the solution is not to root out and eliminate the underlying condition but to acquiesce in it permanently through life-altering chemical and surgical intervention. That ideology, pushed by far-left politicians, celebrities, politically captured academics, and legacy media, has infected an entire generation of children, who have in turn pushed transgenderism on their peers through social media and other means. . . .

> The medical community, with its roots in hard science, is well-positioned to serve as a bulwark against this sociological disease.  And indeed, parents who are desperate to help their confused, frustrated children have understandably turned to medical professionals for help. Unfortunately, those parents have been betrayed by politically captured profiteers at every step. These "professionals" have deployed junk science and false claims about the effects of so-called "gender-affirming care" to justify the barbaric practice of surgically and chemically maiming and sterilizing children. Between 2019 and 2023, an estimated 14,000 children received "treatment" for gender dysphoria, with more than 5,700 subjected to life-altering surgeries.  The practitioners who provided this so-called "care" profited while their patients were left permanently disfigured, scarred, and sterilized. Those children will struggle for the rest of their lives to overcome regret, and their parents will

struggle equally to overcome the guilt of ruining their children's lives on the false and misleading advice of medical providers who told them that surgery or hormone replacement was the best solution to their problems.

The introduction continues:

The Biden administration bears enormous responsibility for the medical community's fraud and exploitation of parents and children who have fallen prey to radical gender ideology. . . .  President Trump has put a stop to this by issuing his executive order "Protecting Children from Chemical and Surgical Mutilation," signed to halt the exploitation enabled by misguided Biden-era policies. Pursuant to the President's directive, I am issuing the following guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents.

The Bondi Memo then directs the following actions.  First, in a section titled "Enforcement of Laws Outlawing Female Genital Mutilation," the Bondi Memo states:

The Department of Justice will not sit idly by while doctors, motivated by ideology, profits, or both, exploit and mutilate our children. Under my watch, the Department will act decisively to protect our children and hold accountable those who mutilate them under the guise of care. I am putting medical practitioners, hospitals, and clinics on notice: In the United States, it is a felony to perform, attempt to perform, or conspire to perform female genital mutilation ("FGM") on any person under the age of 18.  That crime carries a maximum prison sentence of 10 years per count.  I am directing all U.S. Attorneys to investigate all suspected cases of FGM—under the banner of so-called "gender-affirming care" or otherwise—and to prosecute all FGM offenses to the fullest extent possible.

The Department will also ensure that victims and their families are able to report violations to federal law enforcement to expose violators and receive support. The Federal Bureau of Investigation, alongside federal, state, and local partners, will pursue every legitimate lead on possible FGM cases.

Second, in a section titled "Investigations of Violations of the Food, Drug and Cosmetic Act and False Claims Act" the Bondi memo announces:

The Department of Justice will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations. To that end:

- I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug,

and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." Even if otherwise truthful, the promotion of off-label uses of hormones—including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses—run afoul of the FDA's prohibitions on misbranding and mislabeling.

- I am also directing the Civil Division's Fraud Section to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation. Examples include but are not limited to physicians prescribing puberty blockers to a child for an illegitimate reason (*e.g.*, gender dysphoria) but reporting a legitimate purpose (*i.e.*, early onset puberty) to the Centers for Medicare & Medicaid Services, and hospitals performing surgical procedures to remove or modify a child's sex organs while billing Medicaid for an entirely different procedure. Falsely billing the government for the chemical or surgical mutilation of a child is a violation of the False Claims Act and is subject to treble damages and severe penalties.

Finally, after establishing other policies and initiatives, the Bondi Memo ends by stating: "Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community.  Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind 'gender-affirming care.'  Under my leadership, the Department of Justice will bring these practices to an end."

Following the EO and Bondi Memo, on June 11, 2025, Assistant Attorney General Brett A. Shumate issued a memorandum to all DOJ Civil Division employees with the subject "Civil Division Enforcement Priorities" ("Shumate Memo"). [Dkt. 1-7].  In a section entitled "Protecting Women and Children" the Shumate Memo states:

Attorney General Bondi directed the Civil Division to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors

engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" . . . The Attorney General also directed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." . . .

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq.* In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes.

**D.    Aftermath of the Federal Government's Actions**

On February 3, 2025, after issuance of the EO but before the Bondi and Shumate Memos ("the Memos"), the White House issued a press release announcing that some healthcare facilities canceled or limited the provision of gender-affirming care to adolescents, and stating: "Last week, President Donald J. Trump took executive action to protect American children from irreversible chemical and surgical mutilation.  It's already having its intended effect — preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex." News Release, The White House, President Trump is Delivering on His Commitment to Protect our Kids (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protectour-kids/.  Another press release to the same effect was issued by the White House on March 4, 2025. News Release, The White House, President Trump is Protecting America's Children (Mar. 4, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-is-

12

protecting-americas-children/ (announcing further reduction in the provision of gender-affirming care for adolescents).

On June 2, 2025, the Federal Bureau of Investigation ("FBI") posted on X stating: "Help the FBI protect children.  As the Attorney General has made clear, we will protect our children and hold accountable those who mutilate them under the guise of gender-affirming care.  Report tips of any hospitals, clinics, or practitioners performing these surgical procedures on children." The post links to an FBI tip line that requests information "to report federal crimes."

In a press release on July 9, 2025, the Attorney General stated, "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice."  The press release announces twenty subpoenas "to doctors and clinics involved in performing transgender medical procedures on children." Press Release, U.S. Dep't of Just., Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children (Jul. 9, 2025) ("July 9 Press Release"), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

Also on July 9, 2025, in a Federal Trade Commission workshop devoted to "the dangers of so-called gender-affirming care for minors," one panelist argued that doctors providing medical care to transgender adolescents should be prosecuted.  Fed. Trade Comm'n, The Dangers of "Gender-Affirming Care" for Minors, at 1, 29 (Jul. 9, 2025) ("FTC Workshop"), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf.  In response, fellow panelist and Deputy Assistant Attorney General for Consumer Protection at the Civil Division for the DOJ stated that he was "[w]orking on it" and explained that there was a "legal angle" to the issue that "obviously the Department of Justice is

13

interested in." Id. at 29.  Around this same time, the DOJ launched ongoing criminal investigations against providers of gender-affirming care to minors.  Medical providers of gender-affirming care for adolescents have also continued to receive subpoenas from the DOJ. In some challenges to these subpoenas, the Acting Director of the Enforcement and Affirmative Litigation Branch submitted a declaration repeating the DOJ's interpretation of the FDCA.

Since issuance of the Memos, some health insurance providers have changed their medical malpractice coverage to exclude prosecutions related to the provision of gender-affirming care.  Similarly, for fear of prosecution, many healthcare providers have reduced or eliminated the provision of gender-affirming care to TGNBI individuals under nineteen.  On July 25, 2025, the White House issued another press release announcing some of these closures stating, "[d]uring his campaign, President Donald J. Trump repeatedly pledged to end the irreversible chemical and surgical mutilation of our children: 'We are not going to allow child sexual mutilation.'  For years, politicians have promised to end the barbaric, pseudoscientific practice—but President Trump is the only one who has actually delivered." [Dkt. 1-3 at 2].  Due to these closures, in some regions, there are not enough medical providers to meet the need for gender-affirming care.

Plaintiff States allege that state-run and state-affiliated medical providers in Plaintiff States ("State Facilities") have been impacted by the EO and Memos.  Several Plaintiff States fund and operate public hospitals and clinics and employ medical providers that provide or provided gender-affirming care to patients under the age of nineteen.  As providers of gender-affirming care to adolescents, practitioners at State Facilities fear prosecution under the EO and Memos' policies.

14

Due to this fear, some State Facilities have stopped or limited the provision of gender-affirming care to adolescents. Because many providers are limiting or eliminating gender-affirming care for adolescents, State Facilities that continue to provide gender-affirming care to adolescents are experiencing an influx of new patients and inquiries to initiate care. In addition to the expense of handling new patient inquiries, State Facilities have expended significant resources addressing current patients' increased questions and concerns regarding their ongoing care. State providers have ongoing ethical and legal obligations to these current patients, often imposed by state law, which they cannot fulfill if they cannot prescribe gender-affirming care.

Plaintiff States also have legal obligations to provide medically necessary care to minors in their custody, including minors diagnosed with gender dysphoria. If more gender-affirming care providers close their doors, many Plaintiff States may be unable to satisfy these obligations. It has also become more expensive for some Plaintiff States to provide appropriate medical care to minors in their custody because of the difficulty obtaining gender-affirming care and medical complications resulting from the lack of gender-affirming care.

The medical complications associated with deferred care impacted Plaintiffs in another way. Because of program closures, many adolescents with gender dysphoria cannot obtain care at all, resulting in more complicated and expensive medical needs later in life. The cost of this more expensive medical care will be borne by the States, because they are providers of State Medicaid plans and have enacted protection to ensure gender-affirming healthcare is covered by state-offered health insurance.

Under these pressures, on August 1, 2025, Plaintiff States brought this action challenging the Attorney General and DOJ's interpretation of the Female Genital Mutilation Act ("FGM Act"), the Food, Drug, and Cosmetic Act ("FDCA"), and the False Claims Act ("FCA,"

15

collectively "the Statutes") under the APA, on the grounds that they were arbitrary and capricious, contrary to law and in excess of statutory authority, and contrary to constitutional right, power, privilege, or immunity under the Tenth Amendment. Plaintiff States further alleged that Defendants' actions violated the Tenth Amendment by undermining their sovereign authority to regulate medicine and protect their residents' health and safety.

Finally, Plaintiffs seek a declaratory judgment stating that the FGM Act "does not make it a crime for properly licensed persons, performing in their capacity as medical practitioners, to provide medically necessary healthcare to treat gender dysphoria in adolescents," that the FDCA "does not make it unlawful for healthcare providers to provide medically necessary healthcare, including pharmaceutical and surgical therapies, to treat gender dysphoria in adolescents," and that the FCA "does not make it unlawful for healthcare providers (i) to provide medically necessary healthcare, including prescribing or providing drugs off-label, to treat gender dysphoria in adolescents or (ii) to communicate about this care with adolescents or their caregivers in the context of a provider-patient relationship." [Dkt. 1 ¶¶ 243-45]. Defendants filed a Motion to Dismiss arguing that Plaintiffs lack standing, that the Memos are not final agency actions and announce policies that are committed to agency discretion by law, and that Plaintiffs fail to state a claim under the Tenth Amendment. [Dkt. 81].

## II.    LEGAL STANDARD

Plaintiffs' APA claims and standing are challenged under Rule 12(b)(1). A motion under Rule 12(b)(1) challenges the court's subject-matter jurisdiction. See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). Such a motion may present either a sufficiency or a factual challenge. See id. at 363. Where, as here, a defendant challenges the sufficiency of the complaint, but not the facts alleged in the complaint, courts credit the plaintiff's well-pleaded

16

jurisdictional allegations, draw all reasonable inferences in the plaintiff's favor, and decide the motion accordingly. Id.  "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., 62 F.3d 37, 39 (1st Cir. 1995).

Additionally, Defendants challenge Plaintiffs' Tenth Amendment claims under Federal Rule of Civil Procedure 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Reading the complaint "as a whole," courts must accept all factual allegations as true, while legal conclusions are not entitled to such credit. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  Courts must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). Dismissal is appropriate when the complaint fails to allege a "plausible entitlement to relief." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559).  A court may consider extrinsic documents under certain "narrow exceptions," including "documents the authenticity of which are not disputed by the parties; . . . the official public records; . . . documents central to the plaintiffs' claim; [and] . . . documents sufficiently referred to in the complaint." Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  Evidence offered by the defendant may only "become part of the mix . . . to the extent that [it is] uncontradicted." Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007).

### III.    DISCUSSION

Defendants raise four challenges to the Complaint: (1) Plaintiff States do not have standing to bring their claims; (2) issuance of the Memos was not a final agency action; (3) the Memos articulate enforcement priorities, which are committed to agency discretion by law; and (4) Plaintiffs fail to state a claim under the Tenth Amendment.  The Court will start with a preliminary question, central to Defendants' arguments and critical to the Court's reasoning on several issues—namely, whether the Memos announce enforcement priorities or new interpretations of the Statutes.  Following that analysis, the Court will address each of Defendants' allegations in turn.

### A.    Memorandum Interpretation

Defendants argue that the Memos merely articulate DOJ's enforcement priorities in their arguments addressing standing, finality, and whether the Memos articulate policies that are committed to agency discretion by law.  Meanwhile, Plaintiffs maintain that the Memos articulate new interpretations of federal law.

Beginning with the FGM Act, the Bondi Memo announces a new interpretation that categorizes gender-affirming care as female genital mutilation under the FGM Act.  In its introduction, the Bondi Memo equates the provision of gender-affirming care with "mutilation" and calls gender-affirming care a "barbaric practice of surgically and chemically maiming and sterilizing children." [Dkt. 1-6 at 2].  While discussing the FGM Act, the Bondi Memo states that DOJ will "hold accountable those who mutilate [transgender children] under the guise of care" and directs "all U.S. Attorneys to investigate all suspected cases of FGM—under the banner of so-called 'gender-affirming care' or otherwise—and to prosecute all FGM offenses to the fullest extent possible." [Dkt. 1-6 at 4-5].  Further, the Bondi Memo was issued "pursuant to the

18

President's [EO, "Protecting Children from Chemical and Surgical Mutilation."].  In that executive order, the President defines "chemical and surgical mutilation" to mean "gender-affirming care." [Dkt. 1-5 at 2].  In sum, the Bondi Memo announces a new policy to prosecute gender-affirming care as female genital mutilation because it equates gender-affirming care with mutilating children; was issued pursuant to an executive order that does the same; and ties that understanding to the FGM Act.

The Bondi Memo similarly announces a novel interpretation of the FCA.  The Memo repeatedly implies that gender-affirming care is not bona fide medical care by using scare quotes when referring to gender-affirming medical treatments and care providers. [Dkt. 1-6 at 2].  Those care providers are also painted as liars when the Memo describes them as "politically captured profiteers" who "deploy junk science and false claims" when they provide gender-affirming care. [Id.].  Lest the Memo be described as subtle, it explicitly refers to the support of gender-affirming care as "fraud." [Id. at 3].  The Memo ties this understanding of gender-affirming care to the FCA by directing "the Civil Division's Fraud Section to pursue investigations under the False Claims Act of false claims submitted to federal healthcare programs for any non-covered services related to radical gender experimentation," including "physicians prescribing puberty blockers to a child for an illegitimate reason (e.g., gender dysphoria) but reporting a legitimate purpose." [Id. at 5].  In this pronouncement, the Bondi Memo adopts the view that gender dysphoria is not a legitimate reason to submit a claim to federal healthcare programs, that support for gender-affirming care is premised on lies, and that practitioners who inform patients that gender-affirming care could help them are espousing a fiction.  Thus, the Memo's understanding of gender-affirming care, in application, outlaws gender-affirming care under the FCA by identifying the provision of and support for gender-affirming care as a falsehood.

19

Similarly, the Bondi Memo's understanding of gender-affirming care's validity leads to a new interpretation of the FDCA.  The Memo directs "the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violation of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off- label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" [Dkt. 1-6].  According to the Memo, medical providers give "false and misleading advice" when they inform transgender youth that gender-affirming care, including "surgery or hormone replacement[,] [is] the best solution" for their gender dysphoria. [Id. at 3].  These statements establish a new interpretation of the FDCA under which healthcare providers' medically accurate statements about gender-affirming care are false claims prosecutable under the FDCA, regardless of whether they are made in conjunction with on- or off-label uses of medication.  In practice, this prohibition makes it illegal for healthcare providers to consult with their patients about, and prescribe medication for, treatment of their gender dysphoria.

The Memo's concluding paragraph makes its aims crystal clear.  There, the Memo states that children "will suffer for the rest of their lives because of the unconscionable ideology behind 'gender affirming care.'  Under [Attorney General Bondi's] leadership, the Department of Justice will bring these practices to an end." [Dkt. 1-6].  The Memos' interpretations of the Statutes are perfectly aligned with the Attorney General's goal to "end" gender-affirming care.

By its own admission, the Memo announces a change of policy.  Some of the Biden administration's actions in support of the transgender community are detailed in the Memo.  The Memo then states that "President Trump has put a stop to [this support] by issuing [EO 14,187]" and explains that the EO was issued "to halt the exploitation enabled by misguided Biden-era policies." [Id.].  The Memo identifies itself as part of the project to "stop" the prior

20

administration's policies, by stating that it was made "[p]ursuant to the President's directive." [Id. at 4].[8]

The Shumate Memo directs the Civil Division to "use all available resources to prioritize investigations . . . consistent with [the Bondi Memo's] directives." [Dkt. 1-7 at 3]. By doing so, it incorporates the Bondi Memo's novel statutory interpretation. Therefore, the Shumate Memo is also announcing more than mere enforcement priorities. In this instance, the Court need not rely upon a generous motion to dismiss standard. The facts are clear. It is plain from the text and context of the Memos that they announce new interpretations of federal law.

## B.    Standing

Next, the Court turns to the parties' legal arguments, starting with the jurisdictional claims. Standing under Article III of the Constitution is a threshold jurisdictional requirement that must be satisfied before courts may reach the merits. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must plausibly allege: (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 560-61; Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 372 (1st Cir. 2023). Plaintiffs must have standing to assert each of their claims and each requested form of relief. Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008). Where there are multiple plaintiffs, only one needs to meet the standing requirement. Biden v. Nebraska, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has

---

[8] Though not addressing the Memos directly, at least one court has addressed the DOJ's new interpretation of the FDCA. In re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital, 26-MC-0007 (D.R.I. May 13, 2026). There, the court held that DOJ's interpretation "cannot be squared with" First Circuit precedence and is in "direct conflict" with DOJ's "prior legal interpretations of the same statutory scheme." Id. at *15-16.

21

standing, the suit may proceed.") (citing Rumsfeld v. Forum for Acad. & Institutional Rts., Inc., 547 U.S. 47, 52 n.2 (2006)).

### 1.    APA Standing

Plaintiffs have alleged two theories of injuries which are sufficient to establish standing for their APA claims: direct harms and threat of prosecution.  An injury in fact "must be both concrete and particularized and actual or imminent, not conjectural or hypothetical." Van Wagner Bos., LLC v. Davey, 770 F.3d 33, 37 (1st Cir. 2014) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)).  An injury is concrete if it "actually exists" and is "particular" if it was caused by the defendant and the plaintiff was injured. DiCroce v. McNeil Nutritionals, LLC, 82 F.4th 35, 39 (1st Cir. 2023).

First, the Court will address Plaintiffs' fear of future prosecution.  A threatened future injury may be sufficient to establish standing where the threatened injury is "certainly impending" or there is a "'substantial risk' that the harm will occur." Susan B. Anthony List, 573 U.S. at 158 (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)).  But it does not need to be "literally certain that the harms they identify will come about." Clapper, 568 U.S. at 414 n.5.  Courts do not "require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 50 (1st Cir. 2021) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007)).  Whether the threat of prosecution is sufficiently clear "turns very much on the facts of the case." N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 4-5 (1st Cir. 2000).

In assessing whether a risk is sufficiently imminent, courts "are content with any realistic inferences that show a likelihood of prosecution" and favor "a practical approach." Id. at 5. Where a plaintiff challenges the Government's interpretation of a law, courts look to whether the

22

plaintiff has alleged an intent to engage in conduct that is arguably proscribed by the Government's interpretation. See Susan B. Anthony List, 573 U.S. at 159 (plaintiff has standing where they "alleged an intent to engage in the same speech that was the subject of a prior enforcement proceeding"); N.H. Hemp Council, 203 F.3d at 5 (hemp farmer had standing to challenge a Drug Enforcement Administration ("DEA") opinion where the farmer proposed to engage in conduct arguably proscribed by the opinion and the agency expressed its position); 303 Creative LLC v. Elenis, 600 U.S. 570, 588-89, 597 (2023) (wedding website designer who preemptively claimed she would not design a website for a same-sex couple had standing because a credible threat of legal consequences existed, even though no same-sex couple had tried to engage her services). A history of "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" and, therefore, reflects a substantial risk of harm. Susan B. Anthony List, 573 U.S. at 164 (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)).

Here, State Facilities provide gender-affirming care to adolescents. As discussed above, the DOJ has interpreted the Statutes to prohibit that conduct. Not only has the DOJ outlawed the provision of gender-affirming care to adolescents, but the DOJ has already taken steps to enforce their interpretations by issuing numerous subpoenas to gender-affirming care providers and starting investigations. Plaintiff States are not alone in their understanding of DOJ's threats. Insurance providers also understand State Facilities to be at risk of prosecution and have changed their medical malpractice coverage to exclude prosecutions related to the provision of gender-affirming care. The Memos' clear policy announcements and the DOJ's enforcement actions against the same conduct support a finding of injury in fact for pre-enforcement standing.

23

Next, the Court turns to the direct harms that Plaintiff States experience from the Memos. As a result of the Memos, Plaintiffs have been harmed in three distinct ways. First, there has been a significant surge in inquiries from State Facilities' current patients, to whom healthcare providers owe ongoing ethical and legal obligations. State Facilities have had to expend significant time and resources addressing their current patients' questions and ensuring that they fulfill their ethical and legal obligations to these patients. Second, because of the Memos, many hospitals halted or limited the provision of gender-affirming care to adolescents, and State Facilities lost time and money handling an influx of new patients and requests to initiate care. Third, individuals with gender dysphoria who do not receive gender-affirming care until later in life often require more expensive medical care. Plaintiffs have legal obligations to provide gender-affirming care both to minors in their custody and to their residents in general. Accordingly, the additional expense of delayed care will be borne by Plaintiff States. These required additional expenditures are sufficient to establish standing. See Massachusetts v. U.S. Dep't of Health and Hum. Servs., 923 F.3d 209, 227 (1st Cir. 2019) (increased state healthcare expenses are an injury in fact).

There is also a sufficient causal nexus between Defendants' actions and Plaintiffs' harms to establish standing. When a plaintiff's injuries are a "predictable effect" of the defendant's actions, the plaintiff has established standing. Dep't of Commerce v. New York, 588 U.S. 752, 768 (2019). This holds true where a plaintiff's injury results from third-party actions, so long as the plaintiff shows "that third parties will likely react in predictable ways" to the defendant's action. Id.

Take Massachusetts, 923 F.3d 209, for example. There, the Commonwealth challenged Health and Human Services' interim final rule that broadened exemptions for employers with

24

religious or moral objections to providing insurance coverage for contraception. Id. at 212-13. The Commonwealth alleged that, if the rule went into effect, some employers would stop providing insurance coverage for contraception, employees would turn to state-funded contraceptive services or prenatal and postnatal care for unintended pregnancies, and the Commonwealth would incur costs as a result. Id. at 223.  The Commonwealth had standing to challenge the interim final rule because it presented sufficient evidence that employers would rely upon the broadened exemption, employees would increase their reliance upon state-funded services, and these third-party actions would result in higher expenditures for the Commonwealth. Id. at 223.  Plaintiffs have similarly alleged that, because Defendants disincentivized a type of healthcare, patients shifted from other healthcare providers to State Facilities, resulting in increased costs for Plaintiff States.

Here, Plaintiffs have shown three ways in which hospitals and patients will act in "predictable ways" in response to the Memos.  First, out of a reasonable fear that their care will be impacted by the Memos, State Facilities' current patients are frequently reaching out to their care providers with questions and concerns.  State Facilities must expend additional resources to address these concerns as required by their ethical and legal obligations to current patients.

Second, in the face of the EO and Memos outlawing gender-affirming care for individuals under nineteen, many hospitals shut down their gender-affirming care programs for adolescents.  In need of medical care, those patients transferred, or attempted to transfer, their care to State Facilities.  State Facilities must expend time and money to address these inquiries, even if they do not take on new patients.

Third, youth with gender dysphoria are forced to delay gender-affirming care because of limited providers.  Delaying such care often results in permanent, unwanted changes to the

bodies of adolescents with gender dysphoria.  As a result, more expensive care and care which utilizes more State Facility resources is required to treat gender dysphoria in older individuals. This delayed care also costs Plaintiffs money because it makes it more difficult and expensive to provide legally required healthcare to individuals in their custody.  As alleged, each of these "predictable effect[s] of the Government action on the decisions of third parties" will cost Plaintiffs time and money. Dep't of Commerce, 588 U.S. at 768.

In oral argument, Defendants alleged that an opinion in Plaintiffs' favor would not redress their alleged harms because the Attorney General would maintain prosecutorial discretion to enforce the Statutes. Hearing Tr. at 16-17.  But a favorable opinion would limit the Attorney General's discretion by prohibiting enforcement of the Statutes in ways that contradict the law.  Where, as here, the Government's statutory interpretation prohibits plaintiff's conduct, and plaintiffs challenge that interpretation, there is "no question that injury, if any, can be traced directly to the government's threatened enforcement . . . and can be redressed in this action." N.H. Lottery Comm'n, 986 F.3d at 50.

Defendants further argue that "[t]he Supreme Court's decision in Texas squarely forecloses Plaintiffs' claims." [Dkt. 82 at 7 (citing Texas v. United States, 599 U.S. 670 (2023))]. Defendants' reliance upon Texas is misplaced.  In Texas, the Supreme Court held that Texas and Louisiana lacked standing to challenge the Secretary of Homeland Security's guidelines that changed arrest and removal priorities for noncitizens, because the states "lack[] a judicially cognizable interest in the prosecution . . . of another." Id. at 684 (quoting Linda R. S. v. Richard D., 410 U. S. 614, 619 (1973)).  In this case, the Memos are not announcing enforcement priorities and Plaintiffs are not challenging the prosecution of others.  Plaintiffs are challenging

26

new interpretations of long-standing laws that directly harm them and place them at significant risk of prosecution in the future.

Defendant's reliance upon <u>Food & Drug Administration v. Alliance for Hippocratic Medicine</u> is similarly unconvincing. [Dkt. 82 at 11 (citing 602 U.S. 367, 383 (2024))]. There, "the plaintiff doctors and medical associations [were] unregulated parties who [sought] to challenge FDA's regulation *of others*." <u>Id.</u> at 385 (emphasis in original). As previously noted, Plaintiff States are regulated parties challenging harm to their own institutions and, therefore, have standing to bring their APA claims. As the Court finds that Plaintiffs have multiple independently dispositive bases for standing, it need not address Plaintiffs' alleged harms from closing State Facilities or third-party lawsuits.

### 2. Declaratory Judgment Standing

Plaintiffs also seek declaratory judgment against all Defendants. The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The phrase "case of actual controversy" in the Declaratory Judgment Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III. <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240 (1937). To establish standing for a declaratory judgment, the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests"; and be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." <u>MedImmune</u>, 549 U.S. at 127 (quoting <u>Aetna Life Ins.</u>, 300 U.S. at 240-41).

To establish standing for declaratory judgments, courts decide whether there would be an imminent injury or substantial risk of injury if a plaintiff refused to accede to a defendant's demands. N.H. Lottery Comm'n, 986 F.3d at 50.  For instance, in New Hampshire Lottery Commission, the New Hampshire Lottery Commission challenged the Office of Legal Counsel's ("OLC") legal opinion, adopted by DOJ, announcing that all prohibitions in the Wire Act of 1961, save one, apply to all forms of bets or wagers, not just sports gambling. 986 F.3d 38, 44 (1st Cir. 2021).  The Commission had standing to seek a declaratory judgment because they engaged in conduct that was prohibited by OLC's interpretation of a statute, and there was a substantial risk that the plaintiff will be prosecuted for their conduct. Id. at 51.  This was true even though DOJ had never brought an enforcement action against a state lottery. Id. ("[T]he lack of current prosecutions against state lotteries is not dispositive.").

These facts are mirrored in the present case.  At the risk of being repetitive, Plaintiffs provide gender-affirming care to adolescents.  This conduct is prohibited under Defendants' interpretation of the Statutes, and the DOJ has initiated enforcement actions to stop healthcare providers from providing gender-affirming care to adolescents.  As previously discussed, Plaintiffs have been injured by Defendants' interpretation and will face further harms if Defendants' interpretation of the Statutes stands.

Defendants argue that Plaintiffs do not have standing for a declaratory judgment because the Memos and the EO merely announce enforcement priorities.  The Court has already found that the Memos announce new interpretations of the Statutes.  Now, the Court turns to the EO.  Like the Memos, the EO announces new policies regarding gender-affirming care for adolescents.  The EO opens by stating "[a]cross the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false

claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end." [Dkt. 1-5 at 2]. In its "Definitions" section, the EO defines "chemical and surgical mutilation" to mean "gender affirming care." Id. In the section entitled "Directive to the Department of Justice," the President directs the Attorney General to "review [DOJ] enforcement of section 116 of title 18, United States Code [the FGM Act], and prioritize enforcement of protections against female genital mutilation," and "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the [FDCA] by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." Id. at 3.

The EO sets out its goal at the very outset. It aims to "end" gender-affirming care of adolescents. The remainder of the EO lays out how the President plans to meet this goal. The EO is anything but subtle. By defining "chemical and surgical mutilation" to mean "gender affirming care," then telling the Attorney General to prioritize enforcing laws against female genital mutilation, the President commands that gender-affirming care falls within the ambit of the FGM Act. Further, by lambasting medical professionals for their "radical and false claims" about the effects of gender-affirming care and telling the Attorney General to enforce the FDCA against "any entity that may be misleading the public about the long-term side effects of" gender-affirming care, the President announces a policy under which the FDCA can be used against medical professionals informing their patients about the benefits of gender-affirming care for adolescents with gender dysphoria. In short, the EO does not announce enforcement priorities targeting third-parties. Instead, it directs the Attorney General to prosecute gender-affirming care providers, such as State Facilities, using statutes that have not previously been interpreted to allow such prosecutions.

29

Defendants further allege that Plaintiffs do not have standing to bring their declaratory judgment claim because "DOJ has never suggested that merely providing medically necessary care violates federal law in the absence of independent misconduct," and "[t]he only conduct plausibly implicated is misbranding (under the FDCA), 'false claims' (under the FCA), and conduct meeting the statutory definition of FGM." [Dkt. 82 at 12].  To start, the Court has already found that the Memos and EO do more than "suggest[] that merely providing medically necessary care violates federal law in the absence of independent misconduct."  The Memos and EO explicitly outlaw such care.  Additionally, this argument is circular.  The entire controversy between the parties revolves around whether the provision of gender-affirming care to adolescents with gender dysphoria is "independent misconduct" under the Statutes.  The Memos and EO announce that such care is unlawful under the Statutes.  Plaintiff States disagree with Defendants' interpretation.

Finally, the parties' disagreement is not "based on abstractions." In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 916 F.3d 98, 112 (1st Cir. 2019).  Plaintiffs seek a declaratory judgment in light of a particular set of existing facts—specifically, the provision of gender-affirming care by healthcare providers to treat individuals under the age of nineteen diagnosed with gender dysphoria.  Defendants' interpretation directly prohibits such care.  This application of the law is sufficiently "definite and concrete" to establish standing for declaratory judgment. MedImmune, 549 U.S. at 127.  Defendants cannot set forth a broadly applicable policy only to turn about and claim that more details are required to challenge it.

### 3.    Tenth Amendment Standing

Finally, Plaintiffs bring a claim under the Tenth Amendment alleging that the Federal Government acted outside of its authority by prohibiting treatment that Plaintiff States protect.

A state has an interest in its "exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601 (1982).  Thus, "a State clearly has a legitimate interest in the continued enforceability of its own statutes." Maine v. Taylor, 477 U.S. 131, 137 (1986); see Maryland v. King, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

Plaintiff States have enacted laws safeguarding TGNBI individuals' access to gender-affirming care and regulating the practice of medicine.  In direct conflict with these laws, the Memos make the provision of gender-affirming care unlawful and dictate appropriate medical care.  Thus, Plaintiff States have standing to challenge the Memos.  Defendants argue that "Plaintiffs vaguely claim that DOJ's narrow enforcement efforts somehow 'functionally supersede[]' their authority to regulate medicine" without alleging "that any of the federal statutes at issue actually pre-empt or directly conflict with any state law or regulatory program." [Dkt. 82 at 10-11 (citing [Dkt. 1 at ¶ 188])].  The Court has already considered and rejected Defendants' claim that the Memos simply announce "narrow enforcement efforts."  Instead, the EO and Memos outlaw gender-affirming care for individuals under nineteen years of age, in direct conflict with Plaintiffs' laws regulating medicine and protecting adolescents' right to gender-affirming care.  Plaintiffs allege this direct conflict in detail.  Accordingly, Defendants' counterarguments are unavailing.

31

### C.     APA Claims

Defendants argue that Plaintiffs' APA claims fail because the Memos do not constitute a final agency action within the meaning of the APA, and the Memos announce enforcement priorities, which are committed to agency discretion by law.  The Court begins its analysis with whether the Memos are final.

#### 1.     Final Agency Action

"[F]ederal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them." Trump v. Casa, Inc., 606 U.S. 831, 861 (2025).  Congress has provided that authority, in part, under the APA.  Specifically, the APA provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; see Cowels v. Fed. Bureau of Investigation, 936 F.3d 62, 66 (1st Cir. 2019) ("The [APA] waives federal sovereign immunity for suits alleging injury by agency action.") (citing 5 U.S.C. § 702).

An "'agency action,' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  As pertinent to the present action, a "rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).  The Memos are "rules" under the APA because, as explained above, they announce a new interpretation of the Statutes. See Biden v. Texas, 597 U.S. 785, 809-10 (2022) (memorandums announcing new Department of Homeland Security ("DHS") policy were agency actions).

32

To exercise jurisdiction over a claim, the challenged agency action must also be "final." 5 U.S.C. § 704. An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation modified). Actions that bind and direct inferior employees meet the first prong of the finality analysis. Biden v. Texas, 597 U.S. at 808-09 (internal memos were final because they "bound DHS staff" and "direct[ed] DHS personnel to take all appropriate actions"); Appalachian Power Co. v. EPA, 208 F.3d 1015, 1021 (D.C. Cir. 2000) ("If an agency acts as if a document issued at headquarters is controlling in the field . . . if it bases enforcement actions on the policies or interpretations formulated in the document, . . . then the agency's document is for all practical purposes 'binding.'").

Importantly, "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." Abbott Lab'ys v. Gardner, 387 U.S. 136, 149 (1967), abrogated by Califano v. Sanders, 430 U.S. 99 (1977). As such, an agency's characterization of its own action is not dispositive. Appalachian Power Co., 208 F.3d at 1022-23 (D.C. Cir. 2000). Instead, courts look to the context surrounding agency actions, such as how an agency has made use of the action or what it has said about it, to determine whether they are final. See Texas v. EEOC, 933 F.3d 433, 441 (5th Cir. 2019); Tennessee v. Dep't of Educ., 104 F.4th 577, 599 (6th Cir. 2024). Specifically, courts consider whether the action's "impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" Franklin v. Massachusetts, 505 U.S. 788, 796-97 (1992) (quoting Abbott, 387 U.S. at 152).

33

The Memos mark the consummation of the DOJ's decision-making process regarding the interpretation of the Statutes.  The Bondi Memo was issued as "guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents." [Dkt. 1-6 at 4].  It "direct[s] all U.S. Attorneys to investigate all suspected cases of FGM—under the banner of so-called 'gender-affirming care' or otherwise—and to prosecute all FGM offenses to the fullest extent possible," "direct[s] the Civil Division's Consumer Protection Branch" to enforce the FDCA according to the Memo's interpretation, and "direct[s] the Civil Division's Fraud Section" to enforce the FCA according to the Memo's interpretation. [Id. at 4-5].  Because the Memo binds DOJ employees, it marks the consummation of the DOJ's decision-making process. See Biden v. Texas, 597 U.S. at 808-09.

Further, DOJ leadership has made multiple public statements indicating that the Memos announce permanent policies.  As the Shumate Memo makes clear, the Bondi Memo was understood as a "directive," and the Civil Division committed to "use all available resources" in furtherance of the Bondi Memo. [Dkt. 1-7 at 3].  In one press release, the DOJ announced the issuance of twenty subpoenas to doctors and clinics providing gender-affirming care to transgender youth, then stated that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice." July 9 Press Release.  In another press release, the DOJ announced that more than a dozen hospitals and clinics had ended or limited the provision of gender-affirming care to adolescents, noted that the President "pledges to end the irreversible chemical and surgical mutilation of our children," and explained that the President "has actually delivered" on that promise. [Dkt. 1-3 at 2].

Last, but certainly not least, the Acting Director of the Enforcement and Affirmative Litigation Branch submitted a declaration in court filings, which repeats the DOJ's view that the provision of gender-affirming care violates the FDCA, and at least one Assistant United States Attorney has repeated this interpretation in a hearing before a judge.  Taken together, these statements demonstrate that the DOJ understands the Memos to be announcing their marching orders, and DOJ employees are acting accordingly.

As for the Shumate Memo, it incorporates the Bondi Memo's interpretation and directs employees to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Bondi Memo.]" [Dkt. 1-7].  As part of the DOJ's broader announcement and enforcement of a new policy, the Shumate Memo may also be challenged under the APA. Barrick Goldstrike Mines Inc. v. Browner, 215 F.3d 45, 48-49 (D.C. Cir. 2000) ("[W]e have recognized that final agency action may result "from a series of agency pronouncements rather than a single edict.") (quoting Ciba-Geigy Corp. v. U.S.E.P.A., 801 F.2d 430, 435 n.7 (D.C. Cir. 1986)).

The Memos are the "consummation" of DOJ's decision-making process in another sense. Bennett, 520 U.S. at 178.  Based upon the Memos' and Defendants' inflammatory rhetoric regarding TGNBI people and their medical care and the Memos' pronounced goals, the purpose of the Memos is to intimidate and harass.  It aims to end gender-affirming care by frightening gender-affirming care providers, TGNBI people, and the many people who love their TGNBI family, friends, and community members.  This Court is not alone in its view. In re 2025 Subpoena to Children's National Hospital, No. 25-cv-03780, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (the Government had "no purpose other than to intimidate and harass the Hospital and [patients and families], and those similarly situated."); In re: 2025 UPMC Subpoena, No. 25-

MC-01069 (W.D. Pa. Mar. 2, 2026) (Subpoenas to gender-affirming care providers' "rhetoric regarding gender-affirming care reflects callous indifference, if not abject cruelty.  There is more than a 'whiff' of ill-intent.  Arguably, it is closer to a stench."); In re Dep't of Just. Admin. Subpoena No. 25-1431-030, No. 25-MC-00063, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026) ("[T]he government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'").  The Memos accomplish this intimidation by outlawing the provision of gender-affirming care through novel interpretations of the Statutes.  The DOJ need not take any further steps to accomplish its goal. The point is the pronouncement.

The Memos are also actions "by which rights or obligations have been determined, or from which legal consequences will flow." Bennett, 520 U.S. at 178.  This second prong is met where a plaintiff must either change their conduct or risk criminal and civil penalties. U.S. Army Corps of Eng'rs v. Hawkes, 578 U.S. 590, 599-600 (2016) (finding that when an agency has the authority to impose legal consequences on a regulated party, its actions can be considered "final" simply by warning regulated parties that, if they engage in certain conduct, "they do so at the risk of significant criminal and civil penalties"); Tennessee, 104 F.4th at 601 (second prong met where states had "to adjust their operations and to immediately [adopt an interpretation of Title IX] or face the consequences.").  The Memos prohibit conduct that Plaintiff States are currently engaged in—providing gender-affirming care to individuals under the age of nineteen.  Because Plaintiffs must either stop providing gender-affirming care to adolescents or risk prosecution, the Memos are actions by which rights or obligations have been determined and from which legal consequences flow.

36

The Memos also have direct and immediate impacts on the day-to-day business operations of the Plaintiff States' gender-affirming care providers.  Already, current patients are incessantly calling, new patients are inquiring about services, hospitals are receiving subpoenas, and Plaintiffs cannot fulfill their legal obligations to provide healthcare to some of their residents.  These predictable and intended reactions to the Memos have impacted State Facilities' day-to-day operations and placed significant additional burdens on the States' gender-affirming care providers.  Such impacts are "sufficiently direct and immediate" to meet the second prong of the finality analysis. Franklin, 505 U.S. at 796-97 (quoting Abbott Lab'ys, 387 U.S. at 152).  As the Memos meet both prongs of the finality analysis, they are final agency actions.

In support of their argument, Defendants point to a series of cases holding that the issuance of summonses and initiation of investigations are not final agency actions. [Dkt. 82 at 14-15].  These cases are inapposite.  Plaintiff States are not challenging any summonses or investigations.  They are challenging the Memos' interpretation and announcement of the law.

Defendants further argue, "[i]t is only hypothetical later actions by government officials—culminating in an adverse judgment or conviction, for example—that determine any entity's legal rights." [Dkt. 82 at 15].  The Supreme Court directly rejected this argument in Biden v. Texas, 597 U.S. 785 (2022).  There, the appellate court erred in ruling that memos announcing new immigration enforcement priorities were not final agency actions because they were "abstract decisions apart from specific agency action." Id. at 809.  As the Supreme Court explained, "[i]t was not the case that the [memorandums] simply explained DHS's decision, while only the decision itself had legal effect." Id. (internal quotations omitted).  The DHS memorandums were not "abstract decisions"—they "were themselves the operative agency

actions, each of them an 'agency statement . . . designed to implement, interpret, or prescribe law or policy.'" Id. (citing 5 U.S.C. § 551(4)).  So too here.

### 2.        Committed to Agency Discretion

Under APA Section 701(a)(2), a plaintiff may not obtain judicial review for an agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  An action is committed to agency discretion when the agency action is of a kind "traditionally regarded as committed to agency discretion," or when the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Lincoln v. Vigil, 508 U.S. 182, 191 (1993) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).  Section 701(a)(2)'s exception to the presumption of reviewability is "quite narrow[ ]." Dep't of Com., 588 U.S. at 772 (quoting Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv., 586 U.S. 9, 23 (2018)).

Cases where the plaintiff objects that an agency did not properly justify its decision under a standard set forth in the statute are "the sort of routine dispute that federal courts regularly review." Weyerhaeuser, 586 U.S. at 23-24.  In the Memos, the DOJ announced new interpretations of three statutes.  Such a "broad or general enforcement policy" is a "direct interpretation[] of the commands of the substantive statute," not "the sort of mingled assessment[] of fact, policy, and law that drive an individual enforcement decision and that are . . . peculiarly within the agency's expertise and discretion." Casa De Maryland v. U.S. Dep't of Homeland Sec., 924 F.3d 684, 699 (4th Cir. 2019) (quoting Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 677 (D.C. Cir. 1994)); see Edison Elec. Inst. v. U.S.E.P.A., 996 F.2d 326, 333 (D.C. Cir. 1993) ("Clearly, [the EPA's interpretation of a regulation] has to do with the

substantive requirements of the law; it is not the type of discretionary judgment concerning the allocation of enforcement resources that Heckler shields from judicial review.").

The Statutes provide clear standards for enforcement, which Defendants do not contest. The Statutes are not drawn so that they furnish "no meaningful standard" by which to judge the Attorney General's actions. Lincoln, 508 U.S. at 191; see Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 245-46 (D.C. Cir. 1986) ("Nothing in . . . the holding or policy of Heckler v. Chaney [ ] precludes review of a proper plaintiff's timely challenge of an agency's announcement of its interpretation of a statute."). Accordingly, Defendants' actions are not committed to agency discretion by law.

### D. Tenth Amendment

Next, the Court will address Defendants' only challenge to the merits of Plaintiffs' claims. Plaintiffs allege that, by banning gender-affirming healthcare for minors, the EO, Memos, and the actions implementing them violate the Tenth Amendment's protection of Plaintiff States' sovereign authority to regulate medicine and protect the health and safety of their residents. Defendants argue that Plaintiffs have failed to state a claim under the Tenth Amendment.

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Though its text merely states "a truism that all is retained which has not been surrendered," the Tenth Amendment confirms that "the Federal Government is subject to limits that may, in a given instance, reserve power to the States." New York v. United States, 505 US 144, 156-57 (1992) (quoting United States v. Darby, 312 U.S. 100, 124 (1941)). Just as the horizontal separation of powers "serve[s] to prevent the accumulation of excessive

39

power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." Printz v. United States, 521 U.S. 898, 921 (1997) (quoting Gregory v. Ashcroft, 501 U.S. 452, 458 (1991)).

Tenth Amendment jurisprudence "has traveled an unsteady path." New York, 505 U.S. at 160 (detailing the Tenth Amendment's history). Regardless, four major strands can be gleaned from modern Tenth Amendment analysis. First, and most straightforwardly, the Tenth Amendment is violated when the Federal Government acts outside of its delegated authority. See New York, 505 U.S. at 155 (to determine whether there is a Tenth Amendment violation "the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution."). This principle applies equally to actions by the Executive Branch. Gonzalez v. Oregon, 546 U.S. 243 (2006) (rejecting Attorney General's interpretation of the Controlled Substances Act on Tenth Amendment grounds).

In the second line of cases, the anticommandeering cases, Congress cannot "commandee[r] the legislative processes of the States by directly compelling them to act and enforce a federal regulatory program." New York, 505 U.S. at 161 (quoting Hodel v. Va. Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 288 (1981)); see Murphy v. Nat'l Collegiate Athletic Assoc., 584 U.S. 453, 472 (2018) (same). Even where "Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks power directly to compel the States to require or prohibit those acts." New York, 505 U.S. at 166. Of relevance to this case, "[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." Murphy, 584 U.S. at 475-76.

40

The third analysis applies where Congress regulates both States and private actors pursuant to its delegated authority.  In those circumstances, states' Tenth Amendment rights are protected "through the national political process, not through judicially defined spheres of unregulable state activity." South Carolina v. Baker, 485 U.S. 505, 512 (1988) (citing Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 537-54 (1985)).  Although "some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment," the Supreme Court has not elucidated which defects meet that high threshold. Id. at 512-13.  In more recent Tenth Amendment challenges to generally applicable Congressional action, the Supreme Court has not applied any test—thereby signaling, though not expressly stating, an abandonment of judicial review all together in these circumstances. See e.g., Reno v. Condon, 528 U.S. 141 (2000) (upholding a federal law that restricts the disclosure and resale of personal information contained in the records of state motor vehicle departments).

Finally, the Tenth Amendment is used as a tool of statutory interpretation.  In these cases, courts rely upon the background principles of federalism to narrowly interpret a statute such that the statute does not infringe upon states' sphere of sovereign authority. See Gregory, 501 U.S. at 452-54 (applying Tenth Amendment principles to hold the Age Discrimination in Employment Act did not apply to "policy-making" appointees such as state court judges); Bond v. United States, 572 U.S. 844, 862-63 (2014) (applying "the background assumption that Congress normally preserves 'the constitutional balance between the National Government and the States'" to limit the reach of a criminal statute) (quoting Bond v. United States, 564 U.S. 211, 222 (2011)).  Courts require a clear statement that Congress "meant to effect a significant change

41

in the sensitive relation between federal and state" governments before interpreting a statute to do so. Bond, 572 U.S. at 858-59 (quoting United States v. Bass, 404 U.S. 336, 349 (1971)).

Defendants argue that Plaintiffs failed to allege a Tenth Amendment claim on two grounds. First, they allege that Plaintiff States have not established that the Federal Government unconstitutionally commandeered Plaintiff States. This is accurate, because anticommandeering principles do not apply in contexts where the Federal Government regulates both states and private entities. Murphy, 584 U.S. at 475-76. However, Plaintiff States do not attempt to bring a Tenth Amendment claim under an anticommandeering theory. For that same reason, Defendants' reliance upon Massachusetts v. United States Department of Health & Human Services, 682 F.3d 1 (1st Cir. 2012), is misplaced. In that case, the plaintiff states failed to sufficiently allege an anticommandeering challenge to the Defense of Marriage Act ("DOMA"). Id. at 12. In reaching that decision, the First Circuit said that the Tenth Amendment was violated "only where Congress sought to commandeer state governments or otherwise directly dictate the internal operations of state government" and distinguished the instant matter because DOMA only governs "federal programs and funding." Id. at 13. From the emphasis and comparison, it is clear that the First Circuit is discussing whether DOMA governs internal, rather than external state operations, which is a relevant consideration in anticommandeering claims. The court is not and does not foreclose all Tenth Amendment claims that do not bring an anticommandeering challenge.

To Defendants' second argument, relying upon Dalton v. Specter, 511 U.S. 462 (1994), they argue that Plaintiff States simply disagree with the Attorney General's interpretation of the Statutes and "cannot recast their statutory objections into freestanding constitutional claims." [Dkt. 90 at 14]. In Dalton, the plaintiffs sought to enjoin the President's closure of a naval

42

shipyard. 511 U.S. at 464, 466.  Under the Defense Base Closure and Realignment Act of 1990, the President could close a base after the Secretary of Defense submits a recommendation to a commission, and the Commission provides the President with a report. Id. at 464-65.  The Dalton plaintiffs "sought review exclusively under the APA." Id. at 471.

Although the Court of Appeals held APA review was unavailable, it went on to hold that the President's actions were reviewable because "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine.  Thus, judicial review must be available to determine whether the President has statutory authority 'for whatever action' he takes." Id. at 471.  The Supreme Court reversed the Court of Appeals' determination and held that the Secretary of Defense and Commission's recommendations were not final agency actions and the President's decision to close a base was committed to his discretion. Id. at 470-71, 476 (quoting Specter v. Garrett, 995 F.2d 404, 409 (1993)).  In reaching its decision, the Court noted, "[o]ur cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." Id. at 472.

The present matter is distinct from Dalton.  To start, Dalton addressed the reviewability of the President's actions under the APA. Id. at 471.  Here, the Court has already held that the Memos are reviewable under the APA, and Plaintiffs do not challenge the EO under the APA. Plaintiff States have brought an independent claim under the Tenth Amendment, in addition to their claims under the APA and for declaratory judgment.  Further, Plaintiff States do not argue that Defendants' actions automatically violate the Tenth Amendment.  Instead, relying upon Gonzalez v. Oregon, 546 U.S. 243 (2006), Plaintiffs argue that Defendants have violated the Tenth Amendment because they acted outside of the authority granted to them, in an area

43

traditionally reserved to the states, and their actions conflict with State laws.  The comparison with Gonzalez is fitting.

In Gonzalez, the State of Oregon and others mounted a Tenth Amendment challenge to the Attorney General's interpretive rule, which indicated that physicians violated the federal Controlled Substances Act ("CSA") by assisting the suicide of terminally ill patients pursuant to the Oregon Death With Dignity Act. Id. at 249.  By regulating health and safety, the Attorney General's interpretation of the CSA infringed upon an area which was "primarily, and historically, a matter of local concern." Id. at 271 (citing Hillsborough County v. Automated Med. Lab'ys, Inc., 471 U.S. 707, 719 (1985)).  Applying traditional tools of statutory interpretation, the Court assessed whether the Attorney General acted outside of the CSA's statutory authority. Gonzalez, 546 U.S. at 272-74.  In the end, the CSA did not "delegate to a single executive officer the power to effect a radical shift of authority from the States to the Federal Government to define general standards of medical practice to every locality." Id. at 275.  Of note, the Gonzalez Court explicitly did not use the Tenth Amendment as a tool of statutory interpretation to reach its decision. Id. at 274 ("It is unnecessary even to consider the application of clear statement requirements.").

Here, the Federal Government is also regulating an area traditionally reserved for the States. See Medina v. Planned Parenthood S. Atl., 606 U.S. 357, 364 (2025) ("States have traditionally exercised primary responsibility over matters of health and safety, including the regulation of the practice of medicine.").  In fact, the Supreme Court recently repeatedly explained that healthcare for transgender youth, in particular, is a matter best reserved for States. See United States v. Skrmetti, 605 U.S. 495, 524 (2025) (Roberts, C.J., majority opinion) ("We afford States wide discretion to pass legislation in areas where there is medical and scientific

uncertainty."); id. at 532, 540 (Thomas, J., concurring) (States must have the "ability to enact high-stakes medical policies, in which compassion for the child points in both directions"; and, "[i]n areas with this much medical and scientific uncertainty," states must have "wide discretion"); id. at 550 (Barrett, J., and Thomas, J., concurring) (the Constitution "allows the States wide latitude, and [it] presumes that even improvident decisions will eventually be rectified by the democratic processes.").

Plaintiffs' Tenth Amendment claim falls within the first line of Tenth Amendment cases– those challenging the Federal Government's actions as outside of its delegated authority. Plaintiffs argue that the EO and Memos reach far beyond their statutory authority, to which Defendants fail to provide a response. As in Gonzalez, the Memos' interpretations directly conflict with Plaintiff States' laws protecting transgender adolescents' access to gender-affirming care, which were enacted in exercise of Plaintiff States' traditional authority to pass laws regulating medicine and to safeguard its citizens health and welfare. Accordingly, Plaintiffs have stated a claim under the Tenth Amendment.

## IV.    CONCLUSION

Plaintiff States have standing to bring their claims, issuance of the Memos was a final agency action, the Memos' policy pronouncements are not committed to agency discretion by law, and Plaintiffs state a claim under the Tenth Amendment. Accordingly, Defendants' Motion to Dismiss [Dkt. 81] is **DENIED**.

**SO ORDERED.**

Dated: June 3, 2026                                /s/ Angel Kelley
                                                    Hon. Angel Kelley
                                                    United States District Judge

45