**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:25-CV-12162-AK |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD.......................................................................................................... 6

ARGUMENT........................................................................................................................ 7

    I.     Threshold Grounds Independently Require Judgment for Defendants........................... 7

    II.    Plaintiffs' Claims Lack Merit.................................................................................... 7

        A.     The Guidance is within the Department's authority and consistent with law (Count II). .................................................................................... 7

        B.     The Department's enforcement priorities are not arbitrary or capricious (Count I)....................................................................................................11

        C.     The Tenth Amendment does not allow States to veto federal enforcement priorities (Counts III-IV)....................................................................... 14

CONCLUSION ................................................................................................................. 18

i

**TABLE OF AUTHORITIES**

**Cases**

*Abramski v. United States*, 573 U.S. 169 (2014)............................................................ 8

*Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) ............................. 6

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974).................................11

*Califano v. Sanders*, 430 U.S. 99 (1977) ...................................................................... 6

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................. 6

*Connecticut v. Physicians Health Servs. of Ct., Inc.*, 287 F.3d 110 (2d Cir. 2002)...................... 14

*Dalton v. Specter*, 511 U.S. 462 (1994) ...................................................................... 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .................................. 6

*Endocino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)........................................... 13

*FCC v. Fox Television*, 556 U.S. 502 (2009)

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ...................................................11

*Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542(2025) ........................... 13

*Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985) .............................. 16

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ........................................................ 15, 16, 17

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985).................................... 15

*Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635 (1st Cir. 2023) .............................................11

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)............................................................ 6

*Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198 (1st Cir. 2006) ........................................... 6

*Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1 (1st Cir. 2012) ............. 14, 16

*Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174 (D. Mass. 2018) .............................................................................................. 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).. 10

*New York v. United States*, 505 U.S. 144 (1992)......................................................... 14

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151 (D.C. Cir. 2019) ..................................................................................................................... 8

*QueenDoc, PLLC v. DOJ*, No 25-7384, slip op. (9th Cir. August 14, 2026 ............................... 1, 2

*River St. Donuts, LLC v. Napolitano*, 558 F.3d 111 (1st Cir. 2009)............................................. 6, 7

*Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012)............................................................11, 12, 13

*South Carolina v. Baker*, 485 U.S. 505 (1988) ............................................................................ 16

*Town of Johnston v. Fed. Housing Fin. Agency*, 765 F.3d 80 (1st Cir. 2014)................................ 14

*United States v. Armstrong*, 517 U.S. 456, (1996) ...................................................................... 7, 13

*United States v. Article of Drug*, 394 U.S. 784 (1969) .................................................................. 4

*United States v. Baker*, 807 F.2d 1315 (6th Cir. 1986) .................................................................. 14

*United States v. Johnson*, 114 F.3d 476 (4th Cir. 1997)................................................................ 15

*United States v. Regenerative Sciences, LLC*, 741 F.3d 1314 (D.C. Cir. 2014)............................. 9

*United States v. Skrmetti*, 605 U.S. 495 (2025)................................................................... 3, 17, 18

*United States v. Sullivan*, 332 U.S. 689 (1948)............................................................................ 15

*United States v. Texas*, 599 U.S. 670 (2023)................................................................................ 7

**Statutes**

5 U.S.C.
  § 701................................................................................................................................ 6
  § 704................................................................................................................................ 7
  § 706................................................................................................................................ 5

18 U.S.C. § 116................................................................................................................4, 10, 11

21 U.S.C.
  § 331................................................................................................................................ 4
  § 352................................................................................................................................ 4
  § 355................................................................................................................................ 4

28 U.S.C.
  § 509................................................................................................................................ 7
  § 516................................................................................................................................ 7
  § 519................................................................................................................................ 7

31 U.S.C. § 3729................................................................................................................ 4

**Rules**

Fed. R. Civ. P. 56....................................................................................................... 6

**Other Authorities**

Brian Christine, Assistant Sec'y for Health, U.S. HHS, *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* (Dec. 18, 2025) ............................................................... 3, 4

Protecting Children from Chemical and Surgical Mutialtion, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) ) ........................................................................................ 4, 5, 1

**INTRODUCTION**

This case concerns whether States may dictate how the Executive Branch prioritizes its resources to investigate potential violations of federal law.  Plaintiffs seek to prevent the Department of Justice from investigating whether, in some circumstances, providing or seeking reimbursement for certain gender-related medical care to minors could violate three federal statutes—the Federal Food, Drug, and Cosmetic Act (FDCA), the False Claims Act (FCA), or the Female Genital Mutilation (FGM) Act.  Their apparent theory is that these federal laws have no application whatsoever to gender-related medical care, the regulation of which, they claim, is the exclusive province of the States.

That sweeping theory cannot be right.  To take just one example, the FDA has not approved any drug as safe and effective for the treatment of gender dysphoria.  And while drugs approved for other indications may be prescribed "off-label" to treat gender dysphoria, Plaintiffs do not appear to dispute that it may violate the FDCA for manufacturers to market such drugs as a treatment for this condition.  Indeed, a State could no more authorize such marketing than it could deem an unapproved drug lawful to prescribe in the first place.  And while it is no doubt true that States have historically regulated the practice of medicine within their borders, the FDCA has never been thought to improperly trench on any power reserved to the states under the Tenth Amendment.  In short, nothing in the Constitution or the Administrative Procedure Act (APA) gives States a veto over federal enforcement priorities simply because the underlying conduct falls within an area concurrently regulated by the States.

Indeed, in a related case in which Plaintiffs participated as amici, the Ninth Circuit today issued a published opinion squarely holding that "there is nothing improper about a President having policy preferences and directing the Executive Branch to enforce federal law in a manner consistent with those preferences."  *QueerDoc, PLLC v. DOJ*, No. 25-7384, slip op. at 35 (9th Cir.

1

Aug. 14, 2026). In reversing quashal of an administrative subpoena issued by the Department to an online gender-medicine provider, the Court described the progression—from the President's executive orders, to the same guidance at issue here, and then to the investigation of that provider—as "the ordinary operation of the Executive Branch." *Id.* at 42. And as for the Department's authority to investigate such providers, the Court explained that "QueerDoc may itself be misbranding drugs in violation of" federal law, and, further, "may possess information relevant to DOJ's broader investigation of manufacturers and distributors." *Id.* at 26-27.

As explained in prior briefing, there is no need to reach the merits of this case: Plaintiffs lack standing to challenge the Executive Branch's enforcement priorities, which are not final agency action and, in any event, are committed to agency discretion. Regardless, Plaintiffs cannot prevail.

To start, Plaintiffs' claims proceed from the faulty premise that the Department has somehow transformed the provision of any and all gender-related care into a federal offense through guidance documents. It has not, and Plaintiffs' contrary-to-law claim fails for that reason. Their arbitrary-and-capricious claim fares no better, as the Department clearly identified the Presidential directive it was implementing and reasonably explained its enforcement priorities. Plaintiffs' contention otherwise amounts to little more than a policy dispute that does not belong in federal court. And Plaintiffs' erroneous invocation of the Tenth Amendment cannot save their case. The Constitution does not prohibit the federal government from investigating potential violations of federal law simply because they implicate conduct traditionally regulated by the States. Plaintiffs' contrary theory turns the Supremacy Clause on its head and has been consistently rejected by the Supreme Court and First Circuit.

The Court should grant summary judgment to Defendants on all counts.

## BACKGROUND

### A.    Regulatory Landscape

This case concerns the Department's ability to investigate potential violations of federal law in connection with the provision of certain gender-related chemical and surgical interventions to children, sometimes referred to as "gender-affirming care." These interventions include prescription drugs that suppress the production of sex hormones to delay puberty, as well as cross-sex hormones meant to induce physical changes to alter the secondary sexual characteristics to resemble those typically seen in the opposite sex. *See United States v. Skrmetti*, 605 U.S. 495, 503-04 (2025) (describing use of these drugs). Although these drugs are approved by the Food and Drug Administration (FDA) for some uses, the FDA has not determined that any of these drugs are safe or effective for treating gender dysphoria or approved them for such use (or for any other psychiatric disorder).

The use of these interventions to treat gender dysphoria in minors remains subject to "fierce scientific and policy debates." *Skrmetti*, 605 U.S. at 525. As the Supreme Court recently observed, "health authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors," and "more than 20 States have enacted laws banning the provision of sex transition treatments to minors." *Id.* at 504-05. The United States Department of Health and Human Services (HHS) has likewise found, after reviewing the available evidence, that these interventions in minors are associated with serious potential harms—including infertility and sterility, impaired bone density development, cardiovascular and metabolic disease, and psychiatric conditions. Admiral Brian Christine, Assistant Sec'y for Health, U.S. HHS, *Evidence-Based Care for Children*

3

*and Adolescents with Gender Dysphoria* 1 (Dec. 18, 2025) (HHS Statement).[1]   As HHS has concluded, "[c]urrent evidence does not support claims that puberty blockers, cross-sex hormones, and surgeries are safe and effective treatments for pediatric gender dysphoria."  *Id.* at 3.

The Court is already familiar with the three federal statutes relevant here, and the Department's prior brief sets out that statutory framework in greater detail.  *See* Doc No. 105 at 4-7; Doc No. 82 at 2-3.  In brief, the False Claims Act (FCA) imposes liability on persons who knowingly submit false or fraudulent claims for payment to the United States.  31 U.S.C. § 3729. The Federal Food, Drug, and Cosmetic Act (FDCA) extensively regulates, among other things, the manufacture, labeling, marketing, and distribution of drugs in interstate commerce, *see, e.g.*, 21 U.S.C. §§ 331, 352, 355, consistent with its "overriding purpose to protect the public health." *United States v. Article of Drug*, 394 U.S. 784, 798 (1969).  And 18 U.S.C. § 116 makes it a federal crime to perform genital mutilation on minor women.  18 U.S.C. § 116(a).

### B.    The Challenged EO and Guidance

The Court has already canvassed the relevant Executive Order and Department memoranda in detail, *see* Doc No. 105 at 8-12, and Defendants here summarize only the provisions pertinent to this motion.

In January 2025, President issued Executive Order 14187, entitled *Protecting Children From Chemical and Surgical Mutilation*. 90 Fed. Reg. 8771 (Jan. 28, 2025) ("EO").  Section 8 directs the Attorney General to "prioritize investigations and take appropriate action" concerning consumer deception, fraud, and FDCA violations in this area, and to "review" and "prioritize"

---

[1] The *Skrmetti* decision and HHS Statement postdate the challenged actions and are cited here only as background concerning the continuing scientific and policy debate surrounding these experimental procedures.

4

enforcement of the federal prohibition on female genital mutilation. *Id.* § 8(a), (c). The EO further requires that its implementation be "consistent with applicable law." *Id.* § 11(b).

To implement the EO, then–Attorney General Bondi issued a guidance memo to Department employees in April 2025. Doc No. 1-6 (Bondi Memo). "Pursuant to the President's directive," the Bondi Memo prioritizes "appropriate investigations" of potential FDCA "violations" "by manufacturers and distributors engaged in misbranding," such as "the promotion of off-label uses of hormones"; "false claims" submitted to federal healthcare programs, such as those misreporting the reason for a prescription; and "suspected cases of FGM . . . to the fullest extent possible." Bondi Memo at 4-5. Soon after, Assistant Attorney General for the Civil Division Brett Shumate issued a memorandum directing his staff to "prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" for "possible violations," consistent with the EO and Bondi Memo. Doc No. 1-7 (Shumate Memo) (together with the Bondi Memo, "Guidance" or "Memos").

### C.    This Litigation

In August 2025, Plaintiff States filed this suit alleging that the Guidance and EO are unlawful. Defendants moved to dismiss, Doc No. 82, and this Court denied the motion on June 3, 2026, Doc No. 105. Plaintiffs filed a First Amended Complaint (FAC), Doc No. 113, which, as Plaintiffs explained in seeking leave to amend, "merely adds two additional state parties as Plaintiffs" and does not "alter the legal issues central to Plaintiffs' claims." Doc No. 111 at 2. Consistent with this Court's scheduling order, Doc No. 109, Defendants then answered the FAC and produced the administrative record underlying the Guidance, Doc No. 118. Defendants now seek summary judgment on all counts.

**LEGAL STANDARD**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

For APA claims, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 190 (D. Mass. 2018) (citation omitted). The "traditional Rule 56 standard does not apply" to APA claims "due to the limited role of a court in reviewing the administrative record." *Id.* at 189; *see Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (explaining that summary-judgment review of APA claims is narrower than traditional summary-judgment review). Under the APA, an agency action may not be set aside unless it is "arbitrary, capricious," or "not in accordance with law." 5 U.S.C. § 706(2)(A).

APA review of final agency action is highly deferential, and the agency's actions are presumed to be valid. *See River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). "[A] court is not to substitute its judgment for that of the agency." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). Courts instead must consider only whether the action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Thus, a reviewing court's only role in assessing APA claims is to "determine whether the agency's decision is

supported by a rational basis." *River St. Donuts*, 558 F.3d at 114.  If so, the court "must affirm."

*Id.*

## ARGUMENT

**I.      Threshold Grounds Independently Require Judgment for Defendants**

Defendants respectfully preserve the threshold arguments raised in their motion to dismiss

and reply.  Specifically, Plaintiffs lack Article III standing to bring any claim or seek a declaratory

judgment; the Memos are not final agency action under 5 U.S.C. § 704; and decisions concerning

how to prioritize federal investigations are committed to agency discretion by law under 5 U.S.C.

§ 701(a)(2).  *See* Doc No. 82 at 6-19; Doc No. 90 at 2-13.  While Defendants recognize that the

Court rejected those arguments at the motion to dismiss stage and do not seek to relitigate them

here, they respectfully disagree with that decision and incorporate their prior arguments by

reference to ensure that they are preserved for further review.

**II.     Plaintiffs' Claims Lack Merit.**

Even if Plaintiffs' objections to the Guidance were justiciable, their claims would fail.

> **A.      The Guidance is within the Department's authority and consistent with law (Count II).**

The Department has constitutional and statutory authority to set enforcement priorities.

Decisions concerning enforcement of federal law lie within a "special province" of the Executive

Branch, *United States v. Armstrong*, 517 U.S. 456, 464 (1996), and Congress has vested the

functions of the Department in the Attorney General, 28 U.S.C. § 509, who "shall supervise all

litigation" involving the federal government, *id.* § 519.  *See also id.* § 516.  The Department thus

possesses authority to issue Guidance "decid[ing] 'how to prioritize and how aggressively to

pursue legal actions against defendants who violate the law.'"  *United States v. Texas*, 599 U.S.

670, 678 (2023).  Those priorities may change over time: "[n]ew administrations are entitled to

7

reevaluate and modify agency practices, even longstanding ones." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019). Nothing in the APA requires one administration to retain its predecessor's enforcement priorities.

This backdrop illustrates that Plaintiffs' contrary-to-law claim rests on a false premise. Plaintiffs allege that the Bondi and Shumate Memos "state expressly or imply" that providing gender-related care to adolescents itself "violates the FGM statute, FDCA, or FCA." FAC ¶ 213. But the Guidance says no such thing. Instead, the Guidance identifies potential violations of certain existing federal statutes for investigation and possible enforcement. It does not purport to criminalize the provision of gender-related care "standing alone" or otherwise create any new basis for liability. Prayer for Relief, FAC. Nor could it: "criminal laws are for the courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). Consistent with that principle, the operative language of the Guidance is limited to prioritizing investigations of conduct that may independently violate existing federal law—"false claims," FDCA "violations," and "FGM offenses." Bondi Memo at 5. It is clear from the face of the Guidance that Plaintiffs' contrary-to-law claim is badly misplaced.

Start with the FCA. Plaintiffs contend that the FCA does not prohibit providers from furnishing medically necessary care and "accurately bill]ing]" for it, as such care is not "inherently fraudulent." FAC ¶ 217. But the Memos do not say otherwise: they target only *false* claims. The Bondi Memo instructs the Civil Division to investigate "false claims submitted to federal health care programs for any non-covered services," offering as examples a physician who prescribes puberty blockers for one purpose but falsely reports a different diagnosis to CMS and a hospital that performs one procedure while billing Medicaid for "for an entirely different procedure." Bondi Memo at 4. The Shumate Memo likewise identifies providers that seek to evade state

8

restrictions by "knowingly submitting claims to Medicaid with false diagnosis codes." Shumate Memo at 3. Whether any particular gender-care claim is false, knowing, material, or otherwise actionable under the FCA would present case-specific questions. But neither Memo says that accurately billing for a covered service itself violates the FCA.

The same is true of the FDCA. Plaintiffs emphasize that the Act does not itself prohibit doctors from "provid[ing] medically necessary healthcare to treat gender dysphoria in adolescents." FAC ¶ 216. That assertion is both overbroad and beside the point. Initially, physicians do not enjoy a categorical exemption from the FDCA merely because regulated conduct occurs in the course of medical practice. *See, e.g.*, *United States v. Regenerative Sciences, LLC*, 741 F.3d 1314, 1319-24 (D.C. Cir. 2014) (rejecting notion "that the scope of the FDCA depends on state-by-state definitions of the 'practice of medicine'"). And physicians, for example, have no "right to prescribe [an unapproved drug] at all," absent an FDCA exemption. *Id.* at 1324-25. But more fundamentally, while it is true that the FDCA does not generally prohibit a physician from prescribing an approved drug for off-label use, neither does the Guidance. The Bondi Memo instead prioritizes investigations of FDCA violations by "manufacturers and distributors engaged in misbranding by making false claims" about certain drugs. Doc No. 1-6 at 5. And the Shumate Memo similarly targets potential FDCA violations by "pharmaceutical companies that manufacture drugs used in so-called gender transition" and "dealers such as online pharmacies suspected of illegally selling such drugs." Doc No. 1-7 at 4. Thus, even assuming Plaintiffs were right that prescribing such drugs to minors with gender dysphoria is "medically necessary," despite not being approved by the FDA for that purpose, that has nothing to do with whether the Department may lawfully investigate manufacturers and distributors that violate the FDCA's restrictions governing the marketing, labeling, and distribution of drugs.

9

Last, the Guidance is not contrary to the FGM Act. The Bondi Memo merely restates the core prohibition of the statute: "it is a felony to perform, attempt to perform, or conspire to perform female genital mutilation ('FGM') on any person under the age of 18." Doc No. 1-6 at 4. Plaintiffs stress that § 116 defines female genital mutilation as procedures performed for "non-medical reasons" and excludes certain operations "necessary to the health" of the patient when performed by a licensed medical practitioner. 18 U.S.C. § 116(b)(1). True enough. But nothing in the Bondi Memo purports to repeal those requirements or otherwise expand liability beyond § 116's terms. The only change effected by the Bondi Memo is one of enforcement priorities: U.S. Attorneys are directed to "investigate all suspected cases of FGM" and "prosecute all FGM offenses to the fullest extent possible." Doc No. 1-6 at 5-6. Whether a particular procedure was performed for a "non-medical reason" or falls within § 116(b)'s health exception remains an inherently fact-specific inquiry that cannot be prospectively resolved by a State's declaration that all "gender-affirming care," however the State may define it, is "medically necessary."

Last, that the Department's enforcement priorities may be "contrary to state law," FAC ¶ 219, or Plaintiff States' policy preferences, is of course immaterial under the Supremacy Clause. Indeed, if State disagreement made federal enforcement "contrary to law," much of the Department's historic civil-rights enforcement would have been unlawful for the very reason it was necessary. "A change in administration brought about by the people casting their votes is a perfectly reasonably basis for an executive agency's reappraisal" of its priorities, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part), and Plaintiffs' misplaced invocation of state law only underscores that this dispute sounds in policy, not in law.

10

### B. The Department's enforcement priorities are not arbitrary or capricious (Count I).

The Department's articulation of enforcement priorities was not arbitrary and capricious. Plaintiffs contend that the Memos are (1) insufficiently reasoned; (2) rely on impermissible factors; and (3) failed to consider important aspects of the problem. *See* FAC ¶¶ 206-08. Together or separately, these arguments fail under the APA's "highly deferential" standard of review. *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023).

*First*, the Guidance was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). To start, the Memos implement an express presidential directive. Executive Order 14,187 directed the Attorney General to "prioritize investigations and take appropriate action" concerning consumer deception, fraud, and FDCA violations related to the procedures addressed by the Order, and separately to "review" and "prioritize enforcement" of 18 U.S.C. § 116. E.O. 14,187 § 8(a), (c), 90 Fed. Reg. 8771, 8772 (Feb. 3, 2025). The Bondi Memo explains that it was issued "[p]ursuant to the President's directive" and translates that direction into particular enforcement priorities. Bondi Memo at 4. The Shumate Memo, in turn, implements those priorities within the Civil Division, expressly tying its instructions to the Executive Order and Bondi Memo. Shumate Memo at 3. That chain of direction readily supplies a rational explanation for the Department's choice of enforcement priorities. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (even "a decision of less than ideal clarity" will not be found arbitrary or capricious where the "agency's path may reasonably be discerned").

Indeed, an agency "may not simply disregard an Executive Order." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). Nor must it independently reconsider the President's underlying policy judgment when determining how to implement an Executive Order. *See Sherley*,

11

689 F.3d at 785 ("Bound as it is to carry out the President's directives . . . it was not arbitrary or capricious for NIH to disregard comments that" advocated for a policy contrary to the goals of the executive order).

Plaintiffs' "important aspects" argument fails for similar reasons. FAC ¶ 208. They contend that the Department failed adequately to weigh the asserted health benefits of gender-related procedures for minors, States' policies favoring access to those treatments, and the effects that federal enforcement might have on providers and patients. *See id.* But those concerns go to the wisdom of the Administration's underlying policy, not to whether the Department rationally chose to investigate potential violations of federal law in this space. Again, an agency implementing a presidential directive need not reconsider the President's predicate policy choice where the considerations plaintiffs identify are not relevant to the agency's task of implementing that directive. *See Sherley*, 689 F.3d at 785.

Even if more were required, the Department did not overlook that its new priorities represented a change in posture that could ultimately impact this space if enforcement were pursued. The Bondi Memo begins by acknowledging that an increasing number of children have been diagnosed with gender dysphoria in recent years, many of whom receive treatment for gender dysphoria. Doc No. 1-6 at 2. But it also discusses the experiences of detransitioners and the long-term risks associated with gender-related treatments in minors. *Id.* at 2-3. The Guidance then expressly contrasts the new approach with the prior Administration's policies, stating that, "[p]ursuant to the President's directive," the Department would adopt a different enforcement posture. *Id.* at 4. And the Guidance plainly anticipated that this shift could ultimately affect providers if enforcement were pursued: it expressly placed "medical practitioners, hospitals, and clinics on notice" of its changed posture. *Id.*

Plaintiffs also claim to have "longstanding reliance interests in the availability" of gender-related care. But, notably, Plaintiffs identify no prior Department guidance or settled enforcement policy stating that the statutes identified in the Memos are inapplicable to misconduct in this space. FAC ¶ 208. And insofar as Plaintiffs mean that providers expected the Department to exercise enforcement discretion as they perhaps suppose prior administrations had, "a belief about how an agency is likely to exercise its enforcement discretion is not 'a serious reliance interes[t].'" *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025) (quoting *FCC v. Fox Television*, 556 U.S. 502, 515 (2009)). Indeed, given the relative novelty of these treatments, Plaintiffs could not possibly show, for example, "decades of industry reliance on" a "prior policy" of the Department. *Id.* (quoting *Endocino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)).

Last, Plaintiffs assert without citation that the Guidance "rel[ied] on factors that Congress has not intended the [Department] to consider." FAC ¶ 206. This boilerplate recitation of the arbitrary and capricious standard is not well-pled and should be disregarded. In any event, Congress has not established any factors for the Department to consider in setting enforcement priorities. Just the opposite. "The Attorney General . . . retain[s] 'broad discretion' to enforce the Nation's criminal law," and "ha[s] this latitude *because* [he is] designated by statute as the President's delegate[] to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Armstrong*, 517 U.S. at 464 (emphasis added). And as for Plaintiffs' complaint that the Guidance "flow[s] directly from" the Executive Order, *id.*, that also gets it exactly backwards, as explained above. *See Sherley*, 689 F.3d at 784-85

At bottom, Plaintiffs' arbitrary-and-capricious claim amounts to a policy disagreement. The Guidance is both reasonable and reasonably explained, and under the APA's deferential

13

standard of review, the Court should not "substitute its judgment for that of the agency." *Fox Television*, 556 U.S. at 513.

### C. The Tenth Amendment does not allow States to veto federal enforcement priorities (Counts III-IV).

Plaintiffs' Tenth Amendment claims fail as a matter of law. According to Plaintiffs, because the regulation of medicine is traditionally a matter of state concern, the Tenth Amendment prohibits the federal government from enforcing federal law in a manner that purportedly "intrude[s] on" the States' preferred regulation of medical care. FAC ¶ 240. This theory of the Tenth Amendment is incompatible with the Supremacy Clause. And it has been consistently rejected by courts, including the First Circuit. *See Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 12 (1st Cir. 2012).

The Tenth Amendment "merely reiterates that whatever power was not granted to the federal government cannot be exercised by the federal government." *United States v. Baker*, 807 F.2d 1315, 1324 (6th Cir. 1986). Accordingly, with a claim like Plaintiffs', the "proper inquiry" is whether the challenged action (whether executive or legislative) exceeds the federal government's "enumerated powers." *Id.* If the answer to that inquiry is no, a state is left without any Tenth Amendment argument. The rule is clear: "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992); *see Town of Johnston v. Fed. Housing Fin. Agency*, 765 F.3d 80, 86 (1st Cir. 2014) ("Having concluded that the [challenged statutory exemptions] are a constitutional exercise of Congress' power under the Commerce Clause, we necessarily must also conclude that the municipalities' efforts to invoke abstract principles of federalism through the Tenth Amendment fail." (citing *New York*, 505 U.S. at 155-56)); *accord, e.g., Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 122 (2d Cir. 2002) ("Federal statutes validly

14

enacted under one of Congress's enumerated powers . . . cannot violate the Tenth Amendment unless they commandeer the states' executive officials.").

With these principles in mind, Plaintiffs' Tenth Amendment claim is easily disposed of. Not having raised any commandeering or coercion theory, *see* Doc No. 105 at 42, this claim rises and falls with Plaintiffs' assertion that "[n]one of the statutes" cited in the EO and Guidance "authorize Defendants to intrude on an area traditionally" regulated by States, FAC ¶ 231.  As explained, the only remaining question is whether those statutes are valid exercises of Congress's enumerated powers.  They are, and Plaintiffs' have not argued otherwise.  *See* FAC ¶ 12.  Nor could they.  "Even though regulation of health and safety is 'primarily, and historically, a matter of local concern,'" there is "no question that the Federal Government can set uniform national standards in these areas." *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006) (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985)); *see also, e.g.*, *United States v. Sullivan*, 332 U.S. 689, 698 (1948) (affirming "the constitutional power of Congress under the commerce clause to regulate the branding of articles that have completed an interstate shipment and are being held for future sales in purely local or intrastate commerce.").  Indeed, "[f]ederal laws criminalizing conduct within traditional areas of state law . . . are of course commonplace under the dual-sovereign concept"—"and involve no infringement per se of states' sovereignty in the administration of their" state laws. *United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997).

Put differently, Plaintiffs are wrong that the Tenth Amendment carves out substantive enclaves of activity immune from otherwise valid federal regulation merely because States have traditionally regulated in the same area.  The complaint repeatedly emphasizes that medical regulation is a "core function of state authority," that the challenged policies "intrud[e] on an area traditionally left to the province of the States," and that federal enforcement "usurp[s] a core state

15

police power." FAC ¶¶ 228, 230. And that is precisely the enclave theory that the Supreme Court rejected in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985). There, in holding that the Fair Labor Standards Act could be applied to a municipal transit system, the Court expressly overruled—"as unsound in principle and unworkable in practice"—its prior holding that Congress's otherwise valid exercise of federal power could be defeated because it intruded upon a "traditional" or "integral" state governmental function. *Id.* at 546-47. A few terms later, the Court made the point explicit: *Garcia* establishes that Tenth Amendment limits on federal regulation are "structural, not substantive"—and so States must look for "protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity." *South Carolina v. Baker*, 485 U.S. 505, 512 (1988).

*Garcia* and *Baker* foreclose Plaintiffs' argument that medical regulation occupies a special constitutional enclave. And the First Circuit has already applied the same principle to an area at least as deeply rooted in state police powers. In *Massachusetts v. U.S. Department of Health & Human Services*, the court recognized that the federal action at issue "intrude[d] extensively into a realm" (domestic relations) "which is a leading instance of the states' exercise of their broad police-power authority over morality and culture." 682 F.3d 1, 12 (1st Cir. 2012). Yet that traditional state role did not itself create a Tenth Amendment barrier to federal law. Rather, the court explained that the relevant constitutional concerns arise "*only*" where the federal government "sought to commandeer state governments or otherwise directly dictate the internal operations of state government." *Id.* (emphasis added). The Memos do neither. Nor does the EO.

Plaintiffs cite *Gonzales v. Oregon*, 546 U.S. 243 (2006), but that case supports the United States. Far from reviving the discarded enclave theory, *Gonzales* acknowledged that the practice of medicine is not constitutionally immune from federal regulation. 546 U.S. at 271 ("no question"

16

that Congress can "regulate medical practice in [a] given scheme"). It specifically considered whether Congress had, in the Controlled Substances Act, delegated to the Attorney General the authority he claimed. *Id.* at 258-75. The Court resolved that question using traditional tools of statutory interpretation and found it "unnecessary even to consider the application of clear statement requirements." *Id.* at 274. And as this Court recognized, *Gonzales* ultimately turned on whether the Attorney General had acted "outside of the CSA's *statutory* authority." Doc No. 105 at 44. Thus, properly considered, *Gonzales* reinforces the distinction that Plaintiffs seek to blur: federalism principles may inform the interpretation of a federal statute, but they do not transform a disagreement about the scope of delegated statutory authority into a freestanding Tenth Amendment claim.

Plaintiffs only remaining contention is that the EO and Guidance exceed the authority Congress conferred in the statutes on which the challenged actions rely. Those are statutory arguments—not a Tenth Amendment claim—and, for reasons explained above, those arguments fail on their own terms. *See supra* at 7-14; *Dalton v. Specter*, 511 U.S. 462, 472 (1994); Doc No. 90 at 19-20. The Court also understood *Skrmetti* to suggest that healthcare for minors with gender dysphoria "is a matter best reserved" for state regulation. Doc No. 105 at 44. Respectfully, *Skrmetti* does not go that far. The Court there held, in rejecting an equal protection challenge to Tennessee's law, that States receive "wide discretion" to legislate "in areas where there is medical and scientific uncertainty." *Skrmetti*, 605 U.S. at 524. That proposition recognizes substantial room for state policymaking; it does not establish that the same subject is reserved exclusively to the States or insulated from otherwise valid federal law. The concurrences cited by this Court likewise concern the latitude afforded to States when they legislate in this area, not a limitation on federal power. *See* 605 U.S. at 532, 540 (Thomas, J., concurring); *id.* at 550 (Barrett, J., and

17

Thomas, J., concurring).   *Skrmetti* therefore does not alter the controlling Tenth Amendment inquiry in this case, which asks whether the challenged federal action rests on authority delegated to the federal government.

## CONCLUSION

For all these reasons, the Court should grant summary judgment in favor of Defendants.

DATED: August 14, 2026                    Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General

ERIC HAMILTON
Deputy Assistant Attorney General

*/s/ John Bailey*
JOHN BAILEY
Counsel to the Assistant Attorney
General
LINDSEY GILMAN
Trial Attorney
United States Department of Justice
Civil Division
950 Constitution Ave. NW
Washington, DC 20005
Phone: (202) 514-6993
Email: john.bailey@usdoj.gov

*Counsel for Defendants*

## LOCAL RULE 7.1 CERTIFICATION

I, John Bailey, hereby certify that pursuant to L.R. 7.1(a)(2), I conferred with counsel for the Plaintiffs, who oppose this motion.


Dated: August 14, 2026                          */s/ John Bailey*
                                                JOHN BAILEY


## CERTIFICATE OF SERVICE

On August 14, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, District of Massachusetts, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                                                */s/ John Bailey*
                                                JOHN BAILEY

19