UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-12162 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................ i

**STATEMENT OF THE CASE** ........................................ 3

*A. Legal and Factual Background* ........................................ 3

*B. Procedural History* ........................................ 6

**STANDARD OF REVIEW** ........................................ 6

**ARGUMENT** ........................................ 7

**I. This Court Has Jurisdiction.** ........................................ 7

*A. Plaintiff States Have Standing.* ........................................ 7

*B. The Directives Are Final, Judicially Reviewable Agency Action.* ........................................ 9

**II. Plaintiffs are Entitled to Summary Judgment on the Merits of their Claims under the Administrative Procedure Act and the Tenth Amendment.** ........................................ 11

*A. The Directives Are Contrary to Law.* ........................................ 11

*B. The Directives Are Arbitrary and Capricious.* ........................................ 18

*C. The Directives Violate the Tenth Amendment and 5 U.S.C. 706(2)(B).* ........................................ 25

**III. Plaintiffs Are Entitled to the Requested Relief.** ........................................ 28

**CONCLUSION** ........................................ 30

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez*, 585 U.S. 579 (2018) .......... 8

*AFSCME, AFL-CIO v. OMB*, 807 F.Supp.3d 1004 (N.D. Cal. 2025) .......... 21

*Am. Acad. of Pediatrics v. Kennedy,* 823 F.Supp.3d 141 (D. Mass. 2026) .......... 19

*Am. Ass'n of Univ. Professors v. Rubio*, 802 F.Supp.3d 120 (D. Mass. 2025) .......... 25

*Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28 (1st Cir. 2026) .......... 23

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F. Supp. 3d 119 (D. Mass. 2025) .. 19, 20

*Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39 (1st Cir. 2025) .......... 23

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) .......... 11

*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 7

*Biden v. Nebraska*, 600 U.S. 477 (2023) .......... 12, 27

*Bos. Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) .......... 6

*Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624 (D. Mass. Feb. 26, 2026) .......... 10

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .......... 26

*California v. HHS*, 811 F.Supp.3d 183 (D. Mass. 2025) .......... 8

*California v. U.S. Dep't of Transp.*, 808 F.Supp.3d 291 (D.R.I. 2025) .......... 29

*Casa De Maryland v. DHS*, 924 F.3d 684 (4th Cir. 2019) .......... 23

*Clinton v. City of New York*, 524 U.S. 417 (1998) .......... 10

*Coe v. Blanche*, No. 1:26-cv-04641 (S.D.N.Y. July 9, 2026) .......... 5

*County of King v. Turner*, -- F.4th --, No. 25-3664, 2026 WL 2489361 (9th Cir. Aug. 25, 2026) .......... 11, 12

*CSL Plasma Inc. v. CBP*, 628 F.Supp.3d 243 (D.D.C. 2022) .......... 24

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38 (1st Cir. 2020) .... 9

*Dep't of Com. v. New York*, 588 U.S. 752 (2019).............................................................. 11, 21

*DHS v. Regents*, 591 U.S. 1 (2020)........................................................................... 10, 19

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) ........................................................... 9

*District of Columbia v. Dep't of Lab.*, 819 F.3d 444 (D.C. Cir. 2016)......................................... 10

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) .................................................................... 30

*Dorcas Int'l Inst. of R.I. v. USCIS*, 834 F.Supp.3d 242 (D.R.I. 2026) ......................................... 21

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ......................................................... 24

*FCC v. Fox Tel. Sta.*, 556 U.S. 502 (2009)......................................................................... 24, 25

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)........................................................... 18

*FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542 (2025) .......................................... 22, 24

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ...................................................................... 2, 25, 26

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................................................. 26

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985).................................. 26

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)...................................................................... 11

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235 (3d Cir. 2012) ........................................................................................................................ 15

*In re Zofran (Ondansetron) Prods. Liab. Litig.*, 541 F.Supp.3d 164 (D. Mass. 2021), *aff'd,* 57 F.4th 327 (1st Cir. 2023) ...................................................................................................... 15

*Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th 390 (D.C. Cir. 2021).............................................. 27

*Katz v. Pershing, LLC*, 672 F.3d 64 (1st Cir. 2012) ................................................................... 8

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (E.D. La. 2022)......................................................... 19

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)......................................................................... 7

*Maryland v. King*, 567 U.S. 1301 (2012) ............................................................................. 8, 29

*Massachusetts v. HHS*, 923 F.3d 209 (1st Cir. 2019) .......... 8, 27

*Massachusetts v. NIH*, 770 F.Supp.3d 277 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026).. 28

*Mot. Veh. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......... 21

*Moyle v. United States*, 603 U.S. 324 (2024) .......... 26

*N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1 (1st Cir. 2000) .......... 7

*N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021) .......... 9

*Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL 1876366 (D. Mass. June 30, 2026) .......... 12, 21

*Nat'l Educ. Ass'n v. DOE*, 779 F.Supp.3d 149 (D.N.H. 2025) .......... 25

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) .......... 11

*Nat'l TPS All. v. Noem*, 166 F.4th 739 (9th Cir. 2026) .......... 21

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) .......... 20

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.,* 407 F.Supp.2d 323 (D. Mass. 2005) .......... 30

*New York v. Kennedy*, 155 F.4th 67 (1st Cir. 2025) .......... 11

*New York v. Trump*, 171 F.4th 1 (1st Cir. 2026) .......... 18, 29, 30

*New York v. Trump*, 811 F.Supp.3d 215 (D. Mass. 2025) .......... 19, 22

*NFIB v. OSHA*, 595 U.S. 109 (2022) .......... 11

*Nken v. Holder*, 556 U.S. 418 (2009) .......... 30

*Ohio v. EPA*, 603 U.S. 279 (2024) .......... 18, 29

*Olsen v. United States*, 414 F.3d 144 (1st Cir. 2005) .......... 6

*Oregon v. Ashcroft*, 192 F.Supp.2d 1077 (D. Or. 2002) .......... 13

*Peace Ranch, LLC v. Bonta*, 93 F.4th 482 (9th Cir. 2024) .......... 7

*Pub. Emps. for Env't Resp. v. NPS*, No. 19-3629, 2021 WL 1198047 (D.D.C. Mar. 30, 2021) .. 11

*Rhode Island v. Trump*, 155 F.4th 35 (1st Cir. 2025) .......... 30

*Romer v. Evans*, 517 U.S. 620 (1996) .......... 21

*Sackett v. EPA*, 598 U.S. 651 (2023) .......... 25

*Saget v. Trump*, 375 F.Supp.3d 280 (E.D.N.Y. 2019) .......... 25

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) .......... 27

*Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012) .......... 19, 20

*Sierra Club v. EPA*, 955 F.3d 56 (D.C. Cir. 2020) .......... 11

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ........ 12

*South Carolina v. Baker*, 485 U.S. 505 (1988) .......... 28

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......... 7

*Trump v. California*, 609 U.S. __, 2026 WL 2473573 (2026) .......... 2

*U.S. ex rel. Souza v. Embrace Home Loans, Inc.*, 808 F.Supp.3d 314 (D.R.I. 2025) .......... 16

*United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730 (10th Cir. 2018) .......... 17

*United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023) .......... 18

*United States v. Bass*, 404 U.S. 336 (1971) .......... 12

*United States v. Castleman*, 572 U.S. 157 (2014) .......... 26

*United States v. Journey to Hope, Health & Healing, Inc.*, 728 F.Supp.3d 251 (D.R.I. 2024).... 17

*United States v. Regenerative Sciences, LLC*, 741 F.3d 1314 (D.C. Cir. 2014) .......... 16

*United States v. Santos*, 553 U.S. 507 (2008) .......... 12

*United States v. Skrmetti*, 605 U.S. 495 (2024) .......... 2

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977) .......... 21

*United States v. Texas*, 599 U.S. 670 (2023) .......... 10

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016)................. 17

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ....................................................................... 2

*Wash. Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000).......................................... 15, 16

*Washington v. HHS*, No. 6:25-CV-01748, 2025 WL 3002366 (D. Or. Oct. 27, 2025)............... 21

*Washington v. Trump*, 766 F.Supp.3d 1138 (W.D. Wash. 2025) ............................................... 27

*West Virginia v. EPA*, 597 U.S. 697 (2022)............................................................................ 2, 12

*Whitman-Walker Clinic, Inc. v. HHS,* 485 F.Supp.3d 1 (D.D.C. 2020) ..................................... 30

**Statutes**

18 U.S.C. § 116.......................................................................................................... 3, 12, 13, 14

21 U.S.C. § 301 *et seq*............................................................................................................ 3, 14

21 U.S.C. § 321 ......................................................................................................................... 15

21 U.S.C. § 396.......................................................................................................................... 15

31 U.S.C. § 3729 *et seq*.......................................................................................................... 3, 26

42 U.S.C. § 1396r-8 .................................................................................................................... 15

5 U.S.C. § 706........................................................................................................................ 11, 25

Cal. Civ. Code § 1798.301 .......................................................................................................... 27

Mass Gen. Laws ch. 12, § 11I ½................................................................................................. 26

**Other Authorities**

Executive Order No. 14187, 90 Fed. Reg. 881 (Jan. 28, 2025) ................................................ 1, 3

National Institutes of Health Guidelines for Human Stem Cell Research, 74 Fed. Reg. 32170 (July 7, 2009)........................................................................................................................... 20

**Rules**

Fed. R. Civ. P. 25(d) ..................................................................................................................... 3

## INTRODUCTION

Since his first day in office, President Trump has embarked on a campaign to erase transgender individuals and eradicate health care for transgender youth. In this case, Plaintiff States challenge the lynchpin of the administration's efforts to carry out this mandate: the Department of Justice's threats to prosecute healthcare providers and hospitals that provide medical treatments for transgender youth ("gender-affirming care"), using novel, sweeping interpretations of federal laws that have never before been enforced in this context. Specifically, Plaintiff States challenge two Department of Justice ("DOJ") directives, issued by then-Attorney General Pam Bondi and Assistant Attorney General Brett Shumate, ordering the investigation and prosecution of healthcare providers who provide gender-affirming care to minors. Both of these directives were issued pursuant to one section of Executive Order No. 14187, 90 Fed. Reg. 881 (Jan. 28, 2025), entitled "Protecting Children from Chemical and Surgical Mutilation." The Court having denied Defendants' motion to dismiss, the parties have now cross-moved for summary judgment. The Court should deny Defendants' motion for summary judgment, grant summary judgment to Plaintiff States, and enter the requested relief.

As a threshold matter, Defendants do not ask this Court to revisit its prior holdings on standing, finality, or declaratory relief or raise new arguments as to standing or justiciability. (Doc No. 124 at 7, 12). The Court should reaffirm that Plaintiffs' claims are justiciable, reviewable under the Administrative Procedure Act ("APA"), and redressable under the Declaratory Judgment Act, and should, again, reject Defendants' baseless attempt to relitigate its losing characterization of the challenged actions as mere enforcement priorities.

This Court should also find that the challenged DOJ Directives (together, the "Directives")

violate the APA and the Tenth Amendment.[1] The Directives are contrary to law because the federal statutes on which they are premised neither bar gender-affirming care nor vest the President or DOJ with legal authority to selectively outlaw medical treatments. Courts expect Congress to "speak clearly" if it wishes to assign authority to an agency to address significant policy decisions, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), particularly on issues that are "the subject of an earnest and profound debate across the country," *West Virginia v. EPA*, 597 U.S. 697, 732 (2022) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006)); *see United States v. Skrmetti*, 605 U.S. 495, 525 (2024) (propriety of gender-affirming care subject to "fierce scientific and policy debates"). It has done no such thing with respect to any of the three statutes Defendants now threaten to enforce.

In addition, the Directives are arbitrary and capricious because, as Defendants admit and the threadbare administrative record shows, the Directives are based wholly on the EO; lack any legal analysis or factual support; announce a change in agency position without acknowledgment, explanation, or consideration of serious and decades-old reliance interests; and are based on improper and discriminatory motives. Further, because the three statutes at issue lack any clear statement from Congress that those enactments permit the federal government to regulate the

[1] Plaintiffs have asserted that Sections 8(a) and (c) of the Executive Order similarly violate the Tenth Amendment. (*See* Doc. No. 113 ¶¶ 235–241). In *Trump v. California*, 609 U.S. __, 2026 WL 2473573 (2026) (per curiam), in an order granting an emergency stay application, the Supreme Court determined the plaintiff states likely did not have standing to challenge specific provisions of an Executive Order directing the Attorney General to "prioritize" investigation and prosecution of violations of existing federal election laws. The Court found this likely did not harm the plaintiff states because the executive order specified it was to be "implemented consistent with applicable law" and was limited to "only 'appropriate' prosecutions." *Id.* at 2. To the extent the challenged sections of the EO at issue here are similarly construed as being limited to "appropriate" prosecutions consistent with applicable law, Plaintiffs do not move the Court at this time for relief as to the EO. To the extent Defendants disagree, Plaintiffs reserve and adopt the arguments set forth in Section II.C., below, with respect to Sections 8(a) and (c) of the Executive Order.

practice of medicine in this manner, in derogation of traditional state sovereignty, the Directives violate the Tenth Amendment.

## STATEMENT OF THE CASE

### A. Legal and Factual Background

In January 2025, the President issued Executive Order 14187, "Protecting Children From Chemical and Surgical Mutilation" ("the EO"), which called gender-affirming care "a stain on our Nation's history" that "must end." (Doc No. 1-5 at 2). Sections 8(a) and (c) of the EO direct DOJ to review its enforcement of the statute criminalizing female genital mutilation, 18 U.S.C. § 116 ("FGM statute"), in connection with the provision of gender-affirming care, and to prioritize investigations of entities "misleading the public" about gender-affirming care under the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq*. ("FDCA"). (Doc No. 1-5 §§ 1, 8). Three months later, then-Attorney General Bondi[2] issued a memorandum entitled "Preventing the Mutilation of American Children" (the "Bondi Directive"), which pledged that DOJ would bring gender-affirming care "to an end" by (i) enforcing violations of the FGM statute "under the banner of so-called 'gender-affirming care' or otherwise"; (ii) investigating "physicians prescribing puberty blockers to a child for an illegitimate reason (e.g., gender dysphoria)" under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"); and (iii) investigating "false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition' . . . [e]ven if otherwise truthful" under the FDCA. (Doc No. 1-6 at 2-3). Subsequently, Assistant Attorney General Shumate issued another memorandum (the "Shumate Directive") directing the Civil Division to use "all available resources" to implement the EO and

---

[2] Pamela Bondi was the U.S. Attorney General when the Directive was issued. The current Attorney General is Todd Blanche. *See* Fed. R. Civ. P. 25(d).

Bondi Directive against "doctors" and "hospitals," among other entities. (Doc. No. 1-7 at 2–7).

The administration's position represents a marked shift. Federal laws and policies have long authorized medically necessary, gender-affirming health care for adolescents. *See infra* at II.A.2 (discussing federal law protecting access to FDA-approved medications and devices for off-label uses); *see also* BM-AR-0184–BM-AR-0191. In addition, many Plaintiff States have independently protected access to gender-affirming care through state laws, regulations, and constitutional amendments. Plaintiffs' Statement of Material Facts [hereinafter "SMF"] ¶¶ 135–148. These state laws take a variety of forms, including enshrining a standalone right to gender-affirming care (SMF ¶ 138), prohibiting healthcare providers or insurers from discriminating based on gender or gender identity (SMF ¶ 139), requiring insurers to cover gender-affirming care (SMF ¶ 140), protections from out-of-state efforts to penalize gender-affirming care (SMF ¶ 141), and guaranteeing access to gender-affirming care in their state Medicaid programs (SMF ¶ 159). In the States' sovereign judgment, preserving access to this care is critical to ensuring the health, dignity, and autonomy of transgender individuals within their borders. SMF ¶ 137.

The EO and Directives had immediate consequences in Plaintiff States, prompting some providers to cease providing care, causing other providers to absorb displaced patients, and prompting a flood of panicked inquiries to providers and state government offices. SMF ¶¶ 174–180, 188–94. The White House boasted that the actions were having their "intended effect" and, later, that the President had "delivered" on his promise to end gender-affirming care. SMF ¶¶ 14–15, 45–46.

In DOJ's own words, "[a]cting on these directives, the Civil Division launched a nationwide investigation into the child gender-transition industry." SMF ¶ 95. At a workshop convened by the FTC in July 2025, when a panelist suggested that doctors providing medical care

to transgender adolescents should be prosecuted to create a chilling effect across the country, a fellow panelist working at DOJ stated that he was "[w]orking on it." SMF ¶¶ 38–40. Defendants created a dedicated enforcement branch of DOJ and a joint working group with HHS, and sent over twenty subpoenas to doctors and hospitals across the country. SMF ¶¶ 48, 49–63, 103–105; *see* Doc No. 86 at 9–11 (discussing same in opposition to Defendants' motion to dismiss). Multiple courts found that these subpoenas lacked a legitimate purpose and served only to harass and intimidate providers of gender-affirming care. SMF ¶ 52.

In recent months, Defendants have taken additional actions to carry out the EO and Directives, including seeking medical records of youth who received gender-affirming care in Plaintiff States. For example, in April 2026, Defendants filed a motion in the Northern District of Texas to enforce a pending administrative subpoena against a hospital in Rhode Island. SMF ¶¶ 55–57. DOJ has also withdrawn some administrative subpoenas and replaced them with criminal grand jury subpoenas issued to hospitals across the country, including in California and New York, but enforceable only in the Northern District of Texas. SMF ¶¶ 59–62. As part of these criminal investigations, DOJ has sought unredacted patient records, forcing patients and their families to seek emergency court orders to block the release of their private medical information. *Id*. In announcing the issuance of a temporary restraining order in one of these cases, the court found that DOJ had made "no promise that the records would not be used to prosecute the parents of the patients or the doctors who facilitated treatment," noting that DOJ had not assured the court that minor patients themselves would not face prosecution or that information it obtained would not be shared with state or local law enforcement. Transcript of Proceedings at 28–29, *Coe v. Blanche*, No. 1:26-cv-04641 (S.D.N.Y. July 9, 2026), Dkt. No. 77 (transcript of teleconference decision).

Recently, DOJ has announced settlements with hospitals, including in Plaintiff States

Connecticut and New York, which require the hospitals to stop providing gender-affirming care (though they may provide the same treatments for other reasons), and impose penalties up to $10 million. SMF ¶¶ 64–100. DOJ has specifically stated these settlements result from its implementation of the EO and Bondi Directive and reflect its commitment to "holding medical providers, hospitals, and pharmaceutical companies accountable for unsound medical practices and procedures that put our kids at risk." SMF ¶¶ 95–96.

### B. Procedural History

On August 1, 2025, Plaintiff States filed a complaint alleging that the EO, Bondi Directive, and Shumate Directive violate the APA and the Tenth Amendment. (Doc No. 1). Defendants moved to dismiss, and the Court denied the motion. (Doc Nos. 82, 105). The Court held that Plaintiffs had standing; that the EO and Directives announce new statutory interpretations; that the Directives are final agency actions and are reviewable under the APA; and that Plaintiffs had properly stated a claim under the Tenth Amendment. (Doc No. 105). On July 7, 2026, Plaintiffs filed an amended complaint that added two Plaintiff States but did not amend or add any claims. (Doc No. 113). On August 14, 2026, Defendants moved for summary judgment. (Doc No. 124). Plaintiffs now oppose and cross-move for summary judgment.

## STANDARD OF REVIEW

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Bos. Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). A court's review is based on the administrative record, *Olsen v. United States*, 414 F.3d 144, 155 (1st Cir. 2005). Thus, unlike in the ordinary course, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" is unlawful. *Bos. Redev. Auth.*, 838 F.3d at 47. Separately, the court may

consider evidence outside the record for purposes of establishing jurisdiction. *See Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) ("[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## ARGUMENT

### I. This Court Has Jurisdiction.

#### A. Plaintiff States Have Standing.

This Court previously found that Plaintiff States have standing to pursue their claims, (Doc No. 105 at 21–31), and—particularly because Defendants do not dispute the factual bases for that holding, (Doc No. 124 at 7, 12)—it should reaffirm that decision now.

The Directives have harmed Plaintiffs in five distinct ways, each of which independently supports standing for each of Plaintiffs' claims. First, some Plaintiff States themselves provide and bill federal health programs for the targeted medical treatments, SMF ¶¶ 149–153, 156–171, and thus face a direct and imminent risk of prosecution under the challenged Directives. This is sufficient to establish standing to challenge the Directives, especially in light of Defendants' ongoing vigorous efforts to investigate and enforce their novel statutory interpretations against other providers of the targeted medical treatments, *see* SMF ¶¶ 11–113, and their failure to disavow that they will enforce the challenged directives against Plaintiffs. *See, e.g.*, *N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 4–5 (1st Cir. 2000); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–61 (2014); *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 490 (9th Cir. 2024).

Second, Plaintiffs have suffered predictable proprietary harms caused by the EO and Directives' *in terrorem* effect. State Facilities have expended significant time and resources to manage influxes of new and current patients and increased compliance and training costs. SMF ¶¶

191–194. And State Facilities, child welfare agencies, and public health and insurance programs must bear downstream health care costs that accrue when minors are not able to access the treatments they need. SMF ¶¶ 188–194; *see Massachusetts v. HHS*, 923 F.3d 209, 222 (1st Cir. 2019) (citing "bedrock proposition" that fiscal injury to a State that is traceable to challenged action confers standing (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012))); *California v. HHS*, 811 F.Supp.3d 183, 197–200 (D. Mass. 2025) (downstream healthcare costs associated with reduced access to care constituted injury for purposes of state standing).

Third, the Directives have predictably frustrated State agencies' ability to meet their legal obligations to provide medically necessary healthcare to youth in state custody. SMF ¶¶ 195–200. Fourth, Plaintiff States suffer sovereign injury sufficient to confer standing due to the Directives' intrusion on the States' role as regulators of medicine and interference with their ability to give full force and effect to their antidiscrimination laws, shield laws, and laws protecting access to gender-affirming care. *See* App. A to Pls.' Mem. of Law ISO Summ. J. [hereinafter "App. A"]; *infra* at 25-28; SMF ¶¶ 201–202; *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And finally, the Directives present State Facilities and agencies with a Hobson's choice of either continuing to provide the care and risking federal investigation or prosecution, or terminating it and risking liability for failing to meet their legal and ethical obligations to patients. SMF ¶¶ 195–200, 201–202.

Plaintiff States' claim for a declaratory judgment is also properly before the Court. As argued in Plaintiffs' opposition to the motion to dismiss (*see* Doc No. 86 at 20–24, incorporated here by reference), Defendants have created a justiciable controversy through the imminent and substantial risk of prosecution under the novel legal interpretations at issue in the EO and Directives. *See supra* at 4–5, 7 (threats of prosecution); *infra* at 11–18 (interpretations of federal

statutes). Because these adverse legal interests can be addressed through the resolution of purely legal questions—namely, interpretation of those statutes—this Court may appropriately issue a declaratory judgment. *See N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 54, 62 (1st Cir. 2021).

Finally, the remaining requirements for standing are met. Plaintiffs' injuries are either directly caused by or fairly traceable to the Directives because they are the predictable—and indeed, the intended—effect of Defendants' actions. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025); *see also* SMF ¶¶ 14–15, 45–47, 176–180. Undisputed testimony also attributes State Facilities' and State agencies' harms to the Directives. SMF ¶¶ 176–180, 188–194, 195–202. And a favorable decision by this Court "would limit the Attorney General's discretion by prohibiting enforcement of the Statutes in ways that contradict the law." (Doc. No. 105 at 26). Even if other federal actions also chill the provision of the targeted medical treatments, a holding that *this* course of action is unlawful would lessen that overall chilling effect. *See Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 49 (1st Cir. 2020).

### B. The Directives Are Final, Judicially Reviewable Agency Action.

As this Court correctly held, "[i]t is plain from the text and context of the Memos that they announce new interpretations of federal law," with the goal of ending the provision of gender-affirming care. (Doc. No. 105 at 21). This both confers standing on Plaintiffs and meets the test for APA reviewability. While Defendants purport to "recognize that the Court rejected" their finality and committed-to-agency-discretion "arguments at the motion to dismiss stage and do not seek to relitigate them here," (Doc. No. 124 at 12), they nonetheless persist in attempting to recast the Directives as mere "enforcement priorities" that do not adopt new interpretations of federal law. (Doc No. 124 at 12–15). Defendants raise no new arguments that should cause the Court to revisit its conclusions.

While a new administration may be "entitled to reevaluate and modify agency practices" (Doc. No. 124 at 12–13 (citation omitted)), "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). And "[w]hen a new situation arises outside the scope of an old statute, the proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear." *District of Columbia v. Dep't of Lab.*, 819 F.3d 444, 450 (D.C. Cir. 2016) (Kavanaugh, J.). Defendants' weaponization of the three statutes at issue is no mere enforcement priority, but instead the type of exercise of "coercive power" over an individual's liberty interests, "that federal courts often are called upon to protect." *United States v. Texas*, 599 U.S. 670, 678 (2023); *cf. DHS v. Regents*, 591 U.S. 1, 17–18 (2020) (DACA program was "more than simply a non-enforcement policy" within agency discretion but rather "created a program for conferring affirmative immigration relief," and therefore its rescission was reviewable); *Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624, at *6 (D. Mass. Feb. 26, 2026) (DHS policy Memoranda issued pursuant to EO freezing pending asylum applications from countries deemed high risk were final in light of "very serious consequences that will result" for the petitioners). Accordingly, Defendants' invocation of *United States v. Texas* is sorely misplaced. (Doc No. 124 at 12).

If there were any doubt on the question of finality, Defendants' ongoing and escalating enforcement tactics since this case was filed—including the issuance of grand jury subpoenas and announcement of multimillion dollar settlements applying the interpretations of the FCA and FDCA set forth in the Directives, *see* SMF ¶¶ 59–62, 64–100—cement the conclusion that the Directives are final agency action. Defendants are effectuating the "marching orders" set forth in the Directives, *Pub. Emps. for Env't Resp. v. NPS*, No. 19-3629, 2021 WL 1198047, at *9 (D.D.C.

Mar. 30, 2021); operating as though the interpretations of the FCA and FDCA set forth in the Directives are "controlling in the field," *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000); and "appl[ying] the guidance as if it were binding on regulated parties," *Sierra Club v. EPA*, 955 F.3d 56, 62 (D.C. Cir. 2020) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)); *see also New York v. Kennedy*, 155 F.4th 67, 76 (1st Cir. 2025) (agency communique was final "given that it was followed, just days later, by the Department's dismantling of sub-agencies and a RIF impacting 10,000 employees"). Moreover, in challenges to Defendants' enforcement actions under the Directives, numerous courts have since had occasion to adjudicate the lawfulness of the legal theories they advance, further demonstrating that there is "law to apply." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019); *see* SMF ¶¶ 52–62.

## II. Plaintiffs are Entitled to Summary Judgment on the Merits of their Claims under the Administrative Procedure Act and the Tenth Amendment.

### A. The Directives Are Contrary to Law.

In advancing novel interpretations of the FGM, FDCA, and FCA statutes, DOJ endeavors to weaponize its enforcement authority to stamp out an entire field of medicine. Defendants' warped interpretations are contrary to the statutes they purport to interpret and grossly exceed Defendants' statutory authority, rendering them unlawful under the APA. 5 U.S.C. § 706(2)(A), (C); *see also NFIB v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute [and] accordingly possess only the authority Congress has provided."). Though the Directives clearly evince Defendants' desire to end gender-affirming care, the Executive Branch "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013); *County of King v. Turner*, -- F.4th --, No. 25-3664, 2026 WL 2489361, at *11–12 (9th Cir. Aug. 25, 2026) (plaintiffs showed likelihood of success on claim that funding conditions "tied to supra-legal policy objectives," including

objection to "promoting gender ideology," exceeded agency's statutory authority). Nor can the Executive rewrite statutes to further its policy preferences. *See Biden v. Nebraska*, 600 U.S. 477, 506–07 (2023); *Turner*, 2026 WL 2489361, at *11–12; *Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL 1876366, at *33 (D. Mass. June 30, 2026) ("Administrations change with elections; criminal laws do not.").

If Congress had intended these statutes to prevent physicians from providing gender-affirming care, it needed to say so explicitly. It has done no such thing. And as argued further, *infra* at 25–28, the interpretations also encroach on both (i) important policy issues, *see West Virginia*, 597 U.S. at 729–30, and (ii) an area of traditional state authority, *see United States v. Bass*, 404 U.S. 336, 349 (1971), without clear statements from Congress. *See, e.g.*, *Nebraska*, 600 U.S. at 506 (invalidating interpretation of statute that created "mass debt cancellation program"); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (invalidating interpretation of statute that threatened "significant impingement of the States' traditional and primary power over land and water use"). These interpretive principles further underscore that the challenged Directives are contrary to law.[3]

**1. The FGM statute does not apply to the provision of medically necessary gender-affirming care for minors.**

Contrary to Defendants' *post hoc* characterization, providing medically necessary gender-affirming care to people under 19 does not fall within the "core prohibition of the [FGM] statute." (Doc. No. 124 at 15). The FGM Act of 1996 and the Strengthening the Opposition to FGM Act of 2020 (STOP FGM) were passed in response to international outcry and debate over the distinct

[3] Moreover, even if the statutes were ambiguous, which they are not, the rule of lenity would bar the government's novel interpretations because the violations they identify are not "clearly prescribed." *See United States v. Santos*, 553 U.S. 507, 514 (2008).

cultural practice of FGM, which involves the partial or total removal of the external female genitalia (clitoris, labia) or the sewing shut of the vaginal opening, often by traditional practitioners using razor blades or broken glass, and often between infancy and the onset of puberty. SMF ¶¶ 114–118. The FGM statute makes it a federal crime to perform or attempt to perform FGM on an individual under 18, which it defines as "any procedure performed for non-medical reasons that involves partial or total removal of, or other injury to, the external female genitalia," including four specified procedures not at issue in provision of gender-affirming care. 18 U.S.C. § 116(a), (e). The statute further exempts surgical operations "necessary to the health of the person on whom [they are] performed." *Id.* § 116(b).

As an initial matter, the conduct proscribed by the text of the FGM statute does not correspond to any form of healthcare delivered to transgender individuals under the age of 18—the age threshold defined in the statute—and nothing in the administrative record ("AR") indicates the contrary. For this reason alone, the Bondi Directive is facially misguided in its attempt to shoehorn gender-affirming care into the FGM statute's prohibitions.[4]

Further, the plain text and original public meaning of the statute make clear that Congress did not prohibit medical procedures provided to treat recognized medical conditions in a clinical setting, much less permit DOJ to supersede the clinical judgments of licensed practitioners. *See* SMF ¶¶ 114–118. The plain text of the statute twice expressly and unambiguously exempts medical procedures performed by a licensed physician for a legitimate medical reason from its

[4] The fact that Defendants and congresspersons have introduced bills to *amend* the FGM statute to cover gender-affirming care, or to enact separate statutes prohibiting gender-affirming care, *see* SMF ¶¶ 120–123, also shows that federal law does not *currently* prohibit the care. *See Oregon v. Ashcroft*, 192 F.Supp.2d 1077, 1093 (D. Or. 2002) (when legislative efforts failed, "[t]he Executive Branch immediately began its efforts to re-write the law to achieve its goal of abolishing assisted suicide").

ambit. 18 U.S.C. § 116(b), (e). Defendants' attempt to recast medically necessary gender-affirming care provided by licensed physicians in conformity with prevailing clinical guidelines as FGM simply cannot be squared with the statute.

**2. The FDCA does not prohibit prescribing FDA-approved drugs or devices as gender-affirming care.**

The Bondi Directive instructs DOJ attorneys to hold accountable under the FDCA "medical providers," who provide "false and misleading advice" by recommending "surgery or hormone replacement" to transgender youth. (Doc No. 1-6 at 2–3, 5). And the Shumate Directive promises that DOJ's Civil Division will use "all available resources" to investigate and prosecute "doctors" and "hospitals," among other entities, under the FDCA, consistent with the Bondi Directive and EO. (Doc No. 1-7 at 3–4; *see also* Doc. No. 82 at 23 (conceding that the Bondi Directive says "'the promotion of off-label uses of hormones'—*including during the provision of gender-related care*—'run[s] afoul of the FDA's prohibitions of misbranding and mislabeling'" (emphasis added))). The Directives not only threaten liability under the FDCA when providers communicate with their patients about gender-affirming treatments, but also suggest that FDCA liability could attach when medical providers purchase, store, prescribe, or administer FDA-approved drugs for gender-affirming care. (*See* Doc. No. 87-27 at 9 (Hsiao Dec.) (provider or hospital enters "chain of distribution" under FDCA by purchasing, storing, or administering puberty blockers or testosterone)).

This position represents a drastic break from case law, the FDCA's text, and agency practice. The FDCA statutory framework bars the introduction or delivery for introduction into interstate commerce of any food, drug, or device that is adulterated or misbranded. 21 U.S.C. § 331. As Defendants concede, the FDCA does not prohibit the off-label use of approved drugs (Doc No. 118 ¶ 156) and it has long been understood that once a drug is approved, medical

providers may prescribe, administer, and discuss with patients any FDA-approved drug for an off-label purpose. *See, e.g.*, *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 541 F.Supp.3d 164, 173 (D. Mass. 2021) ("[I]t is generally lawful for physicians to prescribe medications for purposes for which they have not been FDA-approved . . . ."), *aff'd*, 57 F.4th 327 (1st Cir. 2023); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012); *Wash. Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000). The same is true for gender-affirming medical care.

Both the FDA and DOJ's Office of Legal Counsel have made public statements, including as recently as last year, confirming that "[a]s a general matter, [the] FDA does not regulate the practice of medicine, which includes 'off-label' prescribing." *See* SMF ¶¶ 126–128. Further, under Medicaid's Drug Rebate Program, off-label prescriptions—including those for medications used in gender-affirming care—are reimbursable if listed in a recognized compendium. *See* 42 U.S.C. § 1396r-8(g)(1)(B)(i), (k)(6). It is implausible that the federal government has been openly, knowingly reimbursing claims that violate the FDCA.

Additionally, when it comes to FDA-approved devices, which, under 21 U.S.C. § 321(h)(1), include implanted puberty blockers often used in gender-affirming care, the plain text of the FDCA permits providers to prescribe or administer devices to patients for off-label uses. *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").

Defendants state that "physicians do not enjoy a categorical exemption from the FDCA merely because regulated conduct occurs in the course of medical practice." (Doc No. 124 at 14).

True enough. But the case they cite, *United States v. Regenerative Sciences, LLC*, 741 F.3d 1314 (D.C. Cir. 2014), did not involve the prescribing and dispensing of FDA-approved drugs or devices, but rather, physicians who manufactured a substance from an existing drug and a patient's stem cells, which was undisputedly a new drug and had not received FDA approval. *See id.* at 1318–19. Accordingly, the physicians were liable under the theories that they had either adulterated a drug by violating federal manufacturing standards, or mislabeled the drug compound by failing to include adequate directions for use or the symbol "Rx only" on the label. *Id.* at 1323–25. That case has no application to physicians or hospitals dispensing unaltered, FDA-approved drugs to patients receiving gender-affirming care.

Defendants identify no case on point supporting their novel theory of FDCA liability. Indeed, endorsing the Directives' interpretation of the FDCA would subject entire fields of medicine to criminal liability for providing routine care. *See Wash. Legal Found.*, 202 F.3d at 333 (emphasis added) (in certain specialties including oncology and pediatrics "the prescription of drugs for unapproved uses . . . is *ubiquitous*"). This cannot be the law.

### 3. The FCA does not treat billing for gender-affirming care as categorically false or fraudulent.

The Directives adopt a novel theory of "falsity" under the FCA that would render billing the federal government for gender-affirming care *per se* fraudulent. To establish a claim pursuant to the FCA, the government must establish four elements: falsity, scienter, materiality, and causation. *U.S. ex rel. Souza v. Embrace Home Loans, Inc.*, 808 F.Supp.3d 314, 347 (D.R.I. 2025). Primarily at issue in this case is the falsity element. Falsity may be established when a claim is untrue on its face—such as billing for one service but providing another—or when a submitter knowingly and falsely certifies compliance with conditions that are material to the government's decision to pay—such as billing for care that was not in fact medically necessary. *See United States*

*v. Journey to Hope, Health & Healing, Inc.*, 728 F.Supp.3d 251, 258 (D.R.I. 2024); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187–90 (2016); *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742 (10th Cir. 2018).

Billing federal health programs for gender-affirming care is neither of these. Yet the Bondi Directive orders DOJ Civil Division to investigate "false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." (Doc No. 1-6 at 5). By way of example, the Bondi Directive cites "physicians prescribing puberty blockers to a child for an illegitimate reason (*e.g.*, gender dysphoria) but reporting a legitimate purpose (*i.e.*, early onset puberty)." *Id*. In a press release announcing a settlement obtained under the Directives, Defendants also described gender-affirming care as "potentially unlawful medical interventions" for which it would be "fraudulent[]" to bill the federal government. SMF ¶ 95. In other words, the Directives assert that billing for gender-affirming care is categorically illegitimate and therefore violates the FCA, though it does not specify how.

Defendants misleadingly argue that the Bondi Directive merely directs resources toward an established theory of liability, targeting only "[in]accurate[] billing for a [non]covered service." (Doc No. 124 at 14). This *post hoc* recharacterization of the Directive is supported neither by the text of the Directive itself nor Defendants' subsequent conduct in carrying it out. Instead, the Bondi Directive on its face announces that providers may be liable under the FCA based on what DOJ and the President have categorically determined to be "illegitimate" courses of treatment for certain individuals. This novel interpretation treats an entire category of medical treatments as improper without regard to any facts. The novelty and breadth of Defendants' interpretation is reinforced by Defendants' conduct, including issuing administrative and criminal grand jury subpoenas based on these theories to providers in some of the Plaintiff States where gender-

affirming care is legal and, in many instances, insurance coverage is mandated by law. SMF ¶¶ 49–62. Defendants claim that their goal is to prevent providers from "evad[ing] state bans on gender dysphoria treatments" (Doc No. 1-7 at 4) by using clinically inappropriate codes in order to obscure a treatment's true purpose, but this is belied by Defendants' numerous active FCA investigations in Plaintiff States where gender-affirming care is lawful and protected. SMF ¶¶ 49–62, 64–100.

Nor does the AR contain any whisper of support that false billing has taken place. *See* AR. Rather, this is DOJ announcing broad, categorical clinical determinations in the absence of any evidence of wrongdoing or inquiry into the underlying clinical facts. But FCA liability is based on what the provider believed was appropriate at the time a claim was submitted—not what the government believes is reasonable after the fact. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749–50 (2023). The clinical questions at issue—such as whether puberty blockers are an appropriate treatment for a patient's gender dysphoria, or whether a transgender young person seeking care is more appropriately diagnosed with gender dysphoria or an endocrine disorder—are decisions for doctors, not lawyers and politicians.

**B. The Directives Are Arbitrary and Capricious.**

DOJ's actions violate the APA for the independent reason that they are arbitrary and capricious. Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A reviewing court "must ensure . . . that the agency has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *New York v. Trump*, 171 F.4th 1, 20 (1st Cir. 2026) (quoting *Ohio v. EPA*, 603 U.S. 279, 292 (2024)). And when adopting a new policy, agencies must further "assess whether there were reliance interests, determine whether they were

significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Here, the Directives and the AR are devoid of relevant facts, fail to explain the reasoning behind the Directives' novel legal interpretations, and fail to take into account Plaintiff States' significant reliance interests. The Directives thus fail the arbitrary-and-capricious standard in several respects.

**1. The Directives are not reasonable or reasonably explained.**

Defendants' sole explanation for the novel legal interpretations set forth in the Directives is that the Executive Order directed their adoption. (Doc No. 124 at 16–17). This explanation fails as a matter of law. It is well-established that the APA does not permit reflexive reliance on presidential directives. *See, e.g.*, *Am. Acad. of Pediatrics v. Kennedy,* 823 F.Supp.3d 141, 161–62 (D. Mass. 2026) ("Defendants cannot disregard the APA's requirements simply because they are following the President's orders."). Rather, agencies must independently satisfy the APA's reasoned decision-making requirement even when implementing an Executive Order, and agency actions explained *only* by presidential directive consistently fail arbitrary-and-capricious review. *See, e.g.*, *New York v. Trump*, 811 F.Supp.3d 215, 235, 240 (D. Mass. 2025) (finding agency action arbitrary and capricious where defendants conceded "the sole factor they considered in deciding to [act] was the President's direction to do so"); *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F. Supp. 3d 119, 179 (D. Mass. 2025) (same); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (E.D. La. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.").

Defendants cite no authority to the contrary, and the sole case they rely on is inapposite. (Doc No. 124 at 16–17). *Sherley v. Sebelius* involved NIH guidance on stem cell research issued to implement an Executive Order. 689 F.3d 776, 780 (D.C. Cir. 2012). But critically, the agency did not rely solely on the EO to justify its decision; the challenged guidance cited extensive

medical, ethical, financial, and scientific analyses, and the administrative record contained detailed explanations and addressed objections and alternatives raised during notice-and-comment. *Id.; see also* National Institutes of Health Guidelines for Human Stem Cell Research, 74 Fed. Reg. 32170 (July 7, 2009). Defendants point to no such independent reasoning, medical or scientific studies, or analyses that informed its actions in this case, and none are present in the administrative record. See Ridolfi-Starr Decl. Exs. 5 (Bondi memo AR index), 6 (Shumate Memo AR index).

To be sure, "an agency 'may not simply disregard an Executive Order.'" (Doc No. 124 at 16 (quoting *Sherley*, 689 F.3d at 784)). But while every presidential administration "enjoys the ability to make policy changes," courts agree that "the agencies that implement those changes have to have a reasoned and reasonable explanation for doing so," a requirement not satisfied by the mere existence of a presidential directive. *AAP*, 791 F.Supp.3d at 185. Defendants' position "would shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024).

In fact, despite arguing that the Court's review is limited to the Administrative Record in APA cases, (*see* Doc. No. 124 at 11), Defendants do not cite the administrative record in their opening brief at all, or even introduce it into evidence. Perhaps this is because nothing in the AR explains the Directives, supports their novel interpretations of the three statutes, or justifies the startling implication that providers of gender-affirming care are violating these laws. Instead, the AR confirms the Directives were motivated not by any reasoned consideration of the facts or of the three statutes at issue, but by an overt policy objective to end gender-affirming care. *See* AR 175–80 (Trump's campaign promise to "revoke" Biden's GAC policies and end GAC). But "[a]n agency may not justify a regulation by invoking broad policy objectives untethered to the governing statute." *Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL

1876366, at *30 (D. Mass. June 30, 2026). "By relying on policy objectives that Congress neither enacted nor identified as relevant," Defendants have "'relied on factors which Congress has not intended it consider,'" which renders the Directives arbitrary and capricious. *Id.* (citing *Mot. Veh. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

When reviewing agency action, a reviewing court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). As this Court correctly found, the Directives' true purpose "is to intimidate and harass" and "to end gender-affirming care by frightening gender-affirming care providers, TGNBI people, and the many people who love their TGNBI family, friends, and community members." (Doc No. 105 at 35). This is an improper purpose that independently renders the Directives arbitrary and capricious under the APA. *See, e.g.*, *Washington v. HHS*, No. 6:25-CV-01748, 2025 WL 3002366, at *20 (D. Or. Oct. 27, 2025) (plaintiff states likely to succeed on merits of argument that agency's demand that grantees delete references to transgender individuals was arbitrary and capricious because its true purpose was to "'erase' transgender and gender diverse people from the program materials consistent with 'this administration's overtly hostile comments regarding transgender people'"); *Dorcas Int'l Inst. of R.I. v. USCIS*, 834 F.Supp.3d 242, 323 n.42 (D.R.I. 2026) (emphasizing that "animus-ridden stereotyping . . . can never be viewed as 'reasonable' decision-making" (quoting *Nat'l TPS All. v. Noem*, 166 F.4th 739, 776 n.5 (9th Cir. 2026) (Mendoza, J., concurring))); *AFSCME, AFL-CIO v. OMB*, 807 F.Supp.3d 1004, 1037 (N.D. Cal. 2025) (plaintiffs likely to succeed on arbitrary and capricious claim where agencies sent out "retaliatory" Reduction-in-Force notices to punish agencies not aligned with the President's policy goals); *see also Romer v. Evans*, 517 U.S. 620, 634 (1996) (law "born of animosity toward the class of persons affected" does not bear rational

relationship to legitimate government purpose).

**2. The Directives changed DOJ's legal position without justification or consideration of serious reliance interests.**

Defendants have failed to provide a reasoned explanation for their abrupt change in policy, or to consider "serious reliance interests" on the agency's prior legal position. *See FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (citation omitted). Since the FGM statute was enacted in 1996, the FDCA in 1938, and the FCA in 1863, Defendants have never once publicly interpreted or enforced the statutes to prohibit providing or billing for entire categories of medical treatment—much less for gender-affirming care for patients under 19. On the contrary, the federal government has approved state Medicaid plans that expressly require coverage for such care, and, as Defendants concede, *see* Doc. No. 118 ¶¶ 2, 147, has reimbursed health care providers with federal funds for providing it. SMF ¶¶ 159–171. These actions have clearly signaled to the regulated community that providing and billing for such care does not violate federal law. SMF ¶¶ 134, 159–173.

Defendants' longstanding interpretations and enforcement of these statutes have shaped providers' practice for many years. In reliance upon Defendants' prior enforcement precedent, States have designed their Medicaid programs to cover gender-affirming care. SMF ¶¶ 159–171; *see New York*, 811 F.Supp.3d at 240–41 (serious reliance interests where states designed energy policies in reliance on agency's prior position). State Facilities have provided this care and billed federal programs for it. SMF ¶¶ 149–153, 171. State Facilities and other healthcare providers have also invested significant capital establishing medical centers and academic programs devoted to gender-affirming care, hiring staff, admitting students, securing facilities, and purchasing equipment. SMF ¶ 152. Additionally, transgender young people and their families relied on the availability of gender-affirming care in states where it is protected to make critical life decisions,

including the decision to move to Plaintiff States. SMF ¶¶ 147–148.

Neither the Directives themselves nor the administrative record reflect consideration of these or any other serious reliance interests imperiled by the Directives' novel legal interpretations. *See Casa De Maryland v. DHS*, 924 F.3d 684, 705 (4th Cir. 2019) (finding DACA rescission arbitrary and capricious because agency failed to consider reliance interests of "[h]undreds of thousands of people [who] had structured their lives on the availability of deferred action during the over five years between the implementation of DACA and the decision to rescind"). Indeed, Defendants take the position in their Answer that the impact of cessation of access to gender-affirming care on the health and wellbeing of transgender people is "irrelevant to any party's claims or defenses in this APA action." (Doc. No. 118 ¶¶ 34–48, 50–52). And the sole source Defendants point to in the AR as demonstrating that they did take relance interests into account—the Bondi Directive's warning that it served to put "medical practitioners, hospitals, and clinics on notice" of Defendants' new interpretations (Doc No. 124 at 17)—establishes no such thing. This single threat falls far short of the "more detailed justification" required in light of the "serious reliance interests" that the Directives upend. *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33–35 (1st Cir. 2026) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 54–55 (1st Cir. 2025) (single sentence in grant termination letter likely insufficient to demonstrate adequate consideration of reliance interests).

Defendants argue they had no obligation to justify the Directives because an agency's enforcement position is not the sort of prior policy position upon which a plaintiff can rely. (Doc No. 124 at 18). But federal courts consistently hold otherwise: action that expands an agency's enforcement authority to reach conduct it previously permitted is a paradigmatic "change-in-position" that can engender serious reliance interests. *See FCC v. Fox Tel. Sta.*, 556 U.S. 502, 512–

16 (2009) (change in position where agency began levying fines and other sanctions for the use of "fleeting expletives" on television when it had previously permitted such use); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218–22 (2016) (same where agency abandoned its longstanding definition of automotive "service advisors" in a statutory safe harbor and began requiring that they receive overtime pay); *CSL Plasma Inc. v. CBP*, 628 F.Supp.3d 243, 258–61 (D.D.C. 2022) (same where agency began disallowing temporary visas to donate blood plasma, when the prior practice of allowing such visas had created a multimillion dollar industry operating for over thirty years).

Defendants' reliance on *FDA*, 604 U.S. at 568, is badly misplaced. (*See* Doc No. 124 at 18). In that case, the Supreme Court found that the agency guidance documents at issue did not reflect any change in position because they did not expand the agency's enforcement authority and plaintiffs' own speculative and incorrect belief about how their e-cigarette applications would fare under the guidance was not a legitimate basis for reliance interests. *Id.* at 584–85. Here, the Directives "[b]y [their] own admission . . . announce[] a change of policy." (Doc. No. 105 at 20.) Plaintiffs relied not upon any speculative forecasting, but on Defendants' established and undisputed enforcement precedent fostering "decades of industry reliance" (Doc No. 124 at 18 (citation omitted))—which *FDA* expressly recognizes as a legitimate basis for reliance interests. *FDA*, 604 U.S. at 584; *see* SMF ¶¶ 149–153, 159–171.

Defendants' suggestion (Doc No. 124 at 18) that Plaintiffs can establish reliance only by identifying a previous, formal government policy stating that gender-affirming care does *not* violate the FGM statute, FDCA, or FCA fares no better. There is no reason such a document would exist, as the application of these statutes to categorically deny the legitimacy of certain fields of medicine was previously unthinkable. In any event, the change-in-position requirement "is not limited to formal rules or official policies and applies equally to practices implied from agency

conduct," including enforcement precedent. *Saget v. Trump*, 375 F.Supp.3d 280, 355–56 (E.D.N.Y. 2019) (collecting cases); *see also Fox*, 556 U.S. at 515–16 (treating agency's enforcement precedent as having established prior position despite no formal written policy).

**C. The Directives Violate the Tenth Amendment and 5 U.S.C. 706(2)(B).**

The Directives, implemented pursuant to Sections 8(a) and (c) of the EO, violate the Tenth Amendment, and accordingly are void as contrary to the Constitution under the APA, 5 U.S.C. § 706(2)(B),[5] because they (i) "reach far beyond [defendants'] statutory authority" and (ii) "directly conflict" with state laws in a traditional sphere of state authority.[6] (Doc No. 105 at 45). As Defendants concede, the "controlling Tenth Amendment inquiry in this case" is "whether the challenged federal action rests on authority delegated to the federal government." (Doc No. 124 at 23). It does not. "[W]hen Congress wants to regulate medical practice in the given scheme, it does so by explicit language in the statute." *Gonzales v. Oregon*, 546 U.S. 243, 272 (2006); *see also Sackett v. EPA*, 598 U.S. 651, 679–80 (2023) (requiring clear statement from Congress when legislating in traditional sphere of state authority). The need for clear statutory language is "especially important" in cases where "the Government's interpretation would intrude on an area traditionally left to state control, namely, the practice of medicine." *Moyle v. United States*, 603

---

[5] "An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." *Nat'l Educ. Ass'n v. DOE*, 779 F.Supp.3d 149, 197 (D.N.H. 2025); *see, e.g.*, *Am. Ass'n of Univ. Professors v. Rubio*, 802 F.Supp.3d 120, 175 (D. Mass. 2025) (policy that violated First Amendment also violated APA).

[6] Plaintiff States maintain that Sections 8(a) and 8(c) of the EO are unconstitutional violations of the Tenth Amendment. However, as explained *supra* at p.2 n.1, to the extent Sections 8(a) and 8(c) of the EO do not impose any obligations on any entity other than the Executive Branch and direct only those investigations and prosecutions that are consistent with applicable law, including state law, Plaintiffs States do not seek summary judgment invalidating those sections of the EO at this time.

U.S. 324, 356 (2024) (Alito, J., dissenting); *see generally Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."). That is because "the background principles of our federal system . . . belie the notion that Congress would use . . . an obscure grant of authority to regulate areas traditionally supervised by the States' police power." *Gonzales*, 546 U.S. at 274; *accord Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991).

Here, no provision of the FGM statute, the FDCA, or the FCA vests DOJ with authority to define the substantive contours of medical practice or to impose national clinical standards. The FCA does not reference medicine at all, much less include language that explicitly grants DOJ authority to declare diagnoses and treatments categorically fraudulent, "illegitimate," (Doc No. 1-6 at 5) or "impermissible" (Doc No. 1-7 at 4); *see* 31 U.S.C. § 3729. The FDCA vests the federal government with authority over only a discrete aspect of drug regulation—the introduction and labeling of drugs and devices in interstate commerce—and "expressly disclaims any intent to directly regulate the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350–51 (2001). Indeed, the FGM statute defines the proscribed conduct, in part, as a procedure performed for "non-medical reasons" and which is not "necessary to the health of the person on whom it is performed," 18 U.S.C. § 116(b)(1), (e), and "manifests no intent to regulate the practice of medicine generally," *see Gonzales*, 546 U.S. at 270, or to vest the Executive Branch with authority to superintend clinical judgments. *See United States v. Castleman*, 572 U.S. 157, 182 (2014) (Scalia, J., concurring in part and concurring the judgment) ("[T]he Department of Justice thankfully receives no deference in our interpretation of the criminal laws . . . .").

The Directives also directly conflict with Plaintiff States' traditional and presently exercised authority to regulate the practice of medicine. *See, e.g.*, Mass Gen. Laws ch. 12, § 11I ½

(access to "gender-affirming health care services is a right secured by the constitution and laws of the commonwealth"); Cal. Civ. Code § 1798.301 ("gender-affirming health care services[] and gender-affirming mental health care services are rights secured by the Constitution and laws of California"); App. A (listing relevant state laws and policies in Plaintiff States). Defendants' actions, which purport to outlaw provision of gender-affirming care, effectively nullify Massachusetts' and California's state laws—among dozens of others—in violation of the Tenth Amendment. *Id.* SMF ¶¶ 136–148, 154, 195–202. Defendants do not dispute this, but instead simply re-assert failed arguments that unduly narrow Tenth Amendment jurisprudence or misstate the basis for this lawsuit. (Doc No. 124 at 19–23).[7] But as this Court correctly recognized, Plaintiffs' Tenth Amendment claim is valid because "the Memos' interpretations directly conflict with Plaintiff States' laws protecting transgender adolescents' access to gender-affirming care, which were enacted in exercise of Plaintiff States' traditional authority to pass laws regulating medicine and to safeguard its citizens health and welfare." (Doc. No. 105 at 45). Defendants also protest that the Constitution empowers Congress to pass laws that regulate the practice of medicine. (Doc No. 124. at 20). But that is irrelevant here, where Congress has not purported to exercise those powers in the FGM statute, the FDCA, or the FCA. And it is beyond dispute that DOJ cannot act pursuant to a hypothetical or nonexistent statutory delegation. *See Biden*, 600 U.S. at 504.

[7] For example, Defendants again argue that *Massachusetts v. HHS* precludes Plaintiffs' Tenth Amendment claim because the Directives do not "commandeer" state governments. (Doc No. 124 at 21.) The Supreme Court has not limited Tenth Amendment claims to these theories, *see, e.g.*, *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013), and courts of appeal have entertained claims like those alleged here against agencies' purported expansions of statutory authority, *see, e.g.*, *Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th 390, 400 (D.C. Cir. 2021); *cf. Washington v. Trump*, 766 F.Supp.3d 1138, 1159 (W.D. Wash. 2025) (plaintiffs' challenge was not to statutes but instead to EO's "purported expansion of that statute").

Defendants assert that *South Carolina v. Baker*, 485 U.S. 505 (1988), forecloses Plaintiffs' theory (Doc No. 124 at 21). But *Baker* is inapposite and, if anything, reinforces Plaintiffs' Tenth Amendment injury. *Baker*'s prohibition on substantive Tenth Amendment claims is limited to challenges of "congressional" action rather than of federal agency action, on grounds that *participation in the national political process* is the very mechanism by which States constrain congressional intrusions into their sovereignty. *Id.* Here, where the DOJ claims unilateral authority to regulate core state activities outside of *any* mechanism involving States, it has "deprived [Plaintiffs] of any right to participate in the national political process," thereby giving rise to the type of structural Tenth Amendment claim permitted under *Baker*. *Id.* at 513.

## III. Plaintiffs Are Entitled to the Requested Relief.

Plaintiffs seek an order (i) declaring unlawful and setting aside the Bondi and Shumate Directives; (ii) declaring that the provision of medically necessary gender-affirming healthcare to a person under 19 years old, filling prescriptions for such care, or billing for such care in accordance with industry-standard billing practices does not violate the FGM Statute, the FDCA, or the FCA; and (iii) enjoining Defendants from enforcing the FGM statute, FDCA, or FCA in the Plaintiff States in violation of the declaratory relief set forth above, as set forth in the accompanying Proposed Order. Each of these forms of relief is appropriate and necessary.

First, Plaintiffs' request for vacatur of the Directives is appropriate. "The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Massachusetts v. NIH*, 770 F.Supp.3d 277, 329 (D. Mass. 2025) (collecting authority), *aff'd*, 164 F.4th 1 (1st Cir. 2026). Second, Plaintiffs are entitled to declaratory relief: Defendants' adoption of novel and unlawful interpretations of three federal statutes in order to intimidate and punish providers in Plaintiff States into discontinuing the targeted treatments

creates an active controversy that can be resolved through the purely legal question of the proper interpretation of the statutes at issue. *See supra* Point I.B. Finally, a permanent injunction prohibiting Defendants from enforcing the FCA, FDCA, or FGM statute in the Plaintiff States in violation of the declaratory judgment requested is necessary for complete relief. Defendants have made plain their intent to continue using the threat of prosecution under the three statutes, even if the Directives are set aside. *See* Doc No. 90 at 8; *see also* SMF ¶¶ 97–98. In light of DOJ's admission that it intends to continue pursuing investigations and prosecutions of providers under these baseless legal theories, and its ongoing campaign to pressure hospitals into settlement, SMF ¶¶ 64–100, vacatur and declaratory relief alone cannot provide complete relief.

Plaintiffs also meet the remaining requirements for an injunction. The Directives cause irreparable harm to Plaintiff States by effectively nullifying state laws that protect access to medical care for transgender individuals. That is "precisely the kind of irreparable harm that weighs in favor of injunctive relief." *California v. U.S. Dep't of Transp.*, 808 F.Supp.3d 291, 313 (D.R.I. 2025); *accord Maryland v. King*, 567 U.S. 1301, 1303 (2012) (preventing states from "effectuating statutes" constitutes irreparable injury (citation omitted)); *Ohio v. EPA,* 603 U.S. 279, 291 (2024) (impairment of States' "sovereign interests in regulating their own industries and citizens" is irreparable harm). The Directives are causing confusion and disruption throughout Plaintiffs' healthcare systems, including at State Facilities, straining providers' resources and compromising delivery of patient care. SMF ¶¶ 174–180, 189–194; *see New York*, 171 F.4th at 24–25 (states irreparably harmed where agency action led to "significant[] impediments to the 'delivery of basic health care services' to vulnerable populations"). And the Directives and Defendants' attempts to enforce them render Plaintiff States unable to meet their legal obligations to provide adequate medical care for individuals in their custody. *See* SMF ¶¶ 195–202; *see also*

*New York*, 171 F.4th at 24–25 (states irreparably harmed where federal action jeopardized state agencies' ability to fulfill key functions).

Finally, the equities and the public interest, which "merge when the [g]overnment is the opposing party," *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)), strongly favor an injunction. "[T]here is generally no public interest in the perpetuation of unlawful agency action," *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025) (citation omitted), while "the public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.,* 407 F.Supp.2d 323, 343 (D. Mass. 2005). Here, the public interest is served by protecting the health and rights of adolescent transgender residents in Plaintiff States, preserving access to lawful medical care under Plaintiffs' state laws, and ensuring State agencies responsible for the care of vulnerable youth can meet their obligations. *See Whitman-Walker Clinic, Inc. v. HHS,* 485 F.Supp.3d 1, 61 (D.D.C. 2020) ("There is clearly a robust public interest in safeguarding prompt access to health care."). The Directives have deprived transgender individuals access to medical care, causing grave medical consequences and acute psychological distress, including several serious self-harm incidents and in at least one case a tragic death by suicide. SMF ¶¶ 181–187. Defendants must be prevented from continuing their harmful and illegal campaign to end lawful medical care in Plaintiff States.

**CONCLUSION**

For the reasons stated above, the Court should deny Defendants' motion for summary judgment, grant Plaintiffs' motion for summary judgment, and enter the requested relief.

Dated: September 14, 2026

**ANDREA JOY CAMPBELL**
Attorney General of the Commonwealth of Massachusetts
By: */s/ Adam M. Cambier*
Adam M. Cambier (BBO No. 690525)
Assistant Attorney General
Allyson Slater (BBO No. 704545)
Director, Reproductive Justice Unit
Morgan Carmen (BBO No. 716769)
Jak Kundl (BBO No. 713951)
Assistant Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2278
adam.cambier@mass.gov
allyson.slater@mass.gov
morgan.carmen@mass.gov
jak.kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**ROB BONTA**
Attorney General of the State of California
By: */s/ Hilary A. Burke Chan*
Hilary A. Burke Chan*
Deputy Attorney General
Neli Palma*
Senior Assistant Attorney General
Kathleen Boergers*
Supervising Deputy Attorney General
Nimrod Pitsker Elias *
Crystal Adams*
Deputy Counsel General
1515 Clay Street, Suite 2000
Oakland, CA 94612
(510) 879-3096
Hilary.Chan@doj.ca.gov

*Counsel for the State of California*

**LETITIA JAMES**
Attorney General of the State of New York
By: */s/ Galen Sherwin*
Galen Sherwin*
Special Counsel, Reproductive Rights
Travis W. England*
Deputy Chief, Civil Rights Bureau
Rabia Muqaddam*
Chief Counsel for Federal Initiatives
Elizabeth A. Brody*
Assistant Solicitor General
Zoe Ridolfi-Starr*
Andres Ivan Navedo*
Assistant Attorneys General
28 Liberty St.
New York, NY 10005
(212) 416-8000
Galen.sherwin@ag.ny.gov
Travis.england@ag.ny.gov
Rabia.muqaddam@ag.ny.gov
Elizabeth.brody1@ag.ny.gov
Zoe.ridolfi-starr@ag.ny.gov
Ivan.navedo@ag.ny.gov

*Counsel for the State of New York*

**WILLIAM TONG**
Attorney General of the State of Connecticut
By: */s/ Emily Gait*
Emily Gait*
Special Counsel for Reproductive Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Emily.gait@ct.gov
mailto:Janelle.Medeiros@ct.gov
*Counsel for the State of Connecticut*

**KWAME RAOUL**
Attorney General of the State of Illinois
By: */s/ Aleeza Strubel*
Aleeza Strubel*
Complex Litigation Counsel, Special Litigation Bureau
Abigail R. Durkin*
Assistant Attorney General II, Special Litigation Bureau
115 S. LaSalle Street, 35th Floor
Chicago, IL 60603
(773) 914-3046
Aleeza.Strubel@ilag.gov
Abigail.Durkin@ilag.gov

*Counsel for the State of Illinois*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware
By: */s/ Vanessa L. Kassab*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Jennifer Kate Aaronson*
Deputy Attorney General
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
Jennifer.aaronson@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General of the District of Columbia
By: */s/ Samantha Hall*
Samantha Hall*
Assistant Attorney General
400 Sixth Street, N.W.
Washington, DC 20001
(202) 788-2081
samantha.hall@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General of the State of Hawaiʻi
By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
Attorney General of the State of Maine
By: */s/ Vivian A. Mikhail*
Vivian A. Mikhail*
Deputy Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
vivian.mikhail@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of the State of Maryland
By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.state.md.us

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of the State of Michigan
By: */s/ Neil Giovanatti*
Neil Giovanatti*
Daniel Ping*
Assistant Counsel General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov

*Counsel for the State of Michigan*

**AARON D. FORD**
Attorney General of the State of Nevada
By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-2496
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of the State of New Jersey
By: */s/ Bryce K. Hurst*
Bryce K. Hurst*
Deputy Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Bryce.Hurst@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of the State of New Mexico
By: */s/ Kalista Wilson*
Kalista Wilson*
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 795-1121
KWilson@nmdoj.gov

*Counsel for the State of New Mexico*

**JOSH SHAPIRO**
In his official capacity as Governor of the Commonwealth of Pennsylvania
By: */s/ Aimee D. Thomson*
Jennifer Selber*
General Counsel
Aimee D. Thomson*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island
By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
kgradowski@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont
By: *s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov
*Attorney for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin
By: */s/ Jody J. Schmelzer*
Jody J. Schmelzer*
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
(608) 266-3094
jody.schmelzer@wisdoj.gov

*Counsel for the State of Wisconsin*

**JAY JONES**
Attorney General of Virginia
By: *s/ Megan C. Keenan*
Megan C. Keenan*
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Attorney for Plaintiff Commonwealth of Virginia*

*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed this Memorandum of Law along with its attachments with the Court's Electronic Court Filing system and it will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

September 14, 2026

*/s/* **Zoe Ridolfi-Starr**_______
Zoe Ridolfi-Starr