# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>*Defendants.* | No. 1:25-cv-12162<br><br>**LEAVE TO FILE UNDER A PSEUDONYM GRANTED ON DECEMBER 19, 2025** |

**DECLARATION OF PLAINTIFF STATE PROVIDER #1**

I, Plaintiff State Provider #1, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am an associate professor of pediatrics at a state-university-operated school of medicine ("State-Operated School of Medicine" or "SOSM"). I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff at my university, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Professional Background**

3. I completed my MD at SOSM and my residency and chief residency in Pediatrics at a top pediatrics residency program. I have been a faculty member at SOSM in the Department of Pediatrics for over 10 years. I am board-certified in General Pediatrics and hold a license to practice medicine in the state where I currently live and work, as well as a neighboring state. I

serve as co-medical director of a clinic that provides gender-affirming health care to pediatric patients, as well as staff physician in General Pediatrics at a hospital in the state where I currently live and work. I have published over 10 peer-reviewed research articles, four book chapters, and have been invited to deliver peer-reviewed presentations at nearly 20 local, regional, national, or international conferences.

4. My responsibilities at SOSM include attending as a general pediatrician in my primary care pediatrics clinic and as a consulting physician in a clinic that serves pediatric patients seeking gender-affirming care and acting as co-medical director of that clinic. My academic work is focused on the health and wellness of LGBTQ+ youth with particular focus on transgender, nonbinary, and gender-diverse youth.

5. All of my research, teaching, and clinical duties are included in my SOSM role. While my clinical practice is conducted in a clinic not owned or operated by SOSM, my clinical practice as a physician is a part of my SOSM role, and my clinical practice is supervised by the Chair of the SOSM Department of Pediatrics.

**The State-Operated School of Medicine**

6. SOSM is the only public medical school in my state. It is a nationally and internationally recognized leader in medical education, research, and service. SOSM advances health and healthcare through a collaborative approach that spans clinical care, research, education, and community engagement. The school maintains a robust statewide presence focused on discovery, innovation, and improving the health of the population of our state and beyond. SOSM's commitment to public service is exemplified through innovative models of care and outreach that have become national benchmarks.

7. Consistently ranked among the nation's top medical schools, SOSM offers a comprehensive academic portfolio that spans the full continuum of medical education. Its nearly 30 departments include nearly 20 clinical sciences, such as Surgery and Human Oncology, as well as 10 basic and population health sciences, such as Cell and Regenerative Biology and Neuroscience.

8. Faculty physicians at SOSM helped provide care to over 865,000 patients in fiscal year 2025, which involved over 4 million outpatient appointments, nearly 250,000 emergency department visits, and almost 90,000 surgeries.

9. Rural health is a key focus of SOSM, which offers educational and training programs focused on rural health for learners ranging from precollege to practicing healthcare professionals. Examples include:

i. a state academy for rural medicine ("SARM"), which offers an integrated rural health curriculum across all four years of medical school;

ii. a three-year "short track" pathway focused on selecting SARM medical students for state rural residency programs;

iii. rural-track or rurally-focused residency programs in Obstetrics and Gynecology, Family Medicine, Psychiatry, and General Surgery;

iv. training programs from high school through practicing health care professionals offered by the state's health education center, designed to increase the distribution of the healthcare workforce and enhance healthcare quality and delivery in communities across all of our state's counties;

v. rural health policy advisory expertise, funding, and physician placement services offered by the state rural health office; and

vi. funding to address rural health projects led by community organizations and rural health systems offered by a state partnership program and SOSM program specifically aimed at improving rural healthcare, respectively.

Rural health telemedicine initiatives include a teleophthalmology program to provide diabetic retinopathy screening.

10. Additionally, SOSM has a cancer center that offers a statewide tumor board, which is open to case review requests by any clinician at no cost, provides a forum for expert SOSM clinicians, pathologists and scientists to discuss and analyze tumor genotypes and molecular abnormalities to recommend patient specific targeted therapies.

11. SOSM also offers student-led and faculty-advised free clinics to provide care for medically underserved populations as a network of clinics, and a neurorehabilitative pro bono clinic to provide physical therapy services to uninsured and medically underserved patient populations.

12. SOSM offers five health professions degree programs: Doctor of Medicine (MD), Doctor of Physical Therapy (DPT), Master of Physician Assistant Studies (MPAS), Master of Genetic Counselor Studies (MCGS), and Master of Public Health (MPH). Dual degree options include MD/PhD (referred to as the Medical Scientist Training Program) and nine different dual degree programs combining a Master of Public Health with another graduate degree. In the basic sciences, the school offers training that provides world-class education and research opportunities leading to MS and PhD degrees.

13. A total of 11 PhD and 9 MS programs are administratively homed at SOSM, and another 7 programs are affiliated with the school. At the postgraduate training level, faculty physicians at SOSM also provide training to residents and fellows in more than 80 specialty and

subspecialty programs accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), and mentor over 200 postdoctoral researchers in the basic sciences. Learner headcounts at SOSM as of fall semester 2025 are approximately 650 medical students, 80 MD/PhD students, 100 MPH students, 140 physician assistant students, 120 physical therapy students, 16 genetic counseling students, 500 PhD students, 200 MS students, 800 graduate medical education residents and fellows, and 200 postdocs.

14. SOSM is home to active research programs in basic, translational, clinical, and population research. It ranked in the top 25 in the nation for National Institutes of Health ("NIH") funding in 2024 among medical schools and within the top 10 among public medical schools, according to Blue Ridge Institute for Medical Research. Principal Investigators at the school advance knowledge and translate laboratory discoveries to bedside application, improving people's lives in our state and beyond. Extramural award funding in 2025 at SOSM totaled approximately $450 million across 1,600 individual awards, with strengths in research on Alzheimer's disease and related dementias, cancers, asthma, theranostics and radiation medicine, precision medicine, and translational research including clinical trials.

15. Recent research breakthroughs by scientists at SOSM include fundamental and translational discoveries in biomarkers for Alzheimer's disease and cancers, cancer therapeutics, theranostics, radiation medicine, transplant medicine, childhood asthma, medical physics, artificial intelligence and machine learning applied to a variety of clinical specialties, biology of aging, precision health, gut microbiome research, and social exposome research.

16. As of fall semester 2025, SOSM employs over 2,000 faculty and nearly 4,000 staff members across 28 academic departments, centers, institutes, and administrative units.

17. A 2021 economic impact report issued by Northstar Analytics, LLC showed that our university, organizations affiliated with the university, and startups related to our university contribute over $30 billion per year to the state's economy. This economic activity supports more than 232,000 jobs and generates approximately $1 billion in state and local taxes. SOSM employs approximately 22% of the university's faculty and staff and accounts for nearly 40% of federal research awards to the university. In 2023, NIH funding to state institutions, led by funding to the state university, totaled over $650 million (over $430 million of which went to the university in fiscal year 2023-24), supporting over 7,500 jobs and generating nearly $1.5 billion in economic activity. This investment is fundamental to our state's position as a national leader in the broader biohealth industry, a sector that sustains over 140,000 jobs statewide.

18. SOSM is a consortium member of the state's biohealth tech hub, which was one of 31 applicants selected by the U.S. Economic Development Administration as a regional tech hub in 2023 and one of 12 tech hubs awarded Phase 2 funding in 2024. The Phase 2 effort focuses on creating new workforce opportunities while facilitating access to new medical innovations, and is expected to directly create up to 30,000 new jobs, with an additional 111,000 indirect jobs.

**<u>Gender-Affirming Care Provided by Faculty at SOSM</u>**

19. For some transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress, known as "gender dysphoria."

20. There are many possible treatments for gender dysphoria including puberty-delaying medications, hormone therapies, and surgical procedures.

21. Faculty of SOSM offer gonadotropin releasing hormone agonists (also called puberty-pausing or delaying medications) and hormone therapies to patients, including

adolescents, as treatment for gender dysphoria in accordance with applicable evidence-based clinical practice guidelines.

22. The pediatric gender-affirming care program staffed by faculty physicians at SOSM was established more than 10 years ago years ago. Physicians from SOSM have cared for approximately 970 patients in this program since its opening, ranging in age from 4 to 22 years old. No medication is prescribed prior to the onset of puberty. In the last 2 years, SOSM providers have seen approximately 545 patients.

23. The primary services provided in the pediatric gender care clinic include:

i. GnRH agonists (puberty pause medications) at or after the onset of puberty. The early end of normal puberty onset is 8 for people assigned a female sex at birth and 9 for people assigned a male sex at birth.

ii. Gender-affirming hormone medications based on clinical readiness assessment (rather than age alone) and when all assessment and parent/guardian consent criteria have been met. The earliest age that I have started gender-affirming hormone medications is 13.

iii. Other medications for menstrual management, such as norethindrone tablets and other medications also used for contraceptive use. These are only used for patients who have had menarche (the onset of menses). The average age of menarche in the United States is approximately 12 years old.

iv. Anti-androgen medications, such as spironolactone or (rarely) bicalutamide. These are used in youth assigned a male sex at birth to decrease the action of testosterone. These are often started concurrently with gender-affirming hormone medications though are occasionally used as monotherapy. These

would not be started prior to the onset of puberty (early end of normal is 9 years old in this population) and would almost always be used only in youth in mid-puberty or later (approximately 11 years old and older), when testosterone levels are higher.

24. The clinic has some known patients who have moved to the region due to legislative action to prohibit gender-affirming care in a neighboring state. Some families of patients with transgender children that were under my care have moved out of the country specifically because of fear of these restrictions.

25. I have patients that travel from a neighboring state to our state or another border state in which I am licensed for transgender care. Other providers in my clinic see people that travel from this neighboring state and a different neighboring state as well.

26. My colleagues and I take our jobs as physicians that provide evidence-based, high-quality care very seriously. Our standard of practice is to require an assessment of readiness from a mental health provider, along with baseline labs, and to obtain informed consent from all parents or guardians with medical decision-making power, prior to prescribing gender-affirming hormone therapy. We have monthly case discussions to review difficult or challenging cases to ensure every patient's treatment plan is appropriate and consistent with the standard of care.

27. As with all medical treatments, patients (or where applicable, their legal guardians) must provide informed consent for gender-affirming care. In accordance with state law, SOSM considers individuals under the age of 18 to be legal minors, and individuals 18 and above to be adults with legal capacity to consent to medical care (absent other factors impacting their capacity such as intellectual or developmental disability). Informed consent is obtained and documented at the conclusion of an informed consent process that includes discussion with the patient (and

parents if the patient is a legal minor). This discussion includes the risks and benefits of the proposed treatment, reasonable alternatives to the proposed treatment, and the risks and benefits associated with those reasonable alternatives. For instance, I discuss the benefit of making a decision to delay gender-affirming care until adult years alongside the risk of negative impact on mental health for untreated gender dysphoria. In the case of GnRH agonists, I discuss the alterative of waiting, with the possible benefit of having the experience of puberty as data in informing that young person's decisions about medical care but with the risk of possible irreversible changes from puberty that may, for some, cause significant gender dysphoria and require surgery in the future. The informed consent process also includes the opportunity for patients (and parents if the patient is a legal minor) to ask questions and have those questions answered by their physician.

28. When pediatric gender-affirming care is accessible and provided with consideration of developmental and social factors (including familial factors), this care can provide life-changing benefits for youth and families – and does not always result in medical treatments. When medical treatments are used, these are evidence-based: the preponderance of evidence shows that pediatric gender-affirming care is associated with improved mental health outcomes, including improved quality of life and psychosocial outcomes. We have had the great privilege over the last 12 years of seeing many youth and young adults that have been able to access gender-affirming care to live as their authentic selves, with improved self-concept and psychosocial health. Consistent with what is shown in the medical literature, rates of regret are extremely low in our patient population.

29. Bills for gender-affirming care submitted for the clinical services that I and other SOSM faculty physician colleagues provide have generally been accepted and paid by Medicaid.

30. SOSM is proud to serve all patients, including transgender adolescents, and recognizes the importance of providing healthcare free from discrimination or bias.

**Federal Actions Targeting Providers of Gender-Affirming Care**

31. I am aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order"). The Executive Order made clear that the federal government intends to restrict gender-affirming care for patients under age 19 and to investigate and penalize medical professionals who provide it.

32. Since the Executive Order was issued, the federal government has taken steps that appear intended to target and intimidate providers of gender-affirming care, including providers at SMPH, and restrict access to such care.

33. On April 22, 2025, U.S. Attorney General Bondi issued a memorandum to all U.S. Department of Justice ("DOJ") employees ("Bondi Directive") to criminally and civilly prosecute "to the fullest extent possible" health care providers who provide medically necessary gender-affirming care to adolescent patients under the federal Female Genital Mutilation statute, 18 U.S.C. § 116 ("FGM"), the Food, Drug & Cosmetics Act, 21 U.S.C. Chapter 9 § 301 *et seq.* ("FDCA"), and/or the False Claims Act, 31 U.S.C. § 3729 ("FCA").

34. On June 11, 2025, U.S. Assistant Attorney General Brett Shumate issued a memorandum ("Shumate Directive") to all DOJ employees laying out the "Civil Division Enforcement Priorities" and directing the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals," and other health care entities to pursue alleged violations of the FDCA in connection with the medications often used in gender-affirming care. It also orders the Civil Division to "aggressively pursue" FCA claims against providers that bill the federal government for gender-affirming care in circumstances where such care would not lawfully be covered.

35. I am aware that the Bondi and Shumate Directives (collectively, "DOJ Directives") announced new enforcement priorities under the FGM, FDCA, and FCA statutes.

36. SOSM is aware that other hospitals have received subpoenas.

37. SOSM and its physicians offer patient-focused medical care in accordance with state and federal laws and regulations, established clinical practice guidelines, and medical ethics rules.

38. It is gravely insulting and beyond comprehension for the federal government to suggest that any regulated, public-facing provider of health care services such as SOSM through its employed physicians would have conducted or sanctioned the practice of female genital mutilation—a painful, horrific crime performed on non-consenting girls and women that has nothing to do with the practice of medicine. For the avoidance of doubt, SOSM physicians have never engaged in female genital mutilation.

**Consequences of Federal Actions on SOSM and Its Patients**

39. The Executive Order and DOJ Directives have had devastating consequences for transgender young people under age 19 and the healthcare providers who care for them.

40. These federal actions suggest that the administration is laying the groundwork to investigate and prosecute institutions like SOSM and its physicians if we continue to provide medically necessary gender-affirming care to patients under 19.

41. I and other SOSM physicians fear that merely providing medically necessary gender-affirming care in accordance with applicable evidence-based clinical practice guidelines will be deemed unlawful under the DOJ Directives as a violation of federal law.

42. I and other SOSM physicians fear that the Bondi and Shumate Directives' interpretation of federal law such as the FGM and/or FCA statutes may apply retroactively and subject our institution and/or our providers to criminal and/or civil liability for care that was

provided months or years ago, even at a time when the federal government formally discouraged discrimination against patients on the basis of gender identity.

43. As a result of these federal actions, doctors who provide gender-affirming care at SOSM are extremely afraid that they will be unjustly targeted by criminal or civil investigations or prosecutions merely for doing their jobs and providing medically necessary gender-affirming care in accordance with state law.

44. SOSM, too, faces the additional burden of complying with onerous and costly investigations and defending itself against baseless claims. Defending against such claims consumes hours per week of physicians and staff whose time could otherwise be used in furtherance of the mission and goals of SOSM.

45. I and other SOSM physicians have been contacted by, and in some cases, have seen patients who were turned away from other institutions which terminated services after the DOJ Directives. This has at times caused an increased patient load, significantly longer wait times for patients, staff shortages, and inability to meet the needs of the growing patient load.

46. These federal actions have caused grave harm to our transgender patients and will likely cause further damage. Patients who have come to me or my physician colleagues for treatment after being turned away by previous providers who ceased offering gender-affirming care after the DOJ Directives have presented with serious harms, such as:

i. suffering from medical consequences as a result of having their medical care abruptly terminated;

ii. suffering from psychological distress at having their medical care abruptly interrupted or terminated;

iii. more acute symptoms of gender dysphoria than usual, which could have been avoided with earlier treatment or consistent, uninterrupted treatment;

iv. more expensive care needs that could have been treated earlier for less money; and

v. families having to travel further to access care, which takes both time and money. Families live in fear of starting care that they know is right for their children and then having it suddenly discontinued.

47. I am extremely concerned about the impact that these federal actions have already had and will have on the mental and physical well-being of our transgender adolescent patients if SOSM is forced to stop providing gender-affirming care to transgender adolescents. Families and patients have described significantly increased anxiety and have explored or pursued options for moving to countries with fewer discriminatory policies (or less threat of discriminatory policies). Patients live in fear of losing access to medically necessary medications that have improved their mental health. Lack of access to these medications would impact patients' physical and mental health, increase the risk of low bone mineral density, depression, and anxiety. Previous literature has shown an association between gender-affirming hormone therapy and lower rates of recent depression or past-year suicide attempts; in addition, transgender adults that received puberty-delaying medications in adolescence showed lower lifetime suicidality. With this literature in mind, I am concerned that lack of access to these medications could also increase the risk of suicidality in this population.

48. SOSM has also been forced to dedicate staff time and resources to analyzing the unclear and changing federal regulation of gender-affirming care, and explaining its implications to concerned patients, their loved ones, and other health care providers. My physician colleagues

and I each spend hours per week communicating with patients and families who are concerned that their child's access to gender-affirming health care will be abruptly interrupted and who are also concerned that if this treatment is no longer provided by SOSM physicians that there will not be alternative providers who will be accessible – either geographically or financially – to treat their child.

49. Additionally, legal, communications, and other administrative staff at SOSM have spent multiple hours per week since the Executive Order analyzing communications and memorandums from DOJ, DOJ actions taken with respect to other health care providers nationally and considering other health care providers' responses to these government directives.

50. Complying with the DOJ Directives and denying adolescents medically necessary gender-affirming care would violate our obligations as healthcare providers to avoid unprofessional conduct as defined in our state's regulations. Forcing providers to choose between, on one hand, violating our regulatory obligations to provide competent medical care, and on the other, facing criminal or civil investigation or prosecution by the federal government causes us profound moral injuries.

51. Complying with the DOJ Directives and denying adolescents medically necessary gender-affirming care would violate our ethical obligations as healthcare providers to provide competent medical care with respect for human dignity and rights and to avoid or minimize harm to our patients. Forcing providers to choose between, on one hand, violating our ethical obligations, and on the other, facing criminal or civil investigation or prosecution causes us profound moral injuries.

52. The Executive Order and other federal actions place physicians like me and institutions like ours in an impossible position. The threat of criminal and civil investigations

and/or prosecutions presents an existential risk to our careers and to the liberty of our physicians, while denying medically necessary gender-affirming care in order to avoid that threat would be harmful for transgender patients, impede the ability of SOSM to fulfill its mission, and expose the institution to continual uncertainty and liability.

53. These conflicting interests have caused me, members of my department, and other physicians within SOSM who provide this care serious distress and confusion about how to navigate our legal and professional obligations to provide medically necessary treatments free from discrimination to patients in need. The Executive Order, DOJ Directives, and accompanying federal actions currently place the institution and its providers in jeopardy of potential, significant legal risk. These Directives strongly imply that the administration views the mere provision of gender-affirming health care as unlawful and state explicitly that the administration intends to prosecute providers aggressively wherever possible.

54. SOSM physicians have continued, with extreme caution and additional oversight, providing transgender adolescents with medically necessary, evidence-based gender-affirming care, and SOSM wishes and intends to continue doing so for as long as it is able consistent with laws, regulations, and other legal directives currently in effect and not otherwise enjoined. However, there is unfortunately a very real possibility that the risk level will soon reach a point where SOSM can no longer tolerate the risk. Should SOSM be forced to change its position, physicians at SOSM will have no choice but to stop providing this care. Such a decision would not result from any concerns about the medical evidence, clinical practice standards, or the well-being of our patients. Rather, the multiple legal threats (and related administrative and financial burdens) posed by the Executive Order and DOJ Directives would make it too risky to continue providing gender-affirming care.

55. I have identified myself with a pseudonym because of threats and harassment my SOSM colleagues and I have received due to our involvement providing gender affirming care. There have been a number of inflammatory online articles about my colleagues and me as the result of over 15 records requests in the span of less than 3 years. These types of harassment have raised concerns about my safety, as well as the safety of my colleagues, patients, and family – at clinic sites and in our homes. This has resulted in my name and contact information being taken off the university website, use of a professional service to remove my home address from the internet, and increased security at my primary care and specialty care clinic.

Dated: December 17, 2025

/s/ State Provider #1___________
State Provider #1