# EXHIBIT 41

# SETTLEMENT AGREEMENT

## I. PARTIES

This Settlement Agreement ("Agreement") is entered into by and between the United States of America, acting through the United States Department of Justice, the State of Ohio ("Ohio"), through the Ohio Attorney General's Office, and The Cleveland Clinic Foundation (collectively "the Parties"), through their authorized representatives.

## II. RECITALS

A. The Cleveland Clinic Foundation ("CCF") is a non-profit corporation organized under the laws of Ohio with its main campus located in Cleveland, Ohio, in addition to dozens of medical facilities it operates across Ohio, Florida, Nevada, Canada, the United Arab Emirates, and the United Kingdom.

B. "Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or non-exempted clinical intervention provided to an individual under eighteen (18) years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's sex, where such intervention would not otherwise be indicated for a congenital, including but not limited to genetic or chromosomal conditions (including patients diagnosed as intersex – ICD Codes Q56.0–59.4), pathological, or a medical condition not related to gender identity. Furthermore, the term Sex-Rejecting Procedure does not include psychological or psychiatric treatments such as talk therapy, counseling, or other

non-medical or surgical mental health interventions. Sex-Rejecting Procedures include, but are not limited to:

(a) *Puberty suppression*: prescription or administration of gonadotropin-releasing hormone (GnRH) agonists or antagonists or functionally equivalent agents, intended to pause or suppress pubertal progression.

(b) *Hormone administration*: prescription or administration of estrogen, testosterone, or synthetic analogs in a manner intended to induce physical traits associated with the opposite sex or to suppress traits associated with the individual's sex.

(c) *Surgical interventions*: any surgical procedure intended to alter, remove, or reconstruct primary or secondary sex characteristics, including but not limited to mastectomy, breast augmentation, genital reconstruction or modification, hysterectomy, oophorectomy, orchiectomy, phalloplasty, vaginoplasty, and other surgeries performed primarily to approximate sex-typical appearance to create physical traits associated with the opposite sex or to suppress traits associated with the individual's sex where there is not an independent medical need. Patients will not be permitted to schedule any prohibited surgical intervention until age eighteen (18). Preoperative testing and care is not permitted until the surgical procedure is scheduled.

(d) *Voice modification interventions*: clinical interventions intended to masculinize or feminize a minor's voice to approximate vocal characteristics typical of the opposite sex where there is not an independent medical need, including but not limited to speech-language therapy when undertaken to alter pitch, resonance, intonation, or speech patterns to align with a gender identity rather than the minor's sex or pharmacological, surgical, or procedural interventions to affect the larynx, vocal cords, or related structures to modify sex-typical voice characteristics that are opposite to a minor's sex.

C. The United States and Ohio allege that they have certain civil claims against CCF arising from the following conduct: From January 1, 2020, through the Effective Date of this Agreement, CCF, through certain individual employees and agents, submitted or caused to be submitted claims for payment for items and services provided in connection with Sex-Rejecting Procedures to insurance plans and payors. The United States and Ohio allege that certain of these claims for payment used diagnosis codes that failed to appropriately reflect that the items and services for which claims were submitted were provided for the purpose of Sex-Rejecting Procedures.

D. CCF expressly denies the United States and Ohio's allegations.

E. This Agreement does not reflect a conclusion or admission that CCF, or any other subcomponent or affiliated entity thereof, is subject to suit or liability under federal civil or criminal law and does not waive any defense that such entities may raise in any future proceeding.

F. To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, to protect the privacy of patient records, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

**III. TERMS AND CONDITIONS**

1. CCF shall pay to the United States the sum of $300,000, and to Ohio the sum of $8,000 (together, the "Settlement Amount"). The Settlement Amount shall constitute a debt immediately due and owing to the United States and Ohio on the Effective Date of this Agreement, as defined below. For the avoidance of doubt, the Settlement Amount constitutes a single payment that satisfies CCF's combined monetary obligations under both this Agreement and the FCA Settlement Agreement entered into between the Parties on or about the same date. CCF's total monetary obligation under both agreements to the United States and Ohio is $308,000, not $308,000 per agreement. This debt shall be discharged by payments to the United States under the following terms and conditions:

a. CCF shall pay the Settlement Amount by electronic funds transfer pursuant to written instructions from the United States no later than thirty (30) days after the Effective Date of this Agreement.

b. CCF shall pay Ohio $8,000 no later than thirty (30) days after the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the Ohio Attorney General's Office.

2. CCF further agrees that it will provide detransitioning supportive services, including, but not limited to medical care for hormonal balancing, endocrine care, surgical revision and reconstruction, fertility restoration, psychological support (including grief counseling), and insurance coordination for individuals seeking detransition who underwent any Sex-Rejecting Procedures before reaching nineteen (19) years of age. For purposes of this Agreement, "Detransition" means the evaluation, management, discontinuation, reversal, or treatment for or modification of the effects of prior Sex-Rejecting Procedures.

a. CCF shall commit to a total value of two million dollars ($2,000,000) of detransitioning care, including insured and uninsured patients. The value of the care will be determined by the charges either submitted to insurance providers or the value of the care written off under CCF's charity care and financial assistance policy.

b. CCF shall ensure that it will provide Detransition care to patients regardless of their ability to pay. CCF will follow its financial assistance policies, including free or reduced-cost care, such that individuals who are uninsured, underinsured, or otherwise unable to afford Detransition care are not denied such services for financial reasons.

c. CCF agrees to use its best efforts to inform the public regarding the availability and accessibility of detransitioning services. Such efforts will include but not be limited to a dedicated conspicuous webpage, a dedicated phone number, a dedicated care coordinator, website optimization, and direct outreach to three (3) entities that provide non-medical services to those seeking to detransition. CCF shall have thirty (30) days from the date of execution to fulfill these efforts.

d. Failure of CCF to comply with the obligations set forth herein with regard to the detransition care shall constitute a material breach of this Agreement.

3. Subject to the exceptions in Paragraph III.5 (concerning excluded claims) below, and conditioned upon CCF's full payment of the Settlement Amount pursuant to Paragraph III.1(a), as well as the provision of Detransitioning Care up to the value of two million dollars ($2,000,000) pursuant to Paragraph III.2, the United States releases CCF and all of its affiliated and subsidiary entities, and all of their current and former board members (collectively, the "Released Parties"), from any civil, administrative, and criminal claims or liabilities the United States has or may have for or related to Sex-Rejecting Procedures under 18 U.S.C. §§ 287, 371, 664, 666, 1001, 1027, 1035, 1341, 1343, 1347, 1349, and 1954; 21 U.S.C. § 331; and 42 U.S.C. § 1320a-7b (the "Released Claims").

4. Subject to the exceptions in Paragraph III.5 (concerning excluded claims) below, and conditioned upon CCF's full payment of the Settlement Amount pursuant to Paragraph III.1(b), as well as the provision of Detransitioning Care up to the value of two million dollars ($2,000,000) pursuant to Paragraph III.2, Ohio releases CCF and the Released Parties from any claim Ohio has for the Covered Conduct under R.C. 2913.40(B) or the common law theories of payment by mistake, unjust enrichment, and fraud.

5. Notwithstanding the releases given in Paragraph III.3 of this Agreement, or any other term of this Agreement, the following claims of the United States and Ohio are specifically reserved and are not released:

a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b. Any liability under the False Claims Act, not explicitly released herein or by other agreement executed at or around the same time with the Department of Justice;

c. Any liability to the United States (or its agencies) or Ohio (or its agencies) for any conduct other than that relating to the Released Claims; and

d. Any liability based upon obligations created by this Agreement.

6. CCF fully and finally releases the United States and Ohio, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that CCF has asserted, could have asserted, or may assert in the future against the United States, or Ohio or their agencies, officers, agents, employees, and servants, related to the allegations in Paragraph II.C and the United States' investigation and prosecution thereof.

7. CCF agrees to the following compliance commitments. CCF's agreement to these compliance commitments represent a condition precedent to the release of the United States' potential claims:

a. CCF agrees not to provide Sex-Rejecting Procedures, whether directly or indirectly, at any facility owned, operated, or controlled by CCF. This obligation applies regardless of the source of payment, clinical setting, or referral pathway, and includes any such services provided through employees, contractors, or third-party arrangements. Any violation of this paragraph shall constitute a material breach of this Agreement. CCF may not evade this obligation through reclassification, relabeling, or modification of services that are materially the same as Sex-Rejecting Procedures.

b. CCF will not own or operate healthcare facilities that provide Sex-Rejecting Procedures, consistent with the same commitments as set out in Paragraph III.7(a) above.

c. Notwithstanding any law to the contrary, CCF will comply with R.C. 3129.02 through 3129.04 and R.C. 3129.06, and Ohio Administrative Code 5160-2-03, 3701-59-06, and 3701-83-60. CCF will immediately cease and refrain from referring, directing, recommending, coordinating, facilitating, or otherwise arranging for Sex-Rejecting Procedures by any third party or external provider, whether within or outside of the CCF enterprise. Nothing in this paragraph

prohibits a referral for psychological counseling or other mental-health services, or referrals for such services intended to support a minor's mental health, provided that such services do not include medical or surgical Sex-Rejecting Procedures. For referrals, in particular, CCF will be bound to follow the protocol set forth under Ohio law where Sex Rejecting procedures are unlawful.

8. CCF will, by no later than one (1) year from the date of this Agreement, implement a compliance program designed to prevent and detect violations of federal laws that prohibit the incorrect billing alleged in Paragraph II.C. The CCF Chief Compliance Officer ("CCO") will certify on an annual basis and at the End of this Agreement to the satisfaction by CCF of this commitment, and specifically that CCF is:

a. Undertaking reasonable efforts to ensure operation in compliance with the requirements of Paragraphs III.7(a), III.7(b), and III.7(c) and Paragraph III.2 above. Such reasonable efforts shall include:

i. An annual clinical review of medical records for compliance with the requirements of Paragraphs III.7(a), III.7(b), and III.7(c) of patients under the age of eighteen (18) meeting the following parameters upon search of the EPIC system:

A. Have a diagnosis code of F64, F64.0, F64.1, F64.2, F64.8, F64.9 and Z87.890; and

B. Have undergone any procedure included in the procedural codes contained in Appendix A of Dr. Mehmet Oz's letter on behalf of the Centers for Medicare & Medicaid Services, dated May 28, 2025 (a copy of which is attached to this agreement); and/or

C. Are currently on any of the medications included in the National Drug Codes contained in Appendix A of Do No Harm's "Children's Hospital Database Project – Data

Gathering and Analysis Methodology", as updated December 2024 (a copy of which is attached to this agreement);

ii. For any patient under the age of eighteen (18) at the time of the medical record search and who has a diagnosis code as set forth in Paragraph III.8(a)(i)(A) above and who has received a lab draw for testosterone or estrogen levels, the coding for those particular tests will be reviewed to ensure they are properly coded under the diagnosis codes set forth in Paragraph III.8(a)(i)(A).

b. Providing annual training on appropriate coding for employees involved in billing for the treatment of pediatric gender dysphoria and pediatric endocrine disorders, provided within the limitations of Paragraph III.7(a) above; and

c. Retaining records, for the period that is consistent with Ohio law, relevant to any allegations in Paragraph II.C.

9. CCF agrees to reasonably cooperate with any investigation by the United States or Ohio of pharmaceutical manufacturers, distributors, retailers, or any other person or entity in the distribution chain related to the distribution of medical products for Sex-Rejecting Procedures. Upon reasonable notice, CCF agrees not to impair the cooperation of relevant employees, and shall use reasonable efforts to provide last known contact information of relevant former personnel for interviews, consistent with the rights and privileges of such individuals. CCF also agrees to, upon reasonable notice, to produce to the United States or to Ohio any available records of any relevant communications between its employees and pharmaceutical manufacturers related to the medical products for Sex-Rejecting Procedures, subject to applicable laws and regulations, including relevant data privacy and national security laws and regulations. Any patient identifiers will be removed prior to production and replaced with unique de-identified codes or existing unique

identifiers, as appropriate, so as to permit tracking and cross-referencing of records without disclosing patient identities.

10. To the extent that CCF identifies conduct occurring at CCF owned, operated, and controlled facilities after the date of the Agreement that violates federal laws in the context of Sex-Rejecting Procedures, CCF will report such conduct promptly to the Department of Justice.

11. The statute of limitations for any claims or charges relating to the conduct relevant to the Released Claims shall be tolled upon the signing of this Agreement until six (6) months after the End of this Agreement.

12. If at any time before the End of this Agreement, CCF, as an organization:

a. Commits any felony under federal law;

b. Provides in connection with this Agreement deliberately false, incomplete, or misleading information;

c. Fails to reasonably cooperate as set forth in this Agreement;

d. Fails to implement any of the agreed upon compliance requirements as set forth in this Agreement; or

e. Otherwise fails specifically to perform or to fulfill completely each of the obligations under the Agreement, regardless of whether the United States becomes aware of such a breach before the End of this Agreement, CCF shall thereafter be subject to the institution of any criminal proceedings for any violation of federal law for which the United States has knowledge, including the Released Claims, which may be pursued by the United States in any appropriate venue.

13. In the event the United States determines that CCF may have breached this Agreement, the United States agrees to provide CCF with written notice prior to instituting any

legal proceedings resulting from such breach. Within thirty (30) days of receipt of such notice, CCF shall have the opportunity to respond to the United States in writing to explain the nature and circumstances of the apparent breach, as well as the actions CCF has taken to address and remediate the situation, which the United States shall consider in determining whether to pursue legal proceedings against CCF.

14. In the event that the United States determines that CCF has breached this Agreement: (a) all statements made by or on behalf of CCF to the United States or to the Court and any testimony given by CCF before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all legal proceedings brought by the United States against CCF; and (b) CCF shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of CCF prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, CCF, will be imputed to CCF for the purpose of determining whether CCF has violated any provision of this Agreement shall be in the sole discretion of the United States. Except as may otherwise be agreed by the parties in connection with a particular transaction, CCF agrees that in the event that, at any time before the End of this Agreement, it undertakes any material change in corporate form, including if it sells, merges, or transfers business operations, it shall include in any contract for sale, merger, transfer, or other material change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. CCF shall

notify the United States at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other material change in corporate form, including dissolution, in order to give the United States an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.

15. This Agreement is binding on CCF, the United States Department of Justice, and Ohio, but specifically does not bind any other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the United States will bring CCF's cooperation and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities upon request. This Agreement does not provide any protection against prosecution for any future conduct by CCF or any of its present or former parents or subsidiaries. Nothing herein shall restrict CCF from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the purposes of this Agreement, as determined by the United States.

16. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

17. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

18. This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the Northern District of Ohio. For purposes of construing this Agreement, this Agreement shall be deemed to

have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

19. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

20. The undersigned represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

21. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

22. This Agreement is binding on the Parties' successors, transferees, and assigns.

23. All Parties consent to any Parties' disclosure of this Agreement, and information about this Agreement, to the public.

24. This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement"). The term of this Agreement shall end five (5) years from the Effective Date of this Agreement ("End of this Agreement"). The Parties agree that CCF's obligations under Paragraphs III.7(a), III.7(b), and III.7(c) will persist for twenty (20) years from the Effective Date of this Agreement, with the same remedies for breach of those provisions available to the Government as if the breach had occurred during the term of this Agreement.

**FOR THE UNITED STATES OF AMERICA**

DATED: ____________________ BY: Brett Shumate
Brett Shumate, Assistant Attorney General
U.S. Department of Justice

**FOR THE STATE OF OHIO**

DATED: ____________________ BY: ____________________________

**FOR THE UNITED STATES OF AMERICA**

DATED: ______________________ BY: ______________________________

U.S. Department of Justice

**FOR THE STATE OF OHIO**

DATED: June 5, 2026 BY: [signature]

DAVE YOST, Ohio Attorney General

**FOR THE CLEVELAND CLINIC FOUNDATION**

DATED: June 5, 2026

BY: Deborah C. Gordon

Deborah C. Gordon
Executive Vice President
Chief Legal Officer
Cleveland Clinic Foundation

DATED: June 5, 2026

BY: G. Z. T.

G. Zachary Terwilliger
Vinson & Elkins LLP
Counsel for Cleveland Clinic Foundation

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice, and the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS), the State of Ohio ("Ohio"), through the Ohio Attorney General's Office, and The Cleveland Clinic Foundation (hereafter collectively referred to as "the Parties"), through their authorized representatives.

RECITALS

A. The Cleveland Clinic Foundation ("CCF") is a non-profit corporation organized under the laws of Ohio with its main campus located in Cleveland, Ohio, in addition to dozens of medical facilities it operates across Ohio, Florida, Nevada, Canada, the United Arab Emirates, and the United Kingdom.

B. The United States and Ohio contend that CCF submitted or caused to be submitted claims for payment to the Medicaid Program, 42 U.S.C. §§ 1396–1396w-5 ("Medicaid").

C. The United States and Ohio contend that they have certain civil claims against CCF arising from the following conduct: From January 1, 2020, through the Effective Date of this Agreement, CCF knowingly submitted claims for payment to Ohio Medicaid with false diagnosis codes for items or services provided to patients under the age of 18 to treat the patients' gender dysphoria or other gender identity related disorder. CCF used false ICD-10 codes – principally E34.8 (other specified endocrine disorders) or E34.9 (endocrine disorder, unspecified) – instead of an accurate diagnosis code to allegedly obscure the true reasons for the items and services provided to the patients. That conduct in the previous two sentences is referred to below as the "Covered Conduct."

D. This Settlement Agreement is neither an admission of liability by CCF nor a concession by the United States or Ohio that their claims are not well founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1. CCF shall pay to the United States and Ohio the sum of $127,000 (the "Settlement Amount").

a. CCF shall pay the United States $119,000 no later than 30 days after the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice.

b. CCF shall pay Ohio $8,000 no later than 30 days after the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the Ohio Attorney General's Office.

2. Subject to the exceptions in Paragraph 4 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount, the United States releases CCF and all of its affiliated and subsidiary entities, (collectively, the "Released Parties") from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729–3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801–3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

3. Ohio releases the Released Parties from any civil or administrative monetary claim Ohio has for the Covered Conduct under R.C. 5164.35 or the common law theories of payment by mistake, unjust enrichment, and fraud.

4. Notwithstanding the release given in Paragraph 2 of this Agreement, or any other term of this Agreement, the following claims and rights of Ohio and the United States are specifically reserved and are not released:

a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b. Any criminal liability;

c. Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal health care programs;

d. Any liability to the United States (or its agencies) or Ohio (or its agencies) for any conduct other than the Covered Conduct;

e. Any liability based upon obligations created by this Agreement;

f. Any liability of individuals;

5. CCF fully and finally releases the United States and Ohio, their agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that CCF has asserted, could have asserted, or may assert in the future against the United States and Ohio, and their agencies, officers, agents, employees, and servants related to the Covered Conduct and the United States' investigation and prosecution thereof.

6. CCF agrees to the following:

a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XX of the Social Security Act, 42 U.S.C. §§ 1395–1395lll and 1396–1396w-5; and the regulations and official program directives

promulgated thereunder) incurred by or on behalf of CCF, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement;

(2) the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3) CCF's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4) the negotiation and performance of this Agreement; and

(5) the payment CCF makes to the United States or Ohio pursuant to this Agreement are unallowable costs for government contracting purposes and under the Medicaid Program (hereinafter referred to as Unallowable Costs).

b. Future Treatment of Unallowable Costs: Unallowable Costs shall be separately determined and accounted for in nonreimbursable cost centers by CCF, and CCF shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by CCF or any of its subsidiaries or affiliates to the Medicaid program.

c. Treatment of Unallowable Costs Previously Submitted for Payment: CCF further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicaid fiscal agents any Unallowable Costs (as defined in Paragraph 6(a)) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or

payment requests already submitted by CCF or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. CCF agrees that the United States, at a minimum, shall be entitled to recoup from CCF any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by CCF or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in Paragraph 6(a)) on CCF or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d. Nothing in this Agreement shall constitute a waiver of the rights of Ohio or the United States to audit, examine, or re-examine CCF's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of Paragraph 6(a)).

7. CCF agrees to cooperate fully and truthfully with the United States' or Ohio's investigation of individuals and entities not released in this Agreement. Upon reasonable notice, CCF agrees not to impair the cooperation of its directors, officers, and employees, and shall use its best efforts to provide last known contact information of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. CCF further agrees to furnish to the United States and Ohio, upon request, complete and unredacted copies of all non-privileged, available documents, reports, memoranda of

interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

8. This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 9 (waiver for beneficiaries paragraph) below.

9. CCF agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

10. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

11. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

12. This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the Northern District of Ohio. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

13. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

14. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

15. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

16. This Agreement is binding on CCF's successors, transferees, heirs, and assigns.

17. All Parties consent to any Parties' disclosure of this Agreement, and information about this Agreement, to the public.

18. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).

FOR THE UNITED STATES OF AMERICA

DATED: ____________________ BY: ____________________
Brett Shumate, Assistant Attorney General
Civil Division

DATED: ____________________ BY: ____________________
DAVID M. TOEPFER
United States Attorney
Northern District of Ohio

DATED: ____________________ BY: ____________________
Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

15. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

16. This Agreement is binding on CCF's successors, transferees, heirs, and assigns.

17. All Parties consent to any Parties' disclosure of this Agreement, and information about this Agreement, to the public.

18. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).

<u>FOR THE UNITED STATES OF AMERICA</u>

DATED: ______________________ BY: ______________________________

Civil Division

DATED: 6/5/2026 BY: ______________________________

DAVID M. TOEPFER
United States Attorney
Northern District of Ohio

DATED: ______________________ BY: ______________________________

Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

15. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

16. This Agreement is binding on CCF's successors, transferees, heirs, and assigns.

17. All Parties consent to any Parties' disclosure of this Agreement, and information about this Agreement, to the public.

18. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).

FOR THE UNITED STATES OF AMERICA

DATED: ______________________ BY: ______________________________

Civil Division

DATED: ______________________ BY: ______________________________

DAVID M. TOEPFER
United States Attorney
Northern District of Ohio

DATED: 06/05/26 BY: SUSAN GILLIN Digitally signed by SUSAN GILLIN Date: 2026.06.05 16:56:07 -04'00'

Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

FOR THE STATE OF OHIO

DATED: June 5, 2026 BY: [signature]

DAVE YOST, Ohio Attorney General

FOR THE CLEVELAND CLINIC FOUNDATION

DATED: ______________________ BY: ______________________________

Deborah C. Gordon
Executive Vice President
Chief Legal Officer
Cleveland Clinic Foundation

DATED: ______________________ BY: ______________________________

G. Zachary Terwilliger
Vinson & Elkins LLP
Counsel for Cleveland Clinic Foundation

FOR THE STATE OF OHIO

DATED: ______________________ BY: ______________________

FOR THE CLEVELAND CLINIC FOUNDATION

DATED: June 5, 2026 BY: ______________________

Deborah C. Gordon
Executive Vice President
Chief Legal Officer
Cleveland Clinic Foundation

DATED: June 5, 2026 BY: ______________________

G. Zachary Terwilliger
Vinson & Elkins LLP
Counsel for Cleveland Clinic Foundation