# EXHIBIT 42

# SETTLEMENT AGREEMENT

## I. PARTIES

This Settlement Agreement ("Agreement") is entered into by and between the United States of America, acting through the United States Department of Justice ("DOJ") and the United States Attorney's Office for the Northern District of Texas, and Connecticut Children's Medical Center (hereinafter, "Connecticut Children's"), (collectively "the Parties"), through their authorized representatives.

## II. RECITALS

A. Connecticut Children's is a not-for-profit health system organized under the laws of Connecticut with its main campus located in Hartford, Connecticut. It operates approximately 20 other medical facilities and is a wholly owned subsidiary of CCMC Corporation.

B. "Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or non-exempted clinical intervention provided to an individual under eighteen (18) years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's sex, where such intervention would not otherwise be indicated for a congenital condition, including but not limited to genetic or chromosomal conditions (including patients diagnosed as intersex, pathological, or a medical condition not related to gender identity). Furthermore, the term Sex-Rejecting Procedure does not include psychological or psychiatric treatments such as talk therapy, counseling, or other non-medical or surgical mental health interventions. Sex-Rejecting Procedures include, but are not limited to:

(a) *Puberty suppression*: prescription or administration of gonadotropin-releasing hormone (GnRH) agonists or antagonists or functionally equivalent agents, intended to pause or suppress pubertal progression.

(b) *Hormone administration*: prescription or administration of estrogen, testosterone, or synthetic analogs in a manner intended to induce physical traits associated with the opposite sex or to suppress traits associated with the individual's sex.

(c) *Surgical interventions*: any surgical procedure intended to alter, remove, or reconstruct primary or secondary sex characteristics, including but not limited to mastectomy, breast augmentation, genital reconstruction or modification, hysterectomy, oophorectomy, orchiectomy, phalloplasty, vaginoplasty, and other surgeries performed primarily to approximate sex-typical appearance to create physical traits associated with the opposite sex or to suppress traits associated with the individual's sex where there is not an independent medical need. Patients will not be permitted to schedule any prohibited surgical intervention until age eighteen (18). Preoperative testing and care is not permitted until the surgical procedure is scheduled.

(d) *Voice modification interventions*: clinical interventions intended to masculinize or feminize a minor's voice to approximate vocal characteristics typical of the opposite sex where there is not an independent medical need, including but not limited to speech-language therapy when undertaken to alter pitch, resonance, intonation, or speech patterns to align with a gender identity rather than the minor's sex or pharmacological, surgical, or procedural interventions to affect the larynx, vocal cords, or related structures to modify sex-typical voice characteristics that are opposite to a minor's sex.

C. The United States investigated the facts and circumstances surrounding Sex-Rejecting Procedures provided by Connecticut Children's from January 1, 2020, through the Effective Date of this Agreement, including but not limited to claims for payment submitted or caused to be submitted by Connecticut Children's to insurance plans and payors for items and services provided during the aforementioned time period in connection with Sex-Rejecting Procedures. Following thorough and careful consideration of the facts and circumstances surfaced during its investigation, including information made available to the United States by Connecticut Children's—which did not include disclosure to the United States by Connecticut Children's of any Protected Health Information (including but not limited to medical

records)—the United States is not bringing an enforcement action based on any violation of civil, administrative, or criminal law as a result of its investigation, subject to a limited exception that may be contained within the FCA Settlement Agreement executed on or about the same date as this Agreement.

D. Connecticut Children's expressly denies any wrongdoing and denies that it committed any violation of civil, administrative, or criminal law related to the United States' investigation.

E. This Agreement does not reflect a conclusion or admission that Connecticut Children's, or any other subcomponent or affiliated entity thereof, is subject to suit or liability under federal civil or criminal law and does not waive any defense that such entities may raise in any future proceeding.

F. To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## III. TERMS AND CONDITIONS

1. Connecticut Children's shall commit to providing a total value of five hundred thousand dollars ($500,000) of Detransition care for Qualified Patients, including insured and uninsured Qualified Patients. For purposes of this Agreement, "Detransition" means the evaluation, management, discontinuation, reversal, or treatment for or modification of the effects of prior Sex-Rejecting Procedures. "Qualified Patients" are those who seek Detransition care at Connecticut Children's who underwent any Sex-Rejecting Procedures at Connecticut Children's before reaching nineteen (19) years of age and who are nineteen (19) years of age or younger at the time they seek to begin their Detransition care. The value of the

care will be determined by the charges either submitted to insurance providers or the amount of the charges discounted under Connecticut Children's charity care and financial assistance policy.

a. Connecticut Children's shall ensure that it will provide Detransition care to Qualified Patients regardless of their ability to pay. Connecticut Children's will follow its financial assistance policies, including free or reduced-cost care, such that Qualified Patients who are uninsured, underinsured, or otherwise unable to afford Detransition care are not denied such services for financial reasons.

b. Connecticut Children's agrees to inform the public regarding the availability and accessibility of Detransition care. Such efforts will include but not be limited to including information about the availability of Detransition care on its public webpage, a dedicated phone number, and a care coordinator specifically assigned to oversee coordination of Detransition support services. Connecticut Children's shall have thirty (30) days from the date of execution to fulfill these efforts.

c. Failure of Connecticut Children's to comply with the obligations set forth herein with regard to the Detransition care shall constitute a material breach of this Agreement.

2. Connecticut Children's shall pay to the United States a total sum of $60,000 (the "Settlement Amount"). The Settlement Amount shall constitute a debt immediately due and owing to the United States on the Effective Date of this Agreement, as defined below. For the avoidance of doubt, the Settlement Amount constitutes a single payment that satisfies Connecticut Children's monetary obligations to the United States under both this Agreement and the FCA Settlement Agreement entered into between the Parties on or about the same date. Connecticut Children's total monetary obligation under both agreements to the United

States is $60,000, not $60,000 per agreement. This debt shall be discharged by payments to the United States under the following terms and conditions:

a. Connecticut Children's shall pay the Settlement Amount by electronic funds transfer pursuant to written instructions from the United States no later than thirty (30) days after the Effective Date of this Agreement.

3. Subject to the exceptions in Paragraph III.4 (concerning excluded claims) below, and conditioned upon Connecticut Children's provision of Detransition care up to the value of five hundred thousand dollars ($500,000) pursuant to Paragraph III.1, as well as the full payment of the Settlement Amount pursuant to Paragraph III.2(a), the United States releases Connecticut Children's, its parent entity CCMC Corporation, and all of its current and former affiliated and subsidiary entities, including Connecticut Children's Specialty Group, Inc., and all of their current and former board members (collectively, the "Released Parties"), from any civil, administrative, and criminal claims or liabilities the United States has or may have for or related to Sex-Rejecting Procedures under 18 U.S.C. §§ 287, 371, 664, 666, 1001, 1027, 1035, 1341, 1343, 1347, 1349, and 1954; 21 U.S.C. § 331; and 42 U.S.C. § 1320a-7b (the "Released Claims").

4. Notwithstanding the releases given in Paragraph III.3 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b. Any liability under the civil False Claims Act, not explicitly released herein or by other agreement executed at or around the same time with the Department of Justice;

c. Any liability to the United States (or its agencies) for any conduct other than

that relating to the Released Claims; and

d. Any liability based upon obligations created by this Agreement.

5. Connecticut Children's fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Connecticut Children's has asserted, could have asserted, or may assert in the future against the United States or its agencies, officers, agents, employees, and servants, related to the United States' investigation described in Paragraph II.C.

6. Connecticut Children's agrees to the following compliance commitments, which represent a condition precedent to the release of the United States' potential claims:

a. Connecticut Children's agrees not to provide Sex-Rejecting Procedures, whether directly or indirectly, at any facility owned, operated, or controlled by Connecticut Children's for a term of ten (10) years from the Execution Date of this Agreement. This obligation applies regardless of the source of payment, clinical setting, or referral pathway, and includes any such services provided through employees, contractors, or third-party arrangements. Any violation of this paragraph shall constitute a material breach of this Agreement. Connecticut Children's may not evade this obligation through reclassification, relabeling, or modification of services that are materially the same as Sex-Rejecting Procedures.

b. Connecticut Children's will not own or operate healthcare facilities that provide Sex-Rejecting Procedures for a term of ten (10) years from the Execution Date of this Agreement, consistent with the same commitments as set out in Paragraph III.6(a) above.

c. Connecticut Children's will immediately cease and refrain from directing, coordinating, facilitating, or otherwise arranging for Sex-Rejecting Procedures by any third

party or external provider, whether within or outside of the Connecticut Children's enterprise. Nothing in this paragraph prohibits a referral for psychological counseling or other mental-health services, or referrals for such services intended to support a minor's mental health, provided that such services do not include medical or surgical Sex-Rejecting Procedures.

7. The United States is aware of information regarding certain compliance measures already implemented by Connecticut Children's concerning the prevention and detection of violations of federal law related to billing and coding for Sex-Rejecting Procedures. In addition, Connecticut Children's commits, by no later than one (1) year from the date of this Agreement, to implement additional compliance measures designed to prevent and detect violations of federal law related to billing and coding for Sex-Rejecting Procedures, and to continue those compliance measures for the term of this Agreement provided in Paragraph III.23.

a. The Connecticut Children's Chief Legal Officer ("CLO") will certify on an annual basis and at the End of this Agreement to the satisfaction by Connecticut Children's of its compliance commitments, and specifically that Connecticut Children's is undertaking reasonable efforts to ensure operation in compliance with the requirements of Paragraphs III.6(a), III.6(b), and III.6(c) and Paragraph III.1 above. Such reasonable efforts shall include, for instance, an annual audit of sampled billing records and a clinical review of associated medical records of the patients for whom those billings were submitted, for those patients under the age of eighteen (18) treated for services (such as lawful mental health or Detransition services) after the Execution Date of this Agreement with claims assigned a diagnosis code of F64, F64.0, F64.1, F64.2, F64.8, F64.9, and Z87.890.

b. Connecticut Children's will provide annual training on appropriate coding for

employees involved in billing for the treatment of any pediatric gender dysphoria and pediatric endocrine disorders to the extent such treatment is not prohibited by this Agreement.

8. Connecticut Children's agrees to reasonably cooperate with any investigation by the United States of pharmaceutical manufacturers, distributors, retailers, or any other third party individual or entity in the distribution chain related to the distribution of medical products for Sex-Rejecting Procedures. Upon reasonable notice, Connecticut Children's agrees not to impair the cooperation of relevant employees, and shall use reasonable efforts to provide last known contact information of relevant former personnel for interviews, consistent with the rights and privileges of such individuals. Connecticut Children's also agrees, upon reasonable notice, to produce to the United States any available records of any relevant communications occurring from January 1, 2020, to July 3, 2025, between its employees and pharmaceutical manufacturers related to the medical products for Sex-Rejecting Procedures, subject to applicable laws and regulations, including relevant data privacy and national security laws and regulations, *provided however* that any patient identifiers will be removed prior to production and replaced with unique de-identified codes or a similar mechanism, as appropriate, so as to protect patient identities while permitting tracking and cross-referencing of records.

9. To the extent that Connecticut Children's identifies conduct occurring at Connecticut Children's owned, operated, and controlled facilities after the date of the Agreement that violates federal laws in the context of Sex-Rejecting Procedures, Connecticut Children's will report such conduct promptly to the Department of Justice.

10. The statute of limitations for any claims or charges relating to the conduct relevant to the Released Claims shall be tolled upon the signing of this Agreement until six (6) months after the End of this Agreement.

11. If at any time before the End of this Agreement, Connecticut Children's, as an organization:

a. Commits any felony under federal law;

b. Provides in connection with this Agreement deliberately false, incomplete, or misleading information;

c. Fails to reasonably cooperate as set forth in this Agreement;

d. Fails to implement any of the agreed upon compliance requirements as set forth in this Agreement; or

e. Otherwise fails specifically to perform or to fulfill completely each of the obligations under the Agreement, regardless of whether the United States becomes aware of such a breach before the End of this Agreement, Connecticut Children's shall thereafter be subject to the institution of any criminal proceedings for any violation of federal law for which the United States has knowledge and has evidence in its possession sufficient to prove the violation beyond a reasonable doubt, including the Released Claims, which may be pursued by the United States in any appropriate venue.

12. In the event the United States determines that Connecticut Children's may have breached this Agreement, the United States agrees to provide Connecticut Children's with written notice prior to instituting any legal proceedings resulting from such breach. Within thirty (30) days of receipt of such notice, Connecticut Children's shall have the opportunity to respond to the United States in writing to explain the nature and circumstances of the apparent breach, as well as the actions Connecticut Children's has taken to address and remediate the situation, which the United States shall consider in determining whether to pursue legal proceedings against Connecticut Children's.

13. In the event that the United States determines that Connecticut Children's has breached this Agreement: (a) all statements made by or on behalf of Connecticut Children's to the United States or to the Court and any testimony given by Connecticut Children's before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all legal proceedings brought by the United States against Connecticut Children's; and (b) Connecticut Children's shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of Connecticut Children's prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, Connecticut Children's, will be imputed to Connecticut Children's for the purpose of determining whether Connecticut Children's has violated any provision of this Agreement shall be in the sole discretion of the United States. Except as may otherwise be agreed by the parties in connection with a particular transaction, Connecticut Children's agrees that in the event that, at any time before the End of this Agreement, it undertakes any material change in corporate form, including if it sells, merges, or transfers business operations, it shall include in any contract for sale, merger, transfer, or other material change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. Connecticut Children's shall notify the United States at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other material change in corporate form, including dissolution, in order to give the United States an

opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.

14. This Agreement is binding on Connecticut Children's and the United States Department of Justice, but specifically does not bind any other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies, or any other authorities, although the United States will bring Connecticut Children's cooperation and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities upon request. This Agreement does not provide any protection against prosecution for any future conduct by Connecticut Children's or any of its present or former parents or subsidiaries. Nothing herein shall restrict Connecticut Children's from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the purposes of this Agreement, as determined by the United States.

15. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

16. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

17. This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the District of Connecticut. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

18. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

19. The undersigned represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

20. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

21. This Agreement is binding on the Parties' successors, transferees, and assigns.

22. All Parties consent to any Parties' disclosure of this Agreement, and information about this Agreement, to the public.

23. This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement"). The term of this Agreement shall end five (5) years from the Effective Date of this Agreement ("End of this Agreement"). The Parties agree that Connecticut Children's obligations under Paragraphs III.6(a), III.6(b), and III.6(c) will persist for ten (10) years from the Effective Date of this Agreement, with the same remedies for breach of those provisions available to the Government as if the breach had occurred during the term of this Agreement.

**FOR THE UNITED STATES OF AMERICA**

DATED: 8/4/26 BY: ____________________

Brett Shumate
Assistant Attorney General
Civil Division
United States Department of Justice

DATED: ____________________ BY: ____________________

Ryan Raybould
United States Attorney
Northern District of Texas

**FOR THE UNITED STATES OF AMERICA**

DATED: ______________________ BY: ______________________________

Brett Shumate
Assistant Attorney General
Civil Division
United States Department of Justice

DATED: 8/4/26 BY: ______________________________

Ryan Raybould
United States Attorney
Northern District of Texas

**FOR CONNECTICUT CHILDREN'S MEDICAL CENTER**

DATED: 8/3/2026 BY: ______________________
Shannon R. Sullivan
President & Chief Executive Officer
Connecticut Children's Medical Center

DATED: 8/3/2026 BY: ______________________
Amelia R. Medina
King & Spalding LLP
Counsel for Connecticut Children's Medical Center

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice ("DOJ") and the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"), and Connecticut Children's Medical Center (hereafter, "Connecticut Children's"), (collectively "the Parties"), through their authorized representatives.

## RECITALS

A. Connecticut Children's is a not-for-profit health system organized under the laws of Connecticut with its main campus located in Hartford, Connecticut. It operates approximately 20 other medical facilities and is a wholly owned subsidiary of CCMC Corporation.

B. The United States contends that Connecticut Children's submitted or caused to be submitted claims for payment to the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid").

C. The United States contends that it has certain civil claims against Connecticut Children's arising from the following conduct: From January 1, 2020, through the Effective Date of this Agreement, Connecticut Children's, in isolated instances, knowingly submitted claims for payment to Medicaid for services provided to patients under the age of 18 for the treatment of gender dysphoria or other gender identity related disorders without using a diagnosis code specifically identifying a gender identity disorder (*e.g.*, F64, F64.0, F64.1, F64.2, F64.8, F64.9, and Z87.890), and instead using a diagnosis code for a different clinical condition. That conduct is referred to below as the "Covered Conduct."

D. This Settlement Agreement is not an admission of liability by Connecticut Children's. Connecticut Children's denies that it engaged in the Covered Conduct.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, to resolve this matter without disclosure to the United States by Connecticut Children's of any Protected Health Information (including but not limited to medical records) of Connecticut Children's patients, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

**TERMS AND CONDITIONS**

1. Connecticut Children's shall pay to the United States the sum of $60,000 (the "Settlement Amount"), of which $30,000 is restitution. The Settlement Amount shall be paid no later than 30 days after the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice.

2. Subject to the exceptions in Paragraph 3 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount, the United States releases Connecticut Children's, its parent entity CCMC Corporation, and all of its current and former affiliated and subsidiary entities, including Connecticut Children's Specialty Group, Inc., and all of their current and former board members (collectively, the "Released Parties") from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729–3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801–3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

3. Notwithstanding the release given in Paragraph 2 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b. Any criminal liability;

c. Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal health care programs;

d. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e. Any liability based upon obligations created by this Agreement;

f. Any liability of individuals.

4. Connecticut Children's fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Connecticut Children's has asserted, could have asserted, or may assert in the future against the United States, and its agencies, officers, agents, employees, and servants related to the Covered Conduct and the United States' investigation and prosecution thereof.

5. Connecticut Children's agrees to the following:

a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Connecticut Children's, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement;

(2) the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3) Connecticut Children's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4) the negotiation and performance of this Agreement; and

(5) the payment Connecticut Children's makes to the United States pursuant to this Agreement are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as "Unallowable Costs").

b. Future Treatment of Unallowable Costs: Unallowable Costs shall be separately determined and accounted for in non-reimbursable cost centers by Connecticut Children's, and Connecticut Children's shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Connecticut Children's or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c. Treatment of Unallowable Costs Previously Submitted for Payment: Connecticut Children's further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements,

information reports, or payment requests already submitted by Connecticut Children's or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Connecticut Children's agrees that the United States, at a minimum, shall be entitled to recoup from Connecticut Children's any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Connecticut Children's or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this paragraph) on Connecticut Children's or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d. Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Connecticut Children's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this paragraph.

6. Connecticut Children's agrees to cooperate fully and truthfully with the United States' investigation of third party individuals and entities not released in this Agreement. Upon reasonable notice, Connecticut Children's agrees not to impair the cooperation of its directors, officers, and employees, and shall use its best efforts to provide last known contact information of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. Connecticut Children's further agrees to furnish to the United

States, upon request, complete and unredacted copies of all non-privileged, available documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf, *provided however* that any patient identifiers will be removed prior to production and replaced with unique de-identified codes or a similar mechanism, as appropriate, to protect patient identities while permitting tracking and cross-referencing of records.

7. This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 8 (waiver for beneficiaries paragraph), below.

8. Connecticut Children's agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

9. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

10. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

11. This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the District of Connecticut. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

12. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

13. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

14. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

15. This Agreement is binding on Connecticut Children's successors, transferees, heirs, and assigns.

16. All Parties consent to any Parties' disclosure of this Agreement, and information about this Agreement, to the public.

17. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).

**FOR THE UNITED STATES OF AMERICA**

DATED: 8/4/26 BY: Brett Shumate

Brett Shumate
Assistant Attorney General
Civil Division
United States Department of Justice

DATED: ______________ BY: ______________________

Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services

**FOR THE UNITED STATES OF AMERICA**

DATED: ______________________ BY: ______________________________
Brett Shumate
Assistant Attorney General
Civil Division
United States Department of Justice

DATED: 8/4/2026 BY: ______________________________
Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services

**FOR CONNECTICUT CHILDREN'S MEDICAL CENTER**

DATED: 8/3/2026

BY: ______________________
Shannon R. Sullivan
President & Chief Executive Officer
Connecticut Children's Medical Center

DATED: 8/3/2026

BY: ______________________
Amelia R. Medina
King & Spalding LLP
Counsel for Connecticut Children's Medical Center