# EXHIBIT 58

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br>*Plaintiffs,*<br>v.<br>DONALD J. TRUMP, et al.,<br>*Defendants.* | No. 1:25-cv-12162<br>**LEAVE TO FILE UNDER A PSEUDONYM GRANTED ON DECEMBER 19, 2025** |

**DECLARATION OF PLAINTIFF STATE PROVIDER # 5**

I, Plaintiff State Provider # 5, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.
2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Background**

3. I am a practicing physician and faculty member at an academic medical center affiliated with and partially funded by my state's public university system. I am dually board-certified, including certification in Pediatrics with the American Board of Pediatrics. I practice medicine in a clinic where I provide gender-affirming medical care to transgender and gender-diverse patients.
4. I am filing this declaration under a pseudonym out of concern for my safety as well as the safety of my family, colleagues, patients and institution. I discuss below my real and present concerns regarding safety and am filing under a pseudonym for protection.

5. I have a Doctor of Medicine Degree, and a Bachelor of Science degree. I am licensed to practice medicine in my state of residence. I have authored more than 20 peer-reviewed publications, the large majority of which focus on health care delivery to transgender and gender-diverse people.
6. Through my training and practice, I am very familiar with the prevailing medical standards and protocols for gender-affirming medical care. To keep abreast of new scientific research and best practice guidelines, I regularly attend national and international conferences on transgender health and review recently published scientific articles on the topic. I maintain a large lecture series on numerous topics within transgender health and update these at least annually to include recent publications.
7. In my clinical practice, I provide gender-affirming medical care for patients with Gender Dysphoria alongside other clinicians. Over the course of my career, I have treated many hundreds of patients with Gender Dysphoria, and where medically appropriate, provided them with gender-affirming care. I treat dozens of adolescents each year. As part of my practice, I am and must be familiar with varied aspects of care for people with Gender Dysphoria, including diagnostic assessment, mental health assessment and treatment, and medical management.
8. In my professional career, I have also participated in developing institutional policy and training measures to improve health care delivery to transgender and gender-diverse people within health systems.

**Clinical Definitions**

9. Gender identity is a person's innate sense of their gender. Gender identity does not always align with sex assigned at birth. Some transgender people experience clinically

significant and prolonged distress, or Gender Dysphoria, due to the incongruence between their gender identity and sex assigned at birth.

10. The diagnosis of Gender Dysphoria is a serious medical condition. It is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders Fifth Edition, Text Revision (DSM-5-TR), and defined as "a marked incongruence between one's experienced/expressed gender and their assigned gender, lasting at least 6 months." Gender Incongruence, a related diagnosis, is also recognized by the World Health Organization's International Statistical Classification of Diseases and Related Health Problems, 11th Edition (ICD-11) as "marked and persistent incongruence between an individual´s experienced gender and the assigned sex."

11. For adolescent patients, Gender Dysphoria may appear for the first time or worsen with the onset of puberty and development of secondary sex characteristics. Such distress can result in a patient becoming withdrawn, socially self-isolated, depressed, anxious, engaging in self-harm behaviors, or suicidal. These risks decline when transgender individuals are supported and live according to their gender identity. If left untreated, Gender Dysphoria can impair a person's ability to function and can cause significant depression, anxiety, self-harm, and suicidality.

12. To receive a diagnosis of Gender Dysphoria, a patient must demonstrate two of the following: "an incongruence between the experienced/expressed gender and primary and/or secondary sex characteristics," "a strong desire to be rid of one's primary and/or secondary sex characteristics," "a strong desire for the primary and/or secondary sex characteristics of the other gender," "a strong desire to be of the other gender," or "a strong conviction that one has the typical feelings and reactions of the other gender."

Gender Dysphoria is also "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."

13. Gender-affirming care can significantly relieve the severe distress of Gender Dysphoria and is medically necessary for many people with this condition. Gender-affirming care generally refers to healthcare services that support a person in living in alignment with their gender identity. Gender-affirming care is a supportive form of healthcare that consists of an array of services that may include social support, mental health, medical, surgical, and other non-medical services. Gender-affirming care is a patient-centered and individualized practice and aims to help individuals align their body, appearance and/or internal experience with their gender identity.

14. Decades of scientific research and clinical experience have demonstrated that, for transgender and gender diverse people who seek gender-affirming care, such care can improve a person's mental health and overall well-being. I have seen first-hand, in my ten years of specialized focus in this area, the many benefits of social transition and gender-affirming medical care. Countless people – adolescents and adults - have shared how the care has opened their lives and allowed them to see a future for themselves when previously they did not.

15. For individuals for whom gender-affirming medical care is indicated and desired, there are no alternative evidence-based treatments for Gender Dysphoria. Though psychiatric care and psychological therapy may help reduce some distress, they do not typically resolve Gender Dysphoria.

**<u>Current Medical Practice</u>**

16. In my current practice, adolescent patients interested in initiating gender-affirming medical care must first complete a comprehensive mental health assessment with a mental health clinician before completing a medical visit with me. The mental health assessment includes both the adolescent patient and their parent(s) or guardian(s). It is beneficial and necessary for adolescent patients and their guardians to be aligned on the goals of treatment. The mental health clinician aims to clarify the patient's experience, goals of treatment, and current mental health status and needs. The mental health clinician also confirms whether the patient meets the criteria for Gender Dysphoria.

17. If a patient meets the clinical criteria for Gender Dysphoria, the mental health clinician will create a plan with the patient and their guardian(s) for next steps. This may include scheduling additional visits with the mental health provider, connecting the patient and their guardian(s) with other community resources, identifying non-medical supports that assist the patient in aligning their body or appearance and identity, and/or recommending the patient for assessment for gender-affirming medical services.

18. At the first appointment with a new adolescent patient, I review the mental health assessment and discuss this history in more detail with the patient and guardian(s). In most cases, the entirety of the visit is spent with both the patient and the guardian(s), as it is of utmost importance that all parties understand each other's experiences and are able to share their unique observations of the patient's gender history. Occasionally, consistent with adolescent confidentiality privileges established within healthcare, sensitive information is elicited from the adolescent without the guardian present. During these comprehensive assessments, I seek to understand how the patient has been experiencing distress over their gender identity so that I can independently confirm a diagnosis of

Gender Dysphoria and advise on the array of treatments that may be beneficial. I also take a full social history to understand the patient's family-life, school-life, peer relationships, and other relationships. If a social transition has occurred, which may include changing name, pronouns, and style of dress or hair, I seek to understand how this has impacted the patient. I then discuss and clarify the patient's goals in seeking medical treatment. I need to ensure that the patient is very explicit about the ways in which they are experiencing dysphoria so that I can discuss the treatment options that are individualized to them. At this first visit I also conduct a physical examination of the patient and may order lab work or imaging tests if indicated. These visits, which we view in continuity with the mental health assessment, are incredibly thorough. The visits are allotted more time than a typical medical appointment and often last upwards of 90 minutes.

19. Over numerous visits, I spend a significant amount of time with my patients and their families. We thoroughly discuss the medication treatment options and their possible benefits, risks and complications. We also discuss any alternative forms of treatment, including nontreatment, and their potential risks and benefits. Written information is provided to all parties. As with any medication, there are risks and benefits that the patients and their guardians need to fully understand. I require informed assent from my adolescent patient and informed consent from their guardian(s) before providing adolescents gender-affirming care. If the patient has two legal guardians, both must independently receive counseling and must consent to any treatment. This lengthy and thorough process ensures that both the patient and their parent(s) or guardian(s) fully

understand the risks and benefits of the course of treatment. I ensure that the patient and their family are aligned in decision-making regarding initiating gender-affirming care.

20. As a part of my training, I learned how to explain medical options to adolescent patients in a developmentally appropriate way. This includes being adept at describing potential changes to their body as a result of gender-affirming care and discussing any potential side effects and other risks. Additionally, I provide written materials and at times informational videos that are designed to speak to a non-medically trained person so that patients and their families can thoroughly review their options at their own pace. Patients and parents both often have many questions. A large part of my role as a medical provider is to listen to their questions, understand their concerns, identify their goals, and create a treatment plan that fits the individual patient and their family.

21. Parents often express concern about their child regretting any decisions made during the adolescent period. I acknowledge this concern as a natural and important part of a parent's role; parents often have a more long-term lifespan perspective than their adolescent children. We discuss that we cannot know with certainty what a given person's future will hold, and that we are working to make our best predictions based on our scientific knowledge and the experiences of others who have navigated various care paths. I share that our scientific literature does provide us with some strong predictors of persistence of Gender Dysphoria, and we discuss how this information applies to the particular patient. I also acknowledge that a minority of people may seek to stop gender-affirming care, and we discuss what the effects of the prior treatments may be in that circumstance. I also discuss that of those who stop gender-affirming care, this occurs for many reasons, including external pressures, a desire not to take ongoing medications, or

an evolution of gender identity. Current data indicate that a very small minority of those who stop treatment regret having received it. I also emphasize that for those who stop treatment, including those who may seek medical treatments to address the physical effects from prior gender-affirming care, we remain available to help them reach their goals. Finally, I acknowledge that in comparison to other types of medical care, the regret rates of gender-affirming treatment are exceptionally low.

22. If both the patient and all legal guardian(s) express a desire to proceed with gender-affirming medical care, we will proceed with treatment. There must be a medical indication of Gender Dysphoria and the treatment plan must be within the standards of care. Gender-affirming medical care can include taking puberty-delaying medications (commonly referred to as "puberty blockers") and gender-affirming hormones, such as testosterone or estradiol (estrogen). I prescribe both puberty-delaying medications and gender-affirming hormones.

23. The standard puberty-delaying medications are GnRH agonists, given by injection or subcutaneous implant. These are fully reversible medications that have been used for over four decades for the treatment of central precocious puberty in children. Likewise, testosterone and estradiol treatment have been used for decades for the induction of puberty in adolescents who do not have typical pubertal development. These medications are used off-label, in accordance with applicable laws and published guidelines, for the treatment of Gender Dysphoria.

24. After a patient begins puberty blockers or gender-affirming hormones, they have continual follow-up visits with me, typically every three to six months depending on the treatment. Both the patient and the guardian(s) participate in these visits. At these visits,

we discuss updates in physical health, mood and mental health, social structure and needs, and any observed physical changes from the treatments. After this follow-up assessment, I discuss a plan of care with the patient and guardian(s) that may include modifications of their medications or dosages, if my assessment suggests any change is indicated. For adolescents, the initial dosage of gender-affirming hormones is typically low and gradually increased over years to mimic pubertal development that is aligned with the pace of their peers' development. It often takes months before the patient or their guardian(s) begin to notice any physical changes.

25. Over the course of my care with patients, I often hear from parents how much they notice their children becoming more confident and comfortable in their bodies. Patients often share they are better able to engage with friends, schoolwork, extracurricular activities and romantic relationships – all important parts of adolescent life. Symptoms of depression and anxiety often improve, and those who have experienced thoughts or actions of self-harm or suicidality often find these subside with time.

26. Due to my lengthy and in-depth relationship with my patients, I have a unique vantage point into my patients' lives. Because the foundation and goals of gender-affirming care are to support patients in thriving in all aspects of their lives, I get to know my patients and their families very well in my course of treating them. Indeed, one of the best parts of my job is getting to know the patients and their families and seeing how a young person can grow into the most successful version of themself. Because I also care for adult patients, I have the additional perspective of seeing people who did or did not have access to care when they felt they needed it in the past. It is clear to me that people who knew

they needed treatment but were not able to access it often experienced ongoing hopelessness and distress that have impaired their abilities to live life fully.

27. I met "Jake" when he was fourteen and seeking gender-affirming testosterone treatment. He was experiencing severe depression and chronic suicidal thinking. Though he had strong clarity about his goals for treatment, his parents were not comfortable proceeding. He had a suicide attempt and was hospitalized. Over many months, we worked to address his depression through therapy and medication, with limited success, and facilitated conversations within the family. His parents spoke of behaviors they wanted to see that they felt would display that he was mature enough to make this big decision; he listened to their concerns and cooperated readily with their request. Ultimately all family members agreed Jake should start testosterone. His depression and anxiety markedly improved over the next two years and he was able to stop antidepressant medication. His depression recurred during the COVID pandemic, and he observed that the most notable thing about his depression was that it was now "just regular depression" like other adolescents at the time; his gender had faded into the background as he felt progressively more comfortable in his body. He has now graduated college with an architecture degree and is thriving in his relationships.

28. With access to medically indicated care, transgender people can experience significant and potentially complete relief from their symptoms of Gender Dysphoria. Not only is this documented in scientific literature and published data, but I have witnessed this in hundreds of patients over the last ten years.

**<u>Federal Actions Targeting Providers of Gender-Affirming Care</u>**

29. My practice of medicine has completely changed since President Donald Trump executed

Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," issued on January 20, 2025 (EO 14,168) and Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation," issued on January 28, 2025 (EO 14,187).

30. EO 14,168, by prohibiting "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," with "sex" being defined as immutable from the time of conception, prohibits treatments that are part of widely accepted protocols for the treatment of Gender Dysphoria that are supported as medically necessary by every major medical association in the country—social transition and gender-affirming medical care.

31. Contrary to medical and biological science, EO 14,168 further states "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."

32. EO 14,168 defines "sex" as "an individual's immutable biological classification as either male or female," that "does not include the concept of 'gender identity'" EO 14,168 § 2(a). EO 14,168 further defines 'Female' as "a person belonging, at conception, to the sex that produces the large reproductive cell," and "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell." EO 14,168 §§ 2(d), (e).

33. EO 14,168's "two-sexes" policy and definition of "sex" do not align with how the term "sex" is commonly understood in the practice of medicine and in the scientific community. According to the American Medical Association, a person's sex is made up of many diverse components. (AMA 2023). Similarly, the Endocrine Society notes that because a person's sex characteristics "may not [always] be in line with each other…, the

terms biological sex and biological male or female are imprecise and should be avoided." (Hembree, et al., 2017).

34. EO 14,168 seeks to deny the existence of transgender people. People having experiences outside of those traditionally defined as "male" or "female" exist in innumerable cultures and countries across the world. Scientists and experts in the areas of sex and gender within various scientific disciplines, including medicine, psychology, anthropology and sociology, consider transgender and gender-diverse experiences to be normative, a natural part of the array of human experiences. Ample evidence exists that attempts to erase this reality are both ineffective and harmful.

35. EO 14,168 also fails to recognize intersex people. The United Nations Office of the High Commissioner of Human Rights estimates that 1.7% of the global population are born with intersex traits, that is anatomic, chromosomal and/or hormonal variations that do not exclusively align with those typically attributed to "male" or "female" sex. This is a biological reality that the EO simply ignores.

36. Despite the overwhelming evidence that gender-affirming care changes many adolescents' lives for the better, EO 14,187 directs the United States Department of Justice (DOJ) to "prioritize enforcement of protections against female genital mutilation," and "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation."

37. Prohibiting people with Gender Dysphoria from socially transitioning and withdrawing or denying gender-affirming medical care to those for whom it is indicated will put them at risk of significant harm to their health and well-being, including heightened risk of self-

harm and suicidality. Research has shown an increase in adolescent suicide attempts in the year following passage of state-level laws restricting gender-affirming care for adolescents.

38. If a patient who has not completed puberty were to lose access to gender-affirming care, they would undergo permanent changes in their body that do not align with their gender identity. The impact of these changes can include acute mental health deterioration as well as the need for surgeries in adulthood that may have been avoided. In addition, individual safety can be impacted, as people may now be more easily determined to be transgender, which increases risk for violence victimization, harassment and discrimination. For a patient receiving gender-affirming hormones, some of the desired changes that they have achieved would stop, and undesired changes would begin or resume. In my extensive experience, even brief interruptions in gender-affirming medical care often have a prompt detrimental impact on a patient's mental health and overall well-being. Adolescents are particularly vulnerable.

39. President Trump's issuance of EO 14,187 and EO 14,168 which both target transgender individuals has had a crushing impact on my patients and their families. Since the Executive Orders were issued, my clinic has received an overwhelming number of messages and phone calls from families who are terrified at the prospect of losing access to this care, or who have lost access to care elsewhere and need a new care location. Many guardians have expressed deep concerns that just the threat of disruption, let alone actual disruption, will significantly worsen their child's mental health. Parents are distraught that they have worked so hard for so many years to protect their children and ensure they are living their best lives, only to have their parental rights dismantled by

these egregious actions. They are absolutely bewildered that their own country could betray them in this way. Guardians have also expressed concerns about the federal government attempting to obtain their child's medical records in an effort to identify adolescents who have accessed this care. There is even alarm that the government will remove their children from their homes because they have received gender-affirming care. Several of my patients and families have moved or are preparing to move out of the country because of fear for their safety.

40. The Executive Orders make me scared for myself, other clinicians, and staff who are providing gender-affirming medical care even though it is lawful in my state. I am very worried that the United States Department of Justice will start investigating and prosecuting clinicians for providing lawful, medically indicated gender-affirming care in accordance with published guidelines and best practice research. Since Attorney General Bondi instructed the DOJ to prosecute the provision of this care, I am even more worried that I will receive a subpoena or other investigative materials that will target the lawful care that I provide my patients. Even though I believe the medical care that I provide is legal, and I feel ethically bound to continue the care, any investigation or potential prosecution by the United States Department of Justice would be harmful to myself and my practice due to the appearance of impropriety. It is well known that gender-affirming care providers or centers receive safety threats on a regular basis, and I am concerned about becoming a target of such threats; I am particularly concerned for my family and for my patients who may themselves become targets or may lose me and/or my colleagues as a resource for their medically necessary care.

**<u>Consequences of Federal Actions on my Institution and Its Patients</u>**

41. My institution, an academic medical center affiliated with a public university, receives state funding. Our gender-affirming care clinicians have needed to redirect time, expertise and resources to prepare for and respond to these actions and threats. These preparations include but are not limited to developing contingency plans for disruptions in care, developing safety and security plans, considering our responses to potential subpoenas and constant monitoring of the legislative and political landscape. In addition, my institution has been receiving an increased volume of new patients as they transfer from other institutions which have terminated or limited services due to threats from federal actions; this has caused delays in access for both new and returning patients. The time spent in these responses is taken from our usual activities; for me, this impacts my availability for direct patient care, research and education. For my institution, these resources are pulled away from our overarching goal of providing outstanding, science-driven and patient-centered care for our entire community.

42. Under my state's law, it is illegal to discriminate on the basis of sex, which includes gender identity, and transgender status. There is no way to discontinue this care without violating nondiscrimination laws, as one's gender identity must be considered in determining access to this care. The amount of moral distress that I and my colleagues experience when facing these possible restrictions on providing care are negatively impacting our mental health. On a personal level, I am experiencing sleep disturbance, feelings of fear and hopelessness, headaches, appetite disturbance, and impaired concentration.

43. I am also very frightened that the incendiary and hyperbolic language of the Executive Orders will incite violence towards institutions and providers who offer gender-affirming

medical care. The rhetoric and vitriol directed against transgender people by the Trump Administration emboldens people to engage in verbal and physical attacks on the transgender and gender-diverse community, and those who love them and take care of them.

44. More than anything, I am scared for my patients. If they lose access to care, then they will likely experience irreversible harms to their health and well-being. My patient "M" has been identifying and living as a boy since early childhood. He received gender-affirming care from me since the age of 13. He is now 17, and has matured into a sophisticated, intelligent and inquisitive young man, college-bound to study political science with a focus on human rights. He and his family have recently moved out of the country due to their safety concerns. Several of my patients and their families have done the same. We are losing bright, talented and engaged Americans because they do not see a future in our country.

Dated: December 19, 2025

/s/ Plaintiff State Provider # 5

__________________________________

Plaintiff State Provider # 5