# EXHIBIT 59

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br>*Plaintiffs,*<br>v.<br>DONALD J. TRUMP, et al.,<br>*Defendants.* | No. 1:25-cv-12162 |

**DECLARATION OF DR. RACHEL SEWELL**

I, Rachel Sewell, MD declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am a Clinical Assistant Professor of Pediatric Endocrinology at the Stanford University School of Medicine. I am a board-certified Pediatric Endocrinologist working at the Stanford Medicine Pediatric and Adolescent Gender Clinic. I am familiar with the information in the statements set forth below through personal knowledge and experience, consultation with my colleagues at Stanford University, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Background**

3. I completed my pediatric residency at University of Colorado School of Medicine in June 2021. My pediatric endocrinology 3-year fellowship began the following month at University of Colorado School of Medicine. Pediatric endocrinologists focus on all aspects of

physiology impacted by hormones including metabolism, thyroid function, puberty and its progression, growth, diabetes, bone health etc. Throughout my fellowship, I prioritized consistent clinical exposure and training at the Children's Hospital of Colorado TRUE Center for Gender Diversity. I provided comprehensive care to gender diverse[1] patients, including those who identify as transgender, between the ages of 4 and 24 years old. Upon completing my fellowship, I decided to seek job opportunities in states that vigorously protect access to medically necessary gender-affirming care for gender diverse youth. I was hired as faculty at Stanford University School of Medicine as a clinician educator in September 2024 and have been in this role since.

4. As a Pediatric Endocrinologist, I provide comprehensive care to all of my patients with endocrine disorders, questions, or concerns. I am currently offering medically accurate information and providing comprehensive care to gender diverse patients at two outpatient clinics. The care includes providing medically accurate information around all aspects of care available to align patients' bodies with their identities including, but not limited to, vocal training, safely wearing compression clothing, puberty suppression, menstrual suppression, anti-androgen treatments, and hormone therapy.

5. I currently practice at Stanford University School of Medicine in the Pediatric and Adolescent Gender Clinic. The clinic operates within the larger Stanford institution and provides comprehensive multi-disciplinary care to our gender diverse patients.

6. The Stanford Medicine Pediatric and Adolescent Gender Clinic was established in 2016. Our multi-disciplinary clinic includes our mental health clinicians, pediatric endocrinologists, an adolescent medicine trained physician, a nutritionist, multiple clinical social

[1] The term "gender diverse" encompasses a range of gender identities that fall outside cisgender and/or binary understandings of gender. It includes transgender people.

workers and nurse practitioners, nurses, and a clinic coordinator. Our patients also have access to speech pathologists and reproductive endocrine and fertility specialists as well as a robust group of surgical subspecialities including urology, plastic surgery, ear/nose/throat, and gynecology.

7. Our clinic provides care to patients in a broad age range from 4 years old up until their early 20s. We serve over 800 patients and the majority are over 10 years old.

8. Care provided to gender diverse patients is individualized and appropriate for their age and development. Younger patients who have not initiated puberty do not receive any form of medical intervention or pharmacotherapy. Care for this age group focuses on providing resources, information, support to the family and young person, and access to our mental health clinicians if needed. Once patients are in endogenous puberty, they can pursue pubertal suppression to avoid the development of permanent secondary sex characteristics that do not align with their identity. These permanent characteristics include breast tissue development, voice deepening/changing, and external genital tissue growth/development. Typically, human bodies begin puberty between 9 and 13 years old. I describe puberty suppression to patients and their guardians as a "pause button" on puberty. If a patient utilizes this treatment in order to have more time without the development of sex characteristics and then decides to stop using the medication, their body will restart making its own endogenous hormones and proceed through puberty. We know this from decades of pediatric patients using these medications to effectively "pause" precocious or early puberty and then "un-pause" puberty by stopping the medications when they reach an appropriate age.

9. If transgender patients have already completed puberty or are unable to utilize pubertal suppression treatments, they may need menstrual suppression or anti-androgen treatments. These treatments do not have permanent effects and are commonly used in the care

of age-matched patients who are not gender diverse to treat common conditions such as dysmenorrhea (severe symptoms associated with periods impacting daily life).

10. Some gender diverse patients who have already undergone puberty may also require hormone therapy (taking estrogen or testosterone). Hormone therapy is available only after a rigorous evaluation process, multiple discussions, and informed consent by the patient or their guardians, as appropriate under state law.

11. Some gender diverse patients may require surgical treatment. If desired by patients, our clinic provides general information regarding surgical interventions available to patients and assists with referring them to the appropriate surgical team for more information.

12. State law provides that individuals above age 18 are, in most cases, adults with legal capacity to consent to this medical care. Individuals below 18 are legal minors whose parents or legal guardians must give informed consent.

13. Our clinic ensures that all patients—and for minors, their guardians—receive medically accurate information on any form of gender-affirming care they are considering, including risks and benefits, which effects are permanent versus reversible, and what is known and unknown. Patients under 18 must also have an evaluation of preparedness with a competent and experienced mental health clinician. Patients—and for minors, their guardians—pursuing hormone therapy or surgical interventions also undergo an extended, rigorous education and evaluation process, and either the adult patient or the minor patient's legal guardians must sign a detailed informed consent form. All guardians must provide informed consent for hormone therapy.

14. The Pediatric and Adolescent Gender Clinic sees patients who moved to California from out-of-state because of restrictions on gender-affirming care in the state where

they lived previously. We also have patients who drive several hours, oftentimes across state borders, to obtain gender-affirming care.

15. I and all the providers at Stanford Medicine's Pediatric and Adolescent Gender Clinic offer patient-focused comprehensive medical care in accordance with state and federal laws, established clinical practice guidelines, the American Academy of Pediatrics, American Psychological Association, and medical ethics.

16. In accordance with state antidiscrimination laws, our policy prohibits staff from denying services or treating a person less well than others based on their protected characteristics, including sex, sexual orientation, gender identity, or gender expression.

**Federal Actions Targeting Providers of Gender-Affirming Care**

17. I am aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order") which announced that the federal government planned to restrict medically necessary care for gender diverse youth and penalize medical professionals who provide it.

18. Since the Executive Order was issued, the federal government has taken steps to implement it that appear intended to target and intimidate providers of gender-affirming care and restrict our patients' access to such care.

19. On April 22, 2025, U.S. Attorney General Bondi issued a memorandum to all U.S. Department of Justice ("DOJ") employees ("Bondi Directive") to criminally and civilly prosecute "to the fullest extent possible" health care providers who provide medically necessary gender-affirming care to pediatric and adolescent patients under the federal Female Genital Mutilation statute, 18 U.S.C. § 116 ("FGM"), the Food, Drug & Cosmetics Act, 21 U.S.C. Chapter 9 § 301 *et seq.* ("FDCA"), and the False Claims Act, 31 U.S.C. § 3729 ("FCA").

20. On June 11, 2025, U.S. Assistant Attorney General Brett Shumate issued a memorandum ("Shumate Directive") to all DOJ employees laying out the "Civil Division Enforcement Priorities" and directing the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals," and other health care entities to pursue alleged violations of the FDCA in connection with the medications often used in gender-affirming care. It also orders the Civil Division to "aggressively pursue" FCA claims against providers that bill the federal government for gender-affirming care in circumstances where such care would not lawfully be covered.

21. I understand that the Bondi and Shumate Directives (collectively, "DOJ Directives") announced new enforcement priorities under the FGM, FDCA, and FCA statutes targeting providers of gender-affirming care like me.

22. At the end of July 2025, Stanford University School of Medicine received a subpoena from the DOJ demanding extensive information related to gender-affirming care provided to patients under 19. All providers in my practice were notified about the importance of identifying and preserving all data related to the subpoena. I remember feeling disheartened and outraged at the broad scope of the subpoena and the allegations they were attempting to hit providers with just for doing our jobs and providing appropriate, necessary healthcare to our transgender patients. I felt affronted personally by the subpoena, along with the Executive Order and DOJ Directives that undergird it, because it accused me and my colleagues of going against every tenet of the Hippocratic oath I proudly took, and of *harming* the patients that I spend every day *caring* for. The subpoena sought extremely broad, sensitive, and detailed information about patients including their addresses, Social Security numbers, and other sensitive and identifying information about patients' medical history and treatment. I fear, and my patients fear, that the

federal government would use this information to target patients of gender-affirming care and their families. I believe that this subpoena was a scare tactic from the federal government to strike fear into providers and coerce them into complying with the Executive Order and DOJ Directives and abandoning the provision of all gender-affirming care to patients under 19.

23. My institution is aware that other providers and other institutions who offer gender-affirming care to patients under 19 have received subpoenas from the DOJ investigating the provision of medically necessary care to gender diverse patients under 19.

24. I and others at Stanford Medicine Pediatric and Adolescent Gender Clinic understand that the FDCA prohibits off-label marketing but does not prohibit medical professionals from prescribing drugs for off-label uses.

25. I and others at Stanford Medicine Pediatric and Adolescent Gender Clinic have generally understood that "marketing" a drug does not include keeping the drug at a hospital pharmacy or dispensing it to patients as part of an office visit. Indeed, these activities are indispensable to my medical practice. In my experience, it would be unprecedented to view these acts as "marketing" under the FDCA. In fact, the field of pediatrics relies on off-label use of medications as many medications have not been completely studied in younger patient populations. If the use of medications for off-label conditions was prohibited, then all providers taking care of our nation's youth would lose the ability to prescribe many medications that are prescribed frequently and do not have comparable alternatives.

26. It has long been my understanding that I may share my clinical experience or any research related to off-label uses in an academic or research setting, or discuss an off-label use as a potential treatment with a patient, and that this is not considered "marketing" an off-label use of a drug.

27. Stanford University School of Medicine and its providers also have extremely robust risk-management measures in place to ensure that we are complying with all federal laws, including the FDCA, the FCA, and other federal statutes. The institution requires all providers to comply with policies related to pharmaceutical marketing, including not accepting gifts or incentives from pharmaceutical representatives and disclosing any consulting arrangements. All providers receive training in recognizing, handling, and disclosing any consulting arrangements.

**Consequences of Federal Actions on Stanford University School of Medicine and Its Patients**

28. These federal actions have had devastating consequences for gender diverse young people under age 19 and the healthcare providers who care for them.

29. The Executive Order, DOJ Directives, and accompanying federal actions suggest that the administration is laying the groundwork to investigate and prosecute providers like me if we continue to provide medically necessary gender-affirming care to patients under 19.

30. I am terrified that merely providing medically necessary gender-affirming care in accordance with applicable evidence-based clinical practice guidelines will be deemed unlawful under the DOJ Directives as a violation of the FGM, FDCA, and/or FCA statutes and that I may face prosecution, exorbitant fines, or even incarceration simply for doing my job and providing lawful, medically necessary care.

31. I am also afraid that the federal government may apply the DOJ Directives' interpretation of the FGM, FDCA, and/or FCA statutes retroactively and subject me to criminal and/or civil liability for care that was provided months or years ago.

32. California state laws prevent healthcare providers and insurers from denying care or discriminating against patients based on their gender identity or diagnosis of gender

dysphoria. Patients' right to access medically necessary gender-affirming care without fear or discrimination are protected under state law. However, many of my patients under age 19 and their guardians have expressed acute fear that the federal government will succeed in stopping providers from offering medically necessary gender-affirming care to gender diverse patients under 19 and make this vitally important form of healthcare inaccessible despite the protections in state law.

33. My colleagues and I who provide gender-affirming care to patients under 19 fear that we will be unjustly targeted by criminal or civil investigations or prosecutions merely for doing our jobs and providing medically necessary gender-affirming care in accordance with state law.

34. Since the Executive Order and DOJ Directives were issued, many healthcare providers in my region who once provided gender-affirming care to youth have stopped offering this care to patients under 19 or significantly limited services that were previously provided. Children's Hospital Los Angeles completely closed its entire Center for Transyouth Health and Development on July 22, 2025. Sutter Health, a not-for-profit health system, has also ceased providing medically necessary gender-affirming care to gender diverse patients under 19 as of December 10, 2025. Kaiser has stopped all gender-affirming surgical procedures on gender diverse patients under 19 years of age.

35. My patients and their guardians have described to me the overwhelming sense of betrayal at witnessing their trusted healthcare providers or hospitals capitulating to federal pressure.

36. The decreasing number of providers offering gender-affirming care to gender diverse patients under 19 has had an enormous impact on my practice. Stanford Medicine

Pediatric and Adolescent Gender Clinic has absorbed many patients who were turned away by their previous gender-affirming care providers after the Executive Order and DOJ Directives.

37. These federal actions have caused grave harm to my gender diverse patients and will likely cause further damage. Patients who have come to our Pediatric and Adolescent Gender Clinic after their previous providers ceased offering gender-affirming care or because they were not able to establish care with other providers have presented with serious preventable harms, such as:

a. Suffering medical consequences as a result of having their medical care abruptly terminated, such as having pubertal suppression implants remain in their bodies after they cease functioning because their previous provider refused to remove them after the Executive Order and DOJ Directives were issued. This can have serious consequences; anything left in the body longer than necessary leads to a more difficult removal given the increase in scar tissue.

b. Since so many providers ceased offering care after the Executive Order and DOJ Directives, some patients have felt forced to seek medications and interventions from unqualified or disreputable sources. This has resulted in unsafe treatments for those patients. Since the Executive Order and DOJ Directives, I have had patients present to our clinic on unsafe doses of medications which have resulted in significant increases in metabolic disease risk, blood clotting risk, and evident injury to several patients' livers. Proper dosing of these medications and monitoring of patients allows us to minimize these risks and avoid harm.

c. Suffering from psychological distress at having their medical care abruptly interrupted or terminated, such as well-founded fear that they will soon be unable

to receive medically necessary care at all. Patients and families have expressed significant mistrust and distrust in providers and the healthcare system generally as a result of losing access to trusted providers.

d. More acute symptoms of gender dysphoria which could have been avoided with earlier and/or consistent treatment. Many patients have had interruptions in their care resulting in an inability to access their medications. I have seen patients whose bodies underwent permanent changes, such as voice deepening, due to their inability to access the hormone therapy and/or anti-androgen treatments they had previously been receiving.

e. Worsening gender dysphoria as a result of the Executive Order and DOJ Directives and those Directives' consequences has directly caused patients to experience mental health crises including episodes of self-harm, suicidal ideation or attempts, and acutely worsening depression or anxiety. These episodes result in a significant drain on resources in our emergency room, psychiatry offices, and mental health practice.

f. More expensive care needs that could have been treated earlier for less money. For example, patients who are unable to access pubertal suppression at the appropriate and safest times may ultimately request or require expensive surgery, such as masculinizing top surgery for a transgender boy who developed breast tissue during puberty. Patients are also spending more money to manage dysphoria with expensive shapewear (i.e. to minimize the appearance of breasts that grew because they were unable to suppress puberty) or working with speech

therapists (i.e. to improve their vocal control allowing them to consistently produce a higher or lower voice) as their endogenous puberty progresses.

38. Financial burdens on families have significantly increased in that they are having to travel—and in some cases, even move—to access this care. Some patients have cited these financial stressors as preventing them from accessing care.

39. Some patients have also expressed to me that they are reluctant to seek gender-affirming care from Stanford providers due to their well-founded fear that their medical information might be forcibly released to federal entities. Other patients and families are scared the federal government will come after parents who allow their children to obtain medically necessary gender-affirming care. I have had several families describe their fear about being added to some form of registry or list just for allowing their child to receive this form of medical care.

40. The federal government's threats in the Executive Order and DOJ Directives have also resulted in my institution changing the way we provide gender-affirming care, including:

a. We have stopped offering some forms of gender-affirming care to patients. Previously, Stanford offered gender diverse patients who warranted treatment with pubertal suppression the option to receive that medication in the form of a small subcutaneous implant. Before the Executive Order, this was a common form of pubertal suppression treatment. Many pediatric patients and their families prefer this option over the alternative (an injection every 1, 3, or 6 months) because the implant lasts much longer and requires fewer medical visits and injections. However, since the Executive Order and DOJ Directives, gender diverse patients at Stanford who warrant treatment with pubertal suppression are

unable to have the longer-lasting subcutaneous implant placed at Stanford. They are still able to receive the injections formulations, but—especially with the escalating federal threats—many patients and guardians want the longer-lasting implant. Unfortunately, they can no longer obtain this at Stanford. This change had nothing to do with any medical, scientific, or other concerns regarding the implant; it is a direct result of the federal threats contained in the Executive Order and DOJ Directives. In contrast, Stanford still places the exact same pubertal suppression implant in pediatric patients to treat other conditions, like precocious puberty—it is only gender diverse patients seeking treatment for gender dysphoria who may no longer receive the implant at Stanford.

b. Because of the Executive Order and DOJ Directives, we have stopped offering any gender-affirming surgery to gender diverse patients under 19. Previously, patients 18 years of age and older could seek a range of gender-affirming surgeries at Stanford. Patients under 18 years old could not access any surgery directly impacting the gonads (testicles or ovaries) or other reproductive tract organs, but where medically appropriate, older teens were sometimes considered eligible for a limited subset of gender-affirming surgeries involving chest tissue (primarily mastectomy, breast reduction, or breast augmentation). Now, no patient under the age of 19 can undergo any surgery related to gender-affirming care at Stanford. The decision to stop offering any gender-affirming surgeries was driven by the federal government's unprecedented threats to prosecute legitimate gender-affirming surgical care as female genital mutilation, as stated in the Executive Order and DOJ Directives. However, patients under 19 who are not seeking

gender affirming care can still undergo identical procedures to treat other diagnoses, such as a teenager receiving a mastectomy for gynecomastia (non-cancerous enlargement of one or both breasts in men), or receive elective breast augmentation. It is only gender diverse patients seeking treatment for gender dysphoria who can no longer access this care here.

c. Since the Executive Order and DOJ Directives, our surgeons have been forced to suspend gender-affirming care abruptly or mid-treatment for some patients, including cancelling previously scheduled surgeries. Multiple patients had undergone extensive evaluation and had been scheduled for gender-affirming care surgeries but had those procedures cancelled. Patients must often wait for years to secure an appointment slot for this treatment and have to plan their lives around these surgeries due to the recovery process. For example, I have had patients put off college, quit their job, or work on weight loss for several years in order to prepare for the procedure and recovery process. Unfortunately, due to the Executive Order and DOJ Directives, many of these appointments were abruptly cancelled—after waiting and planning for months or years, many families and patients were notified that their procedure was canceled or postponed indefinitely just days or weeks before the scheduled date. This led to significant moral and emotional distress for our mental health clinicians as they attempted to support the families and patients through processing this disastrous and distressing news.

41. I am gravely concerned about the impact that these federal actions have already had and will have on the mental and physical wellbeing of my gender diverse patients. We have already witnessed significant deterioration in our gender diverse patient population's mental

health as these vulnerable young people try to cope with these extreme federal attacks and their consequences. The most severe example of this was a clinic patient dying by suicide in August 2025. This loss devastated all of the clinic providers as well as several of our other gender diverse patients who knew the patient who died.

42. The institution and its staff are burdened by complying with onerous and costly investigations and defending against baseless claims. There have been numerous meetings regarding the subpoena, the federal government's investigation of Stanford, and compliance with the Directives' new policies about gender-affirming care. We have also had to spend significant time working with and educating legal counsel regarding our practices in providing medically necessary care to our patients in preparation for any future legal action. These efforts have detracted from my time and ability to provide care to all of my patients, and all the other providers here have faced the same issue. This drain on resources has dramatically reduced Stanford's capacity to provide care to the thousands of patients who depend upon it.

43. We have also been forced to devote significant resources and staff time to analyzing the unclear and changing federal regulation of gender-affirming care, and explaining its implications to staff, patients, and patients' loved ones. This too diverts significant resources away from patient care.

44. Complying with the DOJ Directives would force me to violate my institution's antidiscrimination policy and state antidiscrimination laws. This exposes me and my employer to increased risk of patient litigation.

45. Complying with the DOJ Directives and denying my patients medically necessary gender-affirming care would violate my ethical obligations as a healthcare provider and cause me moral injury. I bear witness to and experience secondary trauma every single day. My gender

diverse patients and their families are terrified and rightfully so. It is incredibly draining to attempt to reassure them and plan for the worst-case scenarios all while providing high-quality medically necessary care. Members of our clinical team, including myself, have had to seek extra mental health support to cope with this extremely frightening, stressful, and demanding time. While this support is absolutely crucial to our wellbeing, providing this additional support for staff is another drain on our program's resources. It is yet another way the Executive Order and DOJ Directives have stolen time and resources away from patient care.

46. The Executive Order, DOJ Directives, and other federal actions place providers like me and institutions like Stanford University School of Medicine in an impossible position. An extremely vulnerable and targeted patient population is desperately seeking the support of healthcare providers in order to receive evidence-based medical care—and yet federal institutions are threatening those who answer this professional and ethical call.

47. But for the threats presented by the Executive Order and the DOJ Directives, Stanford University School of Medicine would still be providing gender-affirming surgeries for gender diverse patients under 19 years old. My institution would like to resume previous practices if those Directives were not in effect.

48. I remain steadfast in my commitment to provide gender diverse youth with medically necessary, evidence-based gender-affirming care, and wish and intend to continue doing so for as long as I am able. However, this commitment to caring for our vulnerable patients places me and my institution at significant legal risk due to the mounting threats presented by the Executive Order and the DOJ Directives. These Directives strongly imply that the administration views the mere provision of this form of health care as unlawful and state explicitly that the administration intends to prosecute aggressively wherever possible. There is unfortunately a very

real possibility that the risk level will soon reach a point where Stanford University School of Medicine can no longer tolerate the risk and will cease providing gender-affirming care to patients under 19 altogether. Should Stanford University School of Medicine be forced to do so, providers throughout the system, including myself, will have no choice but to stop providing this necessary care. Such a decision would not result from concern about the medical evidence, clinical practice standards, or the wellbeing of our patients. Rather, it is the multiple legal threats posed by the Executive Order and DOJ Directives which would make it too risky to continue providing gender-affirming care.

Dated: 12/18/2025

Rachel L. Sewell, MD