# EXHIBIT 63

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS, et al.,

*Plaintiffs,*

v.

DONALD J. TRUMP, et al.,

*Defendants.*

No. 1:25-cv-12162

**LEAVE TO FILE UNDER A PSEUDONYM GRANTED ON DECEMBER 19, 2025**

**DECLARATION OF PLAINTIFF STATE PROVIDER #3**

I, Plaintiff State Provider #3, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am a nurse practitioner at a private healthcare clinic. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with my colleagues, or documents that have been provided to and reviewed by me.

2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

3. I choose to make this declaration using a pseudonym to protect the safety and privacy of myself, my clinic, its employees, and our patients. I am submitting this Declaration despite significant fear that it will put us at risk of substantial harm.

**Background**

4. I am an American Nurses Credentialing Center ("ANCC") board-certified Family Nurse Practitioner licensed to practice in my state of residence. I received my Doctor of Nursing Practice ("DNP") in 2021.

5. After receiving my DNP, I worked at a clinic that provided medical care—including gender-affirming care—to the LGBTQ community. At the time, it was one of the few providers of gender-affirming care in my region. When that clinic closed, I wanted to continue providing lifesaving, medically necessary care to the transgender community.

6. Accordingly, in 2023, I founded a private clinic, where I serve as both a nurse practitioner and the medical director. We provide the highest-quality medical care in a safe and inclusive environment. Although we have a few cisgender patients, our specialty is caring for the transgender community. Our healthcare services include gender-affirming care, primary care, nutritional wellness, and sexual health.

7. We do not offer any form of surgical intervention. In my experience, it is exceptionally rare for an individual with gender dysphoria who is under the age of eighteen to receive surgical intervention.

8. My clinic has three healthcare providers: myself, another nurse practitioner, and a physician. Together we care for roughly 300 patients, the majority of whom are transgender. Approximately thirty of our patients are under the age of nineteen.

9. When medically indicated, we prescribe puberty blockers and hormone therapy to patients diagnosed with gender dysphoria. Most of our patients who receive such gender-affirming care are adults; only a few are under the age of eighteen.

10. At least three of our patients under nineteen have become patients at our office after moving from another state due to restrictions on gender-affirming care.

11. As a nurse practitioner, I will only prescribe gender-affirming care when it is medically indicated.

12. I and all the providers at my clinic undertake a rigorous process to ensure gender-affirming care is medically indicated, including when a patient is under the age of eighteen. That process includes extensive conversations with and examinations of the patient, discussions with and informed consent from the legal guardian(s), and consultation with other medical professionals, including therapists and behavioral health providers. We do not prescribe puberty blockers or hormone therapy unless the patient has been diagnosed with gender dysphoria.

13. I and all the providers at my clinic offer patient-focused medical care in accordance with state and federal laws, established clinical practice guidelines, and medical ethics rules.

14. Consistent with state law, our practice requires that patients (or where applicable, their legal guardians) must provide informed consent for gender-affirming care. State law provides that individuals above age eighteen are, in most cases, adults with legal capacity to consent to medical care. Individuals below eighteen are legal minors whose parent or legal guardian must give informed consent to medical care. We will not prescribe gender-affirming care to a patient under eighteen without the informed consent of the legal guardian(s), the assent of the patient, and a diagnosis of gender dysphoria, along with clearance from a behavioral health provider. Prior to prescribing gender-affirming care, we will also discuss the risks and benefits of the treatment with the patient and, if under eighteen, their legal guardian; we require a comprehensive baseline lab panel to assess liver function and hormone levels; and, at a later appointment, we review the patient's lab results and address any questions they may have. If patients seem unsure about starting gender-affirming care, we will refer them to a behavioral health provider, or consult with their established behavioral health provider to ensure that they

are making the right decision for themselves. After a patient begins receiving care, we continue to monitor hormone levels by conducting frequent lab panels.

15. For many of my transgender patients, gender-affirming care is lifesaving. When a patient with gender dysphoria visits our clinic, I will ask questions to learn about their symptoms. They tell me about their anxiety, depression, self-harm, bullying, and often, suicide attempts. When patients begin receiving gender-affirming care, the change is profound and positive. Patients feel more like themselves and connect to who they truly are. Over time spent with these patients while they undergo their transition, I start to see a light behind their eyes.

16. For example, I began treating one patient when he was fifteen. At the time, he was angry, upset, and dejected, and he was unresponsive to questions. After a rigorous assessment process—which included a diagnosis of gender dysphoria from a behavioral health provider not affiliated with our office, discussions with and informed consent from his parents, and conversations with the rest of his medical providers—we determined that gender-affirming care would be appropriate. He began receiving hormone therapy when he was sixteen. Today, he is a happy eighteen-year-old who is applying to colleges and interviewing for jobs. Gender-affirming care helped him feel like himself and become a healthy and productive member in the community.

17. Our clinic complies with state anti-discrimination laws, which prohibit discrimination on the basis of gender identity or gender expression by healthcare providers and other public accommodations.

**<u>Federal Actions Targeting Providers of Gender-Affirming Care</u>**

18. I am aware of Executive Order no. 14187, entitled “Protecting Children from Chemical and Surgical Mutilation” (“Executive Order”), which announced that the federal

government planned to restrict gender-affirming care for adolescents and penalize medical professionals who provide it.

19. Since the Executive Order was issued, the federal government has taken steps to implement it that appear intended to target and intimidate providers of gender-affirming care and restrict adolescents' access to such care.

20. On April 22, 2025, U.S. Attorney General Pamela Bondi issued a memorandum to all U.S. Department of Justice ("DOJ") employees ("Bondi Directive") to criminally and civilly prosecute "to the fullest extent possible" healthcare providers who provide medically necessary gender-affirming care to adolescent patients under the federal Female Genital Mutilation statute, 18 U.S.C. § 116 ("FGM"), the Food, Drug & Cosmetic Act, 21 U.S.C. Chapter 9 § 301 *et seq.* ("FDCA"), and the False Claims Act, 31 U.S.C. § 3729 ("FCA").

21. On June 11, 2025, U.S. Assistant Attorney General Brett Shumate issued a memorandum ("Shumate Directive") to all DOJ employees laying out the "Civil Division Enforcement Priorities" and directing the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals," and other healthcare entities to pursue alleged violations of the FDCA in connection with the medications often used in gender-affirming care. It also orders the Civil Division to "aggressively pursue" FCA claims against providers that bill the federal government for gender-affirming care in circumstances where such care would not lawfully be covered.

22. I understand that the Bondi and Shumate Directives (collectively, "DOJ Directives") announced new enforcement priorities under the FGM, FDCA, and FCA statutes targeting providers of gender-affirming care like me.

23. I and others at my clinic understand that the FDCA prohibits off-label marketing, but does not prohibit medical professionals from prescribing drugs for "off-label" uses.

24. I and others at my clinic have generally understood that "marketing" a drug does not include keeping the drug at a hospital pharmacy or dispensing it to patients as part of an office visit. Indeed, these activities are indispensable to my medical practice. In my experience, it would be unprecedented to view these acts as "marketing" under the FDCA.

25. It has long been my understanding that I may share my clinical experience or research related to off-label uses in an academic or research setting, or discuss an off-label use as a potential treatment with a patient, and that this is not considered "marketing" an off-label use of a drug.

26. My clinic takes steps to ensure that we are complying with all federal laws, including the FDCA, the FCA, and other federal statutes.

**Consequences of Federal Actions on My Clinic and Its Patients**

27. These federal actions have had devastating consequences for transgender young people under age nineteen and the healthcare providers who care for them.

28. The Executive Order, DOJ Directives, and accompanying federal actions suggest that the administration is laying the groundwork to investigate or prosecute providers like me if we continue to provide medically necessary gender-affirming care to patients under nineteen.

29. I am terrified that merely providing medically necessary gender-affirming care in accordance with applicable evidence-based clinical practice guidelines will be deemed unlawful under the DOJ Directives as a violation of the FGM, FDCA, and/or FCA statutes and that I may face prosecution, exorbitant fines, or even incarceration simply for doing my job and providing lawful, medically necessary care.

30. I am also afraid that the federal government may apply the DOJ Directives' interpretation of the FGM, FDCA, and/or FCA statutes retroactively and subject me to criminal and/or civil liability for care that was provided months or years ago.

31. My colleagues who provide gender-affirming care to patients under nineteen also fear that they will be unjustly targeted by criminal or civil investigations or prosecutions merely for doing their jobs and providing medically necessary gender-affirming care.

32. Since the Executive Order and DOJ Directives were issued, at least two private clinics in my region that once provided gender-affirming care to adolescents have stopped offering this care to patients under nineteen. Additionally, a nearby military hospital has stopped providing gender-affirming care to any of its patients, including those under nineteen.

33. Insurance companies have also reduced their coverage of gender-affirming care. We recently learned that federal employee health insurance providers in the state will, beginning in 2026, no longer cover gender-affirming care for patients under nineteen, and will not cover for patients who wish to start gender-affirming care. As a result, at least two of our patients under age nineteen—and several other patients age nineteen and older—will lose coverage for this medically necessary healthcare.

34. The shrinking number of providers offering gender-affirming care to patients under nineteen has impacted my practice. We have absorbed several patients who, after the Executive Order and DOJ Directives, were turned away by their previous gender-affirming care providers. Four patients have come from the two private clinics, and approximately twenty patients and counting have come from the military hospital. In part because of this rapid influx of patients, my clinic no longer has the bandwidth to offer primary care services to new patients

who do not require gender-affirming care and can therefore obtain their healthcare elsewhere at this time.

35. These federal actions have caused grave harm to my transgender patients and will likely cause further damage. Patients who have come to my clinic after being turned away by their previous providers have presented with serious harms. Because some insurance companies require a referral from a patient's primary care physician before they will cover our clinic's services, several transgender patients are stuck in a limbo. They have been denied gender-affirming care by their current provider, but they still must wait for weeks or months for a referral to us—that is, if their primary care provider is even allowed to refer out, as some clinics and health centers are afraid to refer patients for gender dysphoria. That means that some of our new patients will be arriving at our clinic after months without receiving medically necessary healthcare. That can lead to psychological distress and acute symptoms of gender dysphoria.

36. I am gravely concerned about the impact that these federal actions have already had and will have on the mental and physical wellbeing of my transgender adolescent patients. My clinic and I are committed to continuing providing gender-affirming care. But the DOJ Directives create fear among my patients, who are worried about the continuing availability of their healthcare.

37. My clinic has also been forced to devote significant resources and staff time to analyzing the unclear and changing federal regulation of gender-affirming care, and explaining its implications to staff, patients, and patients' loved ones. This too diverts significant resources away from patient care.

38. The Executive Order, DOJ Directives, and other federal actions place providers like me and institutions like my clinic in an impossible position. If we continue to provide

lifesaving medical care to our patients, we risk federal investigations and prosecution. But if we comply with the Executive Order and DOJ Directives, then we undermine our professional and ethical obligations as healthcare providers and, most devastatingly, jeopardize the lives of our patients.

39. My clinic remains steadfast in its commitment to provide transgender adolescents with medically necessary, evidence-based gender-affirming care. We intend to continue doing so for as long as we can. However, this places us at significant legal risk. The DOJ Directives strongly imply that the administration views the mere provision of this form of healthcare as unlawful, and they make clear their intention to prosecute aggressively wherever possible. If my clinic and I are forced to stop providing this care, it will not be because of any concerns about the medical evidence, clinical practice standards, or the wellbeing of our patients. Rather, it will be the result of the threats posed by the DOJ Directives and other federal actions.

Dated: December 15, 2025

/s/ Plaintiff State Provider #3
__________________________________
Plaintiff State Provider #3