# EXHIBIT 71

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>*Defendants.* | No. 1:25-cv-12162 |

**DECLARATION OF ALEX SHELDON, EXECUTIVE DIRECTOR OF GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ+ EQUALITY**

I, Alex Sheldon, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I go by they/them pronouns.

3. I am the Executive Director of American Association of Physicians for Human Rights, Inc., d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA"), which is an organizational plaintiff in *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337-BAH (D. Md.).

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with GLMA's members and staff, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

5. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

6. I am a professional researcher, strategist, and advocate with over 15 years of experience in the field of human rights, with a particular emphasis on LGBTQ+ rights. Prior to

joining GLMA, I was the Head of Research & Social Impact at an LGBTQ+ start-up company, where I specialized in economic inclusion for LGBTQ+ people. Previously, I served as the Deputy Director of the Clinton Global Initiative (CGI) at the Clinton Foundation, and I held roles at Everytown for Gun Safety, the Movement Advancement Project (MAP), and several international nonprofits.

7. GLMA is a 501(c)(3) national membership nonprofit organization based in Washington D.C. and incorporated in California. Founded in 1981, GLMA is the world's largest and oldest association of LGBTQ+ healthcare professionals. Our mission is to ensure health equity for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) individuals, and equality for LGBTQ+ health professionals in their work and learning environments. To achieve this mission, GLMA utilizes the scientific expertise of its diverse multidisciplinary membership to inform and drive advocacy, education, and research.

8. As Executive Director, I am responsible for the overall leadership, management, and operations of GLMA. My duties include overseeing organization's programs and strategic initiatives; managing staff and contractors; supervising organizational finances and fundraising; and serving as GLMA's primary representative to external partners.

9. GLMA was originally founded as the American Association of Physicians for Human Rights (AAPHR) and was an offshoot of the Bay Area Physicians for Human Rights (BAPHR), a San Francisco-based physician organization founded to fight discrimination faced by gay and lesbian physicians in the workplace based upon their sexual orientation. AAPHR was founded to take this mission to a national level. Its initial mission focused on responding with policy advocacy and public health research to the growing medical crisis that would become the HIV/AIDS epidemic.

10. Since being founded, GLMA's mission has broadened to address the full range of health concerns and issues affecting LGBTQ+ people, including ensuring that sound science and research inform health policy and practices regarding the LGBTQ+ community.

11. GLMA represents the interests of tens of thousands of LGBTQ+ and allied health professionals, as well as millions of LGBTQ+ patients and families. GLMA's membership includes approximately 1,500 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health profession students, and other health professionals. GLMA's members reside and work across the United States and in several other countries. Their practices represent the major health care disciplines and a wide range of health specialties, including endocrinology, internal medicine, family practice, psychiatry, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases.

12. Different healthcare professionals can become and are members of GLMA. General membership in GLMA is open to health professionals and health professionals in training, as defined by GLMA's Board of Directors. These different memberships account for practicing health professionals of all disciplines and specialties, with various years of experience, as well as those who are retired and are students. Members who are health professionals or health professionals in training can serve as committee members and have the right to cast an advisory vote.

13. In addition to general members, GLMA has a "friend" membership for those individuals who are invested in LGBTQ+ health equity but are not directly involved in health professions. Unlike general members, these "health equity supporters" do not have the right to cast an advisory vote.

14. In addition to our formal members, GLMA serves thousands of people in the community through our programs, events, and services every year.

15. GLMA's members include health professionals who provide medical interventions as treatment for gender dysphoria to young people under the age of 19 and who work at medical institutions that receive federal grant funding, from subagencies of the U.S. Department of Health & Human Services, including the Centers for Medicare and Medicaid Services (CMS), National Institutes for Health (NIH), Health Resources and Services Administration (HRSA), Centers for Disease Control and Prevention (CDC), Agency for Healthcare Research and Quality (AHRQ), and Substance Abuse and Mental Health Services Administration (SAMHSA), among others. GLMA's members also include health professionals who conduct federally funded research, including research that is completely unrelated to gender-affirming care, but work at medical institutions that provide medical interventions as treatment for gender dysphoria to young people who are under the age of 19.

16. A portion of GLMA's members are employed by public institutions, including state or local government–affiliated health systems and public universities or academic medical centers. These members hold a range of roles within those institutions, including positions involving direct patient care, and they practice in locations throughout the United States. They also include health professionals who provide medical interventions as treatment for gender dysphoria to young people under the age of 19.

17. GLMA also partners with the American Medical Association (AMA), the United States Preventative Services Task Force (USPSTF), the National Minority Health (NMH) Alliance, the Reproductive Health Coalition, the American Medical Student Association (AMSA),

and the American Academy of Physician Assistants (AAPA), among other medical associations and health organizations.

18. As part of its mission to ensure health care equity for the LGBTQ+ community as well as equity for LGBTQ+ health care professionals, GLMA is committed to breaking down barriers to comprehensive care for the LGBTQ+ community. This includes GLMA's steadfast commitment to ensure that transgender individuals receive the gender-affirming care they want, need, and deserve.

19. For example, in 2018, GLMA adopted a formal policy statement on "Transgender Healthcare." This policy statement (127-18-101-21 - Transgender Healthcare) was readopted in 2021. The policy statement reads: "GLMA: Health Professionals Advancing LGBTQ+ Equality considers therapeutic treatments, including hormone therapy, mental health therapy, vocal therapy, hair removal, and gender-affirming surgeries, as medically necessary for the purpose of gender-affirmation or the treatment of gender dysphoria or gender incongruence. These gender-affirming medical and surgical treatments should be covered by all public and private insurance plans."

20. In 2019, in conjunction with the American Medical Association, GLMA published an issue brief titled "Health insurance coverage for gender-affirming care of transgender patients." This brief discusses both the positive effects and outcomes of gender-affirming medical care for transgender patients, as well as the negative effects and serious health consequences that transgender patients who are denied access to gender-affirming medical care experience when such treatment is medically indicated for them. A copy of the issue brief is available at: https://www.ama-assn.org/system/files/transgender-coverage-issue-brief.pdf.

21. In addition, GLMA seeks to promote education and encourages research surrounding LGBTQ+ health issues. As such, our Annual Conference on LGBTQ+ Health

regularly includes numerous scientific abstracts and poster presentations relating to LGBTQ+ health issues. Some of this research relates to gender-affirming care and the treatment of transgender patients; some of it does not. Since its inception in 1981, GLMA's Annual Conference on LGBTQ+ Health has served as the premier scientific conference for LGBTQ+ and allied health professionals to share innovative health care breakthroughs and interventions, as well as the latest research on LGBTQ+ health. The conference is open to health care providers of all disciplines, researchers, academics, health administrators, policy experts, and others interested LGBTQ+ health.

22. I am aware of several federal actions by the current administration seeking to eliminate access to gender-affirming care for people under 19 by targeting the health professionals and institutions that provide such care.

23. Among these actions are Executive Order 14187 (the "Care Denial Order"), which instructs federal agencies to take immediate steps to ensure that medical institutions, including medical schools and hospitals, receiving federal grant funding, such as research and education grants, end the provision of puberty-delaying hormone blockers, gender-affirming hormone therapy, or gender-affirming surgeries as treatment for transgender patients with gender dysphoria who are under the age of 19 years old, as well as Executive Order 14168 (the "Gender Identity Order"), which requires federal agencies to restrict the use of grant funds to any entities that it considers are promoting "gender ideology," which it defines as recognizing that a person may have a gender identity incongruent with their birth-assigned sex. Throughout this declaration I collectively refer to the "Care Denial Order" and "Gender Identity Order" as "the Executive Orders."

24. These federal actions also include the memorandum issued by Attorney General Pam Bondi on April 22, 2025 titled "Preventing the Mutilation of American Children" (hereafter, "Bondi Memo"), which describes the "radical ideological agenda" of "teach[ing] children to deny biological reality." Pursuant to the Care Denial Order, the Bondi Memo issues "guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents." The Bondi Memo concludes that DOJ will bring "to an end" practices related to "gender-affirming care."

25. The actions also include a memorandum issued by Assistant Attorney General Brett Shumate on June 11, 2025 to employees of the DOJ's Civil Division titled "Civil Division Enforcement Priorities" (hereafter, "Shumate Memo"), which directs to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives."

26. I refer to the Bondi Memo and Shumate Memo collectively as the "DOJ Directives."

27. The DOJ Directives, along with the Care Denial Order, announce that the federal government intends to investigate and prosecute providers who offer gender-affirming care to patients under the age of 19 under the federal Female Genital Mutilation statute, 18 U.S.C. § 116 ("FGM"), the Food, Drug & Cosmetics Act, 21 U.S.C. Chapter 9 § 301 *et seq.* ("FDCA"), and the False Claims Act, 31 U.S.C. § 3729 ("FCA").

28. Furthermore, I am aware that following the DOJ Directives and Care Denial Order, DOJ has sent broad subpoenas to several institutions in which some of our members are employed and provide gender-affirming care. These subpoenas seek not only broad swaths of information pertaining to the institutions provision of gender-affirming care but very concerningly, confidential

medical and personal information of each patient to whom the institution has provided gender-affirming care.

29. I am aware that many of GLMA's members who provide gender-affirming care are aware of this battery of federal actions targeting gender-affirming care and have expressed concern and confusion about what these actions mean for them, their institutions, and the patients for whom they care, including whether they may continue to provide care.

30. For example, the Care Denial Order and DOJ Directives caused confusion about whether health professionals may continue to provide gender-affirming care to patients under 19, consistent with established medical guidelines, without violating the law given the unprecedented understanding of the FGM statute, the FDCA, and the FCA set forth on the DOJ Directives and the Care Denial Order.

31. Though the court in *PFLAG v. Trump* has preliminary enjoined HHS and its subagencies from conditioning, withholding, or terminating federal funding under Section 3(g) of the Gender Identity Order and Section 4 of the Care Denial Order based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen, the aforementioned federal actions, including the DOJ Directives and other provisions of the Care Denial Order have had a chilling effect on healthcare institutions across the country that provide—or until the federal actions, provided—gender-affirming care to people under the age of 19 and in which some of our members are employed and provide (or provided) such care.

32. For example, collectively, the DOJ Directives, provisions of the Care Denial Order, and declarations by a DOJ attorney in several court cases in which the aforementioned subpoenas have been quashed or limited have strongly implied to health professionals like our members that the federal government views the mere provision of gender-affirming care to patients under age

19 as unlawful and that the administration intends to prosecute providers and institutions who offer this care aggressively wherever possible.

33. I am therefore aware through my role at GLMA that health professionals, including some of our members, are concerned and fearful that they will be civilly and/or criminally investigated or prosecuted for simply doing their jobs and providing medically necessary gender-affirming care, consistent with established medical guidelines, to their patients. These concerns include fear of potential incarceration, civil or criminal penalties, loss of professional licensure, financial liability, reputational harm, and adverse employment consequences. Members have also expressed concern about being subject to investigations or complaints based on unclear, shifting, or inconsistently enforced directives.

34. I am aware that pressure has been placed on administrators at health systems and academic medical centers through threats of enforcement actions or funding consequences, which has created a ripple effect for individual providers. Health professionals are expected to carry out institutional directives that may change frequently or lack clear guidance, increasing uncertainty about what conduct is permitted and heightening fear of personal legal or professional risk. These fears are especially acute for members employed by institutions that receive state or federal funding, which have been subject to heightened scrutiny and targeting by the administration through funding mechanisms. Members practicing in these settings report concern that their employment at these institutions may increase their visibility and vulnerability to investigation or enforcement, even when they are providing care consistent with established medical guidelines.

35. In fact, some of the institutions at which our members practice have already received subpoenas from the federal government investigating their provision of gender-affirming care to adolescents. Responding to these subpoenas has imposed significant administrative and

financial burdens on the affected institutions, including costs associated with legal counsel, document review, public relations, and the diversion of staff time and institutional resources. The receipt of subpoenas has also coincided with heightened patient fear and disruptions in care, as patients and families have expressed concern about the scope and implications of the investigations. Members report that, at institutions that have received subpoenas both institutional and individual providers' reputations have been tarnished, and patient trust has been profoundly undermined by the uncertainty surrounding the potential disclosure of confidential patient data. Even where institutions have challenged the subpoenas, the investigative process itself has disrupted care delivery and strained patient-provider relationships.

36. This erosion of trust is evidenced by a marked increase in panicked calls and emails to health professionals, including GLMA members, from patients and families concerned about the security of their medical information, some of whom have delayed or ceased care as a result. In my role at GLMA, I am also aware that many individual providers were not included in institutional discussions regarding the existence, scope, or contents of subpoenas, and in some cases were not informed whether their clinical records were reviewed or whether they were personally named. This lack of transparency has created significant uncertainty, contributing to a culture of fear and vulnerability among providers who remain unsure of their legal exposure while continuing to provide evidence-based care to their patients.

37. The further implementation of Care Denial Order and the DOJ Directives, along with the other aforementioned federal actions, would be devastating for access to care for young transgender people under the age of 19. As such, our members and their patients thus stand to be negatively affected by additional implementation of the Care Denial Order, DOJ Directives, and related agency actions in several ways.

38. All individuals, including transgender and gender diverse young people, deserve access to respectful, compassionate, and evidence-based care. As outlined in our issue brief mentioned above, gender-affirming medical care improves the health, wellbeing, and quality of life of transgender people with gender dysphoria. Conversely, effectively prohibiting access to this evidence-based and effective medical care leads to negative health outcomes. By threatening to prosecute health professionals for merely providing care that is lawful in their statues and is consistent with established medical guidelines, the Care Denial Order and DOJ Directives put transgender young people across the United States at risk of being denied critical and oft times lifesaving healthcare services, leading to potentially severe health consequences. Many of these youth are cared for by GLMA's members.

39. The Care Denial Order, DOJ Directives, and related agency actions are also an affront to healthcare ethics and the principles of equality and inclusivity that should govern healthcare practices. Healthcare professionals have an ethical obligation to prioritize patient care and well-being, and policies like the Care Denial Order and DOJ Directives undermine this obligation.

40. The Care Denial Order, DOJ Directives, and related agency actions place GLMA's health professional members and the medical institutions in which they work in an untenable position. If they choose to comply with the Care Denial Order and DOJ Directives, they endanger the health and wellbeing of their transgender adolescent and young adult patients. If they follow their duty to their patients by providing their transgender adolescent and young adult patients with the best care and the care they need, health professional and medical institutions risk prosecution.

41. GLMA, along with many of its sibling medical and health professional associations, such as the American Medical Association, American Psychiatric Association,

American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatrists, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, Endocrine Society, Pediatric Endocrine Society, and others, supports the provision of gender-affirming medical care to treat gender dysphoria as evidence-based, safe, and effective medicine.

42. In addition, transgender patients frequently face heightened stigma and discrimination and are particularly apprehensive in medical encounters. These concerns of the patients of GLMA's members are magnified by their well-founded belief that the Care Denial Order, DOJ Directives, and other federal agency actions outlined herein seek to encourage discrimination by healthcare professionals and healthcare institutions.

43. One of the guiding ethics of medicine is to treat all patients equally. We do not treat blue-eyed people better than brown-eyed people. We do not treat women better than men. We do not provide better care to blonde-haired people than red-haired people. Health professionals see people at their most vulnerable; the trust placed in them is sacred. To tie a healthcare provider's hands, to not permit a provider to make individualized assessments of the medical needs of all patients, hurts patients by preventing them from accessing needed care even at trusted facilities and practices.

44. The Care Denial Order and DOJ Directives, and related federal agency actions conflict with GLMA's health professional members ability to provide evidence-based care to their transgender adolescent and young adult patients in a manner that is consistent with their oaths.

45. If not enjoined the Care Denial Order, DOJ Directives, and related agency actions will harm GLMA's health professional members and the transgender adolescent and young adult patients whom GLMA's health professional members treat. Our members have expressed mass

confusion and fear across a multitude of medical institutions across the country, including public health institutions.

46. For example, as a result of the threats contained in the Care Denial Order and DOJ Directives, some of the institutions in which our members practice have ceased providing gender-affirming care to adolescents, limited the gender-affirming care services available, or temporarily suspended services. These include, but are not limited to, Virginia Commonwealth University, Denver Health, Children's National Hospital, Penn State Health, University of Pittsburgh Medical Center, Rush Medical Center, and Children's Hospital Los Angeles. Others may soon be forced to do so. Some of these institutions who have ceased, limited, or paused gender-affirming care to patients under age 19 are public and state-run institutions, including but not limited to Virginia Commonwealth University and Denver Health.

47. At institutions that have ceased or paused care in response to the Care Denial Order, DOJ Directives, and related agency actions our members have received calls from their patients who are experiencing significant distress and even suicidality as a result of their appointments being canceled. Even where institutions later resumed some services, the disruptions have undermined patient-provider trust, and members report that some patients delayed, disengaged from, or sought to transfer their care elsewhere as a result.

48. Our members who continue to offer gender-affirming care to patients under 19 are concerned that they or their institutions may be investigated and prosecuted by the federal government for merely providing evidence-based care consistent with medical guidelines. And even at these institutions continuing to provide care, the widespread fear has led many patients to express feelings of extreme distress and even suicidality as a result of fear of discontinued care. What is more, the ceasing, limiting, and pausing of gender-affirming care to patients under age 19

caused by the Care Denial Order, the Directives, and related agency actions at other institutions has negatively impacted our members at institutions that continue to provide gender-affirming care to patients under age 19 as it has created increased demand for their services, required the absorption of these displaced patients, and increased wait times, placing increased burdens and costs on these institutions and providers.

49. Our members who provide medically necessary gender-affirming care to patients under age 19 wish to continue doing so without the threat of federal prosecution. This includes members who practice at public and state-run institutions.

50. The Care Denial Order, the Directives, and related agency actions have created a pervasive climate of fear. Many of our members fear coming forward and speaking publicly about these actions or the harms that they have caused lest they become targets of the threatened investigations or prosecutions. Other individual member providers of gender-affirming care would be willing to come forward but are unable to do so due to their institutions' own fears that the institutions will be targeted.

51. The Care Denial Order, DOJ Directives, and related agency actions have also chilled the provision of gender-affirming care for people under the age of 19 in our country, which has harmed our members' patients who have been deprived of necessary care.

52. GLMA exists to foster a world where healthcare professionals can make decisions to best care for LGBTQ+ individuals. To prevent our members from being able to provide this oft lifesaving, evidence-based, and effective medical care would significantly hamper our mission to foster health equity for the LGBTQ+ community.

53. As an organization dedicated to supporting LGBTQ+ medical professionals and advocating for LGBTQ+ health equity, GLMA strongly condemns regressive and discriminatory

policies like the Care Denial Order, DOJ Directives, and other related federal actions outlined herein and affirms our unwavering commitment to championing equitable and inclusive healthcare for all individuals, without exception.

54. GLMA stands firm in its resolve to fight against policies that undermine the principles of equality, respect, and evidence-based care. I therefore submit this testimony on behalf of GLMA to give voice to our members' concerns and to highlight the severe harms these federal actions have caused to our members, the individuals our members care for, and the medical profession as a whole.

Dated: December 18, 2025

Alex Sheldon
Executive Director, GLMA