# EXHIBIT 73

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF MASSACHUSETTS, et al.,

*Plaintiffs,*

v.

DONALD J. TRUMP, et al.,

*Defendants.*

No. 1:25-cv-12162

I, Nina Aledort, Ph.D., declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Deputy Commissioner at the New York State Office of Children and Family Services ("OCFS"). I am familiar with the information in the statements set forth below either through personal knowledge, consultation with OCFS staff, or documents that have been provided to and reviewed by me. I could testify competently to these facts if called as a witness.

2. I submit this Declaration in support of the States' Opposition to the Motion to Dismiss.

**Professional Background**

3. I have been Deputy Commissioner at OCFS since 2019. I am a social services professional with extensive experience working with vulnerable youth for more than 30 years. I hold a Bachelor's Degree from Washington University, and a Master's of Social Work, a Master's of Philosophy, and a Doctorate in Social Welfare from the City University of New York. I have worked in a multitude of environments including nonprofit direct service agencies for

LGBTQ homeless youth and youth returning from jail, a research center within a City university, pediatric clinics for hematology/oncology and infectious diseases, community health care clinics, legal defense organizations, and local and state government. During my career, I have authored peer-reviewed articles and presented at conferences in the U.S. and internationally on topics including permanency planning with lesbian and gay youth, young women reentering the community after incarceration, and foster care and human trafficking.[1]

4. I have worked with youth who identify as LGBTQ since 1997 in drop-in centers, hospitals, detention centers, jails, and foster care, and have conducted research studying the needs and experiences of LGBTQ young people. I have been a champion of programming that appropriately supports LGBTQ youth across juvenile justice and child welfare settings.

5. My responsibilities at OCFS include leading two distinct teams: one focused on oversight, regulation, and programming and the other focused on research and data analytics. Specific areas that my program team works on include youth aging out of foster care, homeless youth, justice-involved youth, positive youth development, diverting youth from detention and residential care, and trafficked youth. In the research department, our team's focus is on child welfare prevention and intervention, federal reporting, and juvenile justice. My division works in close coordination with OCFS's Division of Juvenile Justice and Opportunities for Youth and the agency's Division of Child Welfare and Community Services.

**<u>OCFS Programs, Services, and Policies</u>**

---

[1] *See, e.g.*, Madeline Hannan, Kathryn Martin, Kimberly Caceres, & Nina Aledort, *Children at Risk: Foster Care and Human Trafficking,* in Human Trafficking Is a Public Health Issue 105 (Makini Chisolm-Straker & Hanni Stoklosa eds., 2017); Nina Aledort, *"I'm Not Trying to Go Back": Young Women's Strengths Navigating their Return from Incarceration*, Doctoral Dissertation (Feb. 2013); Gerald P. Mallon, Nina Aledort, & Michael Ferrara, *There's no place like home: permanency planning with lesbian and gay youth in congregate care*, 82(2) Child Welfare 407 (Mar./Apr. 2002).

6. OCFS's mission is to promote the safety and well-being of New York's children, families, and vulnerable populations.[2] To accomplish its mission, OCFS provides a vast array of programs and services throughout the state including implementing and overseeing child protective services and preventive services; overseeing and monitoring childcare centers and afterschool programs; responsibility for many elements of the state's juvenile justice system; overseeing protective programs for vulnerable adults; overseeing the functions of the State Commission for the Blind; and coordinating state government response to the needs of Native Americans on reservations and in communities.

7. New York State has a state-supervised, locally administered child welfare system, with state-level oversight and monitoring by OCFS. OCFS oversees child protective services, preventive services for children and families, the foster care system, and adoption programs, while the administration of these programs is provided by the local department of social services in each county and New York City. Based on the structure of the child welfare system in New York State, youth who are placed in foster care are placed in the care and custody of the Commissioner of the local district. Youth may remain in foster care until age 21. In 2024, 14,796 foster youth were in the care and custody of local districts.[3] OCFS monitors and provides guidance to the local districts to ensure they comply with state requirements.

8. OCFS is also responsible for many aspects of the state's juvenile justice system. OCFS is responsible for youth up to age 21 adjudicated delinquent or committed pursuant to the Penal Law and, in limited cases, youth up to age 23. OCFS currently manages nine residential

---

[2] OCFS, *About OCFS*, https://ocfs.ny.gov/main/about/ (last visited July 29, 2025).
[3] OCFS, *Foster Care Annual Report* (Dec. 2024), https://ocfs.ny.gov/reports/custody/fc-biannual/Total-Number-of-Children-Placed-Foster-Care-Settings-2024Dec.pdf.

facilities in which these youth are housed. As of December 31, 2024, 718 total youth were placed in OCFS custody.[4]

9. OCFS also certifies, oversees, and monitors the state's juvenile detention programs which house certain youth awaiting adjudication on delinquency and criminal charges. These programs are operated at the county level or by authorized agencies. There are 21 detention programs in the state, including New York City, in which youth up to age 21 awaiting adjudication are housed. In 2024, 4,303 youth were admitted to detention programs.[5] These youth are not in OCFS custody but OCFS is responsible for monitoring the counties and agencies that operate the detention programs to ensure they comply with state requirements.

10. In addition to the child welfare and juvenile justice services that OCFS supervises and provides, the agency also oversees the state's 143 individual residential programs for runaway and homeless youth, which includes runaway and homeless youth shelters, transitional independent living program group residences, transitional independent living program supported residences, and short-term interim family homes. In 2020, 4,162 runaway or homeless youth were admitted to these facilities.[6] Youth admitted to residential runaway and homeless youth programs are provided care and services by the certified program, and the youth may voluntarily leave at any time. OCFS certifies and monitors all runaway and homeless youth program models to ensure they comply with state requirements.

11. Many youth in the care or custody of OCFS or the local districts and agencies operating foster care or juvenile detention programs that OCFS monitors ("Monitored

---

[4] OCFS, Division of Juvenile Justice and Opportunities for Youth, *Youth in Care Report* (2024), https://ocfs.ny.gov/reports/jj-yic/Youth-In-Care-Report-2024.pdf.
[5] OCFS, Division of Youth Development and Partnerships for Success, *Five-Year Detention Admission Trends* (2025), https://ocfs.ny.gov/reports/detention/five-year/Five-Year-Detention-Admission-Trends.pdf.
[6] OCFS, *Runaway and Homeless Youth Annual Report* (2020), https://ocfs.ny.gov/programs/youth/rhy/assets/reports/RHY-Annual-Report-2020.pdf.

Agencies") are transgender. LGBTQ youth and transgender youth in particular are overrepresented in foster care, both nationally[7] and in New York.[8] In New York City, more than one in three youth in foster care identifies as LGBTQ.[9] LGBTQ youth are also overrepresented in the juvenile justice system.

12. OCFS is committed to maintaining and promoting safe, respectful, and affirming environments for LGBTQ youth in OCFS-operated juvenile justice residential facilities[10] and in Monitored Agencies.[11]

---

[7] One study found that 30.4% of youth living in foster care self-identified as LGBTQ, compared to 11.2% of youth in a nationally representative sample. Laura Baams et al., *LGBTQ Youth in Unstable House and Foster Care*, 143(3) Pediatrics (Mar. 1, 2019), https://pubmed.ncbi.nlm.nih.gov/30745432/. Another found that the percentage of transgender youth living in the foster care system was double the percentage of youth living outside the foster care system. Bianca D.M. Wilson et al., The Williams Institute, *Sexual and Gender Minority Youth in Foster Care* (Aug. 2014), (study found that the percentage of transgender youth living in the foster care system was double the percentage of youth living outside the foster care system); OCFS, LGBTQ+ Youth in Foster Care Listening Sessions Report (2021) https://ocfs.ny.gov/programs/youth/LGBTQ/assets/docs/LGBTQ-Listening-Sessions-Report-2020-21.pdf.https://williamsinstitute.law.ucla.edu/publications/sgm-youth-la-foster-care/; *see also* OCFS, LGBTQ+ Youth in Foster Care Listening Sessions Report (2021) https://ocfs.ny.gov/programs/youth/LGBTQ/assets/docs/LGBTQ-Listening-Sessions-Report-2020-21.pdf.

[8] A study commissioned by the New York City Administration for Children's Services found that more than one in three (34.1%) youth in foster care in the city identify as LGBTQ, a number substantially higher than the proportion of LGBTQ youth in the general population. Theo G.M. Sandfort, Experiences and Well-Being of Sexual and Gender Diverse Youth in Foster Care in New York City (2019), https://www.nyc.gov/assets/acs/pdf/about/2020/WellBeingStudyLGBTQ.pdf.

[9] *Id.*

[10] OCFS, *Policy and Procedures Manual 3442.00: Lesbian, Gay, Bisexual, Transgender, and Questioning Youth: Promoting Dignity and Respect* (Feb. 7, 2020) (attached as Exhibit A).

[11] *See* OCFS, *Health Services Manual for Children in Foster Care* (May 2024), https://ocfs.ny.gov/main/sppd/health-services/docs/manual/WTHS-Manual.pdf ("If a [transgender] youth needs medical care related to gender transition, it is important that they receive gender-affirming care."). Runaway and homeless youth are not under the care or custody of OCFS, and therefore the agency does not have a formal legal obligation to ensure their access to necessary medical care. Nonetheless, OCFS is committed to providing the services and supports that runaway and homeless youth need and doing so in a manner responsive to their gender identity. OCFS is required to ensure that all RHY program staff are trained to provide culturally competent services and support to LGBTQ youth, including transgender youth, and their families. N.Y. Exec. Law § 532-e(7); OCFS, *Administrative Directive 20-OCFS-ADM-03: Runaway and Homeless Youth Provider Training on Lesbian, Gay, Bisexual, Transgender, Questioning, and Queer Cultural Competency* (Jan. 23, 2020), https://ocfs.ny.gov/main/policies/external/ocfs_2020/ADM/20-OCFS-ADM-03.pdf.

13. OCFS has a constitutional obligation to provide youth incarcerated in its juvenile justice facilities with adequate medical care, including medically necessary gender-affirming care.[12]

14. OCFS has a statutory obligation to provide youth incarcerated in its juvenile justice facilities with appropriate physical and mental health services, including medically necessary gender-affirming care.[13]

15. Detention facilities are required to provide detained youth with appropriate health services, including medically necessary gender-affirming care.[14] OCFS monitors detention facilities to ensure they comply with this requirement.

16. The agencies that operate the state's foster care programs are required to provide comprehensive physical and mental health services, including medically necessary gender-affirming care, to every youth in their care or custody.[15] OCFS monitors local districts and agencies to ensure they comply with this requirement.

17. In my decades of experience working with youth who identify as transgender, and the healthcare professionals who treat them, I am aware that medical professionals often prescribe forms of gender-affirming care as medically necessary treatments for adolescents with gender dysphoria because such care can improve the mental health and overall wellbeing of transgender individuals, support psychological wellbeing, and help prevent self-harm and suicide.

---

[12] U.S. Const. amend. VII; N.Y. Const. art. I, § 5.
[13] N.Y. Exec. Law §§ 504-a, 508.
[14] N.Y. Comp. Codes R. & Regs tit. 9, §§ 180-1.9, 180-3.21.
[15] N.Y. Comp. Codes R. & Regs tit. 18, §441.22.

18. Accordingly, OCFS's obligation to provide adequate medical care includes affording individuals access to medically necessary gender-affirming care as prescribed by treating clinicians.

19. New York State law protects transgender people from discrimination. The state constitution prohibits discrimination on the basis of sex, gender identity, or gender expression.[16] State antidiscrimination laws further prohibit discrimination based on sex, gender identity, or gender expression, including in the provision of social services or medical care.[17] State regulations governing foster care,[18] juvenile justice facilities,[19] and programs for runaway and homeless youth[20] explicitly prohibit discrimination based on sex, gender identity, or gender expression.

20. Under the laws and policies described above, OCFS may not discriminate against transgender adolescents and must therefore treat an individual seeking medical care for gender dysphoria in the same way it would treat an individual seeking medical care for any other diagnosis. It must also ensure the Monitored Entities responsible for juvenile detention and foster care programs do the same.

21. In addition, New York State has a strong policy that transgender people, including adolescents, should have access to medically necessary gender-affirming care and has recently passed laws protecting access to such care.[21]

**<u>OCFS Policies and Practices Comport With These Requirements</u>**

---

[16] N.Y. Const. art. I, § 11.
[17] N.Y. Exec. L. § 296(2); N.Y. Civ. Rts. L. § 40-c. These laws apply to OCFS and the Monitored Entities as public accommodations.
[18] N.Y. Comp. Codes R. & Regs tit. 18, § 441.24.
[19] N.Y. Comp. Codes R. & Regs tit. 9, §§ 180-1.5, 180-3.4(d).
[20] N.Y. Comp. Codes R. & Regs tit. 9, § 182-1.5.
[21] *See* S.2475-B, 2023-24 Leg. Sess. (N.Y. 2023); S.8058, 2023-24 Leg. Sess. (N.Y. 2024).

22. OCFS must comply with these state laws, as must the Monitored Entities it oversees which operate the state's juvenile detention and foster care programs. Accordingly, OCFS operates and oversees programs in a manner consistent with its legal obligation to ensure individuals in custody can access medically necessary healthcare and are treated equally regardless of sex, gender identity, or gender expression.

23. OCFS takes all appropriate steps to ensure that transgender youth in its custody receive the medical care they need.

24. For example, OCFS policy requires that all youth arriving at an OCFS-operated facility receive a comprehensive health screening to identify, among other things, whether the youth is taking any existing medications including hormone therapy.[22] If an adolescent is being treated with puberty blockers or hormone therapy at the time they enter an OCFS-operated residential juvenile justice facility, OCFS policy is that the facility must assist the adolescent to continue that course of treatment.[23] If hormone therapy is discontinued for any youth in custody, OCFS policy requires that the agency monitor for and treat symptoms that may occur as a result.[24]

25. OCFS policy requires that all youth in OCFS-operated residential juvenile justice facilities receive a comprehensive medical and mental health assessment upon their admission to identify their physical and mental health needs and develop an appropriate plan of care to

[22] Exhibit A.

[23] *Id.*; *see also* OCFS, *Policy and Procedures Manual 3243.31: Medications* (Aug. 8, 2025) ("Necessary medications will be continued without interruption whenever youth are admitted into the custody of [OCFS] or transferred among [OCFS] programs.") (attached as Exhibit B).

[24] Exhibit A.

address them.[25] Each youth must also receive an annual reassessment to evaluate and update that youth's health needs and plan of care.[26]

26. OCFS requires and trains its staff to provide youth in OCFS-operated juvenile justice facilities with information about their right to request to continue or begin hormone therapy or other forms of gender-affirming care.[27] Youth who request to begin gender-affirming care while in OCFS custody are referred to an appropriate healthcare provider at their facility for discussion and evaluation. OCFS, in consultation with medical and behavioral health staff at the facility, determines whether it is appropriate to refer the youth to a specialist to be evaluated for gender-affirming care based on accepted standards of medical care, the youth's best interest, and parental consent as required by state law.[28] (See further discussion of parental consent, *infra* at 35.) Where appropriate, OCFS will identify and refer the youth to a qualified medical specialist in the community to evaluate the youth and provide appropriate care. OCFS will monitor and support in following the treatment plan recommended by the specialist.

27. OCFS policy forbids discrimination by all employees, contractors, and volunteers on the basis of sex, gender identity, or gender expression in OCFS-operated residential facilities.[29]

28. OCFS also takes appropriate steps to ensure the Monitored Entities comply with state requirements to ensure that youth in their care receive the medical care they need, including medically necessary gender-affirming care. OCFS monitors these Entities for compliance with these requirements.

---

[25] OCFS, *Policy and Procedures Manual 3243.33: Behavioral Health Services* (July 8, 2017) (attached as Exhibit C); OCFS, *Policy and Procedures Manual 3243.19: Admission and Annual Medical Assessments* (Nov. 29, 2023) (attached as Exhibit D).
[26] Exhibit D.
[27] Exhibit A.
[28] *Id.*
[29] *Id.*

29. For example, OCFS's guidance to local districts regarding health services for youth in foster care instructs foster care agencies that "[i]f a [transgender] youth needs medical care related to gender transition, it is important that they receive gender-affirming care. . . . Gender-affirming care improves the mental health and overall well-being of [transgender] individuals[.]"[30]

30. Additionally, every youth placed in foster care must receive an individualized "support plan" to evaluate and address their health needs.[31] This plan is developed collaboratively by the youth's parent or guardian, the youth (when age appropriate), a clinical team member who works with the youth, the youth's case planner, and the case manager, along with any relevant medical providers, education staff, or other service providers.[32] State regulations require that every support plan be "responsive to the individual child's expressed sexual orientation, gender and gender identity" and address any related health needs.[33]

31. Every youth admitted to a juvenile detention facility must receive a comprehensive health assessment within 72 hours of their admission to identify their health needs and develop an appropriate service plan for addressing them.[34]

32. OCFS directs the local districts to provide transgender youth in foster care with a safe, secure, and affirming environment and comprehensive health services to meet their

---

[30] OCFS, *Health Services Manual for Children in Foster Care* 11-18 (May 2024), https://ocfs.ny.gov/main/sppd/health-services/docs/manual/WTHS-Manual.pdf.
[31] N.Y. Comp. Codes R. & Regs tit. 18, § 441.22(a); OCFS, *Administrative Directive 21-OCFS-ADM-05: Regulatory Changes and Standards of Care for Youth in Congregate Care Settings* (Apr. 6, 2021), https://ocfs.ny.gov/main/policies/external/ocfs_2021/ADM/21-OCFS-ADM-05.pdf.
[32] N.Y. Comp. Codes R. & Regs tit. 18, § 441.22(a).
[33] *Id.*
[34] N.Y. Comp. Codes R. & Regs tit. 9, § 180-1.9(b); N.Y. Comp. Codes R. & Regs tit. 9, § 180-3.21.

particular health needs, by healthcare professionals with experience caring for transgender youth.[35]

33. Monitored Entities are required to maintain policies governing the appropriate treatment of youth in care and custody; OCFS has issued guidance and model policies to effectuate this mandate and requires Monitored Entities submit their policies to OCFS for review to ensure they are compliant.[36]

34. These policies and practices comport with OCFS's legal obligations to ensure that the youth in its care or custody have access to medically necessary health care[37] and its oversight responsibility to ensure that the Monitored Entities do the same. They are further consistent with the state constitution, antidiscrimination laws, and applicable regulations, which all prohibit discrimination against transgender people.[38]

35. OCFS recognizes the importance of parental consent related to gender-affirming care. Consistent with state law, OCFS and the Monitored Entities must obtain parental consent before a minor receives any non-routine medical care, including applicable gender-affirming care.[39] New York law provides limited exceptions where a minor may give consent for their own medical care.[40]

---

[35] OCFS, *Health Services Manual for Children in Foster Care* 11-18 (May 2024), https://ocfs.ny.gov/main/sppd/health-services/docs/manual/WTHS-Manual.pdf.
[36] OCFS, *Administrative Directive 21-OCFS-ADM-05: Regulatory Changes and Standards of Care for Youth in Congregate Care Settings* (Apr. 6, 2021), https://www.ocfs.ny.gov/main/policies/external/ocfs_2021/ADM/21-OCFS-ADM-05.pdf; *see also* OCFS, *Administrative Directive 21-OCFS-ADM-05: LGBTQ Sample Policy* (Apr. 6, 2021), https://ocfs.ny.gov/main/policies/external/ocfs_2021/ADM/21-OCFS-ADM-05-Att-E-LGBTQ.pdf.
[37] N.Y. Exec. Law §§ 504-a, 508.
[38] N.Y. Const. art. I, § 11; N.Y. Exec. Law § 296 *et. seq.*; N.Y. Comp. Codes R. & Regs tit. 18, § 441.24; N.Y. Comp. Codes R. & Regs tit. 9, §§ 180-1.5, 180-3.4(d).
[39] OCFS, *Policy and Procedures Manual 3243.14: Medical and Dental Care for Youth: Consent and Refusal* (Aug. 21, 2025) (attached as Exhibit E); OCFS, *Health Services Manual for Children in Foster Care* 11-18 (May 2024), https://ocfs.ny.gov/main/sppd/health-services/docs/manual/WTHS-Manual.pdf.
[40] For example, state law specifies that runaway and homeless youth can consent to their own medical care and mental health care, as can minors who are parents. N.Y. Pub. Health Law § 2504.

36. Youth 18 years of age and older are authorized by state law and policy to consent to their own care.

**Federal Actions to Restrict Gender-Affirming Care for Adolescents**

37. I am aware of Executive Order no. 14187, entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order"). That Executive Order makes clear it is the policy of the federal government that gender-affirming care should be prohibited for adolescents.

38. I understand that, since late January 2025, the federal government has undertaken several harmful actions to implement the Executive Order; target providers of gender-affirming care, including in New York; and restrict adolescents' access to such care. These federal actions include the memorandum issued by Attorney General Pam Bondi on April 22, 2025 and the memorandum issued by Assistant Attorney General Brett Shumate on June 11, 2025 (collectively, "DOJ Directives") targeting the provision of gender-affirming care to patients under age 19.

**Consequences of Federal Actions to Restrict Gender-Affirming Care for Adolescents**

39. The Executive Order, the DOJ Directives, and other federal agency actions to implement the directives set forth in the Executive Order have undermined OCFS's mission and interfered with its ability to serve New York's youth, families, and vulnerable communities, and in particular, transgender adolescents in the programs OCFS oversees and operates, and they will continue to do so.

40. These federal actions have already had a chilling effect on providers who offer gender-affirming care. OCFS is aware that numerous healthcare providers in New York have eliminated or significantly reduced the provision of some or all forms of gender-affirming care to

adolescents as a result of the Executive Order and DOJ Directives. For example, in New York City, several hospitals and community-based providers either eliminated or reduced gender-affirming care services to transgender youth. OCFS is concerned that this chilling effect will continue to intensify and more providers will cease providing gender-affirming care to adolescents as a result of these federal actions.

41. This shrinking number of providers is having a profound impact on the services available to the youth that OCFS and the Monitored Entities serve. If the pool of providers continues to shrink, it will become harder and may ultimately become impossible to find healthcare providers who can provide appropriate medical care to transgender adolescents.

42. The Executive Order and DOJ Directives cause grave harm to the transgender youth that OCFS serves. Transgender youth benefit from access to gender-affirming care, which measurably improves their physical and psychological wellbeing. If this care becomes inaccessible, transgender youth in the care or custody of OCFS or the Monitored Entities are likely to suffer severe psychological distress and other negative health outcomes. OCFS is extremely concerned for the physical and mental wellbeing of transgender youth under its care, custody, or oversight as a result of these federal actions.

43. As psychological distress among transgender adolescents in OCFS care, custody, or oversight increases, so too does the demand for mental health services and other support services. This strains the resources of OCFS and the other state and local programs that provide these services. It also results in longer wait times for the many young people throughout New York who rely on these mental health services and other support services—not just those who are transgender.

44. If the Executive Order and DOJ Directives are enforced, OCFS will be unable to fulfill its legal obligations because OCFS will be unable to assist youth in its custody to obtain this form of medically necessary healthcare. This will expose OCFS to litigation risk and will harm the youth that OCFS serves. For example, if a transgender adolescent in OCFS custody is already receiving hormone therapy but OCFS cannot find any doctor willing or able to continue that course of treatment, then that adolescent will be forced to abruptly stop the treatment. Such abrupt changes in medication can cause serious physical and mental health risks—but OCFS may simply have no way to obtain the medical care the adolescent needs and protect the adolescent from those health risks.

45. The Monitored Entities, which OCFS is responsible for overseeing, will also be unable to fulfill their legal obligation to assist youth in their care or custody to obtain this form of medically necessary healthcare.

46. If the Executive Order and DOJ Directives are enforced, OCFS will be unable to comply with the antidiscrimination requirements enshrined in New York's constitution and reinforced in state statutes and regulations, because OCFS will be unable to provide transgender adolescents and/or adolescents seeking treatment for gender dysphoria with access to medical care in the same manner as it does for similarly situated cisgender adolescents and/or adolescents seeking treatment for other diagnoses. This will further expose OCFS to litigation risk.

47. The Monitored Entities will similarly be unable to comply with state antidiscrimination requirements.

**Conclusion**

48. OCFS wishes to comply with state law and ensure that transgender youth in custody can access the medical care they need, including medically necessary gender-affirming

care. However, these federal actions have interfered with OCFS's ability to do so and may ultimately make it impossible.

49. I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Date: Nina Aledort

Nina Aledort, Ph.D.
Deputy Commissioner, New York State Office of Children and Family Services

# EXHIBIT A

Office of Children and Family Services

**Policy and Procedures Manual**

**Lesbian, Gay, Bisexual, Transgender, and Questioning Youth; Promoting Dignity and Respect** **(PPM 3442.00)**

| Approved By: *Sheila J. Poole (signed)* **Sheila J. Poole, Commissioner** | Date Issued: **February 7, 2020** | Number of Pages: **12** | Appendix Pages: **N/A** |
|---|---|---|---|
| Related Laws: **Civil Rights Law Section 40-c** **Executive Law Article 15** | Division/Office: **Juvenile Justice and Opportunities for Youth** | Contact Office/Bureau/Unit: **Bureau of Behavioral Health Services** | |
| Supporting Regulations: **9 NYCRR 7424.1** | American Correctional Association Standards (ACA): **4-JCF-2A-22; 4-JCF-3A-02** | | |
| Regulatory Bulletins and Directives: **N/A** | Local Operating Procedure: **Required** ☐ **N/A** ☒ | | |
| Related Policies: **PPM 2082, *Discrimination Prevention*** **PPM 3243.31, *Medications*** **PPM 3243.33, *Behavioral Health Services*** **PPM 3247.18, *Contraband, Inspections and Searches in OCFS Facilities and Programs*** **PPM 3402.00, *Limited Secure and Non-Secure Facilities Admission and Orientation*** **PPM 3402.01, *Secure Facilities Admission and Orientation*** **PPM 3444.00, *Youth Grievance Program*** | Related Forms: **N/A** | | |
| Supersedes: **PPM 3442.00, *Lesbian, Gay, Bisexual, Transgender and Questioning Youth* (3/17/08)** | | | |

Summary:

**The New York State Office of Children and Family Services is committed to providing lesbian, gay, bisexual, transgender, intersex, queer, and questioning youth in**

**residential and community programs it operates with safe, respectful, affirming, inclusive and discrimination-free environments.**

## I. POLICY

It is the policy of the New York State Office of Children and Family Services (OCFS) to maintain and promote safe, respectful, and affirming environments for lesbian, gay, bisexual, transgender, queer, and questioning (LGBTQ) youth in OCFS-operated residential and community programs. All OCFS employees, contract providers, and volunteers are prohibited from engaging in any form of discrimination against or harassment of youth based on actual or perceived sexual orientation, gender identity, and gender expression. OCFS is committed to providing a healthy and accepting setting for all youth placed in facilities and community programs by training staff and educating youth on LGBTQ issues. Any discrimination against or harassment of youth, including by other youth, will not be tolerated. The provision of services within OCFS facilities and programs will be based on professional standards and will be free of institutional and personal bias. OCFS staff will recognize and address the individual needs of the youth and will apply OCFS policies and practices fairly to all youth in OCFS facilities and community programs.

## II. DEFINITIONS

**LGBTQ** – an acronym commonly used to refer to lesbian, gay, bisexual, transgender, queer, and questioning individuals.

**LGBTQ youth** – includes all youth who have self-identified as lesbian, gay, bisexual, transgender, queer, or questioning their sexual orientation or gender identity (for purposes of this policy).

**Sexual Orientation** – refers to an individual’s emotional, romantic, and/or sexual attraction to other persons. Examples of sexual orientations may include gay, lesbian, straight, bisexual, pansexual, and asexual.

**Gender identity** – refers to a person’s concept of self as woman/girl, man/boy, a blend of both, another gender, or no gender. A person’s gender identity may be the same or different from their assigned sex at birth.

**Cisgender** – refers to a person whose gender identity matches their assigned sex at birth.

**Gender expression** – refers to the way a person expresses their gender through clothing, appearance, behavior, speech, etc. A person’s gender expression may vary from the norms traditionally associated with their assigned sex at birth. Gender expression is a separate concept from sexual orientation and gender identity.

**Gender nonconforming** – having or being perceived to have gender characteristics and/or behaviors that do not conform to traditional or societal expectations. These expectations vary across cultures and have changed over time. Gender nonconforming people may or may not identify as LGBTQ.

**Lesbian** – refers to a woman/girl who is emotionally, romantically, and/or sexually

attracted to other women/girls.

**Gay** – refers to a person who is emotionally, romantically, and/or sexually attracted to people of the same gender. Sometimes, it may be used to refer to gay men and boys only. This term is currently preferred over the term "homosexual."

**Bisexual** – refers to a person who is emotionally, romantically, and/or sexually attracted not exclusively to people of one sex or gender.

**Asexual** – refers to a person who may not experience sexual attraction or has little interest in sexual activity; asexuality exists along a spectrum.

**Pansexual** – refers to a person who is emotionally, romantically, and/or physically attracted to people regardless of their sex, gender, and/or gender identity. A pansexual person may be, but is not necessarily, a person who identifies as bisexual.

**Straight** – refers to a person who is emotionally, romantically, or sexually attracted to people of the opposite sex or gender.

**Transgender** – an adjective and umbrella term that describes a person/people whose sex assigned at birth differs (in varying degrees) from their gender identity.

**Transgender female** – refers to a person who was assigned the sex of male at birth and who identify as female. Similarly, the terms *transgender girls* and *transgender women* refer to those who now identify as girls or women.

**Transgender male** – refers to a person who was assigned the sex of female at birth and who identify as male. Similarly, the terms *transgender boys* and *transgender men* refer to those who now identify as boys or men.

**Misgendering** – Transgender and gender nonconforming people may choose to be referred to with a pronoun consistent with their gender identity rather than the sex assigned to them at birth. Misgendering refers to the intentional use of pronouns based on the sex assigned to a person at birth instead of the pronouns the person has requested be used.

**Deadnaming** – Transgender or gender nonconforming youth may choose to be referred to by a name consistent with their identity rather than their legal name. Deadnaming refers to the intentional use of a youth's legal name instead of their chosen name.

**Questioning** – refers to a person who is exploring or questioning issues of sexual orientation or gender identity or expression. Some questioning people may ultimately identify as gay, lesbian, bisexual, or transgender; others may identify as heterosexual and cisgender.

**Queer** – has historically been used in derogatory or violent ways toward LGBTQ people. However, the term has been reclaimed for positive use by some LGBTQ individuals and communities. The positive usage of this term intentionally does not have a strict definition, and there are three general ways it is used:

- A sexual orientation identity, used instead of or in addition to identities such as lesbian, gay, bisexual, asexual, etc.

- A way to broadly refer to people who are not heterosexual or cisgender (Ask an individual if they use this word to describe themselves, as some people do not like the term.)
- A sociopolitical term to signify resistance to the "status quo" of sexuality and/or gender The term queer should never be used pejoratively.

**Intersex** – A term describing people who have physical sex characteristics (i.e., chromosomes, genitals, and/or gonads) that are not considered typical within the binary framework of male/female. Some examples of these conditions include ambiguous external genitalia, lack of typical responsivity to sex-related hormones, and inconsistency between external genitalia and reproductive organs.

**Nonbinary** – refers to individuals who do not identify as male or female but as neither, as a combination, and/or as something else.

## III. PROCEDURES

### A. Training of Staff

OCFS will provide strength-based training to all Division of Juvenile Justice and Opportunities for Youth (DJJOY) staff, aftercare administrators, Office of the Ombudsman, the LGBTQ Accommodations and Oversight Committee, and other appropriate OCFS staff regarding the goals and requirements of this policy. Training will focus on raising awareness and staff capacity to respond to sexual orientation, gender identity, and gender expression (often referred to as SOGIE) issues in residential settings and community programs. Training will foster understanding of common issues faced by LGBTQ youth and their families, and will promote behaviors and interactions that demonstrate affirmation, dignity, and respect. Training will also include identifying behaviors that constitute discrimination and harassment, and the procedures for preventing, intervening on, and reporting such behavior.

### B. Resource and Policy Dissemination to Youth

OCFS will provide written and verbal information to all youth in OCFS-operated facilities and community programs regarding this policy, including their rights and responsibilities under this policy and the procedures for reporting complaints.

1. DJJOY programs will affirm the identity of the youth they serve by creating supportive environments. It is important that educational books and other reading materials for youth interested in learning more about LGBTQ identity are available and reflect diverse experiences and identities. OCFS will make reading materials available in languages other than English as needed.

2. LGBTQ literature and other signs/posters that indicate staff are knowledgeable and open to communication should be visible in the common areas and elsewhere in facilities.

3. OCFS will provide youth with access to supportive resources containing age appropriate LGBTQ information, including a reading list, website list of community resource supports, and advocacy groups.

## C. Disclosure

1. Staff should not make assumptions about a youth's sexual orientation or gender identity. There are no tools or instruments to assess a person's sexual orientation or gender identity. Staff can only know a youth's sexual orientation or gender identity if they self-disclose.

2. Youth may disclose their sexual orientation and/or gender identity to staff when they are ready. Staff should promote a safe and affirming environment and trusting relationship for such disclosure. When youth are placed with OCFS, intake staff will provide opportunities for youth to disclose their sexual orientation and gender identity through direct inquiry.

3. If youth disclose to staff that they are LGBTQ, it is important to talk with them about it in an open, affirming, and understanding fashion. Staff should acknowledge the disclosure and discuss with the youth what it means for them to be lesbian, gay, bisexual, transgender, or questioning to the extent the youth wants or needs to have this conversation.

4. It is important to respect a youth's confidentiality. Staff may only share information disclosed by youth regarding their sexual orientation and gender identity with individuals outside of the treatment team if the youth consents to such disclosure or as necessary to protect the youth from harm. Youth will be informed that information disclosed regarding their sexual orientation and gender identity may be discussed with other members of the treatment team in accordance with the above-stated guidelines. Staff members must inform youth that under certain circumstances, such as in connection with a placement/transfer request, OCFS may be required to disclose to their parent(s)/guardian that the youth has raised issues relating to gender identity or gender expression in relation to their facility placement. When OCFS is required to make such a disclosure, staff members will be affirming of the youth's gender identify or expression and provide the youth's parent or guardian with resources to better understand their child's LGBTQ identity.

## D. Youth Placement

Youth can request placement in or transfer to a facility based upon their gender identity during the intake process or at any other time. Requests for such placement will be forwarded to the LGBTQ Accommodations and Oversight Committee for review and disposition. The Committee will begin its review with the presumption that the most appropriate placement for a youth is one that affirms their gender identity and/or where the youth feels safest. In making its decision, the committee must carefully consider all relevant factors, including but not limited to: the youth's informed request/consent, their ability to understand the implications of their request, the youth's emotional and physical safety, informed consent from the youth's legal guardian where required, the youth's developmental stage in transition to their identified gender, and mental health and medical assessments. Where indicated, the Committee will confer with the youth's clinician, case manager, medical staff, direct care staff, and any others involved in mental health, psychosocial, education, and medical assessments to account for the recommendations of the treatment team. The Committee will work closely with DJJOY's administration to assess all relevant factors included in making this decision

and to support the success of such youth placements. If a youth is not placed in a facility that matches their gender identity, the facility in which the youth is placed must respect and affirm the youth's gender identity and meet the youth's emotional and psychological needs.

**E. Prevention of Harassment and Discrimination**

OCFS staff are responsible for modeling appropriate and affirming behavior at all times. OCFS staff will not tolerate discriminatory or harassing behavior by staff or youth toward youth based on actual or perceived sexual orientation, gender identity, or gender expression, and must take immediate action to intervene in any such situations. OCFS staff are required to report all incidents of staff discrimination toward youth based on the youth's actual or perceived sexual orientation, gender identity, or gender expression. OCFS staff will actively engage and redirect youth who engage in harassing or bullying behaviors. Staff will not attempt to convince LGBTQ youth to reject, change, or hide their sexual orientation or gender identity.

**F. Language, Name, and Pronouns**

1. Staff should use the words gay, lesbian, bisexual, queer, and transgender in an appropriate context when talking with youth about sexual and gender diversity, and not use value-laden terms such as homosexual or transvestite. There are many ways in which LGBTQ individuals identify that are not all covered in the Definitions section of this policy. These identities vary across individuals and can change over time. To the best of their ability, staff should use the language that youth use to describe themselves. Staff should also use inclusive and gender-neutral language as much as possible. When staff become aware of a new term with which they are not familiar, they will try to understand the term in order to stay current with the evolving language used by LGBTQ youth.

2. It is OCFS's policy to allow youth to request use of a chosen first name rather than their legal name. Consistent with this policy, youth may designate a first name that they wish to use. Staff members will address and refer to the youth by the requested name and pronouns, regardless of placement, appearance, anatomy, medical history, sex assigned at birth, or legal name. Staff should understand that the ability to choose a name and/or a pronoun(s) consistent with the youth's gender identity, rather than the youth's sex assigned at birth, may be especially important to transgender youth. Staff are prohibited from intentionally misgendering or deadnaming youth. The youth's requested name and pronouns should be used in documentation relating to the youth, while also identifying the youth's legal name, except when such use may disclose the youth's gender identity to persons the youth is not comfortable having such information.Youth will not be permitted to request names affiliated with gangs or that otherwise present safety issues. LGBTQ youth requesting use of a name or pronoun will be prompted to discuss in what context and with whom their requested name and pronouns will be used. This is important because the youth may not yet have disclosed their gender identity to family members. Youth may elect to be referred to by their requested name and pronouns while in a DJJOY facility but may not want facility staff to refer to them as such when talking with families or outside providers.

3. Although a legal name change is not required for a youth to use a requested name

while in OCFS custody, transgender youth may be interested in legally changing their names to ones that reflect their gender identity. A transgender youth who is interested in applying to legally change their name will be referred to the Office of the Ombudsman and to additional programs from which youth may receive assistance with legal name changes.

**G. Communication and Documentation**

1. Ongoing communication among staff and between staff and youth is central to good care and supervision for all youth, including LGBTQ youth.

2. Documentation is an essential treatment team communication tool. All staff who interact with LGBTQ youth should maintain ongoing documentation in accordance with established protocols so that critical information is shared, and appropriate care and treatment are coordinated and provided. Also, LGBTQ youth, especially youth who are questioning their gender identity, may go through multiple name and pronoun changes. This is a common experience for youth seeking to better understand and define their identity. Maintaining current records of these changes allows youth to be referred consistently by their chosen name and pronouns.

3. In keeping with established policy and procedures for all youth, confidentiality must be maintained in all forms of communication, including written documentation. No information regarding a youth's sexual orientation or gender identity will be shared with their families, other youth, or outside providers unless doing so has been requested by the youth or as necessary to protect the youth from harm.

4. Documentation protects youth and facility staff. Staff will document and report any complaints of discrimination or harassment in accordance with established OCFS policies and procedures. OCFS will investigate all claims of discrimination and harassment and take appropriate remedial administrative action consistent with applicable collective bargaining agreements.

**H. Reporting Responsibilities and Procedures for Staff**

OCFS staff have an obligation to report any incidents of discrimination or harassment, or any other conduct by staff that violates this policy. Reports must be made according to current OCFS protocols.

**I. Incident Reporting Procedures for Youth**

The *Youth Grievance Program* policy (PPM 3444.00) and the Office of the Ombudsman are available for youth to express and resolve concerns regarding their care and treatment.

**J. Enforcement**

Supervisory and management staff will treat all incidents of discrimination and harassment seriously and report them promptly. In accordance with applicable OCFS policy and procedures, and consistent with applicable collective bargaining agreements, OCFS will investigate alleged violations of this policy and take

appropriate corrective or disciplinary action.

**K. LGBTQ Accommodations and Oversight Committee**

Certain issues that require consideration of a LGBTQ youth's individual circumstances are to be referred to the Bureau of Behavioral Health Services for determination by the LGBTQ Accommodations and Oversight Committee.

1. The issues that must be referred to the LGBTQ Accommodations and Oversight Committee include youth requests for placement in or transfer to a facility based upon gender identity or gender expression, requests to wear a nonstandard uniform (other than undergarments), and other requests for modified clothing and self-care items that are consistent with a youth's gender identity and/or expression.

2. When facility staff receive a request from a youth concerning accommodations, the request should be referred immediately to the Bureau of Behavioral Health Services, along with all relevant reports and facility records. The LGBTQ Accommodations and Oversight Committee will acknowledge the request and initiate an initial review of the request within one week. The committee will secure enough information to assess, make a determination, and respond to the youth's request within two weeks. A written determination will constitute a final decision. A youth's gender identity-based request will be accommodated whenever possible.

3. The LGBTQ Accommodations and Oversight Committee is comprised of representatives from the Office of the Ombudsman; the Division of Legal Affairs; and DJJOY, including Administration, Bureau of Behavioral Health Services, Bureau of Health Services, and designated facility staff with assistance from LGBTQ consultants. The Committee will include individuals with understanding of and expertise in issues facing LGBTQ youth.

**L. General Facility Operations**

All OCFS youth must abide by the *NY Model Youth Manual* and are accountable for their behavior. All youth are expected to be respectful of others and their environment.

1. Safety and security, as well as OCFS treatment and care practices, remain paramount for all youth in OCFS facilities.

2. All youth need to feel safe in their environment for positive programming and positive youth outcomes to occur.

3. Rules must be maintained with dignity and respect for all youth.

4. Staff will help youth to understand the rationale behind their decisions and responses to youth (especially when those decisions and responses are specifically connected to a youth's gender identity or sexual orientation), and youth should be given the appropriate opportunity to express themselves.

5. Staff will provide youth with information about the LGBTQ Accommodations and Oversight Committee, the right to request a uniform or facility change, and the right to request to continue or begin hormone therapy or request other gender-affirming

medical care through the Bureau of Health Services.

6. Staff should instruct youth that any anti-LGBTQ threats of violence, actual violence, or disrespectful or suggestive comments or gestures toward any youth, including misgendering and deadnaming, will not be tolerated.

7. The treatment team will decide how to approach LGBTQ issues, as they would with behavior of any youth (i.e., as a team or in each specific unit). Good care and supervision of youth requires consistency.

8. Certain behaviors are inappropriate regardless of a youth's gender identity, gender expression, or sexual orientation (e.g., seductive or sexual behavior, exchanging sexually suggestive notes). Staff must maintain boundaries for safe and appropriate supervision of all youth.

9. As with all youth, LGBTQ youth will be included in all activities or jobs for which they qualify and show a positive interest.

10. Sexual orientation and gender identity are two separate things. Staff will remember that transgender girls are girls (not gay boys) and may be attracted to any gender(s). Transgender boys are boys (not lesbians) and may be attracted to any gender(s).

**M. Medical Evaluation and Care**

1. All youth arriving at an OCFS facility have an initial health screening, which includes identification of existing medications being taken by the youth. If during the screening, a transgender youth is identified as undergoing hormone therapy, staff should follow existing OCFS policy and practice for the continuation of medication upon admission (see PPM 3243.31, *Medications*). Medical and behavioral health staff should monitor youth for any symptoms that might occur as a result of any changes in related treatment.

2. Transgender youth who request to begin hormone therapy or other gender-affirming medical care while in OCFS care should be referred to facility medical and behavioral health staff for an evaluation. Medical and behavioral health facility staff will inform and seek guidance from the Bureau of Health Services. OCFS will make a determination regarding the initiation of hormone therapy or other gender-affirming medical care based on accepted standards of care and the youth's best interest. Appropriate consent must first be sought and obtained, as required by law.

3. Facility medical staff should provide appropriate medical information and education for all youth.

**N. Mental Health Assessments of LGBTQ Youth**

1. As in all assessment situations, OCFS clinicians will engage LGBTQ youth with sensitivity and self-awareness. Clinicians will not assume any pathology simply because a youth is LGBTQ or gender nonconforming. In addition to the typical developmental and social challenges experienced by most adolescents, clinicians

should be aware that LGBTQ youth also frequently face pressures based on their gender identity or sexual orientation, and that difficulties in coping with these challenges may result in comorbid problems, including increased suicide risk, depression and anxiety, tobacco/drug/alcohol abuse, and dropping out of school.

2. It is important that every youth receive a comprehensive biopsychosocial screening and assessment, so that individual needs can be identified, and appropriate treatments can be provided.

3. Assessments should include a family evaluation, and where clinically indicated, a psychiatric evaluation for any related mental health distress and potential comorbid problems requiring mental health care and treatment.

4. In ongoing clinical work, clinicians should help LGBTQ youth explore their feelings about their gender identity or sexual orientation, along with related issues and questions, in a safe and affirming manner. Clinicians should help youth reduce co-occurring problems or distress related to their gender identity or sexual orientation, and develop their strengths, coping skills, and resiliency. Clinical staff working with transgender youth should become familiar with recent literature and affirmative cultural practices to assist youth with developing a healthy, positive sense of themselves.

5. Where clinically indicated, facility clinical staff working with transgender youth should refer the youth for a diagnostic assessment by or in consultation with LGBTQ specialists in the field. Clinicians must be aware that professional mental health organizations, including the National Association for Social Workers and the American Psychiatric Association, strongly condemn any attempt to change a youth's sexual orientation or gender identity through "corrective" or "reparative therapies." Attempts to do so are strictly prohibited by this policy and by state law.

6. Due to the high risk of substance use behaviors for LGBTQ youth, a comprehensive assessment of the youth and family history should be incorporated into the overall biopsychosocial assessment. Clinicians should be aware that a large percentage of youth report alcohol and drug use as common mechanisms for coping with feelings of severe isolation.

**O. Counseling**

1. If a youth discloses that they are lesbian, gay, bisexual, transgender, or questioning while in placement, the youth should be offered appropriate counseling and information to support the youth with individual, family, and health issues.

2. The supervisory staff is responsible for referring any youth for counseling, mental health, health, or other program services as appropriate.

3. All staff should recognize that a youth questioning their sexuality and/or gender is a normal part of development, especially for adolescents, and that a youth may be currently unsure of their identity for any number of reasons.

4. Counselors should facilitate exploration of any gender or sexuality issues with

LGBTQ youth by being open, affirming, and empathic. Staff is prohibited from imposing their personal beliefs on youth and families by attempting to change a youth's sexual orientation, gender identity, or gender expression.

5. Counseling sessions for the entire youth population should include group and individual opportunities to discuss any gender identity questions or feelings that may arise as a result of having youth in a residential setting who may be perceived as "different."

**P. Search Issues**

1. All youth will be searched as provided by OCFS policy and procedure (PPM 3247.18, *Contraband, Inspections and Searches in OCFS Facilities and Programs*). All employees conducting a search must assure its thoroughness while maintaining the dignity of the youth being searched.

2. Transgender youth may request that either male or female staff conduct a strip search when such a search is required. This request will be accommodated whenever possible, considering staffing and safety needs.

3. Searches will not be used for the purposes of determining a youth's genitals or secondary sex characteristics.

**Q. Clothing**

1. All youth must wear DJJOY-approved uniforms.

2. All youth may receive undergarments of their choice among available agency supplies regardless of their gender, except where not therapeutically indicated. Other requests by youth for clothing and personal self-care items consistent with their identified gender will be referred to the Bureau of Behavioral Health Services for review and determination by the LGBTQ Accommodations and Oversight Committee.

3. Bras and other modified clothing and self-care items will be removed from youth at night for safety reasons where indicated.

**R. Personal Grooming**

Grooming rules and restrictions, including rules regarding hair, makeup, shaving, etc., will be the same in male and female facilities. Youth may not be prevented from or disciplined for engaging in personal grooming that does not match gender norms.

Examples of grooming rules that may impact transgender and gender nonconforming youth include the following:

- Youth may tie long hair back with a hair band.
- Youth with long hair can receive a basic cut and shape.
- Youth must maintain fingernails and toenails at a length that supports safety and security.

- Youth may, but are not required to, shave their faces and bodies, as permitted by OCFS policy, in keeping with safety and security concerns.

**S. Individual Bedrooms**

Transgender youth must be placed in a facility that can provide individual sleeping quarters (one-person bedroom) to allow for privacy. Any exceptions must be authorized by the Associate Commissioner for Programs and Services and documented in the youth's record.

**T. Bathroom Facilities**

1. Transgender youth shall be allowed to use individual stalls.

2. Transgender youth must be allowed to shower privately. When individual showers are not available, the youth can be the first or last in line to use a shower, so they have the option to shower separately.

3. Transgender youth shall not be required to use a single occupancy bathroom on the sole basis that they are LGBTQ, gender nonconforming, nonbinary, or because of another individual's discomfort or concerns with the youth's sexual orientation, gender identity, and gender expression.

**U. Transition/Discharge Planning**

1. When any LGBTQ youth transfers to another OCFS facility or is discharged, members of the treatment team will collaborate and share information with the receiving facility or Community Multi-Services Office (CMSO) to coordinate the youth's transitions. The treatment team must request the youth's consent before sharing information relating to the youth's sexual orientation or gender identity with the receiving facility or CMSO.

2. It is critical for staff members to work with the youth's family throughout placement to enhance community reentry efforts. However, staff should recognize that LGBTQ youth may be estranged from their family and/or may not want their family to know about their sexual orientation or gender identity.

3. Staff working with LGBTQ youth will identify and become familiar with community resources to support LGBTQ youth and their families. Staff should assist families of LGBTQ youth in identifying supportive resources and professionals in appropriate LGBTQ issues in their area.

4. Staff should recognize that resources that are helpful to some youth may not be helpful for LGBTQ youth if the resources are not accepting and supportive of LGBTQ youth. Staff should evaluate resources to determine their appropriateness. OCFS will make every effort to refer youth to LGBTQ-affirming programs and resources.

5. As with all youth, staff will assist LGBTQ youth in safely reintegrating into the community. Staff should be aware that LGBTQ youth are more likely than other youth to be homeless.

# EXHIBIT B

NEW YORK STATE | Office of Children and Family Services

Policy and Procedures Manual

**Medications** **(PPM 3243.31)**

| | | | |
|---|---|---|---|
| Approved By: [signature] | Date Issued: **August 08, 2025** | Number of Pages: **18** | Appendix Pages: **N/A** |
| Related Laws: **Education Law §§ 6527, 6807, 6902, 6909** **Public Health Law § 2166 and Article 33** | Division/Office: **Division of Juvenile Justice and Opportunities for Youth** | Contact Office/Bureau/Unit: **Bureau of Health Services** | |
| Supporting Regulations: **10 NYCRR Part 80** **8 NYCRR Part 29, 64.7** | American Correctional Association Standards (ACA): **4-JCF-4C-28** **3-JCRF-4C-08** | | |
| Regulatory Bulletins and Directives: **NYS Education Department, Office of the Professions, Deputy Commissioner's Practice Memorandum 2001.2 (2/27/01)** | Local Operating Procedure: **Required ☐ N/A X** | | |
| Related Policies: **2651.00, *Employee Discipline*** **3243.14, *Medical and Dental Care for Youth: Consent and Refusal*** **3243.32, *Psychiatric Medications*** **3243.37, *Contraception and Pregnancy*** **3243.39, *Continuity of Medical and Dental Services for Youth at the Time of Transfer and Release*** **3429.00, *Reportable Incidents*** **3456.00, *Reporting of Familial Child Abuse and Maltreatment*** **3456.01, *Justice Center Reportable Incidents in OCFS* Residential *Facilities and Programs*** | Related Forms: **OCFS-1455, *Medical Record Progress Notes*** **OCFS-1457, *Medication Administration Record*** **OCFS-2004, *Reportable Incident Report*** **OCFS-2106, *Medication Arrival Log*** **OCFS-3141, *Log for Daily Inquiry and Observation for Side Effects of Psychiatric Medicine*** **OCFS-4490, *Health Services Controlled Items Count Form*** **OCFS-4491, *Perpetual Inventory Record*** **OCFS-4492, *Provider Order Sheet*** **OCFS-4604, *Transfer-Discharge Health Summary*** **OCFS-4681, *Medication Error Plan*** **NYSDOH-166, *Controlled Substance Inventory*** **NYSDOH-2094*, Loss of Controlled Substances Report*** **NYSDOH-2340, *Request for Approval of Disposal/Destruction of Controlled Substances*** | | |
| Supersedes: **PPM 3243.31, *Medications* 9/12/2022** | | | |

Summary**: This policy establishes standards for management of medications in youth facilities programmed by the Division of Juvenile Justice and Opportunities for Youth.**

# I. POLICY

## A. Medications and Continuity of Care

Necessary medications will be continued without interruption whenever youth are admitted into the custody of the New York State (NYS) Office of Children and Family Services (OCFS) Division of Juvenile Justice and Opportunities for Youth (DJJOY) or transferred among DJJOY programs. Measures must be taken to continue medications under special circumstances, including, but not limited to, during transport, off-ground trips, and home visits. Both facility administration and medical staff must take necessary steps, and plan in advance, to provide for the uninterrupted continuation of medications at the time of release or transfer to another program, required under PPM 3243.39, *Continuity of Medical and Dental Services for Youth at the Time of Transfer and Release.*

## B. Orders/Facility Formulary

There will be a NYS-licensed practitioner's order for all prescription drugs dispensed or administered within NYS OCFS DJJOY facilities. The facility physician will provide non-patient specific standing orders for nursing care of benign, self-limited conditions utilizing over-the-counter medications. These standing orders must not include use of prescription medications.

## C. Pharmacy/Facility Formulary

OCFS and the NYS Office of General Services (OGS) have established contracts with licensed pharmacies. Facilities must use the OGS-contracted pharmacy designated by the Bureau of Health Services (BHS) unless that pharmacy is unable to meet the needs of the facility as specified in the OGS bid documents and contract.

All prescriptions written for youth will be logged onto OCFS-2106, *Medication Arrival Log*, when the pharmacy order is electronically placed. All medications will be stored in secured areas inaccessible to youth but readily accessible to medical staff for medication administration or trained non-medical staff for supervised self-administration of medication (SSAM) by youth.

Each facility will maintain a current license from the NYS Department of Health (NYSDOH), Bureau of Narcotic Enforcement, as a Class 3A Institutional Dispenser, Limited, and will comply with the NYSDOH controlled substance regulations.

Medications will be administered in accordance with the orders of a licensed practitioner and documented on OCFS-1457, *Medication Administration Record*, or an equivalent form supplied by the pharmacy.

Specific policies and procedures related to psychiatric medications are set forth in PPM 3243.32, *Psychiatric Medication*.

## II. DEFINITIONS

A. **Administration of Medication:** Medication administration is the process by which a single dose of medication is provided to and taken by a patient. Administration of medication shall be performed by a nurse, other health professional licensed to administer medications in OCFS facilities, or program staff supervising the self-administration of medication.

B. **Class 3A Institutional Dispenser, Limited, License:** A license issued by the NYSDOH Bureau of Narcotic Enforcement authorizing a facility to possess and administer patient-specific controlled substance medications dispensed by a licensed pharmacy pursuant to orders from an authorized practitioner.

C. **Controlled substance medication:** A medication that has a high potential for abuse or addiction and is therefore subject to special laws and regulations governing prescription, dispensing, storage, administration, disposal, and record keeping.

D. **Dispensing of medication:** The process by which a pharmacist or licensed prescriber takes medication from bulk stock to fill a prescription for an individual patient.

E. **Epinephrine Auto-Injector:** A prefilled syringe containing a single injectable dose of epinephrine, to be used as an emergency measure for the treatment of severe respiratory distress resulting from an allergic reaction.

F. **Medication Administration Record (MAR):** The MAR documents the administration of medications to youth. It is provided by a contract pharmacy.

G. **Psychiatric medication:** Any medication prescribed by a psychiatrist for the treatment of mental illness PPM 3243.32, *Psychiatric Medication*).

H. **Supervised self-administration of medication (SSAM):** When youth take their medication under the supervision of trained non-medical staff when no licensed medical professionals are on duty.

I. **Unit-dose medication:** A system in which the dispensing pharmacy packages each dose of medication individually to facilitate accurate administration of the correct dose. The pharmacy most commonly packages each dose in a clear plastic blister on a 30-day card (referred to as a “unit-dose blister card” in this policy).

J. **Medication order:** An order for medication issued by a licensed prescriber, written on an institutional order form in the health record or in an electronic prescribing platform for use by staff nurses. This order directs the nurses to administer the medication that has been prescribed.

K. **Medication prescription:** An order for medication issued by a licensed prescriber, submitted electronically through an electronic prescribing platform for use by a pharmacy. This order directs the pharmacy to dispense the medication that has been prescribed.

## III. PROCEDURE

### A. Admission

1. Necessary medications will be continued without interruption whenever youth are admitted into the custody of DJJOY or transferred among DJJOY programs.

2. Medical staff must verify that there is a legitimate order or prescription for the medication. The pharmacy label on a current medication that states the patient's name, drug, dose, and frequency is adequate confirmation. A current order on the patient's health records or telephone consultation with the prescriber can also be used to confirm the medication.

3. Only medications in the original and appropriately labeled pharmacy container or manufacturer's packaging will be accepted for use in the facilities.

4. Any medication that is not in its original container, is not properly labeled, or shows obvious signs of tampering (i.e., different kinds of pills in the same bottle) is considered contaminated and will be disposed of by the medical staff per BHS guidelines.

5. When any possible contraindication to continuation of a medication is found upon admission of a youth, medical staff will consult with the facility physician whether to continue the medication as prescribed. The following are instances where continuing a medication is contraindicated without consulting the provider:

   (a) The number of doses left compared to the date of the prescription makes it clear that the youth has not actually been taking the medication.

   (b) The dose of medication appears unusually large compared to usual doses commonly prescribed.

6. Medication from outside pharmacies may be used initially but will be replaced by a new prescription from the facility pharmacy based on a facility prescriber's order as soon as it is practical to do so.

7. When a youth is admitted without necessary medications, medical staff will take necessary action to obtain a prescription and procure the needed medication in a timely manner.

### B. Continuity of Medications at the Time of Transfer, Release, or Discharge

1. Medical staff will take necessary steps and plan, in advance, to provide for the uninterrupted continuation of necessary medications at the time of release or discharge to the community or transfer to another program. Please refer to PPM 3243.39, *Continuity of Medical and Dental Services for Youth at the Time of Transfer and Release.*

2. A 30-day supply of medication dispensed in child-proof containers will be provided to the parent, guardian, or responsible adult at the time of release. Youth 18 years or older may be given their own medications.

3. Follow-up appointments with community providers to continue necessary health care services will be made prior to release. The appointment must be within four (4) weeks of release so that the youth does not run out of needed prescription medication before the appointment occurs. In extreme cases or when an appointment cannot be made within four (4) weeks of release, an OCFS medical provider can extend a medication order.

4. Whenever youth are released and medications do not accompany them, transport or CMSO staff must notify the BHS and take immediate action to address the issue.

**C. Standing Orders**

1. Non-patient specific standing orders for nursing care of benign, self-limited conditions utilizing over-the-counter medications will be maintained at each facility. These standing orders must not include use of prescription medications.

   (a) Standing orders will be reviewed and updated annually by the facility physician, and then forwarded to the BHS for annual review, approval, and signature by the chief of medical services. Changes to standing orders from the previous year will be highlighted to simplify the BHS review.

   (b) A copy of the facility standing orders, signed by the facility physician assistant (PA), nurse practitioner (NP), or medical doctor (MD), will be placed in the "Orders" section of each youth medical record.

2. Non-patient specific standing orders for use of prescription medications may be used for staff hepatitis B immunization, staff tuberculosis skin testing, and emergency management of anaphylaxis.

3. All other orders for prescription or non-prescription medications must be specific for an individual patient.

4. Licensed medical professionals may provide immunizations based on a youth's file in the NYS Immunization Information System (NYSIIS).

**D. Prescription Practices**

1. The BHS will provide each facility with official NYSDOH institutional prescription pads that include the name of the facility. These pads may be used by consultants who see youth at the facility (for example, dentist, psychiatrist, facility physician) and by PAs, NPs, or MDs to write prescriptions when needed.

2. There will be a NYS-licensed practitioner's order for all prescription drugs dispensed to or administered in DJJOY facilities.

3. Practitioners' orders for medications will be electronically prescribed directly to the pharmacy for dispensing, using the electronic prescribing platform contracted by NYS. Each electronic prescription must have a matching written practitioner's order on OCFS-4492, *Provider Order Sheet*, or equivalent pharmacy-supplied order forms and maintained in the "Orders" section of the youth medical record.

4. Every medication order or prescription will include the drug, form of medication, dosage, route of administration, frequency of administration, and duration of treatment. The start date will be the date when the pharmacy fills the prescription unless specified otherwise in the order. The stop date will be the date the last dose is to be administered in accordance with the prescription duration that was ordered.

5. A separate prescription will be sent to the pharmacy for each specific dose of medication to be given. This ensures only one set of instructions on the blister pack card from the pharmacy. For example, if a provider orders Clonidine 0.1mg BID, only one prescription needs to be sent. If the order is for Clonidine 0.1mg QAM and 0.3mg at HS, two separate prescriptions must be ordered so two separate blister pack cards come from the pharmacy, one with the AM dose and one for the PM dose.

6. In an urgent situation, the practitioner may give a verbal order over the telephone for medications. The verbal order must be signed at the practitioner's next facility visit. Only licensed medical professionals will accept verbal orders. The practitioner providing the verbal order will submit the prescription electronically directly to the pharmacy. The licensed medical professional accepting a verbal order will (i) read back the order to the practitioner who will then confirm the accuracy of the order, (ii) immediately record the order in the "Orders" section of the youth's medical record and transcribe the order onto the Medication Administration Record, and (iii) sign and date the order sheet indicating that the order has been signed off and implemented.

7. Prescription medications will be ordered for a maximum of 30 days. The decision to reorder, change, or discontinue a chronic medication will be made only after a face-to-face clinical evaluation of the youth by a prescribing practitioner. The purpose of this clinical evaluation is to determine if the medication is still needed, if it is having the intended effect, and if there are any significant side effects. Limited-duration medication orders (not long-term or chronic) will automatically terminate after the total number of ordered doses have been administered unless the order is completely rewritten. Chronic medications will not automatically terminate when the current order has been completed. Prior to the discontinuance of a chronic medication, medical staff will notify the prescribing practitioner so that a specific action can be taken to renew, discontinue, or change the chronic medication order.

8. Every medication order or prescription, unless otherwise indicated by the prescriber, will be eligible for trained non-medical staff to SSAM when no licensed medical professionals are on duty. Any member of a youth's support team may identify or raise a concern about the youth's capability to successfully self-administer their medication under the supervision of a non-medical staff member. The youth's support team will convene and decide if any changes to the SSAM

protocol will be made for any particular youth. If the prescriber identifies that the medication is not appropriate for SSAM, the order will indicate so, and alternative instructions will be given in the event SSAM is required. See section Q**. Supervision of Self Administration of Medications (SSAM)** for additional guidance.

9. Prior to initiation of a medication, prescribers will explain to youth the reason for the prescription, the expected effects, and any significant side effects, symptoms, or adverse reactions.

10. Prescribers are primarily responsible for monitoring youth for side effects and complications of medications. If not using a pharmacy-provided MAR, the OCFS-3141, *Log for Daily Inquiry and Observation for Side Effects of Psychiatric Medicine,* should be used to monitor side effects and complications. The prescriber will order appropriate laboratory tests, clinical assessments, and follow-up visits consistent with established standards and current practice. Medical staff will promptly obtain all tests ordered by the prescriber.

## E. Facility Formulary

1. Each facility will maintain a written list of all medications that are to be regularly stocked in the medical unit for treatment of youth. This written list is called the facility formulary. The formulary will include over-the-counter medications used in accordance with facility standing orders as well as prescription drugs stocked for urgent or emergency use.

2. Each facility formulary shall be reviewed and updated at least annually by the facility physician, and then forwarded to the BHS for annual review and approval by the chief of medical services. Changes to the facility formulary from the previous year will be highlighted to simplify the BHS review.

3. Practitioners may order any medications currently available through an NYS-licensed pharmacy that are deemed necessary for adequate treatment. The formulary is not intended to limit prescribing practices in any way. It merely defines what is to be kept in stock in the medical unit.

4. Under the direction of the BHS and the facility physician, medical staff will maintain an “Emergency Medication Kit” (eKit), which will contain starter doses of selected prescription medications to initiate treatment immediately in urgent situations.

5. Starter doses are to be used in situations when delay in initiation of treatment would be detrimental to the youth’s health. Starter doses may be used until the youth’s individual prescription has been filled, usually no more than 24 to 48 hours.

6. Medical staff shall review the expiration dates of all stock medications monthly to discard and replace those that are about to expire. The date of the last review is documented on the card on the box or drawer where stock medications are stored.

## F. Dispensing Pharmacy

1. OCFS and OGS have established contracts with NYS-licensed pharmacies. Facilities must use the OGS contract pharmacy designated by the BHS unless that pharmacy is unable to meet the needs of the facility as specified in the OGS bid documents and contract. In the unusual circumstance that the OGS pharmacy contractor is consistently unable to meet the facility needs, the BHS must be notified and will assist in resolution of the problem.

2. Each OGS contract pharmacy will establish a relationship in advance with a local pharmacy to fill urgently needed prescriptions when the contract pharmacy cannot provide the medications within the required time frame. This service may be needed at night or on weekends after evaluation of a youth in the emergency room. Facility medical and administrative staff must know how to access this service when needed.

3. The name, address, and telephone number of the OGS contract pharmacy and emergency backup pharmacy will be recorded on the inside cover of the Medication Administration Notebook to make this information readily available to all medical staff.

4. Prescription medications for use in the facility will be obtained in unit-dose blister cards.

5. Non-prescription “over the counter” medications that are available in unit-dose packaging will be ordered and administered as such. Facilities will order non-prescription medications in bulk form only if they are unavailable as unit doses.

6. Medical staff will keep track of what has been ordered from the pharmacy using the OCFS-2106, *Medication Arrival Log*.

## G. Delivery and Receipt of Medications from the Pharmacy

1. Medications are delivered by a courier to each facility. When medical staff are on duty, the medication delivery will be referred to them.

   (a) The delivery will be recorded on the OCFS-2106, *Medication Arrival Log*, which includes the date, prescription number, patient name, drug, strength, and quantity received. This log is used to confirm that all prescription orders were filled and to confirm pharmacy bills.

   (b) A copy of the pharmacy manifest is acceptable for the purposes of confirmation only if the above information is included. Medical staff must confirm that the information on the manifest is correct and sign the slip. The manifest must be kept in a binder or envelope according to the date so it can be easily referenced. The manifests are then used to verify that every prescription billed by the pharmacy was in fact received at the facility.

2. When medical staff are not on duty, delivery of medications will be reported to the facility director or designee (duty officer).

(a) Receipt of medications will be recorded in the main facility logbook in accordance with facility procedures, documenting what was delivered and where it was stored.

(b) As soon as possible, the medications will be appropriately secured in a double-locked cabinet, refrigerator, or freezer inaccessible to youth.

(c) When a delivery is labeled that it must be kept frozen or refrigerated, special care must be taken to immediately place it in the medical unit freezer or refrigerator, and the location will be documented in the main facility logbook.

(d) Medical staff must be informed that a delivery was received when they are back on duty again. Medical staff must make a log entry in the main facility logbook that they have read the log and received the medications.

**H. Storage of Medications**

5. Each facility must maintain a current license from the NYSDOH, Bureau of Narcotic Enforcement, as a Class 3A Institutional Dispenser, Limited, and must comply with the NYSDOH-controlled substance regulations.

6. Orders for controlled medications will be electronically prescribed using the state contracted electronic prescribing platform certified by the federal Drug Enforcement Administration (DEA) to support Electronic Prescribing for Controlled Substances (EPCS). Only licensed practitioners with a current DEA registration are authorized to write controlled substance prescriptions in OCFS facilities.

7. Controlled medications will be stored in wall-mounted, double-locked, metal cabinets. Both the inner and outer doors will have keylocks, and a different key will be required to open each door. All leftover or excess non-narcotic prescription medication will be returned to the pharmacy in its original unit dose packaging for credit. Controlled medications cannot be returned and must be destroyed in compliance with NYSDOH regulations. See section **H.7. Storage of Medications** below for additional guidance.

8. Medical staff on duty will count the controlled medications at the beginning of each shift and at the end of the closing shift of the night and will record the count on OCFS-4490, *Health Services Controlled Items Count Form*. When there are two nursing shifts, the incoming and outgoing staff will count the controlled substances together.

9. Medical staff will maintain a perpetual inventory for each controlled medication that is prescribed using OCFS-4490, *Health Services Controlled Items Count Form*, or an equivalent form supplied by the pharmacy. The perpetual inventory documents each dose that is removed from the package for administration.

10. OCFS-4490, *Health Services Controlled Items Count Form*OCFS-4490, *Health Services Controlled Items Count Form*, and OCFS-4491, *Perpetual Inventory Record*OCFS-4491, *Perpetual Inventory Record*, are facility records that

document proper management of controlled medications. These forms are to be kept on file at the facility and are not part of the youth's health record.

(a) If the count is off, indicating that controlled medication is missing and unaccounted for, facility administration will be informed as soon as possible. The facility will also be required to initiate an investigation into the missing and unaccounted for controlled medication and contact the BHS as soon as possible.

(b) An OCFS-2004, *Reportable Incident Report*OCFS-2004, *Reportable Incident Report* is also required as the missing medication is contraband. Medical staff and facility administration will undertake a systematic review of records and search to determine what happened to the apparently missing and unaccounted for controlled medication (PPM 3429.00, *Reportable Incidents*).PPM 3429.00, *Reportable Incidents*).

(c) If confirmed after careful review and investigation, missing, lost, or stolen controlled substances must be reported promptly to the NYSDOH Bureau of Narcotic Enforcement using form NYSDOH-2094, *Loss of Controlled Substances Report*.

11. Leftover or excess controlled substance medications will be destroyed promptly following procedures established by the NYSDOH Bureau of Narcotic Enforcement. Permission to destroy controlled substances is sought on form NYSDOH-2340, *Request for Approval of Disposal/Destruction of Controlled Substance Form*, and recorded on form NYSDOH-166, C*ontrolled Substance Inventory Form*.

12. Effective June 27, 2022, medical professionals who prescribe an opioid in a calendar year to at-risk youth must also prescribe an opioid antagonist (e.g., Narcan) to such youth. Youth are considered at risk when any of the following factors are present:

(a) A history of substance use disorder.

(b) High dose or cumulative prescriptions that result in 90 morphine milligram equivalents or higher per day.

(c) Concurrent use of opioids and benzodiazepine or nonbenzodiazepine sedative hypnotics.

## I. Medication Administration

1. Medications will be administered following the orders of a licensed practitioner. Unless otherwise specified by the prescriber, the standard times, and frequencies at DJJOY facilities are as follows:

| | | |
|---|---|---|
| QD | Every day | 8 am |
| BID | Twice a day | 8 am and 8 pm |
| TID | Three times a day | 8 am, 2 pm, and 8 pm |

| | | |
|---|---|---|
| QID | Four times a day | 8 am, 12 pm, 4 pm, and 8 pm |
| q6h | Every 6 hours | 6 am, 12 pm, 6 pm, 12 am |
| q8h | Every 8 hours | 8 am, 4 pm, 12 am |
| 12h | Every 12 hours | 8 am and 8 pm |
| HS | At the hour of sleep | 8 pm or later |

2. Pursuant to standard nursing practice, medications may be administered within one (1) hour of the prescribed or scheduled time. Any medications administered outside of these parameters must have a corresponding provider order, approving the late administration.

3. A OCFS-1455, *Medical Record Progress Notes*, form must be written up by medical staff for every medication that is given outside of the scheduled time parameters to include the provider who was notified, the medication, scheduled time, time given, and why it was late.

4. Youth may not possess prescription medications. Prescription medications are maintained securely by medical staff in the medical unit. See section **P. Special Circumstances** for situations where youth may be in possession of their prescription medications.

5. Whenever there are licensed medical professionals on duty, only the licensed professionals will administer prescription medications.

**J. Documentation of Medication Administration**

1. Medication administration will be documented on form OCFS-1457, *Medication Administration Record,* or an equivalent form supplied by the pharmacy.

   (a) Current MAR will be kept in a three-ring binder labeled "Medication Log."

   (b) New MARs will be initiated for each youth every month, and the previous month's MAR will be placed in the "Medications" section of the youth's health record.

2. Administration of prescription and non-prescription medications will be documented immediately after administration of the dose on the MAR form by the responsible staff person before moving on to the next dose for the next youth. Documentation of medication administration will never be left to the end of the medication pass to be done all at once.

3. When scheduled doses of medication are not provided to the youth, the reason for the missed dose will be recorded on the MAR form using the standard codes listed on the form.

4. Medical staff will review the Medication Log at least weekly to determine that all medications are being given as ordered. The review will include both the front and back of the MAR forms to determine that all documentation of routine and pro re nata (PRN or "as needed") medications is complete. This review will be documented on the "Administrative Review" line on the form.

5. If medications are not being given as ordered, corrective action will be taken by medical staff and facility administration to establish proper medication administration practices.

6. New prescriptions should be started as soon as the medication is delivered to the facility, usually within 24 to48 hours. If this is not done, corrective action must be taken to determine why the medication was not ordered, not delivered, or not started.

7. PRN medications are documented on the back of the MAR. In addition to documenting PRN administration, PRN medications also require follow up for efficacy.

**K. Medication Events**

1. A medication error is any preventable event that may cause or lead to inappropriate medication use or patient harm while the medication is in the control of the medical staff or youth. Such events may be related to professional practice, health care products, procedures, and systems, including prescribing, order communication, product labeling, packaging, dispensing, distribution, administration, education, and monitoring.

2. There are different types of medication errors. All medication errors are serious; however, not all medication errors pose serious medical risks. Types of medication errors include wrong person, wrong drug, wrong dose, wrong time, wrong route, and medication not given. Medication errors will be broken down into nine categories:

   **A -** No Error: Circumstances or events that have the capacity to cause error (no actual error).
   **B -** Error-- No Harm: Error did not reach the patient.
   **C -** Error-- No Harm: Error reached the patient but did not cause harm.
   **D -** Error-- No Harm: Error reached the patient and required monitoring and/or intervention to preclude/prevent harm.
   **E -** Error, Harm: Error may have contributed to and/or resulted in temporary harm and/or required intervention.
   **F -** Error-- Harm: Error may have contributed to and/or resulted in temporary harm requiring initial or prolonged hospitalization.
   **G -** Error-- Harm: Error may have contributed to and/or resulted in permanent harm to the patient.
   **H -** Error-- Harm: Error occurred that required intervention necessary to sustain life.
   **I -** Error, Death: Error may have contributed to and/or resulted in the patient's death.

3. When a medication error occurs, medical staff or trained non-medical staff must immediately notify their immediate supervisor and the administrator on duty at the facility. The supervisor will initiate the facility's administrative response to a medication error, including a reportable incident report and notification to the BHS.

An OCFS-2004, *Reportable Incident Report* must be completed. Refer to PPM 3429.00, *Reportable Incidents.*

4. As soon as discovered, the medication administrator will notify the prescriber of the medication that has been missed or given in error to a youth. The prescriber will determine if the error is potentially harmful and advise the medication administrator what should be done.

5. The medication administrator will document the error in an OCFS-1455, *Medical Record Progress Notes* and follow-up.

6. The medication administrator will complete OCFS-4681, *Medication Error Plan,* and give to their RN supervisor.

7. The medication administrator will notify the youth and the parent or guardian of the error, potential for harm, and steps being taken to mitigate or prevent harm.

8. Medical staff will monitor the involved youth over the next 24 hours to assess clinically for any adverse effects related to the medication error. This follow-up must be documented in the OCFS-1455, *Medical Record Progress Notes*.

9. Medical staff will make copies of the documentation of the error, including relevant MAR, prescription cards, progress notes, controlled substance counts, and perpetual inventory records and provide them to the RN supervisor with OCFS-4681, *Medication Error Plan*.

10. The RN supervisor will complete their section of OCFS-4681, *Medication Error Plan*, and forward a copy of it along with the documentation gathered by the medication administrator to BHS for review.

11. The BHSBHS will review the completed OCFS-4681, *Medication Error Plan*, form provided by the RN supervisor and will assist in analyzing the underlying causes of the error and help identify system improvements to prevent similar errors in the future.

12. If the circumstances give reasonable cause to suspect that child abuse or maltreatment has occurred, a report will be made pursuant to the provisions of PPM 3456.01, *Justice Center-Related Reportable Incidents in OCFS Residential Facilities and Programs*.

13. Appropriate corrective action will be taken to guard against future errors including, but not limited to, (1) review of procedures, (2) correction of procedures, if deficiencies are found, and (3) corrective action concerning staff if appropriate, which may include disciplinary action.

**L. Preventing Medication Diversion**

1. Medical staff must perform a mouth check after every administration of a medication.

2. It is common for youth intending to divert medication to purposefully create a disturbance during medication administration. If the environment becomes disorderly, this creates distractions allowing an opportunity for a youth to divert medication.

3. As soon as a disruption occurs, the medical staff must halt the medication pass and alert facility administration for additional support to secure the procedure.

4. If a youth is repeatedly disruptive, facility administration will remove the youth and coordinate with the medical department to set up an alternate time for the youth to receive their medication without distractions.

5. There are instances where a youth may refuse a mouth check. A youth who refuses a mouth check is at high risk of diverting medication if no other steps are taken.

6. Immediately after a mouth check refusal, facility administration staff must search and isolate the youth for a minimum of 20 minutes. This time allows for any medication in the cheek pocket to dissolve and prevents the youth from potentially passing the medication to someone else.

7. If a youth resists routine mouth checks or has been found to divert medication, notification must be submitted to the prescriber, the BHS home office, and the facility assistant director. If appropriate, orders to crush the youth's medications may be instituted.

8. "Cheeking" is a common means of diversion where a youth pretends to swallow a medication but instead holds the medication in their cheek pocket for later use. Youth may pretend to put medication in their mouth when they are actually keeping them in their hand to slide into a pocket. To prevent medication diversion the following guidelines must be followed when administering medication to youth:

   (a) Facility administration staff are responsible for maintaining order and safety during medication administration.

   (b) Facility administration staff will not allow more than one youth at a time at the medication cart or window.

   (c) Medical staff is authorized to halt the medication administration at the first sign of disruption and will not restart until facility administration restores order.

   (d) Medical staff will observe the medication being placed in the mouth directly from the medication cup.

   (e) Medical staff will verify that the medication is on the tongue and has not been misdirected.

   (f) Medical staff will have the youth drink a minimum of 4 oz of water from a clear cup before leaving the area.

(g) Medical staff will check the oral cavity with a tongue depressor, noting all areas, and use a pen light to assure adequate visualization of the entire mouth.

(h) Medical staff will check both sides of the hands and in between fingers.

(i) If youth refuse a mouth check, facility administration must search the youth and isolate them for a minimum of 20 minutes.

**M. Medication Refusals**

**Management of youth who refuse to take their prescribed medication is discussed** section III.F **in** ***PPM 3243.14, Medical and Dental Care for Youth: Consent and Refusal.***

1. Youth at risk for anaphylactic reactions must have an epinephrine auto-injector immediately available for life-saving treatment whenever needed.

2. The BHS has issued detailed guidelines to all medical staff that describe the responsibilities of medical staff and direct care staff for implementation of an individualized epinephrine auto-injector program for youth at risk in various DJJOY-operated programs.

3. Medical staff are responsible for identifying youth at risk for anaphylaxis and initiating the epinephrine auto-injector program, including training the youth to self-administer the epinephrine auto-injector and staff to recognize a potentially life-threatening reaction.

4. Program staff must maintain the epinephrine auto-injector on the unit and carry it with them whenever supervising youth off the unit. In this way, life-saving treatment will be immediately available to the youth if it is needed. Direct care staff will supervise self-administration by the youth when an anaphylactic reaction occurs.

5. The epinephrine auto-injector guidelines apply to all settings in OCFS.

6. Any use of the epinephrine auto-injector on a person must be referred to an emergency room immediately. As soon as practical, all necessary parties are to be informed, i.e., facility administration, the BHS, other staff via a reportable incident report, and the youth's parent or guardian, per emergency notification protocols.

**N. Managing Medications During Youth Transport**

1. Every effort will be made to administer scheduled medications before or after scheduled transportation of youth. Prior to scheduled transport, medical staff will confer with prescribers to determine if medication can be given prior to or after transport times, and appropriate orders will be obtained to support such changes whenever possible. It should only be necessary to provide medications for self-administration during transport when accommodations cannot be made to administer the medication at another time.

2. If medication administration is required during transport:

   (a) Medical staff will package the health records but keep the medications that will be self-administered during transport separate.

   (b) Medical staff will prepare a Transport Medication Envelope with the following materials:

   - Photocopy of the current medication administration record.
   - Photocopy of the controlled substance perpetual inventory, if applicable.
   - Unit-dose blister card for the medications that are due during transport.
   - Any other PRN medications that may be needed urgently such as an asthma inhaler or prescribed pain medications.

3. All medications must be in the original pharmacy containers or manufacturer packaging.

4. Medical staff will arrange for both the Confidential Health Records Envelope and the Transport Medication Envelope to be given to the transport staff prior to departure.

5. Medical staff will verbally inform transport staff that the youth is scheduled to self-administer medication supervised by trained non-medical staff during transport and the time the medication is due. They will also inform transport staff of any health alerts at that time.

6. Supervision of self-administration of medication during transport:

   (a) All OCFS staff who transport youth must complete the training course "Supervision of Self-Administration of Medications" before supervising self-administration of medications by youth.

   (b) Transport staff must be sure they have all materials needed to facilitate youth self-administration of oral medication. This may include water, cups, tongue depressors, flashlight, or other devices used to confirm that the medication has been swallowed.

   (c) Transport staff will follow the routine procedures for the supervision of self-administration of medication by youth. Transport staff supervising this procedure must document that the medication was taken on the photocopy of the medication administration record enclosed in the Transport Medication Envelope.

   (d) Upon arrival at an off-site location, transport staff will turn over the Transport Medication Envelope and Confidential Health Records Envelope directly to the medical staff or duty officer (if the medical staff is unavailable). Quantities of medication will be checked and compared to the total documented on the

Transfer/Discharge Summary and MAR. This transaction must be logged in the main facility logbook.

(e) Receipt of medications must be documented in the facility or unit log in accordance with facility procedure. The photocopy of the MAR documenting that medications were taken during transport will be attached to the current MAR.

**O. Special Circumstances**

1. Often youth return from an emergency room evaluation with a prescription and orders to begin treatment. Each facility will have a procedure in place to obtain prescribed medication and initiate the ordered treatment. The facility procedures for implementation of emergency room treatment plans in the absence of medical staff on duty will be submitted to the BHS for review and approval.

2. Trained non-medical staff will implement the medication orders or treatment consistent with the SSAM by youth and in accordance with their training.

3. When a youth is hospitalized, medical staff will inform the receiving hospital in detail about the youth's current active health problems and medications. This will be done verbally, by telephone, to provide the information in a timely manner so that no doses will be missed.

4. When the facility director deems a youth to be responsible enough, the youth may keep oral contraceptive pills in their possession and take them without direct supervision per PPM 3243.37, *Contraception and Pregnancy.*

5. A diabetic youth treated with insulin may be permitted to draw up the required dose and self-inject their insulin under direct supervision of medical staff or trained non-medical staff. Staff supervising self-administration of insulin will document the dose in the OCFS-1457, *Medication Administration Record,* form and note that it was self-administered.

**P. Supervision of Self Administration of Medication (SSAM)**

1. When no licensed medical professional is on duty, youth may self-administer their medications while under the direct supervision of trained non-medical staff. Medical staff will inform facility administration in advance about medications that are to be self-administered and will make access to the medication available to the staff as/when needed to supervise youth self-administration. Psychiatric medications and controlled substance medications may be self-administered by youth if necessary.

2. If medical staff are absent unexpectedly, the facility director or designee may request guidance from the BHS about medications that may need to be self-administered and relay that information to facility administration staff. This communication will be documented in the unit log.

3. SSAM will be documented immediately after administration of the dose on the OCFS-1457, *Medication Administration Record* form by the responsible staff person before moving on to the next dose for the next youth. Documentation of medication administration will never be left to the end of the medication pass to be done all at once.

4. Trained non-medical staff who supervise youth SSAM must take the agency training course "Supervision of Self-Administration of Medications" before exercising SSAM. This training is delivered to staff as part of the Juvenile Justice Basic Academy Training curriculum and is also offered by the Bureau of Training on-site at individual facilities when necessary.

# EXHIBIT C

NEW YORK STATE | Office of Children and Family Services

Policy and Procedures Manual

**Behavioral Health Services** **(PPM 3243.33)**

| | | | |
|---|---|---|---|
| Approved By:<br>*Sheila J. Poole*<br>**Sheila J. Poole, Acting Commissioner** | Date Issued:<br>**July 27, 2017** | Number of Pages:<br>**15** | Appendix Pages:<br>**3** |
| Related Laws:<br>**NYS Executive Law, Sect. 515-b (1)**<br>**NYS Law Article 32, Title 14 Mental Hygiene Law** | Division/Office:<br>**Juvenile Justice and Opportunities for Youth** | Contact Office/Bureau/Unit:<br>**Behavioral Health Services** | |
| Supporting Regulations:<br>**NYS OASAS Operating Regulation Part 824** | American Correctional Association Standards (ACA):<br>**3-JTS-4C-18, 41, 34** | | |
| Regulatory Bulletins and Directives:<br>**N/A** | Local Operating Practice:<br>**Required** ☒ **N/A** ☐ | | |
| **Related Policies:**<br>**PPM 3243.14, *Consent for Medical and Dental Care for Youth***<br>**PPM 3243.15, *Refusal of Medical and Dental Care by Youth***<br>**PPM 3243.18, *Initial Mental Health and Health Screening Interview for Facility Residents***<br>**PPM 3243.32, *Psychiatric Medicine***<br>**PPM 3243.34, *Psychiatric Hospitalizations***<br>**PPM 3247.12, *Crisis Prevention and Management***<br>**PPM 3247.60, *Suicide Risk Reduction and Response***<br>**PPM 3429.00, *Reportable Incidents*** | **Related Forms:**<br>**OCFS-1448, *Admission Screening Interview***<br>**OCFS-2098, *Individual Intervention Plan***<br>***OCFS-4498, Mental Health Alert to Reportable Incidents***<br>***OCFS-4603, Authorization for Release of Information***<br>***OCFS-4603S, Autorización para Divulgar Información*** | | |
| **Supersedes:**<br>**PPM 3243.33, *Behavioral Health Services* (5/21/2015)** | | | |
| Summary:<br>**This policy describes the continuum of behavioral health services available to youth placed with the Office of Children and Family Services' Division of Juvenile Justice and Opportunities for Youth and provides a template for a local operating procedure for providing behavioral health services.** | | | |

## I. POLICY

It is the policy of the New York State Office of Children and Family Services (OCFS) that all youth placed with the Division of Juvenile Justice and Opportunities for Youth (DJJOY) have access to quality, strength-based behavioral and mental health assessments and treatment while in its care, and that appropriate linkages to follow-up behavioral health services are provided for youth returning to the community. Under the OCFS's Bureau of Behavioral Health Services (BBHS), mental health clinicians will provide treatment services that are child- and family-focused, culturally competent, developmentally appropriate, trauma informed, empirically validated or considered promising practices, and well-integrated with other facility and community services. Clinical staff will work collaboratively with families, facility staff, community staff, administrators, OCFS home office administration, and other child-serving agencies, to promote emotional health and resilience in youth. Overall, DJJOY's behavioral health services are designed to facilitate successful adjustment of youth in their home community.

## II. DEFINITIONS

A. **Behavioral Health Service** - Any assessment or treatment service related to mental health problems or disorders, substance abuse, sexually harmful behaviors, developmental disabilities as well as other specialized treatments.

B. **Diagnostic and Statistical Manual of Mental Disorders (DSM)** - A manual published by the American Psychiatric Association that covers all mental health disorders for children and adults. It also includes information on etiology or causes, statistics, age of onset, and prognosis.

C. **Direct Care Staff** - DJJOY staff who provide direct supervision of youth. These staff work in DJJOY facilities and community programs. Job titles include, but may not be limited to: Youth Division Aide 2-4, Youth Counselor 1-3 (facility- or community- based), Cadet Leader 1-4, Cadet Counselor, and Youth Recreation Specialist 1–3.

D. **Direct Service Staff** - DJJOY staff in routine contact with youth. These staff may or may not have direct supervision of the youth. Job titles include, but may not be limited to: Teacher 1-4, Vocational Instructor 1-4, Vocational Specialist 1-2, Teaching Assistant, Education Supervisor, Education Coordinator, Recreation Program Leader 1, Chaplain, Nurse Administrator 1, Nurse 2, Nurse Practitioner, Physician's Assistant, Clinical Physician 2, Psychologist 2, Associate Psychologist, Principal Psychologist, Licensed Psychologist, Social Work Supervisor 1-3, Licensed Master Social Worker 2, Psychiatrist 1-2, Dental Assistant, Dental Hygienist, Dentist 1-2, Cadet Program Education Coordinator, Cadet Program Education Specialist 1-4, Cook, Head Cook, Food Service Worker 1-2, and Facility Food Services Manager.

E. **Integrated Support/Treatment Plan** - The integrated support/treatment plan is a comprehensive set of goals and objectives composed at the first support/treatment team meeting, which is held within 30 days after the youth is admitted to the facility. The Integrated Support/Treatment Plan includes input from all treatment providers as well as from the youth and his/her family. The plan is reviewed, updated, and modified as appropriate every 30 days thereafter.

F. **Juvenile Justice Information System (JJIS)** - A software application that contains the documentation of behavioral health services provided to youth within DJJOY.

JJIS also supports youth admissions and movements, case management, and billing/financial functions related to juvenile justice youth placed with OCFS by the courts. JJIS is integrated with the juvenile detention automated system (for non-NYC youth), and is used by intake, classification and movement, behavioral health, education, medical, case managers and clinicians, and administrative staff. JJIS is also integrated with the Automated Restraint Tracking System (ARTS) for juvenile justice youth in OCFS's care. JJIS provides operational and management reports, and assists with automating workflow alerts and reminders to support case management functions and timelines.

G. **Mental Health Clinician (also, Clinician**) - The clinician is a qualified mental health professional who provides mental health assessment and/or treatment services to youth. They are employed directly by OCFS or are on contract with OCFS.

H. **Mental Health Rounds** - Mental health rounds occur weekly; the purpose is to provide a format for information sharing between the treating psychiatrist and the members of the youth's support team. Rounds include: a brief review of youth treated by the psychiatrist with whom support team members share their experiences, observations, and assessments of youth. Where indicated, rounds will be used to identify and address acute treatment-related issues for youth, to discuss progress and challenges for individual youth, and to provide for ongoing discussions regarding a youth's treatment goals and discharge plans. Rounds include the following staff: psychiatrist, psychiatric nurse practitioner (if applicable), clinician, case manager, representatives of the direct care staff, and representatives from education and medical departments. The clinician will write a short summary note of the discussion on each youth presented and record this note in the youth's JJIS Clinical Contact Notes.

I. **Qualified Mental Health Professional (QMHP)-** a mental health care provider authorized and sufficiently trained to provide the services they undertake to provide.

J. **Support/Service Provider** - All members of a youth's support/treatment team.

K. **Support/Treatment Team -** All the individuals who are engaged in the treatment and support of a youth constitute the support/treatment team—including the facility and community staff, the youth, and the youth's family. The team meets regularly to discuss progress and strategies for assisting the youth and family members in making treatment gains. The meetings are held every 30 days or more frequently, if needed.

L. **Therapist** - A qualified mental health professional who provides psychotherapeutic treatment services to youth in OCFS's care.

## III. PROCEDURE

### A. Initial Screening and Intake Assessment

1. Initial Mental Health and Health Screening

    a. Within one hour of admission to any DJJOY facility and before the youth is placed into the general population of any program, a mental health and health screening interview (OCFS-1448, *Admission Screening Interview*) is to be conducted by a trained staff person to determine urgent health and mental health

needs that require immediate attention. (See PPM 3243.18, *Initial Mental Health and Health Screening Interview for Facility Youth*).). Youth assessed as demonstrating risk to self will be placed on suicide watch.

b. All staff must pay particularly close attention to new admissions during program activities, as this period of adjustment to a new environment can provide important information about a youth's ongoing mental status and emerging mental health needs.

2. Initial Mental Health Contact

a. Within 72 hours of admission to a facility, every youth is assigned a clinician who will meet with the youth for an initial interview (mental status exam), which is documented in JJIS. Prior to and during this meeting, the clinician reviews prior mental health assessments. During this meeting, the clinician also:

i. conducts and documents a clinical interview, and

ii. administers a BBHS-approved suicide risk screen.

b. The initial level and frequency of ongoing mental health services is, in part, determined by the reception assessment, clinical observations, reports from direct service and direct care staff regarding mental health symptoms and behaviors, a review of the youth's mental health history, and the facility's initial mental health assessment.

c. Clinician caseloads are documented in JJIS, kept current, and monitored by the assistant facility director for treatment services.

3. Initial Comprehensive Mental Health Assessment

a. All youth newly admitted to OCFS-DJJOY receive an initial comprehensive mental health assessment completed by a qualified mental health professional. For youth adjudicated as non-secure, unspecified, and limited secure, the comprehensive mental health assessment will occur at the reception center over the course of the youth's 14-day stay. For youth admitted to secure facilities, the evaluation occurs at the receiving facility and begins within seven days of admission with a written report completed within 30 days of placement. The comprehensive mental health assessment consists of a diagnostic interview and observations of the youth, record review, and the administration of valid measures approved by BBHS to assess for, at a minimum, suicide risk, anxiety and mood disorders, trauma, and drug and alcohol use. The written report will include biopsychosocial history, behavioral observations, results of psychological testing, diagnostic impressions, and treatment recommendations, which are recorded in the JJIS/BBHS/psychological evaluation and integrated assessments

b. When a DSM diagnosis is present, a primary or working diagnosis will be indicated in the youth's case record. This initial diagnosis is given by the evaluating psychiatrist, psychiatric nurse practitioner, or another qualified mental health professional. The qualified mental health professional completing the initial mental health assessment must enter the DSM diagnoses into JJIS. Changes to the initial DSM diagnosis will be made by consensus of the mental health professionals and recorded in JJIS.

c. When indicated by history, presentation, or by referral of a clinician, the mental health assessment will also include a psychiatric diagnostic evaluation completed by a psychiatrist or by a psychiatric nurse practitioner. This evaluation will include the following components: identifying data, chief complaint, history of presenting problem, review of symptoms, medical history, psychiatric history, school history, family history, substance use history, mental status, case formulation, DSM diagnoses, and treatment recommendations. The psychiatric diagnostic assessment is recorded in JJIS/BBHS/ psychological evaluation and integrated assessments.

**B. Mental Health Treatment**

1. Mental Health Staffing

Mental health services are provided along a continuum of care within DJJOY. All facilities provide mental health treatment services by qualified professional staff consisting of psychologists, social workers, or psychiatric nurse practitioners. Facilities have assistant facility directors for treatment who provide clinical and administrative supervision in the facility and infuse clinical principles into the overall facility programming. Qualified mental health professionals will be clinically supervised by an assistant facility director for treatment or other BBHS designee. Psychopharmacological treatment must be provided by board eligible psychiatrists or psychiatric nurse practitioners who are supervised administratively by an assistant facility d irector for t reatment and clinically by the supervising psychiatrist. Each facility must develop a procedure for contacting a qualified mental health professional outside of regular working hours in the event of a youth's mental health crisis or another emergency. These procedures must be reviewed and approved by the BBHS's director or his/her designee on a yearly basis and in the event the treatment plan changes.

2. Ongoing Mental Health Contacts

a. All youth in facility will receive individual therapy from his/her assigned clinician at least once per week. This service provides a basis for ongoing assessment of the youth's behavioral health needs. All services provided by clinicians are documented in the JJIS/BBHS/Clinical Contact Note within a week of the session/provision of service.

b. The youth's assigned clinician will have contact with the youth's family/caregiver/release resource at least twice monthly and will provide the family with psycho-educational services as indicated. The clinician will work to engage the family in the treatment process. Contacts with the family as well as attempted contacts must be documented in JJIS/BBHS/Clinical Contact Note within a week.

c. The individualized treatment goals, objectives, and interventions used will be documented by the clinician in the youth's Integrated Support Plan in JJIS. Changes in mental health treatment, including frequency of contact, duration, intensity, or modality are determined by the youth's clinician in consultation with the assistant facility director for treatment services.

d. Mental health treatment is an ongoing process and is assessed in weekly mental

health rounds and monthly support/treatment team meetings. Ongoing assessment of the youth includes: review of the diagnostic formulation and conceptualization, symptom presentation, behavioral interventions used, and the effectiveness of treatment modalities employed.

3. Mental Health Services

a. General Mental Health Treatment for Youth and Families

i. Clinical staff provide individual, group, and family therapy; crisis evaluation and intervention; and mental health discharge/transition planning. Clinicians facilitate psychiatric hospitalization (see PPM 3243.34, *Psychiatric Hospitalization*) or transfer to other mental health program(s) if necessary, and communicate on a regular basis with the treating hospital staff during the youth's stay.

ii. Clinical staff provide evidence-based or evidence-supported treatments (e.g., cognitive behavioral therapy, trauma-focused cognitive behavioral therapy, dialectical behavior therapy, etc.) appropriate to the identified diagnostic and behavioral needs of the youth. Clinicians work to include family members, guardians, and other significant individuals in the treatment process. Every effort is made to engage the youth in treatment, using strategies that focus on the strengths and goals of the youth and their family. For each youth, the clinician will regularly assess and report on the effectiveness of interventions during the support/treatment team meetings and mental health rounds, and adjust the treatment strategies as needed to facilitate progress.

b. Enhanced Mental Health Services for Youth:

i. Psychiatric Services: DJJOY facilities will offer psychiatric services including assessment, diagnosis, medication therapy, and medication monitoring. These services adhere to professional standards and are integrated within the overall behavioral health treatment of youth.

- Psychiatric evaluations include: a review of prior records, including those that document interviews with parents or guardians; an assessment of the youth's current mental status, present illness, current medications, and medication effectiveness; history of medication treatment and responses, adverse side effects or medication allergies; social history; substance abuse history; and an explanation of how the youth's symptoms meet the criteria for any diagnosis.

- Psychiatric medicine may be prescribed when clinically indicated to treat DSM disorders and symptoms. The prescription of psychiatric medicine will address the youth's symptoms, be prescribed in standard dosages, be modified as clinically indicated, and be documented with accurate and complete justification in the youth's record in both the psychiatrist's contact note and in the medication log (see PPM 3243.32, *Psychiatric Medicine*).

- The psychiatrist, nurse practitioner as applicable participates in the weekly mental health rounds and contribute information about

diagnosis/es, medications, benefits, and side effects. Consensus of team members is achieved during these meetings, with resultant modification of treatment parameters determined by all participants per the team discussions. The primary diagnosis may change as treatment progresses and more information about the youth becomes available.

- Psychiatric follow-up occurs at least monthly for youth prescribed psychotropic medication. Psychiatric follow-up appointments include a meeting between the youth and the psychiatrist or psychiatric nurse practitioner. The clinician may also be present. The youth is interviewed about interim history and pertinent symptoms. Medication benefits and side effects are elicited and treatment changes are discussed.

- The psychiatrist provides a summary of the diagnostic evaluation and follow-up meetings to the weekly mental health rounds as a subject matter for team discussion. The assistant facility director for treatment services will determine if there is a need for the psychiatrist to be present at support/treatment team meetings.

- The psychiatrist or psychiatric nurse practitioner will seek to obtain informed consent and youth assent for prescribed medication in accordance with agency policy (see PPM 3243.32). The clinical staff tracks symptom changes and side effects, and reports these to the psychiatrist, the clinician, and the nurse.

ii. Intensive Treatment Mental Health Units: Mental Health Units (MHUs) are discrete programs located within designated DJJOY facilities. These programs are designed to provide intensive treatment for youth who require a higher level mental health care than that provided in a generic living unit. BBHS will coordinate, review and approve referrals to MHUs per established standards.

**C. Integration and Coordination of Mental Health Treatment Services**

All mental health, substance abuse, and other clinical treatment services will be integrated and coordinated within the facility. Providers review relevant information and treatment progress with all members of the support team to provide effective therapeutic services to each youth.

1. Facility Clinicians:

   a. Communicate on a regular basis with direct service, direct care, and administrative staff regarding the youth's mental health treatment.

   b. Enter a brief summary note of the youth's mental health needs into an *Individual Intervention Plan* (IIP), to be available to direct care staff for review and reference. The notes in the IIP provide instruction on preferred strategies and approaches for routine care and crisis intervention for each youth. Youth with known trauma histories or serious mental health issues who may require special restraint considerations will be flagged with an alert, and designated safety precautions will be specified on the IIP. Clinicians will update each youth's IIP as needed, and staff will regularly review the IIPs for the youth in their care (minimally at each support/treatment team meeting).

c. Participate in the youth's psychiatric visits. If the clinician does not participate in the session, they will meet with the psychiatrist prior to the youth's session to communicate treatment issues and progress. The treating clinician(s) and the psychiatrist (with input from the mental health rounds team) will develop a uniform working diagnosis, which is reflected in JJIS and in the support plan. The treating clinician is also responsible for communicating all changes to the youth's team (including medication changes, expected outcomes of medication changes, potential side effects, etc.) following the youth's psychiatric visit.

d. Attend support/treatment team meetings (including related case reviews and red flag meetings) to provide input regarding the youth's treatment and behavioral progress, and record this input in the support/treatment plan on a monthly basis. At support/treatment team meetings, all relevant treatment services are discussed and noted in the integrated support plan, including: mental health care (including psychiatry), substance abuse treatment, treatment of sexually harmful behaviors, and any other specialized behavioral health interventions.

2. In order to facilitate the transition for youth from the residential facility to their home communities, facility clinicians:

a. Establish communication with community providers and Community Multi-Services Office' (CMSO) team members to identify and engage community re-entry services. The clinician will work with the CMSO team to identify and engage necessary community providers immediately following admission of the youth to the DJJOY facility.

b. Establish and maintain communication with the youth's guardian and other family members. A letter must be mailed to all legal guardians providing the names of the support/treatment team members as well as a contact number where team members can be reached at the facility. Every effort is made to engage the youth's family and community-based services in follow-up treatment planning. Family contacts may be made in person, by video conference, or by telephone conference. Contacts are required to take place twice monthly at a minimum and must be documented in JJIS/BBHS/Clinical Contact Note.

c. Refer any youth who requires community-based mental health care, including substance abuse treatment and/or any other clinically indicated service, to appropriate agencies and programs (e.g., Clinic, Intensive Case Management, Residential Treatment Facility, OMH-Licensed Community Residence, OMH- or OASAS-licensed Day Treatment). These programs may require application to the youth's county of origin, e.g., Single Point of Access (SPOA) or for New York City (C-SPOA). In other cases, referrals may be for wrap-around services, such as those provided in the Bridges to Health (B2H) Waiver program. The DJJOY referring clinician obtains required written consent from the parent/person with capacity to consent prior to sending copies of behavioral health records to any treatment provider. OCFS-4603, *Authorization for Release of Information* can be found on the OCFS intranet.

d. Complete a Continuity of Care Plan (COC) prior to discharge from facility for all youth on his/her caseload. The plan will include compliance with the community agency's referral process, if applicable, and the date and time for the intake appointment at the provider agency. The clinician must see that the information

is communicated to the community team, the youth, and the family. The youth must not be discharged from the facility until the COC Plan receives approval from BBHS unless a court order requires such release.

e. For youth who are receiving psychotropic medication at the time of facility discharge, the clinician will refer that youth to a community psychiatrist and an outpatient treatment provider. Clinical staff will also submit a Continuity of Care Plan (COC) via the JJIS/COC submission process for a youth receiving psychotropic medication prior to the youth's facility discharge. The youth must not be discharged from the facility until the COC Plan receives approval from BBHS or the facility's assistant director for treatment services unless a court order requires such release.

3. Community-Based Clinicians:

a. Establish ongoing communication and relationships with community providers for the purpose of identifying and accessing resources that are available to meet the needs of each youth and family.

b. Establish ongoing communication with facility-based support/treatment team members to identify resources for any necessary ongoing community-based treatment, and engage early in the facility-based treatment planning process for each youth.

c. Where indicated, establish and maintain communication with the youth's guardian and other family members. Every effort is made to engage the youth's family and community providers in the treatment planning process. Family contacts may be by video conference, telephone, or in person and must be documented in JJIS.

d. Follow up as needed on referrals for youth requiring community-based mental health care to facilitate linkage to appropriate agencies and programs. These programs may include intensive service provision and follow-up (e.g., Intensive Case Management, Residential Treatment Facility, Community Residence, Day Treatment, etc.), and may require coordination with the youth's home county. In other cases, referrals may have been made for wrap-around services.

e. Work with the facility-based clinician prior to facility discharge for a youth on their caseload that requires mental health, substance abuse, or other specialty treatments or services in the community in order to support linkages between the facility and community services. Such linkages must minimally include compliance with the community agency's referral process, clinician- to-clinician discussion about treatment needs, and securing a date and time for the intake appointment at the agency. This information must be communicated to the team, the youth, and the family.

f. Follow up with transitioning youth receiving psychotropic medication at the time of transfer to the community. For youth referred to a community psychiatrist and/or an outpatient treatment provider, the community-based clinicians assists to facilitate the youth and family's engagement in these community-based services.

g. Work with the facility-based clinician prior to facility discharge for a youth on their

caseload that requires mental health, substance abuse, or other specialty treatments or services in the community in order to support linkages between the facility and community services. Such linkages must minimally include compliance with the community agency's referral process, clinician-to-clinician discussion about treatment needs, and securing a date and time for the intake appointment at the agency. This information must be communicated to the team, the youth, and the family.

4. Consultation and Training for Staff:

   a. Mental health clinicians provide consultation to direct care staff, consisting of case-specific consultation, consultation and training at support/treatment team meetings and case reviews, or otherwise as directed by the assistant director for treatment services.

   b. Formal training in mental health needs of DJJOY youth will be delivered yearly to all direct care, direct service and administrative facility staff by qualified trained OCFS staff. The training curriculum includes: mental health diagnostic issues; use of behavioral, therapeutic, and pharmacological treatment; management of mental health crisis situations; and other relevant topics as designated by BBHS and the Bureau of Training.

   c. Trained OCFS staff provide training on psychiatric medication, including use and common side effects, to all facility staff.

**D. Mental Health Observations, Referrals, and Response to Crisis**

1. Trained direct care and direct service staff are expected to follow the recommendations provided by qualified mental health professional staff indicated on the youth's IIP, for individual youth de-escalation and mental health crisis response interventions. IIPs will be reviewed and, if appropriate, updated by the clinician following any mental health related crisis experienced by youth on his/her caseload. Changes to the IIP are reviewed as needed at pre-shift briefings, intact team meetings, mental health rounds, red-flag reviews and support/treatment team meetings.

2. When an incident is reported as per OCFS PPM 3429.00, *Reportable Incidents*, that involves mental health issues (e.g., suicide attempt, self-inflicted injury), a facility mental health clinician must complete a *Mental Health Alert to Reportable Incidents* (MHARI) in JJIS/BBHS/MHARI.

3. If a youth is assessed as requiring more intensive (non-crisis) and/or longer term treatment for mental health, substance abuse, or significant cognitive delays than can be provided within the DJJOY system, steps may be taken to refer the youth to an alternate level of care that better meets the youth's needs. Such a process will include consultation with the director of BBHS or a BBHS administrative designee. If the determination is made that a youth is appropriate for referral to another treatment setting, BBHS will support the facility in initiating procedures to transfer the youth to such a setting.

**E. Refusal of Mental Health Services**

Clinical staff will document a youth's refusal of recommended mental health treatment,

and will develop objectives designed to engage youth in accepting care. Youth will not be removed from a clinician's caseload due to refusal of treatment; however, the treatment team and the assistant facility director for treatment services can make a decision to transfer a youth to another clinician's care if it is agreed that another clinician can better meet the youth's needs. Ongoing efforts to engage youth in treatment services must be implemented and recorded in the youth's behavioral health record in JJIS. The treating clinician must also document efforts to continue to engage family or legal guardians who refuse to participate in the youth's treatment. Youth who refuse mental health treatment and present a danger to themselves or others will be referred to a psychiatric facility. The procedures outlined in PPM 3243.15, *Refusal of Medical or Dental Care* must be followed if a youth refuses psychiatric medicine. A youth who exhibits a severe mental health disorder, but whose legal guardian refuses to provide consent for treatment, will be referred to the BBHS for consideration of additional steps that may be taken to provide appropriate and needed care, as required by PPM 3243.14, Consent *for Medical and Dental Care*.

**F. Substance Abuse Interventions and Treatment**

Substance abuse services will be provided along a continuum of care within DJJOY facilities and community programs. The varying levels of intervention are designed to meet the identified needs of each youth, as assessed at the DJJOY reception center, receiving facility, or at any time during the youth's placement with OCFS. DJJOY will consult with the New York State Office of Alcoholism and Substance Abuse Services (OASAS) to promote the utilization of best practices in the provision of substance abuse treatment in DJJOY facilities. Oversight and quality assurance of substance abuse services will be provided by the BBHS coordinator of substance abuse services.

While at the DJJOY reception center, youth entering non-secure or limited secure levels of care receive assessments to assist in determining substance abuse treatment needs, using evidence-based instruments endorsed or approved by OASAS and overseen by BBHS.

Youth placed at the secure level and those admitted directly to non-secure or limited secure facility, will be evaluated by facility clinicians following their admission (see III.A.3). As part of the evaluation process, clinicians will assess each youth for the presence of a Substance Use Disorder, resulting in a diagnosis (or lack thereof) and treatment recommendations.

1. All youth in DJJOY facilities will receive educational and treatment services regarding substance use along the following continuum of care: prevention and education, treatment, and discrete substance abuse treatment.

    a. Prevention and Education - DJJOY facility staff must provide a comprehensive substance abuse education and prevention program. This curriculum will be administered by trained direct care or direct service staff.

    b. Treatment - Interventions will be provided to DJJOY youth requiring substance abuse services during their stay in a facility. Youth identified with substance abuse treatment needs are provided services by an OCFS clinician with experience and training in the provision of substance abuse services. The need for substance abuse assessment or for treatment services will be identified via a screening tool utilized during the intake process or at any time during the course of placement. Youth who are identified as having substance abuse

treatment needs are referred to the qualified substance abuse clinician for a comprehensive substance abuse assessment. If determined to meet criteria for services, the youth will receive treatment, relapse prevention, and release planning services from a substance abuse clinician.

c. Discrete Substance Abuse Treatment Unit - Youth who have been identified as requiring intensive substance abuse treatment will be referred to a Discrete Substance Abuse Unit operating under a certificate of approval from OASAS as a specialized service, pursuant to Article 32, Title 14 of the NYS Mental Hygiene Law. The criteria for admission to the unit is based on but not limited to DSM diagnostic criteria for substance use disorders and/or American Society of Addiction Medicine (ASAM) Criteria for Adolescents. These units will adhere to the New York State Regulation Part 824 set forth by OASAS.

2. Relapse Prevention Plan: The challenges faced by youth with substance use disorders as they return to their families, schools and communities will be addressed in a Relapse Prevention Plan developed by the youth and his/her treatment/support team, and documented within the Community Re-entry Plan in JJIS. The Relapse Prevention Plan will be developed for all youth with substance use disorders prior to release from a facility and will be included in the youth's portfolio.

**G. Sexually Harmful Behaviors: Intervention and Treatment**

1. Treatment services for youth who have engaged in sexually harmful behaviors will be provided within DJJOY facilities and community programs using nationally recognized standards along a continuum of care. Treatment consists of an integrated approach combining cognitive-behavioral, psycho-educational, and psychodynamic treatment with appropriate adjunctive therapies, augmented by family and community support. Treatment will be directed specifically toward resolving and rehabilitating the youth's presenting sexually harmful behavior. DJJOY programs that treat sexually harmful behaviors provide empirically supported treatment for youth adjudicated for an act which is a sex offense and youth that are not so adjudicated but exhibit sexually harmful behaviors in the areas of: moral decision-making, developing a sense of empathy and compassion, increasing the youth's capacity for both emotional and behavioral self-regulation, and disengaging from patterns of victimizing and sexually abusive behavior.

2. Any youth who has been adjudicated for a sex offense or who is assessed to potentially require treatment for sexually harmful behavior at reception or other facility must receive a comprehensive assessment by a qualified sexually harmful behavior treatment clinician. A qualified clinician will administer the assessment within 30 days of facility admission. Sexually harmful behavior treatment clinicians report their findings on the OCFS *Sexually Harmful Behavior Treatment Assessment* form. The assessment will inform treatment planning by identifying risk levels and will provide guidance regarding individual treatment needs.

3. Clinicians who treat sexually harmful behaviors will coordinate with youth division aide staff and case managers to provide individual and group treatment. Core strategies include the provision of a safe, predictable, and consistent environment that provides external controls and is conducive to positive growth, as well as utilization of a strength-based, trauma-informed, developmentally appropriate treatment model, which treats the youth in a broad interpersonal and social context. All treatment interventions will be individualized to recognize the youth's strengths,

needs, and progress toward treatment goals. Sexually harmful behavior treatment clinicians will follow BBHS's Integrated Support Plan, with goals and objectives pertaining to the treatment of sexually harmful behaviors

4. The youth's family members will be actively engaged in the treatment process whenever possible through family meetings and/or through video conferencing and regular phone calls. When a youth who has received treatment for sexually harmful behaviors in residential care is being considered for another level of care (e.g., from a secure to limited secure or community placement), the clinician and community service team (CST) case manager will submit a transition recommendation to the Safety Review Committee at least 60 days prior to youth's release to the community for approval. The CST case manager is responsible for completing the *Planned Community Services,* with the CMSO's transition recommendation.

   The transition recommendation must include:

   a. A clinical determination focusing on the youth's readiness for the recommended transition plan

   b. Victim impact potential

   c. Risk assessment

   d. Educational and vocational plans

   e. Completed Community Safety Plan

   f. A clearly written aftercare plan by the CST staff, including confirmation of acceptance to outpatient treatment for sexually harmful behavior treatment, when appropriate

   g. Positive home assessment in place, and if necessary, a signed family safety plan

   h. An established permanency plan goal

   i. Current extension of placement status, if appropriate

5. In order to provide for both youth and community safety, active and meaningful participation in treatment is a minimum requirement for all youth. Reports of treatment progress (or failure to make treatment progress) will be forwarded to presiding courts and judges as requested. Failure to adequately engage in treatment during facility placement can be grounds for continued referral to appropriate treatment following transition to community care.

**H. Clinical Documentation of Mental Health Treatment**

1. Mental health documentation reflecting assessment, treatment planning, treatment progress, mental health contacts, and treatment outcomes will be completed by clinical staff for each youth and will include the following:

   a. The Initial Mental Health and Health Screening Interview (OCFS-1448, *Admission Screening Interview*) is a screening tool completed by trained staff on admission and stored within the medical record.

b. The Initial Screening and Intake Assessment Reports (Mental Health, Sexually Harmful Behaviors, Intellectual/Development and Alcohol and Other Drug Service's Needs) are completed at reception for non-secure or limited secure youth and at secure centers for secure level youth. These reports are placed into the youth's main case file and documented in JJIS.

c. The Initial Mental Status Exam, completed by the assigned clinician within 72 hours of admission of the youth to a facility, covers areas addressed in section III. A, 2, a, above, and is updated as needed. Mental status exams are recorded in JJIS.

d. The Integrated Assessment is completed by the clinician in collaboration with members of the youth's team by day 21 following the youth's admission to a facility, and it is recorded in JJIS/BBHS/Integrated Assessment. The Integrated Assessment provides a comprehensive history of the youth and informs the development of the youth's treatment/support plan.

e. The Integrated Support/Treatment Plan is completed for all youth at the time of the support/treatment team meeting (monthly) or more frequently if warranted, and is recorded in JJIS/BBHS/Integrated Support Plan. Monthly updates reflecting the youth's and family's progress in treatment as well as the treatment team's interventions are noted on the Integrated Support Plan (ISP).

f. A BBHS Clinical Contact Note, reflecting the content of any clinical session, must be completed each time a youth is seen by a clinician. Every youth contact or collateral contact must be reflected on an electronic BBHS Clinical Contact Note, located in JJIS/BBHS/Clinical Contact Note. BBHS Clinical Contact Notes completed in JJIS are stored electronically in a secure clinical progress note format. Access to JJIS behavioral health information is strictly regulated by BBHS.

g. A Community Re-Entry Plan must be completed prior to facility discharge for each youth transitioning to the community. The plan must include a summary of the youth's course of treatment while in DJJOY, diagnosis, medications, and future treatment recommendations; it is recorded in JJIS/BBHS/Community Re-entry Plan.

h. A Mental Health Continuity of Care Plan (COC) is also completed by the clinician for each youth prior to the youth's return to the community from the facility, and it is recorded and submitted in JJIS/BBHS/COC. The COC plan records all mental health referrals and appointments for youth returning to the community. For youth receiving psychotropic medications, a list of current medications is also included in the COC.

2. The youth's main paper file (case record) will include records and documents of previous mental health services obtained prior to the youth's placement in OCFS. The mental health record that reflects the provision of mental health services throughout the youth's stay in DJJOY is maintained in JJIS.

3. The confidentiality of both the paper and electronic mental health records is to be maintained by the mental health clinician and the treatment/support team, in keeping with all applicable policies, laws, rules, regulations, and legal requirements.

4. When a youth is released from a facility to the supervision of the designated CMSO, the complete behavioral health record must be securely stored, marked confidential, and sent to the CMSO along with the main case record.

## I. Treatment Oversight and Clinical Supervision

Mental health services are locally monitored by assistant facility directors for treatment services and centrally monitored by the BBHS administrative staff at home office. BBHS provides ongoing program evaluation and program development with respect to mental health needs of youth and families. BBHS provides program oversight, quality assurance, and clinical supervision for delivery of treatment services throughout DJJOY. BBHS staff have a direct role in the hiring of clinicians (in cooperation with facility administrators), compliance with professional standards, providing professional training opportunities, overseeing the delivery of quality treatment via direct clinical supervision of facility assistant directors for treatment services and community services mental health staff, and planning for enhanced services relative to the changing needs of youth and the emergence of new, empirically driven treatments. BBHS manages the movement of youth within DJJOY programs per their treatment needs, reviews continuity of care plans for youth with mental health needs who are returning to the community, and provides technical assistance and training to clinical and direct care staff, facility administrators, and community staff in the field.

**LOCAL OPERATING PROCEDURE**
(Insert Facility Name)

| | | |
|---|---|---|
| Approved By (DJJOY Dep. Com.): | Effective Date: | Number of Pages |
| Policy Name:<br>**Behavioral Health Services** | | Policy Number:<br>**3243.33** |
| Related Laws:<br>**NYS Executive Law, Sect. 515-b (1)**<br>**NYS Law Article 32, Title 14 Mental Hygiene Law** | Division/Office:<br>**Juvenile Justice and Opportunities for Youth** | Contact Office/Bureau/Unit:<br>**Behavioral Health Services** |
| Supporting Regulations:<br>**NYS OASAS Operating Regulation Part 824**<br>Department of Justice Substantive Remedial Measures: N/A | Related Policies:<br>**PPM 3243.18, *Initial Mental Health and Health Screening Interview for Facility Residents***<br>**PPM 3247.60, *Suicide Risk Reduction and Response***<br>**PPM 3247.12, *Crisis Prevention and Management***<br>**PPM 3429.00, *Reportable Incidents***<br>**PPM 3243.34, *Psychiatric Hospitalizations***<br>**PPM 3243.32, *Psychiatric Medicine***<br>**PPM 3243.14, *Consent for Medical and Dental Care for Youth***<br>**PPM 3243.15, *Refusal of Medical and Dental Care by Youth*** | Regulatory Bulletins and Directives:<br>**N/A** |
| *American Correctional Association Standards (ACA):*<br>**ACA 3-JTS-4C-18, 41, 34** | | *Supersedes:*<br>**PPM 3243.33, *Behavioral Health Services* (5/21/2015)** |

**PRACTICE**

1. Within one hour of admission to any Division of Juvenile Justice and Opportunities for Youth (DJJOY) facility and before the youth is placed into the general population of any program, a mental health and health screening interview using form OCFS-1448 must be conducted by a trained staff person to determine urgent health and mental health needs that require immediate attention. (See PPM 3243.18, *Initial Mental Health and Health Screening Interview for Facility Youth.*)

   **A. How will staff be trained?**
   **B. How will the facility monitor that only trained staff members conduct the screening?**

**C. How will the facility monitor that the screening is done within an hour of admission?**

2. Identification of acute mental health needs on form OCFS-1448 will result in an immediate referral to a qualified mental health professional for further assessment, treatment, or additional referral.

   **A. How will the facility monitor that the referral is done?**

3. Within 72 hours of admission to a facility, every youth will be assigned a clinician who will meet with the youth for an initial interview ( mental status exam), which is documented in JJIS.

   **A. How will the facility monitor that every youth is assigned a clinician within? 72 hours?**
   **B. Who is responsible for assigning each youth a clinician?**
   **C. How will the facility monitor that every youth receives an initial mental status exam within 72 hours?**

4. **For secure facilities only**, the comprehensive mental health assessment/psychological evaluation occur at the receiving facility and will begin within seven days of the youth's admission, and a written report will be completed by day 30.

   **A. How will the facility assign these tasks and monitor their completion?**

5. Each facility must develop a procedure for contacting a qualified mental health professional outside of regular working hours in the event of a youth's mental health crisis or another emergency. These procedures must be reviewed and approved by the director of BBHS or his/her designee on a yearly basis and in the event the plan changes.

   **A. What is your procedure for developing the clinician on-call schedule?**
   **B. How is it communicated to the appropriate staff in your facility?**

6. Every youth in a facility will receive individual therapy from his/her assigned clinician **at least once per week.**

   **A. What is your mechanism to monitor that sessions are occurring per policy?**
   **B. What supports will the facility administration provide to their clinicians to facilitate ongoing therapy sessions?**

7. The youth's assigned clinician will have contact with the youth's family/caregiver/release resource at least **twice monthly** and will provide the family with psycho-education as indicated.

   **A. What is your mechanism to monitor that contact with the youth's family is? occurring per policy?**

   **B. What supports will facility administration provide to their clinicians to facilitate ongoing family contact?**

**8.** Each facility director must require that groups occur as scheduled and always have group leaders or identified backup staff member available.

**A. What is your mechanism to see that groups are occurring as required?**
**B. How will you see that group leaders are freed from other tasks so that they are available during group time?**
**C. How will you see that the schedule allows groups to occur and that other activities do not compete with the group schedule?**
**D. Who will be responsible for identifying adequate space for groups to meet?**

**9.** Each facility director must require that case review meetings (i.e., mental health rounds, support team meetings, intact team meetings, etc.) occur as scheduled and always include all relevant staff.

**A. What is your mechanism for seeing that meetings are occurring?**

**10.** All mental health, substance abuse, and other clinical treatment services will be integrated and coordinated within the facility. Clinicians review relevant information and treatment progress with all members of the support team to provide effective therapeutic services to each youth.

**A. What mechanisms, both formal and informal, will the facility implement so that clinical services are integrated into the overall programming of the facility?**
**B. What is your facility's mechanism to provide direct care staff with relevant clinical information?**

**11.** All youth in DJJOY facilities receive educational and treatment services regarding substance use along the following continuum of care: prevention and education, treatment, or discrete substance abuse treatment, as appropriate.

**A. What are your facility's procedures for determining the level of care each youth will receive?**
**B. Who is responsible for monitoring that those services are being provided?**

**12.** When a youth is released from a facility to the supervision of the designated CMSO, the complete behavioral health record must be securely stored, marked confidential, and sent to the CMSO along with the main case record.

**A. What is the facility's practice to ensure this occurs?**

| | | |
|---|---|---|
| Submitted by | Title | Date |

# EXHIBIT D

Policy and Procedures Manual

Office of Children and Family Services

**Admission and Annual Medical Assessments** **(PPM 3243.19)**

| | | | |
|---|---|---|---|
| Approved By:<br>*Suzanne Miles-Gustave, Esq. (signed)*<br>**Suzanne Miles-Gustave, Esq.**<br>**Acting Commissioner** | Date Issued:<br>**November 29, 2023** | Number of Pages:<br>**6** | Appendix Pages:<br>**N/A** |
| Related Laws:<br>**N/A** | Division/Office:<br>**Division of Juvenile Justice and Opportunities for Youth** | Contact Office/Bureau/Unit:<br>**Bureau of Health Services** | |
| Supporting Regulations:<br>**9 NYCRR 7403.7, 7410.9** | American Correctional Association Standards (ACA):<br>**4-JCF-4C-03; 04; 19**<br>**3-JCRF-4C-11** | | |
| Regulatory Bulletins & Directives:<br>***New York Medicaid Child/Teen Health Program (C/THP) Provider Manual – Early and Periodic Screening, Diagnosis, and Treatment (EPSDT)*** | Local Operating Practice:<br>**Required** ☐ **N/A** ☒ | | |
| Related Policies:<br>**PPM 1901.00, *OCFS HIPAA Security***<br>**PPM 3243.18, *Initial Mental Health and Health Screening Interview for Facility Youth***<br>**PPM 3243.20, *Immunization of Youth in DJJOY Facilities***<br>**PPM 3243.21, *Health Records for Youth in Residential Care***<br>**PPM 3243.22, *Health Related Activity Restrictions for Youth***<br>**PPM 3243.30, *Dental Health Care Services***<br>**PPM 3243.31, *Medications***<br>**PPM, 3243.32, *Psychiatric Medications***<br>**PPM 3243.51, *Tuberculosis Screening and Follow-Up for Youth in Residential Care*** | Related Forms:<br>**OCFS-1452, *History and Systems Review***<br>**OCFS-1453, *Physical Examination***<br>**OCFS-1454, *Problem Statement and Plan of Action***<br>**OCFS-2098, *Individual Intervention Plan***<br>**OCFS-4417, *Restricted Activity Notification***<br>**OCFS-4418, *Notification of Restricted Physical Intervention for Medical Reasons***<br>**OCFS-4894, *Youth Medical Record Face Sheet***<br>**OCFS-5362, *Medical and Dental Admission Checklist***<br>**OCFS-7046, *Confidential Request for Sick Call*** | | |
| Supersedes: **PPM 3243.19, *Admission and Annual Medical Assessments* (12/23/2021)** | | | |

SUMMARY: **This policy describes the admission and annual medical assessments of youth admitted to residential care in Division of Juvenile Justice and Opportunities for Youth facilities.**

## I. POLICY

Youth shall receive a comprehensive medical assessment and physical examination within seven (7) days of their admission to residential care at the New York State Office of Children and Family Services' (OCFS) Division of Juvenile Justice and Opportunities for Youth (DJJOY) facilities. The outcome and purpose of the admission physical and medical assessment is to identify each medical problem and associated plan of care. Admission includes any youth admitted to a DJJOY facility from the community or from a voluntary agency. See section **II.** (**F) Intra-System Transfer Admissions** for guidance regarding facility-to-facility transfers.

## II. PROCEDURE

### A. General Principles of the Admission Physical and Medical Assessment

The admission physical and medical assessment is guided by the standards in the *New York Medicaid Child/Teen Health Program (C/THP) Provider Manual – Early and Periodic Screening, Diagnosis, and Treatment (EPSDT)*.

DJJOY medical assessments are more extensive than routine periodic care recommended for the general population, as youth entering juvenile justice programs often have a history of fragmented medical care.

### B. Ectoparasite Control

1. Youth admitted from detention or directly from the community are at risk for infestation from skin parasites such as scabies and lice, also called ectoparasites. Ectoparasites are more commonly found in congregate living conditions with close contact and poor hygiene.

2. Medical staff will provide an approved insecticidal soap to every youth admitted from detention, a voluntary agency, or directly from the community for use in the initial shower upon admission to care. This is supervised by facility staff and occurs before the initial medical assessment during initial processing.

### C. Nursing Assessment/Health History

1. Medical staff will use form OCFS-5362, *Medical and Dental Admission Checklist*, depending on admission type, to guide the medical and dental admission process and complete the necessary parts of the comprehensive assessment.

2. Prior to admission, intake staff will upload the youth's OCFS-4644, *Intake Medical/Mental Health Questionnaire,* to the youth's record in the Juvenile Justice Information System (JJIS) in "Intake" under "Electronic Documents." Medical staff will review this document at admission and be aware of the youth's past health problems and past health providers.

3. Health records from secure detention or recent voluntary foster care agency placement should accompany the youth at the time of admission. When youth have been absent without official leave from a voluntary agency placement, Community

Multi-Services Office (CMSO) staff must request records from that agency.

4. Facility nursing staff will verify that the OCFS-1448, *Admission Screening Interview,* has been completed and staff will obtain, within 24 hours of admission, health history directly from the youth and document such information on form OCFS-1452, *History and Systems Review*. All documentation must be placed in the youth's medical chart.

5. At the time of the admission, medical assessment staff will inform the youth about the procedures for requesting health services, including both routine care (the sick-call request procedure using OCFS-7046, *Confidential Request for Sick Call*) and urgent care (acute illness or injury care via informing staff).

6. At the time of admission to the facility, staff will review the youth's current medications and continue them per PPM 3243.31, *Medications*, and PPM, *3243.32, Psychiatric Medications.*

7. In accordance with PPM 3243.21, *Health Records for Youth in Residential Care*, facility health care staff are responsible for placing youth identification labels on all pages (both front and back) of the youth's medical chart.

8. Staff will request records of care for active, acute, or chronic health problems from past health care providers. Staff will ask the youth, parent, or guardian to identify such providers or find the information in the Youth Health Passport, a health summary of prior care based on Medicaid claims data, which is accessed via the youth's record in JJIS. Staff must obtain immunization records from the New York State Immunization Information System or the New York Citywide Immunization Registry in accordance with PPM 3243.20, *Immunization of Youth in DJJOY Facilities*.

9. The youth's admission health assessment will inform the facility director and unit staff, as well as recreation, education, food services, dental, and/or mental health staff, of any special needs or disabilities that are relevant to their work. Nursing staff must submit an OCFS-2098, *Individual Intervention Plan,* per facility requirements, and OCFS-4417, *Restricted Activity Notification*,, , and OCFS-4418, *Notification of Restricted Physical Intervention for Medical Reasons,* as needed.

**D. Physical Examination**

A physician or mid-level provider must complete the youth's physical and medical assessment within the first seven (7) days after admission to DJJOY residential care, preferably within the first 24 to 48 hours. A physician or mid-level provider must review OCFS-1452, *History and Systems Review,* before performing a complete physical examination on the youth. After performing a complete physical examination on the youth, they must document such information on form OCFS-1453, *Physical Examination*.

a. Rectal examination will be offered to all youth as medically indicated.

b. Pelvic examination will be offered to all youth as medically indicated. The exam may be done on- or off-site.

2. The height, weight, and body mass index will be plotted on standard adolescent growth charts. This helps to identify youth with obesity, short stature for age, underweight for height, or failure to thrive.

3. For active, chronic, or significant past health problems, nursing staff or the provider will obtain additional history from the parent, guardian, or another adult who has knowledge about the youth's health history and needs.

4. When youth reports having a food allergy, the medical provider will determine if a radioallergosorbent test (RAST) should be completed.

5. A physician or mid-level provider will document the outcomes and plan of action of the admission physical and medical assessment on form OCFS-1454, *Problem Statement and Plan of Action*.

   a. The plan of action addresses the management of each problem identified on the problem statement.

   b. A medical plan of action generally includes diagnostic, therapeutic, specialist consultations, patient education, and follow-up components.

6. The supervising physician (when there is a facility physician assistant) or the collaborating physician (when there is a facility nurse practitioner) will review and approve the *Problem Statement and Plan of Action* for each youth.

7. The routine admission dental assessment is discussed in PPM 3243.30, *Dental Health Care Services*.

**E. Laboratory and Other Tests**

1. Blood tests routinely performed for every new admission include the following:

   a. Complete blood count with differential count of white blood cells and platelet count

   b. Comprehensive metabolic panel and lipid panel. (These tests must be collected in the morning after an overnight fast.)

   c. Thyroid function tests including TSH and T-4

   d. Serological test for syphilis

   e. Solubility test for sickle cell

   f. Serum human chorionic gonadotropin (HCG) test for pregnancy (for youth with reproductive organs capable of pregnancy)

   g. Hepatitis C

   h. Hemoglobin A1C

   i. HIV

2. Urine tests routinely performed:

   a. Urinalysis (biochemical and microscopic)
   (Note: This test should not be collected in the morning while fasting, as the concentrated urine may give false positive results.)

   b. Nucleic acid amplification tests for chlamydia and gonorrhea

3. QuantiFERON-TB Gold for tuberculosis (See PPM 3243.51, *Tuberculosis Screening and Follow-Up for Youth in Residential Care.*)

4. Sensory screening tests routinely performed:

   a. Visual acuity screening using a Snellen wall chart or equivalent.

   b. Hearing screening using pure tones in each ear at 25 decibels (Audioscope® or equivalent)

5. Additional tests of blood and urine, X-rays, or other diagnostic tests may be done based on specific clinical indications. For example:

   a. A RAST test to confirm a food allergy.

   b. Youth with abnormal liver function tests should be tested for viral hepatitis.

   c. Youth with positive sickle cell screening should have hemoglobin electrophoresis.

   d. Youth with positive syphilis serology should have a treponemal-specific test to confirm current or past syphilis infection.

6. Alerts concerning medical needs:

   a. Staff must note drug, food, or insect sting allergies that can cause anaphylactic reactions on form OCFS-4894, *Youth Medical Record Face Sheet*, and place the form on the cover of the youth's medical chart.

   b. Staff will initiate an individualized epinephrine auto-injector for youth with confirmed serious allergic reactions in accordance with the epinephrine auto-injector guidelines issued by the OCFS Bureau of Health Services.

   c. Medical staff will update the JJIS "Alerts" section to include current and accurate information.

7. All resulting forms associated with an admission must be filed in the youth's medical chart, in accordance with PPM 3243.21, *Health Records for Youth in Residential Care*.

**F. Intra-System Transfer Admission**

When OCFS transfers a youth between DJJOY facilities, OCFS will also transfer their

medical chart with them (see PPM 3243.21, *Health Records for Youth in Residential Care*). If a youth has received continuous care in another DJJOY facility in the preceding 12 months, it is not necessary for the admitting facility to repeat the assessment. The admitting facility will use OCFS-5362, *Medical and Dental Admission Checklist*, and will review the youth's health needs and continue care as appropriate. Orders written by DJJOY providers do not need to be rewritten. Staff must review and document them in the progress notes along with any changes that were made. If a youth is transferred from a CMSO and has been in the community for more than 90 days, the facility must perform a new admission physical and medical assessment.

**G. Annual Medical Assessment**

There will be an annual medical assessment in which staff review, update, and repeat the health history; review systems; perform physical examinations, laboratory, and other diagnostic screening tests; develop a problem list and a plan of action wherever necessary and appropriate.

# EXHIBIT E

**Office of Children and Family Services**

Policy and Procedures Manual

**Medical and Dental Care for Youth: Consent and Refusal** **(PPM 3243.14)**

| | | | |
|---|---|---|---|
| Approved By:<br>*DaMia Harris-Madden /s/*<br>**Commissioner** | Date Issued:<br>**August 21, 2025** | Number of Pages:<br>**9** | Appendix Pages:<br>**N/A** |
| Related Laws:<br>**Family Court Act § 355.4**<br>**Penal Law § 70.20**<br>**Public Health Law § 2504** | Division/Office:<br>**Division of Juvenile Justice and Opportunities for Youth** | Contact Office/Bureau/Unit:<br>**Bureau of Health Services** | |
| Supporting Regulations:<br>**N/A** | American Correctional Association Standards (ACA):<br>**3-JCF-4C-44; 3-JCRF-4C-25** | | |
| Regulatory Bulletins and Directives:<br>**N/A** | Local Operating Procedure:<br>**Required** ☐ **N/A** ☒ | | |
| Related Policies:<br>**PPM 3243.21, *Health Records for Youth in Residential Care***<br>**PPM 3243.30, *Dental Health Care Services***<br>**PPM 3243.32, *Psychiatric Medication***<br>**PPM 3243.50, *Confidential HIV Testing and Screening of Youth in DJJOY Facilities***<br>**PPM 3247.12, *Crisis Prevention and Management***<br>**PPM 3429.00, *Reportable Incidents*** | Related Forms:<br>**OCFS-HS11, *Dental Care Notification and Consent***<br>**OCFS-1100, *Medical Consent***<br>**OCFS-2079, *Activity Rule Violation – Incident Report***<br>**OCFS-4528, *Refusal of Medical Care/Examination/Evaluation and/or Treatment*** | | |
| Supersedes: **PPM 3243.14, *Medical and Dental Care for Youth: Consent and Refusal* (2/1/2023)** | | | |
| Summary:<br>**This policy describes requirements for informed consent and refusal of medical and dental care for youth placed in residential facilities operated by the Office of Children and Family Services' Division of Juvenile Justice and Opportunities for Youth.** | | | |

## I. POLICY

It is the policy of the New York State Office of Children and Family Services' (OCFS) Division of Juvenile Justice and Opportunities for Youth (DJJOY) that health programs in residential facilities comply with all applicable state and federal laws and regulations concerning the following:

- Informed consent for medical and dental care

- Consent of a legal guardian for the care of a youth
- Consent by a youth for their own care

It is also the policy of OCFS that youth may refuse medical or dental care.

In emergency situations, the provision of care despite refusal must be addressed according to the procedures outlined in this policy.

## II. DEFINITIONS

**A. Assent**: The verbal acknowledgement and understanding of the treatment by youth unable to provide legal consent due to their age, which is to be documented by health staff in the youth's medical record.

**B. Consenting Youth**: Some youth in DJJOY care may provide consent for medical or dental procedures:

1. Youth 18 years of age and older

2. Married youth

3. Youth who are the parent of a child (Youth may consent to care for both, themselves, and their child.)

4. Youth seeking reproductive health services, including those in any of the following categories:

   a. To maintain a healthy pregnancy

   b. To terminate a pregnancy

   c. To seek contraceptive counseling, information, or services

   d. To seek care for diagnosis or treatment of a sexually transmitted infection

   e. To seek care for diagnosis or treatment of HIV infection

**NOTE**: The consenting youth must provide consent for the release of information related to any of the care listed above.

**C. Informed Consent**: Consent obtained only after the parent, legal guardian, or consenting youth is informed by a health professional, in a language they understand, about the nature of the care or procedure, the reasons for the procedure to be performed, the specific procedures or care that will be provided, and any significant risks or side effects. The health professional must also provide information on alternatives to the procedure, specifying the risks and benefits of the alternatives.

D. **Necessary Medical Services:** Medical or dental services that, in the professional judgment of the treating physician or dentist, are required to prevent serious or permanent harm to the youth.

The following definitions include general descriptions of the types of services that constitute routine care versus non-routine care. Determinations regarding whether a service is routine or non-routine shall be based on each specific youth and how the specific event or service may affect that youth. Such determinations shall only be made by a duly licensed physician or dentist. Staff shall consult the Bureau of Health Services (BHS) for any questions or concerns regarding whether treatment is routine or non-routine.

E. **Non-Routine Medical or Dental Services:** Services that are invasive or involve more than minimal risk of harm. Examples include, but are not limited to, surgery, tooth extraction, medical imaging involving contrast media, and placement of an intravenous line.

F. **Routine Dental Services:** All preventive services as well as certain restorative services. Examples include, but are not limited to, cleaning, scaling, polishing, topical fluoride treatment, and application of sealants to eligible molars. Routine restorative services include procedures such as simple and complex fillings under local anesthesia. Orthodontia and invasive procedures such as extraction or root canal are not considered routine services and require specific informed consent.

G. **Routine Medical Services:** Medical services that are part of usual primary care. They include, but are not limited to, medical history, physical examination, diagnostic laboratory tests and X-rays, immunizations, and most medications or treatments required to manage acute illness or injury. Obtaining medical history from previous medical providers, including requests for copies of records, and consultation with a medical specialist for diagnosis and management recommendations are also considered routine. Invasive procedures such as biopsy are not considered routine and require specific informed consent.

H. **Routine Surgical Consultation:** Consultation with a surgeon or surgical subspecialist for diagnosis and management recommendations as well as follow-up after surgery are considered routine and do not require specific informed consent. A surgical procedure is not routine and requires specific informed consent.

## III. PROCEDURE

### A. Consent for Routine Medical or Dental Services

1. For youth placed with OCFS, unless the court order states otherwise, the placement or commitment order issued by the court is deemed to grant consent to the agency to render routine medical, dental, and mental health services to youth.

    a. The Bureau of Classification and Movement identifies situations where the

agency does not have the authority to provide routine medical, dental, or mental health services. Where the court order specifically indicates that it does not grant consent to the agency, it must be noted prominently in the youth's health record and in the "Alerts" in the Juvenile Justice Information System (JJIS).

b. Form OCFS-1100, *Medical Consent*, is provided to non-OCFS health providers to confirm that the youth is in OCFS custody and to inform them that OCFS has the authority to consent to routine care. A redacted copy of the court order will be provided upon the request of such provider. Before submitting a copy of the court order to such provider, BHS shall consult with the OCFS Division of Legal Affairs.

**B. Consent for Non-Routine Medical or Dental Services**

1. Except as specified in sections III(C) and III(H) of this policy, for all non-routine medical and dental services, informed consent from a consenting youth or the youth's parent or legal guardian must be obtained and documented in the youth's medical record.

    a. When staff cannot reach a parent or legal guardian to obtain informed consent for necessary medical services despite diligent efforts, the Division of Legal Affairs may seek authority to provide treatment from the court.

    b. When a parent or legal guardian refuses to consent to medical services determined to be necessary, staff must report this refusal to BHS. BHS will consult with the Division of Legal Affairs and the Office of the Ombudsman. The chief of medical services and general counsel (or designees) are responsible for determining the necessary action.

    c. If there is a question about the mental capacity of the parent, legal guardian, or youth to provide informed consent or assent for non-routine medical or dental services, staff must refer the matter to BHS. As above, BHS will consult with the Division of Legal Affairs and the Office of the Ombudsman. The chief of medical services and general counsel (or designees) are responsible for determining the necessary action.

2. Procedure for Obtaining Informed Consent for Non-routine Medical or Dental Services

    a. The health provider performing the procedure or prescribing medication will discuss the matter with the parent, legal guardian, or consenting youth to answer their questions and obtain informed consent. The Community Services Team case manager may need to coordinate contact between the guardian and the health professional.

    b. If the parent, legal guardian, or consenting youth have any questions about the proposed services, the health provider must provide any available information necessary to satisfy their concerns before obtaining their

informed consent.

3. Documentation of Consent for Non-Routine Medical or Dental Services

   a. Spoken consent may be obtained in person or via telephone and documented in the health record progress notes. In addition to the health provider who informs the parent, legal guardian, or consenting youth about the needed services, there must also be a witness. The provider must confirm that the parent, legal guardian, or consenting youth expresses understanding of the nature, risks, and benefits of the services and has been given an opportunity to ask questions and have them answered. The witness must confirm that the discussion took place and that the parent, legal guardian, or consenting youth did (or did not) provide informed consent to the services.

   b. Services may be provided based upon spoken consent. Staff must obtain subsequent written confirmation of informed consent from the parent, legal guardian, or consenting youth.

      i. Facility medical staff shall track the receipt of signed informed consents and will report non-returned consents to the facility administration for assistance.

   c. In accordance with PPM 3243.30, *Dental Health Care Services*, consent for needed dental care must be requested using form OCFS-HS11.

**C. Consent in Emergency Situations**

1. Emergency Services: Medical, dental, and hospital services may be provided to youth of any age without consent or assent when, in the provider's judgment, the youth is in immediate need of medical attention and an attempt to secure consent or assent would result in a delay of treatment, increasing the risk to the youth's life or health.

2. Diligent efforts must be made to notify and inform the parent or legal guardian and obtain any required consent for necessary services in emergency or urgent situations, preferably before services are rendered or as soon as possible after services are rendered. If the youth is a consenting youth, no such notification will occur without the youth's consent.

**D. Consent in Special Cases/Special Circumstances**

1. Consent for psychiatric medications is discussed in PPM 3243.32, *Psychiatric Medication.*

2. Consent related to HIV testing, treatment, and information sharing is discussed in PPM 3243.50, *Confidential HIV Testing and Screening of Youth in DJJOY Facilities.*

3. Consent for release of medical records is discussed in PPM 3243.21, *Health*

*Records for Youth in Residential Care.*

## E. Health Care Refusal by Youth – General Principles

1. Refusals must be reported to the youth's medical provider. Youth who refuse care must be asked to sign form OCFS-4528, *Refusal of Medical Care/Examination/Evaluation and/or Treatment,* in the presence of a facility staff member

2. Youth must not be disciplined or punished for refusing medical or dental services. However, the following situations may apply:

   a. A youth who refuses communicable disease screening may be separated from the general population until it can be determined that the youth is not infectious.

   b. A youth who refuses medical or dental services may have their activities restricted based on the assessment of the practitioner. The activities of a youth who refuses services may be limited only to an extent consistent with and required by the youth's health needs.

3. Youth support staff will make reasonable efforts to encourage a youth to accept prescribed treatment.

4. Refusal of care by a youth at one time does not justify denial of care at a later time. Health staff shall make all reasonable efforts to continue to offer previously refused care to the youth for so long as the youth's condition warrants it.

## F. Refusal of Medication

1. Youth who refuse medication should be taken to the medication administration location, at a prescribed time, to communicate refusal directly to health staff. Staff must not forcibly take the youth to the medication administration location.

   a. If a youth refuses the prescribed medication, the refusal form must be signed, and provider notified.

2. If the youth is unable to be brought to the medical unit, a facility administrator (director, assistant director, youth counselor, or administrator on duty) must be informed and meet with the youth as soon as possible to discuss the need for medication and the reasons for the youth's refusal and to advise the youth to accept the medication as prescribed.

   a. The administrator must complete an OCFS-2079, *Activity Rule Violation-Incident Report,* which documents the circumstances of the refusal, including the name of the youth, the unit staff member who reported the refusal, the reasons for not taking the youth to health staff to discuss and document the refusal, and any additional information pertinent to the

refusal.

3. The health staff member or the facility administrator who discusses the refusal with the youth must complete form OCFS-4528, *Refusal of Medical Care/Examination,/Evaluation and/or Treatment*, and witness the youth's signature on the form. Once completed, the OCFS-4528 form will then be given to the health staff who will

   - document the refusal in the Medication Administration Record (MAR),
   - place the form in the consent section of the youth's medical chart, and
   - inform the prescribing provider that a youth has refused medication.

4. If a youth refuses to sign OCFS-4528, the staff member who witnessed the medication refusal must document the refusal to sign on the form by checking the box denoting such refusal and sign the form themselves. A second staff person must also sign as witness that the youth refused the medication and refused to sign the form.

5. When the medication refused was prescribed by a youth's treating psychiatrist, the psychiatrist must review all medication refusal forms before their next meeting with the youth.

6. If, in the opinion of the prescribing provider, the refusal poses a significant risk to the youth's health and well-being, the parent or legal guardian of the youth must be informed of the refusal as soon as possible. If the youth is refusing psychiatric medication, the mental health clinician will inform the family. If the youth is refusing other medication, a member of the medical staff will inform the family. If the youth is a consenting youth, no such notification will occur without the youth's consent.

7. The health staff must include medication refusals in their report to the youth's support team and that team must address medication refusals in its discussion of the youth's progress in treatment whenever such refusal is likely to affect the youth's progress in treatment, such as psychotropics or medications for which refusal may be intended as self-harm.

**G. Counseling by Health Staff**

1. Youth who refuse medical treatment must be counseled by health staff as soon as possible, but no later than the end of the next nursing shift.

2. During counseling, health staff must

   a. try to elicit from the youth their reason for refusal, address these concerns directly, and make every effort to resolve any misunderstanding regarding the treatment. Health staff must seek assistance from qualified staff to address concerns such as previous trauma or apprehension.

   b. explain the benefits of the proposed treatment and risks associated with

the refusal of such care.

c. explore reasonable alternatives that may be acceptable to the youth or address the special needs of the youth.

d. involve, if necessary, mental health staff who have a good rapport with the youth, parents, and other adults who may be trusted by the youth to encourage the youth to accept treatment, provided that the consenting youth or parent or legal guardian, as applicable, has consented to the release of such information, if necessary; and

e. notify the assigned mental health clinician who will consult with the youth to discuss the reasons for refusal, the importance of compliance with recommended treatment, and alternative approaches to treatment that might accommodate the youth's concerns or special needs. In the case of recurrent refusal of psychiatric medications, the youth's clinician should establish a treatment objective to educate the youth regarding the need for compliance with recommended treatment.

3. Health staff must offer youth opportunities to change their minds and obtain the services they previously refused, consistent with clinical standards and need. Refusal of services by a youth at one time does not justify denial of care at a later time. Each offer of care and each refusal must be documented in the youth’s health record.

4. Health staff must keep the facility administration informed as to patterns of refusals and necessary actions. Activity restrictions based on medical need will be determined as necessary.

**H. Administration of Treatment Over Youth Objection**

1. When a youth refuses treatment and it is the professional judgment of the treating health professional that failure to provide the care is likely to cause serious or permanent harm to the youth, this must be reported to the OCFS chief of medical services or designee. If the chief of medical services or designee agrees that failure to provide the care is likely to cause serious or permanent harm to the youth, the chief of medical services or designee must contact the Division of Legal Affairs for advice on how to proceed.

2. The legal division will, in consultation with the chief of medical services or designee and the associate commissioner of youth health and wellness, review the referral from the chief of medical services, considering matters such as the youth’s age, the individual responsible for providing consent, and the status of the youth’s condition, and determine what further action is appropriate. In the event that the Division of Legal Affairs determines that court action for treatment over objection is necessary, the chief of medical services will notify the Office of the Ombudsman. If the legal division has determined that it is legally permissible to provide treatment over objection without a court order, the chief of medical services may issue an order to provide treatment

over the youth's objection. If the legal division determines that it is not legally permissible to order treatment over the youth's objection, the chief of medical services may not issue an order to provide treatment over objection.

3. In the event of an immediate life-threatening situation in which a youth is refusing treatment, facility administrators and health staff must take all actions necessary to resolve the emergency and contact the chief of medical services or designee as soon as possible.

   a. Once the situation is stabilized, or sooner, if possible, staff must proceed to notify the parent or guardian and obtain consent, as appropriate, according to section III(C)(3) above.

   b. If physical force is necessary to facilitate the provision of treatment for a life-threatening situation, only the minimum amount of force necessary to accomplish the medical treatment may be used, as a last resort.