# EXHIBIT 86

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br>*Plaintiffs,*<br>v.<br>DONALD J. TRUMP, et al.,<br>*Defendants.* | No. 1:25-cv-12162 |

**DECLARATION OF FRANCISCO J. SILVA**

I, Francisco J. Silva, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am the President and Chief Executive Officer (CEO) of the California Primary Care Association (CPCA). I have held this position since February 2022. As President and CEO, my responsibilities include overseeing CPCA's strategic direction, operations, and external engagement on behalf of California's community health centers (CHCs).

3. CPCA represents the interests of California's nearly 2,300 nonprofit community health centers who provide care to 6.2 million unique patients each year. CPCA's members include community and free clinics, federally funded and federally designated clinics, rural and urban clinics, large and small clinic organizations, and clinics dedicated to special needs and special populations. Services include comprehensive primary and preventive care, women's health, dental care, mental health, substance use treatment, health education, outreach and enrollment, pharmacy and more. The Federal Bureau of Primary Health Care has designated CPCA as the state primary care association. CPCA receives federal program support to develop and enhance services for member clinics.

4. CPCA's mission is to lead and position community clinics, health centers, and networks through advocacy, education and services as key players in the healthcare delivery system to improve the health status of their communities.

5. Many community health centers (CHCs) provide gender-affirming care as part of standard clinical care. CHCs are required to provide comprehensive primary and preventive care to all age groups in an inclusive manner, including for transgender, gender-diverse and intersex (TGI) patients. State anti-discrimination statutes independently require equal access to medically necessary care regardless of gender identity or expression. Thousands of TGI patients receive primary, preventative, and gender-affirming care services each year across the CHC network. Health centers commonly offer hormone therapy, puberty blockers, mental health services, lab work, and referrals for ancillary services.

6. Since January 2025, CPCA members have expressed escalating concerns regarding federal threats related to providing gender-affirming care and direct threats to the healthcare facilities and professionals who provide this care.

7. I am familiar with Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," issued on January 20, 2025 (EO 14,168) and Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation," issued on January 28, 2025 (EO 14,187).

8. Additionally, I am aware of various federal actions implementing these executive orders, including: (1) CMS's April 11, 2025 Letter reminding states "of their responsibility to ensure that Medicaid payments are consistent with quality of care and that covered services are provided in a manner consistent with the best interests of recipients;" (2) CMS Administrator Dr. Mehmet Oz's April 11, 2025 statement that "Medicaid dollars are not to be used for gender reassignment surgeries or hormone treatments in minors;" (3) HHS's April 14, 2025 Guidance clarifying protections that will be provided for whistleblowers who report healthcare providers who provide gender-affirming care; (4) the April 22, 2025 memo issued by Attorney General

Pamela Jo Bondi directing the prosecution of the provision of gender-affirming care as a violation of the federal female genital mutilation statute; (5) the May 28, 2025 CMS Letter to hospitals seeking financial data, including billing codes, related to gender-affirming care; (6) in September 2025, Health Resources Services Administration (HRSA) published updated agency priorities, stating an explicit de-prioritization of programs offering gender-affirming care for minors, unless legally required; and (7) effective October 1, 2025, Health and Human Services (HHS) updated their Grant Policy Statement, including language that introduced a "termination for convenience" clause, allowing grants to be ended if they no longer align with agency priorities, without appeal.

9. Based on my communications with CHC leaders across California and knowledge of the communities they provide services to, I believe these federal actions have and are continuing to have a damaging effect on CHCs that provide medically necessary gender-affirming care. CHCs fear being investigated and prosecuted for providing gender-affirming care pursuant to Attorney General Bondi and Assistant Attorney General Shumate's directives. CPCA has members who are aware that at least one healthcare facility in California has received a subpoena from the U.S. Department of Justice (DOJ) seeking confidential medical records from the last several years. I understand that the federal government is seeking patients' medical records and the personal information of providers, including physician's social security numbers.

10. CHCs have expressed confusion and concern about these federal actions. CHCs fear that providing gender-affirming care could lead to fines, legal repercussions, or loss of critical funding, including Medicaid, Medicare, grants, Federally Qualified Health Center status, or access to the 340B program. This confusion has led health centers to feel apprehension over continuing to provide gender-affirming care for both adolescents and adults in some clinical settings. For providers who do continue to offer this care, access to medically necessary and appropriate services – as determined in partnership between the clinician, patient, and their families – is increasingly inaccessible.

11. Medical malpractice insurance companies have informed some CHCs that the companies will not cover physicians if the physician is sued or is subject to legal action by the federal government for providing gender-affirming care. With the threat of losing malpractice insurance coverage, some CHCs may decide to stop providing gender-affirming care due to the newly heightened liability risks.

12. CHCs also worry that their physicians' and patients' personal information will be disclosed to the federal government and their names potentially leaked to the public, which could expose them to unwarranted scrutiny and serious threats to their physical safety. Gender-affirming care services are billed using specific procedure codes that identify the service as gender-affirming, ensuring that the care is tracked to the individual patient.

13. In the wake of this growing federal intervention, I am aware that Children's Hospital Los Angeles (CHLA) has closed its Center for Transyouth Health and Development and Gender-Affirming Care surgical program, effective July 22, 2025. I am also aware that Stanford Medicine and Kaiser Permanente have decided to pause gender-affirming surgical procedures for patients under 19. Stanford implemented the pause on June 2, 2025, and Kaiser Permanente paused procedures beginning August 29, 2025. Because hospitals have been a primary source of youth gender-affirming care, pre-emptive compliance in discontinuing care is particularly disruptive. It has placed increased pressure on CHCs, who also face federal funding risks, and many patients have been left without continuity of care for these medically necessary, time-sensitive services.

14. CHCs and their patients have been and continue to be harmed by the threats by the federal government that resulted in CHLA, Stanford and Kaiser's decisions to end or modify their gender-affirming care services. CHCs and their physicians' risk having their longstanding relationships with patients interfered with by federal government actions. Patients have been forced to transition to new facilities and programs or go on waiting lists to continue receiving care and are navigating major hurdles and managing the emotional and mental burden of re-establishing care and explaining their medical history to new providers. Some patients are unable to find

continuity of care or are forced to travel significant distances to obtain care. CPCA members have reported that parents of patients don't know where to turn to get access to care for their children and feel devastated by the sudden withdrawal of care and difficulty accessing necessary medications. Clinicians have reported a need to monitor adolescent transgender patients for new-onset suicidal ideation following loss of care, including loss of access to surgical options.

15. CHCs have begun to absorb patients who were turned away by their previous gender-affirming care providers after the Executive Order and DOJ Directives. CPCA members reported that additional patients sought care at their CHCs due to hospital reductions or discontinuation of gender-affirming care services. This increase in patient volume has created longer wait times, staff shortages, and strain on clinical and administrative resources, making it challenging for CHCs to fully meet the increased demand for care. CHCs are concerned that this pressure will only grow if hospitals continue closing their doors or further reduce gender-affirming care services. Currently, CHCs do not have the capacity to absorb the full scope of patients who have lost care through hospital clinic or service line closures.

16. The Trump Administration's attacks on gender-affirming care are sowing distrust between CHC patients and their providers. Due to decisions at multiple facilities to end or modify gender-affirming care services in response to threats from the federal government, CPCA members report that CHC patients are becoming increasingly wary of trusting whether they will be able to continue receiving gender-affirming care services. This distrust could lead to some patients withdrawing from the healthcare system more broadly. If CHCs lack the ability to assure their patients that patients will continue to receive gender-affirming care, patients may be less willing to seek consistent healthcare services.

17. The Trump Administration's actions are perpetuating a chilling effect on the medical profession and making it difficult for CHCs to provide gender-affirming care. This has led some health centers to discontinue gender-affirming care services for adolescents or freeze their patient panels for these services to individuals under 19. Furthermore, I understand that some

CHCs that continue to provide gender-affirming care are doing so without drawing attention to avoid negative repercussions. These attempts to go unnoticed make it difficult for new patients or members of the public to learn about gender-affirming care and find available providers. Additionally, when longstanding providers of care are no longer making information about gender dysphoria or gender affirming care publicly available on their websites, this opens the door to others to promote misinformation and disinformation that will harm patients. Underserved communities are particularly vulnerable to the harms caused by lack of access to care and barriers to accessing medically accurate information.

18. Since the Trump Administration took office, CPCA's members have grown increasingly fearful about what the Administration will do to prevent providers from offering gender-affirming care. Our members worry about their ability to serve their communities. They also worry about their risk of civil or criminal liability, the personal safety of their healthcare professionals, and the health and well-being of their patients, who are and will continue to experience irreversible harms.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

DATED and SIGNED this 16th day of December 2025 at Sacramento, California.



FRANCISCO J. SILVA