# EXHIBIT 88

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br>*Plaintiffs,*<br>v.<br>DONALD J. TRUMP, et al.,<br>*Defendants.* | No. 1:25-cv-12162<br>**LEAVE TO FILE UNDER A PSEUDONYM GRANTED ON DECEMBER 19, 2025** |

**DECLARATION OF CALIFORNIA PROVIDER # 1**

I, California Provider #1, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.
2. I submit this Declaration in support of the Plaintiff States' Opposition to Defendants' Motion to Dismiss.

**Background**

3. I am a practicing physician in the state of California. I am board-certified in Pediatrics and Adolescent Medicine with the American Board of Pediatrics. I practice medicine in a clinic where I provide medically necessary, gender-affirming medical care to transgender and gender-diverse adolescent and young adult patients.
4. I am filing this declaration under a pseudonym out of concern for my safety as well as the safety of my family, colleagues, and patients. I discuss below my real and present concerns regarding safety and am filing under a pseudonym for protection.
5. I have a Doctor of Medicine Degree, a Bachelor of Science degree, and two Master's

Degrees in other areas of science. I am licensed to practice medicine in the State of California. I have authored more than 30 peer-reviewed publications related to gender-affirming care. I also have served on multiple boards and advisory committees related to youth care around the country. I have spoken internationally on several occasions about transgender youth care.

6. Through my training and practice, I am very familiar with the prevailing medical standards and protocols for gender-affirming medical care, including the standards promulgated by the widely accepted Endocrine Society. The Endocrine Society guidelines of care are internationally accepted guidelines designed to promote the health and welfare of transgender and gender-diverse patients.

7. In my practice, our providers keep up to date on best practices of care by attending conferences, reading contemporaneous literature and conducting our own research studies related to the experiences of transgender youth and young adults.

8. In my clinical practice, I provide gender-affirming medical care for adolescents and young adults alongside other clinicians. Over the course of my career, I have treated hundreds of patients with gender dysphoria, and when medically appropriate, provided them with gender-affirming care. I continue care for hundreds of patients each year, as well as initiate new care with dozens more. As part of my practice, I am and must be familiar with the endocrinologic aspect as well as the adolescent developmental aspects of care for the diagnosis of gender dysphoria, including mental health treatment, assessment, and diagnosis.

**Clinical Definitions**

9. Gender identity is described as a person's innate sense of their gender. All people have a gender identity and for the most part, gender identity aligns with the physiologic features

associated with sex assigned at birth. However, for a small portion of individuals, gender identity does not align with sex designated at birth as determined by genital anatomy and/or intrauterine chromosomal analysis. Some transgender people experience clinically significant and prolonged distress, or gender dysphoria, due to this incongruence.

10. The diagnosis of gender dysphoria is a serious medical condition. It is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM). The current version, known as the Fifth Edition, Text Revision (DSM-5-TR), was released in 2022. The DSM-5-TR defines gender dysphoria "as a marked incongruence between one's experienced/expressed gender and their assigned gender, lasting at least 6 months." American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787.

11. For adolescent patients, gender dysphoria may worsen, or emerge, with the onset of puberty and development of secondary sex characteristics. Such distress can result in a patient becoming withdrawn, socially self-isolated, depressed, anxious, engaging in self-harm behaviors, or becoming suicidal. These risks decline when transgender individuals are supported and live according to their gender identity. This improvement is clinically witnessed by dozens of clinicians doing gender care, parents, family members, and the patients themselves and is also demonstrated in the extant literature. If left untreated, gender dysphoria can impair a person's ability to function and can cause significant depression, anxiety, self-harm, and suicidality.

12. To receive a diagnosis of gender dysphoria, a patient must demonstrate two of the following criteria: "an incongruence between the experienced/expressed gender and primary and/or secondary sex characteristics," "a strong desire to be rid one's primary and/or secondary sex

characteristics," "a strong desire for the primary and/or secondary sex characteristics of the other gender," "a strong desire to be of the other gender," or "a strong conviction that one has the typical feelings and reactions of the other gender." Gender dysphoria is also "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." These symptoms must be present for a minimum of six months.

13. Gender-affirming care consists of an array of services that may include social, legal mental health, medical, surgical, and other non-medical services that can support a person in living in alignment with their gender identity. Gender-affirming medical care refers to endocrinological and surgical interventions that bring an individual's physical appearance into alignment with their gender. Gender-affirming healthcare is medically necessary for people with this condition and can help alleviate symptoms of gender dysphoria. Gender-affirming care is a patient-centered practice and aims to help individuals live in the most authentic way possible.

14. Decades of scientific research and clinical experience have demonstrated that, for transgender and gender diverse people who seek gender-affirming care, such care can improve a person's mental health and overall well-being. I have seen first-hand in nearly 20 years of practice, the many benefits of both social transition and gender-affirming medical and surgical care.

15. For individuals for whom gender-affirming medical care is clinically indicated, there are no alternative evidence-based treatments for gender dysphoria.

**Current Medical Practice**

16. Prior to meeting with me for a medical assessment, most adolescents have participated and are participating in mental health therapy. This may be because they were experiencing

depression, anxiety or other mental health issues sometimes arising from gender dysphoria and sometimes mental health issues independent of gender dysphoria. Occasionally individuals are in therapy simply because they are exploring their gender.

17. For many adolescents, social transition for a period of time before they seek gender-affirming medical care is a common occurrence. Social transition involves the employment of reversible interventions that help an individual feel and be perceived as their appropriate gender. These interventions may include using a different name, pronouns, attire, hairstyle, and clothing.

18. Additionally, most adolescents have gone through a lengthy internal and private process aimed at discovering, naming, and understanding their experience and feelings related to their gender.

19. When patients engage in care for the first time, an assessment is undertaken. This assessment includes gaining an understanding of the adolescent's timeline and process of gender discovery and exploration, history of prior or existing use of reversible interventions (elements of social transition), effectiveness of those interventions, knowledge about and goals of medical interventions. Information about school and/or employment environment and the possibility of bullying or discrimination is also assessed. A mental health history includes any diagnoses, the extent of mental health therapy a young person has undergone, and how symptoms of any mental health issue are impacting the adolescent's function. Family dynamics, including gaining an understanding of how conflict within the family is managed, how both immediate and extended family members have responded to a young person disclosing their gender and how that may have changed over time is explored. It is critical that the history of or ongoing experiences of trauma be explored. If young people

need additional interventions in order to address any of the above, referrals to applicable services are provided. The visits are longer than a typical appointment; they can last upwards of 90 minutes, and intake can continue over several visits.

20. Parents and/or guardians also have an opportunity to provide input on their own understanding of their adolescent's gender development; when they may have noted anything indicating gender dysphoria, when their adolescent disclosed to them, and how the family has been functioning. This time is also an opportunity for parents to express any fears, concerns and uncertainties they may have related to their child's assertion of gender and interventions moving forward. Parents also have space to discuss their perspectives on whether interventions aimed at lessening gender dysphoria have led to improvement in their child's mental health, affect, socialization, school function or other areas. The team may recommend that patient and/or their family engage in additional therapy if it could be helpful.

**Informed Consent**

21. The capacity for adolescents to provide autonomous decision making has been explored across many fields of medicine. In 2021, the World Health Organization (WHO) provided recommendations and guidelines regarding the assessment of adolescents' decision-making capacity. All adolescents who are under eighteen years old require parental consent to engage in any medical care including puberty blockers and/or hormones. Providers utilize up-to-date informed consent forms that are reviewed in detail to inform both adolescents and consenting parents/guardians about the interventions. The World Health Organization defines informed consent as "a (usually written) agreement of permission based on full, clear information on the nature, risks and alternatives of a medical treatment or procedure and their implications" to be obtained prior to commencement of such intervention.

22. The WHO also discusses the model of shared decision making, emphasizing that this approach to medical care moves away from a historic, paternalistic view of decision making in medicine. Shared decision making includes describing treatment options, tailoring information, exploring patient preferences, and deliberation.

23. In my practice, our consent forms include information about expected changes, permanent changes, those changes that require ongoing use of interventions, and potential side effects. Negative side effects include potential medical side effects and those related to discontinuation of care as well as any potential impact on fertility. Youth and their parents or guardians receive a copy of the consent form to review and have at home. No interventions commence without this process.

24. Assessing capacity for consent is something that medical professionals do routinely. Extant data demonstrate that adolescents have the same capacity to make logical, reasoned decisions as adults. The four elements of capacity for decision making include: 1. Expressing a choice; 2. Understanding; 3. Reasoning and 4. Appreciation.

25. Expressing a choice is predominantly defined as meeting a threshold for communication. From the age of 5, children have reasonable understanding of language, with refinement thereof continuing to the age of 9 and further throughout adolescence.

26. Understanding requires the following skills: sufficient intelligence and language proficiency to process information, the ability to orient and direct attention toward the information, and finally, memory and recall. The foundation for these skills is laid down in the first year of life. Orienting and attention maturity develops around the ages of 7–10. Memory specifically increases between the ages of 6 and 12 and then goes on to slightly increase during adolescence. Children at the age of 10–12 appear to have recall abilities comparable to

adults.

27. Reasoning requires the ability for logical reasoning as well as weighing risks and benefits. Children at the age of 6 to 8 already demonstrate the ability for logic reasoning. Between the ages of 8 and 11, children's reasoning skills improve significantly, mainly due to improved use and access to their own knowledge. Complex reasoning about alternative causal relations needs more time to develop, in adolescence is has become more accurate, but even adults often make mistakes. Risk identification develops strongly between the ages of 6 and 10. Adults are better in identifying risks than children and adolescents but not in identification of benefits.

28. Appreciation implies that someone will understand various options available as well as the relationship of such options for one's personal situation. Abstract thinking about things that are intangible is necessary to understand the consequences of a decision. Children begin to recognize their own beliefs which contributes to the development of their own norms and values between the ages of 3 and 4. This recognition of their own beliefs and desires increases their understanding of how these beliefs influence their actions.

29. The ability to assess whether or not someone has the capacity to consent to interventions is determined by conversations with patients, and in the case of minors, with their parents as well. Broadly speaking, I follow the four step process outlined by the WHO's tool for healthcare providers. The four steps are; 1. Joint exploration of the situation and options; 2. Common synthesis of the situation; 3. Decision point and 4. Follow-up.

30. Joint exploration is a conversation about how young people have come to think about and understand their gender, if any efforts have been undertaken to alter their gender expression in a more congruent manner (such as changing names, pronouns, hair, clothing etc.) and if

those efforts have resulted in decrease of their gender distress, who/how/when/if they have disclosed their gender to other's in their lives (parents, friends, partners, teachers, doctors, counselors, therapists).

31. This information is also gathered from parents/guardians as they are the most familiar with their child and have witnessed the distress and potential improvement after initial, reversible interventions have commenced.

32. These conversations also include the youth's interests and desires around what they are seeking in regards to their physicality to diminish their distress. This is important as there are occasions when what patients want is not attainable through medical interventions.

33. Gender dysphoria, both those aspects that determine the threshold for a diagnosis, and those experiences that are outside the diagnostic criteria are assessed. These are the actual or potentially concerning experiences that many youth (and adults) with gender dysphoria have had related to their gender incongruence. A discussion of the way and intensity in which these experiences impact a youth's life is important. Because the majority of young people seeking medical interventions have addressed these elements extensively in therapy, they are repeating many things.

34. In my practice, youth ages 12+ meet with a behavioral health professional prior to meeting with a medical provider. Much of what is addressed in this conversation has already been discussed within the context of ongoing therapy that has, and is, occurring simultaneously with engagement in our clinic.

35. Step two of the capacity assessment outlined by the WHO is common synthesis of the information. This step involves summarizing the information that has been shared and ensure a common understanding. During this part of the process, our behavioral health and medical

professionals are specifically looking for potential issues that may impact decision making. We are discovering the level of gender consolidation and the likelihood that patients will get what they are anticipating with medical intervention. For example, if a young person only began thinking their gender is different 8 weeks prior to the appointment, medical intervention would not be recommended. It is the case that for most youth, their process of figuring out who they are and what they need related to gender began long before disclosure to parents/guardians, and well before engaging in services at our center. Occasionally we will reach out to mental health professionals not embedded within our center to get additional details about a young person if necessary. Parents/guardians are present for this information gathering.

36. Youth and parents are afforded the opportunity to meet with our providers alone in order to present information they feel uncomfortable discussing with their child present, or if a youth is struggling to speak to their distress with their parent/guardian present.

37. Step three is the decision point; this involves deciding whether or not the adolescent and the parent(s)/guardian(s) have demonstrated capacity to consent (see above) as well as a discussion of recommendations for any medical interventions.

38. Step four is follow-up. Follow-up scheduling is done regardless of whether there is consensus about moving forward with medical interventions or not. Continued conversations about the potential impact of moving forward or not moving forward are essential. For adolescents initiating medical interventions, follow up is essential for adjusting medication, assessing for negative side effects, and assuring positive impact resulting from medical care.

39. Finally, when recommendations involving minors are being made, the legal parent(s)/guardian(s) is required to provide informed consent as well. The parameters for

determining capacity for adults to make decisions related to healthcare on behalf of their minor child are similar to those discussed above.

40. If medical intervention is warranted, I have a thorough discussion with the adolescent and the parent(s) that includes medical options and non-medical options for mitigating gender dysphoria. Medical interventions vary, based on the age, pubertal stage, gender consolidation and readiness (of both the youth and the parent(s).

41. For youth who may benefit from the use of blockers, I stress the importance of understanding what would happen if endogenous puberty occurred and what will happen if central blockers are employed. It is important for any individual undergoing medical interventions to understand the expected changes as well as the possibility of negative side effects. I provide a thorough review of the hypothalamic-pituitary-gonadal axis and how it is impacted when a central blocker is employed. I review the potential side effects including slower bone density accrual, impact on linear growth, remote possibility of pseudotumor cerebri, weight gain and emotional lability. I discuss the timeline for endogenous puberty to resume should the patient discontinue central blockers. We discuss the impact of puberty blockers on future fertility should they continue to hormone therapy at a later time. For those designated male at birth, there is an additional discussion about the ramifications of early pubertal blockade effect on future surgery.

42. For youth initiating hormones, a similar consent process occurs, appropriate to the intervention being recommended. Like all medications, central blockers and hormones carry the risk of potential side effects which are reviewed with youth and parent(s) thoroughly. Effects of hormones (estrogen and testosterone) fall into three buckets; 1. Expected changes that are primarily desirable, 2. Expected changes that are neutral or undesirable, and 3. Rare

potential medical side effects. In addition to the changes that ensue with the use of these medications, the expected timeline for the changes is another important aspect to the care. Another way that effects of hormones are discussed is presenting which changes are permanent, and which require ongoing use of hormones.

43. While puberty blockers, estradiol and testosterone are not specifically labelled for use in patients with gender dysphoria, they are frequently used for medical purposes in cisgender youth for a variety of issues including precocious puberty, hypogonadism, endometriosis, contraception and others. The safety of these medications is well established. It is very common in medicine to use medications that are considered "off-label." This designation is not given because of safety issues. It is time consuming and costly for pharmaceutical companies to get FDA approval for every potential use of a medication.

44. Families and young people are always provided the option of doing no medical intervention. Among patients starting hormones, we discuss the option for fertility preservation prior to initiating estrogen or testosterone.

45. The vast majority of my patients have familiarity with the narrative of the most public de-transitioners, predominantly those with regret. While I do have conversations with my adolescent patients about this, I find that most of my patients, while sympathetic to the experiences of those individuals who regret their interventions, do not find these stories applicable to their own situations.

46. After a patient begins puberty blockers or gender-affirming hormones, they have continual follow-up visits with me, typically every three months or so or sooner in the first year or if there are concerns or doses are being adjusted. Follow up visits include an assessment of impact of treatment (social, emotionally and physically), ongoing mental health support,

adherence to medication, presence of any undesirable side effects and subsequent management, and finally the clinical changes associated with medical interventions. If the patient is a minor, parental/guardian perspective about any changes is also queried. Dosing adjustments are made depending on clinical changes and serum hormone levels.

**Impact of Providing Gender-Affirming Care**

47. Over the past 20 years, I have seen improvement in mental health and quality of life increasingly over time for the vast majority of my patients. Youth begin to participate in school, family events, employment and friend groups. I witness a decrease in anxiety and depression symptoms. I have witnessed youth with selective mutism become able to talk. Many young people are able to form romantic partnerships, improve self-efficacy and increase confidence. Many patients endorse the care they have received to be life-saving. These improvements have also been endorsed by the other providers on my team.

48. Recently a parent of a patient of mine (now 19 y/o in care for nearly 10 years) wrote this in an email; "You've saved so many children's lives, including my own and I'm forever grateful for the work that you do…I've always felt so lucky to have been able to access your expertise with you. Thank you for everything you've done for my not so little girl."

49. With access to medically indicated care, transgender people can experience significant improvements in mental health and functioning. These changes are documented in the extant literature as well as anecdotally by clinicians.

**Federal Actions Targeting Providers of Gender-Affirming Care**

50. My practice of medicine has completely changed since President Donald Trump executed Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," issued on January 20, 2025 (EO

14,168) and Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation," issued on January 28, 2025 (EO 14,187).

51. EO 14,168 signals the prohibition of the following for individuals under the age of 19 years "any medical procedure, treatment, or drug for the purpose of conforming one's appearance to that of the opposite sex," with "sex" being defined as immutable from the time of conception. These treatments are part of widely accepted protocols for the treatment of gender dysphoria and are supported by every major medical association in the country—social transition and gender-affirming medical care.

52. Contrary to medical and biological science, EO 14,168 further states "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."

53. EO 14,168 defines "sex" as "an individual's immutable biological classification as either male or female," that "does not include the concept of 'gender identity'" EO 14,168 § 2(a). EO 14,168 further defines '[f]emale' as "a person belonging, at conception, to the sex that produces the large reproductive cell," and "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell." EO 14,168 §§ 2(d), (e).

54. EO 14,168's "two-sexes" policy and definition of "sex" do not align with how the term "sex" is commonly understood in the practice of medicine and in the scientific community. According to the American Medical Association, a person's sex is made up of many diverse components. (AMA 2023). Similarly, the Endocrine Society notes that because a person's sex characteristics "may not [always] be in line with each other…, the terms biological sex and biological male or female are imprecise and should be avoided." (Hembree, et al., 2017).

55. EO 14,168 seeks to deny the existence of transgender people. There are archaeological and

anthropologic data suggesting the existence of transgender people, and written accounts from pre-1800's of this developmental trajectory. The EO takes aim at not just transgender youth, but at the entire community of trans and gender diverse individuals.

56. EO 14,187 falsely equates gender-affirming care with chemical and surgical mutilation, including female genital mutilation. The World Health Organization (WHO) has grouped the types of FGM into four broad categories: Type I (commonly referred to as "clitoridectomy"): the excision of the prepuce with or without excision of the clitoris; Type II (commonly referred to as "excision"): the excision of the prepuce and clitoris together with partial or total excision of the labia minora; Type III (commonly referred to as "infibulation"): the excision of part or all of the external genitalia and stitching or narrowing of the vaginal opening. Type IV: all other procedures involving partial or total removal of the female external genitalia for cultural or any other non-therapeutic reasons.

57. Medical care for minors includes none of the above-mentioned procedures. To equate medically necessary care for those with gender dysphoria (such as puberty blockers and hormones) to a practice that violates the human rights of girls and women to non-discrimination, health and physical integrity is purposefully done to confuse and alarm those who are unfamiliar with transgender experience or medical care. In fact, provision of gender-affirming care does precisely the opposite; it respects the rights of all youth and adults to receive the medically appropriate care necessary for the treatment of gender dysphoria. It is denying access to this care that violates the human rights to non-discrimination, health and physical integrity.

58. Despite the overwhelming evidence that gender-affirming care changes many adolescents' lives for the better, EO 14,187 directs the United States Department of Justice (DOJ) to

"prioritize enforcement of protections against female genital mutilation," and "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation."

59. In the wake of this growing federal crackdown on gender-affirming care, I am aware that Children's Hospital Los Angeles (CHLA) closed its Center for Transyouth Health and Development and Gender-Affirming Care surgical program, effective July 22, 2025. CHLA housed the longest running and largest center for transgender youth in the country. The first transgender adolescent was provided services in 1991. The center has provided medically necessary healthcare for hundreds, if not thousands, of trans and gender diverse young people over its tenure. CHLA has publicly stated that it is ceasing its gender-affirming care services because of the Trump Administration's increasingly aggressive attacks on gender-affirming care and the physicians and facilities that provide it.

60. I am also aware that, effective June 2, 2025, Stanford Medicine has paused its gender-affirming surgical procedures for patients under 19 years of age. Stanford stated its decision was informed by the latest actions and directives from the federal government.

61. In addition, I am aware that Kaiser Permanente has also paused gender-affirming surgical procedures for patients under age 19 years of age.

62. I have recently become aware that the University of California Los Angeles is no longer taking new minor patients into their gender program.

63. I am also aware that DOJ has issued subpoenas to Children's hospitals across the country requesting private patient data for individuals who have provided or received gender-affirming care. Many, if not all, of my current and prior patients are incredibly concerned

about their personal medical information falling into the hands of the federal government. All of my fellow healthcare providers are also extremely concerned that their personal information may be shared with a federal government who is openly hostile and exhibits animus against anyone who provides gender-affirming care.

64. Denying gender-affirming medical care to those for whom it is medically necessary would put them at risk of significant harm to their physical and mental health and well-being. There are already cases of my patients with deteriorating mental health since the release of the Executive Orders.

65. If a patient were to lose access to gender-affirming care, they would undergo permanent changes in their body that do not align with their gender identity. For a patient receiving gender-affirming hormones, some of the desired changes that they have achieved would stop, and undesired changes would begin. Those changes that are dependent on continued use of testosterone include redistribution of body fat away from the hips and chest, an increase in upper body musculature, amenorrhea (cessation of menses) and terminal male pattern body hair growth. The biggest concern is the psychological affirmation of self that occurs with the use of gender concordant hormones, in this case, testosterone. For those transfeminine individuals, estrogen promotes and sustains breast development, softening of skin, decrease in genital size, decreased spontaneous erections, and slowing of male pattern hair growth. In my extensive experience, even brief interruptions in gender-affirming medical care can have a detrimental impact on a patient's mental health and overall well-being.

66. For those youth who have endorsed a gender other than that assigned at birth and are fully appropriate to undergo suspension of pubertal changes, the prospect of undergoing endogenous puberty is unbearable. For transgender girls, endogenous male puberty brings a

deeper voice, development of an Adam's Apple (in many), tall stature, maturing of male genitalia, enlargement of hands and feet and the development of male pattern body and facial hair. These changes are permanent and cannot be reversed. For transgender boys, endogenous puberty brings breast development, widening of the hips, menstrual periods, and premature fusion of the growth plates resulting in a relatively short stature for these boys. Most of these things are not reversible with medical interventions, or in the case of breast development, require surgery at a later time. Access to puberty blockers to avoid the irreversible changes of endogenous puberty has been demonstrated to have a positive effect on mental health. Being identifiable as a transgender person, especially a transgender woman, brings the undeniable risk of discrimination, harassment, violence, and sometimes homicide.

67. President Trump's issuance of EO 14,187 and EO 14,168 which both target transgender individuals, has had an unprecedented negative impact on my patients and their families as well as myself and my community of care providers. Since the Executive Orders were issued, my clinic has received hundreds of messages and phone calls from families who are terrified at the prospect of losing access to this care. Many parents and guardians have expressed deep concerns that just the threat of disruption, let alone actual disruption, will significantly worsen their child's mental health.

68. Guardians have also expressed concerns about the federal government attempting to obtain their child's medical records in an effort to identify adolescents who have accessed this care. There is even alarm that the government will remove their children from their homes and prosecute parents for supporting their youth in accessing gender-affirming care.

69. The Executive Orders make me alarmed for myself, other clinicians, and staff who are providing gender-affirming medical care even though it is lawful and protected in California.

I am terrified that the DOJ will start investigating and prosecuting clinicians for providing lawful, medically indicated gender-affirming care. Since Attorney General Bondi instructed the DOJ to prosecute the provision of this care, I am even more worried that I will receive a subpoena or other investigative materials that will target the lawful care that I provide my patients. Even though I know the medical care that I provide is legal, any investigation or potential prosecution by the DOJ would be harmful to myself and my practice due to the implication of impropriety. I am incredibly concerned that I will be prosecuted under the Female Genital Mutilation statute, or for false claims.

**Consequences of Federal Actions on my Practice and Its Patients**

70. Because federal subpoenas can request patient charts, I am extraordinarily worried that the names of and information about my patients will be released, further inciting terror among families and the youth themselves.

71. After the Executive Orders were issued, my practice has changed drastically. In the face of the financial threat to large institutions that are significantly dependent on federal dollars for clinical care and research, I, like others, have had to move my practice to a private institution. It is difficult to overcome the emotional toll and moral injury of leaving an institution in which I had spent multiple decades. Additionally, I was responsible for the emotional health and safety of hundreds of patients and families as well as my team. Suddenly faced with the threat of prosecution for supporting transgender youth, providers and parents alike are panicking. There are many parents new to care questioning the legality of the provision of care. Many providers are choosing to leave the field entirely, contributing to an already difficult to access field of medicine. As larger institutions in California make decisions to restrict or completely abandon care, more patients will be left without access to medically

necessary services. Private practitioners can only absorb so many patients, and in Southern California, our pipelines are already bottlenecked because of the sudden closure of CHLA's large program. The added threat of gender related medical care being denied to patients with MediCal poses an even greater barriers to care and contributes to the already existing disparity for less resourced transgender youth and families. Those private practitioners interested in continuing to serve lower income patients will have to determine how to structure our services to subsidize care for those with publicly funded healthcare, creating even more chaos added to having to pivot so quickly to maintain services.

72. I am also very frightened that the incendiary and hyperbolic language of the Executive Orders will incite violence towards institutions and providers who offer gender-affirming medical care. Since the Executive Orders were issued, protesters have gathered outside of the building(s) where I practice. I have received several emails since the Executive Orders were issued with revolting threats against my life and wellbeing. I am fearful that as the Trump Administration escalates their attacks on transgender people and access to gender-affirming care, these actions will only escalate. The lives of transgender youth, their families and us as providers have been put in jeopardy.

73. More than anything, I am scared for my patients. If they lose access to care, then they will experience irreversible harms to their health and well-being.

Dated: 12/12/25

/s/ California Provider # 1

__________________________________

California Provider # 1