UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-12162 |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs by their undersigned counsel submit this Statement of Material Facts in support of their Cross-Motion for Summary Judgment.[1]

**A. Background on Gender-Affirming Care.**

1. Transgender, non-binary, and intersex (TGNBI) individuals exist. *See generally* BM-AR-0589–BM-AR-0976; BM-AR-0329–BM-AR-0588.

2. Transgender individuals are people whose gender identity is different from their sex assigned at birth. BM-AR-0834; BM-AR-0582.

3. "Gender identity" describes a person's internal, intrinsic sense of their own gender. BM-AR-0582; BM-AR-0829.

4. Approximately 300,000 individuals ages 13 to 17 in the United States (about 1.4% of that age group) identify as transgender. Ridolfi-Starr Decl. Ex. 3 at 1, n.1.[2]

---

[1] Though this is a cross-motion, because Defendants did not file a Statement of Material Facts accompanying their Motion for Summary Judgment (Doc No. 124), Plaintiffs begin the Statement of Material Facts at "1."

[2] All further references to the Exhibits included herein are to the Ridolfi-Starr Declaration, unless otherwise noted.

5. "Gender-affirming care" refers to social, psychological, behavioral, and medical interventions designed to support and affirm an individual's gender identity. World Health Organization, *Gender incongruence and transgender health in the ICD*, https://www.who.int/standards/classifications/frequently-asked-questions/gender-incongruence-and-transgender-health-in-the-icd (last visited Sep. 13, 2026), Ex. 9; *see also* BM-AR-0582–BM-AR-0583.

6. Gender-affirming care encompasses medical treatments for gender dysphoria, gender incongruence, and gender-related distress. *See* BM-AR-0348.

a. "Gender dysphoria" is a diagnostic term that refers to clinically significant distress caused by the incongruence between a TGNBI person's gender identity and sex assigned at birth, as defined by the American Psychiatric Association's *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition ("DSM-5"). BM-AR-0582; BM-AR-0733. Not all TGNBI people experience gender dysphoria. BM-AR-0582.

b. "Gender incongruence" is a diagnostic term that refers to a marked and persistent incongruence between an individual's experienced gender and the assigned sex, as defined by the World Health Organization's International Classification of Diseases, 11th Revision ("ICD-11"). BM-AR-0582; BM-AR-0829; BM-AR-0733.

c. "The International Classification of Diseases (ICD) is a globally used medical classification of anything that is relevant to health care and is used clinically for medical diagnosis. (https://icd.who.int/en). It is developed and annually

updated by the World Health Organization (WHO) and is the mandatory global data standard for recording health information." BM-AR-0831.

d. Unlike gender dysphoria, "gender incongruence" does not include distress among its diagnostic requirements and is not classified as a mental health disorder. BM-AR-0733; BM-AR-0606–BM-AR-0607.

e. The most recent ICD revision moved the diagnosis out of the "mental and behavioural disorders" chapter and into the "sexual health" chapter in order to avoid pathologizing or stigmatizing transgender people. BM-AR-0733; BM-AR-0606–BM-AR-0607; *see also* Ex. 9.

f. "Gender-related distress" describes distress arising from a broad range of experiences connected to a child or young person's gender identity development. BM-AR-0830. It is often used to describe the experiences of young people where a gender dysphoria diagnosis has not, or not yet, been made. *Id.*

g. All three terms are commonly used in the diagnosis and treatment of transgender adolescents. *See* BM-AR-0733; *see generally* BM-AR-0589–BM-AR-0976; BM-AR-0329–BM-AR-0588.

7. Gender-affirming care can also encompass treatment for a range of conditions and diagnoses related to, symptomatic of, or impacted by gender dysphoria, gender incongruence, or gender-related distress, such as menstrual complications; endocrine disorders; mental health conditions; sexual health; hair growth; metabolic systems; or fertility and reproductive health concerns. *See, e.g.*, BM-AR-0486–BM-AR-0506; Ex. 10 ¶ 23(iii).

8. Gender-affirming care includes a range of treatments and services across multiple medical disciplines, including puberty blocking medications, hormone therapy, surgical interventions, voice therapy, and counseling. *See generally* BM-AR-0589–BM-AR-0976; BM-AR-0329–BM-AR-0588; Ex. 2, Section 2(c) (noting the phrase "gender-affirming care" can refer to use of puberty blocking medications, hormone therapy, and surgical interventions for transgender people).

9. Major medical organizations in the United States have endorsed gender-affirming care as evidence-based health care that can be medically necessary in individual circumstances. These organizations include the American Academy of Pediatrics, Doc No. 87-18, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Society for Reproductive Medicine, American College of Physicians, American Medical Association, American Psychiatric Association, and the Endocrine Society. Exs. 13-19; Doc No. 118 (Defendants' Answer) ¶ 53.

10. In their brief in Support of Summary Judgment, Defendants refer to gender-affirming care as "gender-related medical care" or "gender-related chemical and surgical interventions." (*See, e.g.*, Doc No. 124 at 6, 8).

## B. The Administration's Nationwide Campaign to End Gender-Affirming Care.

***President Trump Issues an Executive Order Directing His Administration to Attack Gender-Affirming Care.***

11. On January 20, 2025, President Trump issued Executive Order 14,168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Doc No. 118 ¶¶ 108–09; Ex. 1.

12. On January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting Children From Chemical and Surgical Mutilation."[3] Doc No. 118 ¶¶ 110–12; Ex. 2.

13. On the same day, President Trump announced the Executive Order on Truth Social, describing it as "banning the chemical castration and mutilation of innocent children in the United States of America." Ex. 20.

14. Less than one week later, on February 3, 2025, the White House issued a press release titled, "President Trump is Delivering on His Commitment to Protect our Kids" stating: "Last week, President Donald J. Trump took executive action to protect American children from irreversible chemical and surgical mutilation. It's already having its intended effect — preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex." Ex. 21; Doc No. 118 ¶ 171.

15. The February 3, 2025, White House press release states that "Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs," and listed eight specific providers, six of which are in Plaintiff States. Ex. 21.

16. On March 4, 2025, the White House issued a press release: "President Trump is Protecting America's Children." Ex. 22.

17. The March 4, 2025 press release states, "Health systems across the nation stopped or downsized their sex change programs for minors following President Trump's 'Protecting Children from Chemical and Surgical Mutilation' executive order." Ex. 22.

[3] Hereinafter, all references to "the EO" refer to Executive Order 14,187.

***Agency Defendants Issue and Implement the DOJ Directives.***

18. On April 22, 2025, then-Attorney General Pamela Jo Bondi issued a Directive on "Preventing the Mutilation of American Children." Ex. 3 (Bondi Memo); Doc No. 118 ¶¶ 1, 120–29.

19. The Bondi Directive equates transgender identity with a "sociological disease" that must be "root[ed] out and eliminate[d]." Ex. 3; Doc No. 118 ¶¶ 1, 120–29.

20. The Bondi Directive describes transgender individuals as "infected," "tragic," and "absurd." Ex. 3; Doc No. 118 ¶ 1, 120–29.

21. The Bondi Directive describes gender-affirming care as an "ideological attack," "barbaric practice," "surgical[] and chemical[] maiming and sterilization" that leaves patients "permanently disfigured, scarred, and sterilized." Ex. 3; Doc No. 118 ¶ 1, 120–29.

22. The Bondi Directive "notif[ied] the public that the Department is eager to work with qui tam whistleblowers" on False Claims Act cases involving gender-affirming care. Ex. 3; Doc No. 118 ¶ 1, 120–29.

23. The Bondi Directive informed the public that "[t]he False Claims Act allows private citizens to file these actions on behalf of the government against those who have defrauded the government. In meritorious cases, the Department of Justice can intervene, and even if the Department takes over the case, the relator may receive a portion of the government's financial recovery. In 2024 alone, qui tam relators received a $344 million share of victories won by the Department." Ex. 3; Doc No. 118 ¶¶ 1, 120–29.

24. On April 28, 2025, the White House issued a fact sheet titled "Report to the President on Protecting Children from Surgical and Chemical Mutilation Executive Summary." Ex. 23.

25. The April 28, 2025 fact sheet states that, pursuant to the EO, DOJ had "initiated investigations of multiple entities that have misled the public about the long-term side effects of chemical and surgical mutilation under the Food, Drug, and Cosmetic Act." Ex. 23.

26. The April 28, 2025 fact sheet lists other federal agency actions taken to implement the EO. Ex. 23.

27. On June 2, 2025, the Federal Bureau of Investigation (FBI) launched a tipline that it announced in an X post. Doc No. 118 ¶ 130; Ex. 24.

28. The FBI's June 2, 2025, X post stated: "Help the FBI protect children. As the Attorney General has made clear, we will protect our children and hold accountable those who mutilate them under the guise of gender-affirming care. Report tips of any hospitals, clinics, or practitioners performing these surgical procedures on children." Doc No. 118 ¶ 130; Ex. 24.

29. On June 11, 2025, Defendant Brett Shumate was sworn in as Assistant Attorney General leading DOJ's Civil Division. *See* 171 Cong. Rec. S3,282 (daily ed. Jun. 9, 2025) (vote on Shumate nomination); Ex. 25.

30. On June 11, 2025, his first day leading the Civil Division, Defendant Brett Shumate issued the document titled "Civil Division Enforcement Priorities." Doc No. 118 ¶131; Ex. 4.

31. The Shumate Directive "directs Civil Division attorneys to prioritize investigations and enforcement actions advancing those priorities." Doc No. 118 ¶ 132.

32. Specifically, the Shumate Directive directs the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" to pursue alleged violations "of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called

gender transition; and (2) dealers such as online pharmacies suspected of illegally selling such drugs." Doc No. 118 ¶ 133.

33. The Shumate Directive further directs the Civil Division to "aggressively pursue claims under the False Claims Act against healthcare providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes." Doc No. 188 ¶ 134.

34. On June 11, 2025, DOJ issued administrative subpoenas to providers of gender-affirming care, including to some providers in the Plaintiff States, including Massachusetts, New York, and California. Exs. 26-27; *see also In re 2025 Children's Hospital of Los Angeles Subpoena,* No. 2:25-cv-11183 (C.D. Cal. Jan. 22, 2026).

35. On June 12, 2025, Children's Hospital Los Angeles announced the complete closure of its Center for Transyouth Health and Development citing "significant operational, legal, and financial risks stemming from the shifting policy landscape at both the state and federal levels." Doc No. 118 ¶ 177; Ex. 28.

36. On June 24, 2025, Fox News published a newspaper article reporting that the FBI had opened criminal investigations under the FGM statute of three hospitals—Boston Children's Hospital, Children's Hospital of Colorado, and Children's Hospital Los Angeles—that provide or provided gender-affirming care to patients under 19. Ex. 29.

37. On July 2, 2025, the U.S. Department of Health and Human Services (HHS) issued a press release announcing a new working group in partnership with DOJ to "make referrals to DOJ of potential violations of the FCA that reflect Working Group priorities." Doc No. 118 ¶ 159; Ex. 30.

38. On July 9, 2025, the Federal Trade Commission held a workshop devoted to "the dangers of so-called gender-affirming care for minors," and the question of whether providers of transgender medical treatments were engaging in "unfair or deceptive trade practices." Doc No. 118 ¶ 141; Ex. 31.

39. At the July 9, 2025, FTC workshop, one panelist argued that doctors providing medical care to transgender adolescents should be prosecuted to create a chilling effect across the country, suggesting that "'then these people will be held accountable and there's a very good chance this will stop even in blue states.'" Doc No. 118 ¶ 141; Ex. 31.

40. In response, a fellow panelist and Deputy Assistant Attorney General in the DOJ's Civil Division stated that he was "[w]orking on it" and that there was a "legal angle" that "obviously the Department of Justice interested in." Doc No. 118 ¶ 141; Ex. 31.

41. On July 9, 2025, DOJ issued a press release announcing its issuance of 20 subpoenas to providers of gender-affirming care (at least some of which had been issued on June 11, 2025, *see supra* at ¶ 34), including to some providers in Plaintiff States. Doc No. 118 ¶ 138; Ex. 32.

42. The July 9, 2025, press release attributes the following quote to former-Attorney General Bondi: "Medical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice." Doc No. 118 ¶ 138; Ex. 32.

43. On July 20, 2025, the White House issued a press release: "President Trump Marks Six Months in Office with Historic Successes." Doc No. 118 ¶ 173; Ex. 33.

44. The July 20, 2025 press release listed as one such success: "Hospitals and hospital systems across the country have halted so-called 'gender-affirming care' for minors following President Trump's executive order [14187]." Doc No. 118 ¶ 173; Ex. 33.

45. On July 25, 2025, the White House issued a press release: "President Trump Promised to End Child Sexual Mutilation—and He Delivered." Doc No. 118 ¶ 4; Ex. 34.

46. The July 25, 2025, press release states, "During his campaign, President Donald J. Trump repeatedly pledged to end the irreversible chemical and surgical mutilation of our children: 'We are not going to allow child sexual mutilation.' For years, politicians have promised to end the barbaric, pseudoscientific practice — but President Trump is the only one who has actually delivered." Doc No. 118 ¶ 4; Ex. 34.

47. The July 25, 2025 release listed 21 hospital systems that had suspended or curtailed provision of gender-affirming care following the EO and Directives. Most of the listed providers operate in Plaintiff States. Doc No. 118 ¶ 4; Ex. 34.

48. On September 25, 2025, DOJ launched an "Enforcement & Affirmative Litigation Branch" tasked with, in part, "protecting women and children from pharmaceutical companies, health care providers, and medical associations profiting off of false and misleading claims related to so-called gender transition." Ex. 35.

***Subpoena litigation relating to Defendants investigations and requests for patient data and medical records.***

49. Pursuant to the Directives, federal agencies have initiated investigations into whether the provision of gender-affirming care violates federal law. Doc No. 118 ¶ 4.

50. As part of those investigations, federal agencies have sought data and medical records via administrative subpoenas pertaining to provision of that care to patients. Doc No. 118 ¶ 4.

51. Some recipients of DOJ's subpoenas, as well as patients and families whose information was requested in the subpoenas, have initiated legal proceedings seeking to quash the subpoenas or prevent disclosure of patient information from the providers to DOJ. *See sources cited in* ¶¶ 52-62, *infra*.

52. Several courts have granted motions to quash these subpoenas. *See Seattle Child.'s Hosp. v. U.S. Dep't of Just.*, No. 2:25-mc-00041, 2025 WL 3562151, at *12 (W.D. Wash. Sep. 3, 2025) (granting motion to quash DOJ subpoena issued to Seattle Children's Hospital), *appeal docketed*, No. 26-4009 (9th Cir. June 23, 2026); *Seattle Child.'s Hosp. v. U.S. Dep't of Just.*, No. 2:25-mc-00041, 2026 WL 1102159 (W.D. Wash. Apr. 23, 2026) (denying DOJ's motion to alter or amend judgment); *In re Admin. Subpoena No. 25-1431-019*, 800 F.Supp.3d 229, 239 (D. Mass. 2025) (granting motion to quash DOJ subpoena issued to Boston Children's Hospital), *appeal docketed*, No. 26-1093 (1st Cir. Jan. 30, 2026); *In re Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass. Nov. 24, 2025), Dkt. No. 52 (electronic order denying DOJ's motion to alter the judgment); *QueerDoc, PLLC, v. U.S. Dep't of Justice*, 807 F.Supp.3d 1295, 1301 (W.D. Wash. 2025) (granting motion to quash DOJ subpoena issued to telehealth provider Queerdoc), *rev'd and remanded*, No. 25-7384, 2026 WL 2359440 (9th Cir. Aug. 14, 2026); *In re Subpoena No. 25-1431-014*, 810 F.Supp.3d 555, 563 (E.D. Pa. 2025) (granting in part motion to quash subpoena issued to Children's Hospital of Philadelphia), *appeal dismissed*, No. 26-1134 (3d Cir. May 12, 2026), Dkt. No. 26; *In re 2025 Subpoena to Child.'s Nat'l Hosp.*, No. 1:25-CV-03780-JRR, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (granting motion to quash DOJ subpoena issued to Children's National Hospital), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063, 2026 WL 33398, at *11 (D. Colo. Jan. 5, 2026) (magistrate

judge recommending that Children's Hospital Colorado's motion to quash DOJ subpoena be granted); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *3 (W.D. Pa. Dec. 24, 2025) (granting motion to quash DOJ subpoena issued to UPMC), *reaffirmed*, No. 2:25-mc-01069 (W.D. Pa. Mar. 2, 2026) Dkt. No. 66, *appeal dismissed*, No. 26-1401 (3d Cir. Aug. 12, 2026) Dkt. No. 30; *see also* Notice of Dismissal, *In re 2025 Children's Hospital of Los Angeles Subpoena,* No. 2:25-cv-11183 (C.D. Cal. Jan. 22, 2026) (notifying court that Children's Hospital of Los Angeles and DOJ reached a settlement concerning DOJ subpoena and voluntarily dismissing the action without prejudice).

53. Attorneys from DOJ's newly formed Enforcement & Affirmative Litigation Branch have appeared for DOJ in the lawsuits challenging DOJ subpoenas. *See*, *e.g.*, *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069 (W.D. Pa.), Dkt. No. 34 (pro hac vice filed October 30, 2025) and similar docket entries for sources cited in ¶ 52, *supra.*

54. In *In re Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, the Child Advocate for the State of Rhode Island moved to quash a DOJ subpoena seeking information and documents concerning the identities, diagnoses, clinical assessments of patients at Rhode Island Hospital. On May 11, 2026, Rhode Island Hospital also moved for emergency relief to quash the DOJ subpoena. On May 13, 2026, the court granted the emergency motions to quash. *In re Admin. Subpoena 25-1431-032 to Rhode Is. Hosp*., No. 1:26-MC-0007-MSM-AEM, 2026 WL 1392565, at *10 (D.R.I. May 14, 2026) (amended).

55. On April 30, 2026, DOJ sought to enforce its existing administrative subpoena to Rhode Island Hospital in the Northern District of Texas, prompting litigation both within the Northern District of Texas and Fifth Circuit, and the District of Rhode Island and First Circuit. *See In the Matter of Administrative Subpoena 25-1431-032*, No. 4:26-mc-00006-O, 2026 WL

1204327, (N.D. Tex. Apr. 30, 2026) (Reed O'Connor, J.) (Order); *United States v. Rhode Island Hospital*, No. 26-10431 (5th Cir. May 12, 2026) (Unpublished Order); *In Re: Motion to Quash Administrative Subpoena to Rhode Island Hospital*, 26-mc-00007-MSM-AEM (D.R.I.) (filed May 4, 2026); *In Re: Motion to Quash Administrative Subpoena to Rhode Island Hospital*, 177 F.4th 21 (1st Cir. 2026).

56. In an X post discussing the Rhode Island Hospital litigation, Defendant Brett Shumate characterized the investigation of Rhode Island Hospital as an "investigation[] into so-called 'gender-affirming care[.]'" Ex. 96.

57. In the *Rhode Island Hospital* proceedings in D.R.I. and in N.D. TX, DOJ's filings are signed by DOJ attorneys including Brett Shumate, Lisa Hsiao, and other lawyers from the DOJ's newly established Enforcement and Affirmative Litigation Branch. *See, e.g.*, Government's Response in Opposition at 34, *In re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, 1:26-mc-00007 (D.R.I. May 7, 2026), Dkt. No. 9; Government's Petition for Enforcement of Administrative Subpoena Pursuant to 18 U.S.C. 3486(c) at 12, *In re Administrative Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026), Doc No. 1.

58. In its *Rhode Island Hospital* briefing in the Northern District of Texas, Defendant asserted that the administration's "nationwide investigation" into gender-affirming care providers "is being carried on" in the Northern District of Texas. *See* Government's Response in Opposition to Emergency Motion for Stay Pending Appeal at 2, *In re Administrative Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. May 8, 2026), Dkt. No. 11.

59. On or around May 12, 2026, New York University Langone Health (NYULH) issued a public notice that on May 7, 2026, it received a grand jury subpoena from the U.S.

Attorney's Office in the Northern District of Texas for information about NYULH's provision of gender-affirming care. It posted a copy of the subpoena online at https://nyulangone.org/files/nyu-gj-subpoena.pdf. Ex. 37. It was substantially similar to the Administrative Subpoena NYULH had received June 11, 2025. *See* Exs. 27, 37.

60. The grand jury subpoena NYULH posted specifies that records be sent to Special Agent Bradley Cooper in the FDA's Office of Criminal Investigations Kansas City Field Office. https://nyulangone.org/files/nyu-gj-subpoena.pdf at 5. Ex. 37.

61. On June 2, 2026, a proposed class action was filed against then-Acting Attorney General Todd Blanche and DOJ, as well as NYULH, in the Southern District of New York by plaintiffs seeking to protect from disclosure their sensitive health information that might be the subject of subpoenas from DOJ to NYULH and other hospitals in New York City. Complaint for Declaratory and Injunctive Relief, *Coe v. Blanche*, 26-cv-04641 (S.D.N.Y. June 2, 2026), Dkt. No. 1; *see also Coe v. Blanche*, No. 26-cv-4641, 2026 WL 1951390, at *1–2 (S.D.N.Y. July 6, 2026) (granting preliminary injunction and extending provisional class certification).

62. News reports covering the NYULH litigation and legal filings in other related litigation indicated that other hospitals have received grand jury subpoenas demanding the same kind of information as was in the grand jury subpoena to NYULH. Exs. 37; 38 (reporting Mount Sinai hospital in New York City had received grand jury subpoena); First Amended Complaint ¶ 7, *Z.A. v. Blanche*, No. 26-cv-04998-PCP (N.D. Cal. June 8, 2026), Dkt. No. 41 (gov.uscourts.cand.470905.41.0.pdf) (alleging that Lucile Salter Packard Children's Hospital, at Stanford, "is one of the institutions that has received a federal grand jury subpoena seeking identifying information and PHI for transgender minors and young adults to whom it provided care"); *Z.A. v. Blanche*, No. 26-cv-04998-PCP, 2026 WL 1907181, at *24–25 (N.D. Cal. July 2,

2026) (granting in part motions for provisional class certification and preliminary injunction), *appeal docketed*, No. 26-4388 (9th Cir. July 10, 2026).

63. On August 11, 2026, President Trump posted on Truth Social, "Thanks to our strong position and pressure on this issue over the past year and a half, dozens of U.S. hospitals have already ended this so-called 'gender-affirming care,' and we expect many more to follow. . . . While the Dumocrat [*sic*] Party wants your kids to be able to chop off their reproductive organs before they are old enough to vote, President Donald J. Trump (ME!) and the Republican Party say that is ABSURD, and we will protect America's children." Ex. 39.

***DOJ's Continued Campaign to "End Pediatric 'Gender-Affirming Care'" Through Settlements.***

64. Several hospitals have entered into settlements to resolve investigations opened under the EO and Directives into the hospitals' provision of gender-affirming care to patients under 18, including hospitals in Plaintiff States Connecticut and New York. Exs. 40-43.

65. The hospitals where such settlements have been made public are:

a. Texas Children's Hospital. Ex. 40.

b. Cleveland Clinic. Ex. 41.

c. Connecticut Children's. Ex. 42.

d. Mount Sinai. Ex. 43.

66. On May 15, 2026, DOJ announced a settlement with Texas Children's Hospital. Ex. 44.

67. The press release states that "the investigations into sex-rejecting procedures on minors are being led by the Justice Department's Civil Division Enforcement and Affirmative Litigation Branch and Commercial Litigation Branch, Fraud Section." Ex. 44.

68. On May 18, 2026, Brett Shumate announced the Texas settlement on X as a "landmark $10 million resolution to stop 'gender-affirming care' in Texas. Ex. 45.

69. On July 17, 2026, more than two months after issuing the press release regarding Texas Children's Hospital, Brett Shumate, on behalf of DOJ, signed the settlement agreement between the United States and Texas Children's Hospital. Settlement Agreement. Ex. 40.

70. The settlement comprises two signed agreements. Ex. 40.

71. The settlement requires the hospital to pay $10 million in damages and penalties and permanently cease providing gender-affirming care to patients of any age. Ex. 40.

72. The settlement requires the hospital to create and maintain a list of every past, present, and future patient of any age whose records include any gender dysphoria or gender-identity disorder diagnosis. Ex. 40.

73. DOJ negotiated the settlement on behalf of HHS OIG, which also signed the agreement. Ex. 40.

74. The settlement is the result of coordination with the Texas Attorney General, who is also a party to the agreement. Ex. 40.

75. The share of the settlement due to the United States was $1.395 million. The remainder went to Texas and the *qui tam* relator who initiated the suit. Ex. 40.

76. The settlement is signed by, *inter alia*, Defendant Brett Shumate; Susan Gillin, Assistant Inspector General for Legal Affairs of the Office of the Inspector General of HHS; John Marck, U.S. Attorney for the Southern District of Texas; and Ken Paxton, Texas Attorney General. Ex. 40.

77. On June 5, 2026, DOJ announced a settlement with the Cleveland Clinic Foundation. Exs. 41, 45.

78. The settlement comprises two signed agreements. Ex. 41.

79. The settlement is a joint settlement with both DOJ and the Ohio Attorney General.

80. The settlement requires the hospital to pay $300,000 to the federal government and $8,000 to Ohio. *Id.*

81. The settlement prohibits the hospital from providing gender-affirming care to patients under 18, or referring patients for such care, for a period of 20 years. *Id.*

82. DOJ's press release announcing the settlement describes the agreement as securing "the cessation of these dangerous practices masquerading as medical treatment[.]" *Id.*

83. DOJ negotiated the settlement in coordination with HHS OIG, which signed the agreement. *Id.*

84. The settlement is signed by, *inter alia*, Defendant Brett Shumate; Susan Gillin, Assistant Inspector General for Legal Affairs of the Office of the Inspector General of HHS; David Toepfer, U.S. Attorney for the Northern District of Ohio; and Dave Yost, Ohio Attorney General. *Id.*

85. DOJ's press release announcing the settlement stated, "[t]hese matters and the investigations into sex-rejecting procedures on minors are being led by the Justice Department's Civil Division Enforcement and Affirmative Litigation Branch and Commercial Litigation Branch, Fraud Section." *Id.*

86. On August 5, 2026, DOJ announced a settlement with Connecticut Children's Hospital. Exs. 42, 47.

87. DOJ's press release announcing the settlement states the "resolution obtained in this matter was the result of a coordinated effort between the Civil Division's Enforcement and Affirmative Litigation Branch and the Commercial Litigation Branch, Fraud Section, the U.S.

Attorney's Office for the Northern District of Texas, and the Department of Health and Human Services Office of Inspector General." Ex. 47.

88. DOJ's press release announcing the settlement quotes Associate Attorney General Stanley Woodward as saying, "'The Department of Justice will stop at nothing to protect America's children . . . This resolution is a reminder to hospitals, medical providers, and pharmaceutical companies that the Justice Department will vigorously enforce federal law, especially where the lives of children are endangered.'" *Id.*

89. The settlement comprises two signed agreements. Ex. 42.

90. The settlement requires the hospital to pay the United States $60,000 and cease providing gender-affirming care to patients under 18 or referring patients for such care. *Id.*

91. DOJ negotiated the settlement in coordination with HHS OIG, which signed the settlement. *Id.*.

92. The settlement is signed by, *inter alia*, Defendant Brett Shumate; Susan Gillin, Assistant Inspector General for Legal Affairs of the Office of the Inspector General of HHS; and Ryan Raybould, U.S. Attorney for the Northern District of Texas. *Id.*

93. On September 4, 2026, DOJ announced a settlement with Mount Sinai Health System. Ex. 43.

94. DOJ's press release announcing the Mount Sinai settlement states the hospital will be required to pay an undisclosed monetary penalty and cease providing gender-affirming care to patients under 18. *Id.*

95. DOJ's press release announcing the Mount Sinai settlement stated:

> In January 2025, President Trump issued an order "Protecting Children from Chemical and Surgical Mutilation," directing the Department of Justice to prioritize investigations and enforcement actions involving violations of federal law in the provision of so-called "gender-affirming care" to children. In April 2025,

> Attorney General Pam Bondi issued a memorandum on "Preventing the Mutilation of American Children."
>
> Acting on these directives, the Civil Division launched a nationwide investigation into the child gender-transition industry. The investigation examines potential violations of the Food, Drug, and Cosmetic Act, the False Claims Act, and other federal health care laws, including fraudulent billing practices such as the use of false diagnosis codes to obtain payment from federal health care programs and private insurers. These schemes compound the harm inflicted on vulnerable children by fraudulently shifting the cost of potentially unlawful medical interventions to taxpayers and insurers.
>
> Today's agreement is one result of that nationwide investigation.

Ex. *Id.*

96. DOJ's press release announcing the Mount Sinai settlement describes the settlement as "the result of a coordinated effort between the Civil Division's Enforcement and Affirmative Litigation Branch and the Commercial Litigation Branch, Fraud Section, the U.S. Attorney's Office for the Northern District of Texas, the U.S. Department of Health and Human Services, Office of Inspector General, and the Food and Drug Administration Office of Criminal Investigations." *Id.*

97. DOJ's press release announcing the Mount Sinai settlement stated that securing the settlement reflects its commitment to "holding medical providers, hospitals, and pharmaceutical companies accountable for unsound medical practices and procedures that put our kids at risk," and that "[t]he Civil Division's Enforcement & Affirmative Litigation Branch and Commercial Litigation Branch will continue to pursue these cases across the country[.]" *Id.*

98. DOJ's press release announcing the Mount Sinai settlement quotes Defendant Brett Shumate as saying: "While we are grateful when we secure resolutions to end this discredited practice and protect children, we must not and will not rest in our pursuit of justice for the victims it has left behind." *Id.*

99. On September 4, 2026, DOJ, under the handle @TheJusticeDept, posted an X message titled: "Justice Department Secures Agreement with Mount Sinai to End Pediatric 'Gender-Affirming Care. Ex. 48.

100. Also on September 4, 2026, Brett Shumate, under the handle @AAGShumate, reposted the Mount Sinai announcement from @TheJusticeDept and stated: "As part of another groundbreaking resolution with @TheJusticeDept, Mount Sinai Health System will no longer perform sex-rejecting procedures on children in New York and has agreed to provide free medical care to victims of these procedures. @AGToddBlanche @USAttyRaybould" Ex. 49.

***Other Federal Agencies' Actions to End Gender-Affirming Care.***

101. Defendants have admitted that the administration's attack on gender-affirming care is a "whole of government effort." *See* Doc No. 99 at 71:24; *see also* Ex 43.

102. DOJ has worked in active concert with other federal agencies, including HHS and the FDA, to implement and enforce the EO and Directives. Ex. 43.

103. On July 2, 2025, DOJ and HHS announced the formation of a joint False Claims Act Working Group. Ex. 30.

104. The press release announcing the Working Group describes its mandate as "strengthening their ongoing collaboration to advance priority enforcement areas" as articulated in the Shumate Directive. *Id.*

105. The press release announcing the Working Group states that "HHS shall make referrals to DOJ of potential violations of the FCA that reflect Working Group priorities" including those articulated in the Shumate Directive. *Id.*

106. On August 13, 2026, the U.S. Department of Health and Human Services (HHS) released a report titled *Wolves in White Coats: How Doctors and Hospitals Pushed and Profited*

*from the Fraud of "Gender Medicine,* "a commissioned report examining insurance coding practices, perverse financial incentives, and the provision of sex-rejecting procedures for minors." Ex. 50.

107. On August 12, 2026, Secretary Kennedy wrote to the HHS Inspector General stating, *inter alia*: "The analysis conducted in HHS's Wolves in White Coats: How Doctors and Hospitals Pushed and Profited from the Fraud of 'Gender Medicine' Report identifies an objectively defined cohort of claims that exhibit potentially anomalous billing patterns, which justifies further scrutiny by the HHS OIG." Ex. 51 at 1.

108. Secretary Kennedy's August 12, 2026 letter referred dozens of health care providers for investigation by the HHS Office of Inspector General ("HHS OIG"). *Id.*

109. State Facilities owned, operated, and/or funded by Plaintiff States were among the providers Secretary Kennedy referred to HHS OIG for investigation. *Id.*

110. Health care providers that operate in Plaintiff States were among the providers Secretary Kennedy referred to HHS OIG for investigation. *Id.*

111. In *Endocrine Society v. Federal Trade Commission*, No. CV-26-512, 2026 WL 1257289, at **8, 11-12 (D. D.C. May 7, 2026), the U.S. District Court for the District of Columbia preliminarily enjoined the FTC from investigating the plaintiff medical organization for its statements endorsing medically necessary gender-affirming care.

112. The Court stated that the civil investigative demand issued by the FTC was "one more step in a multiagency campaign to stamp out" gender-affirming care, including the "legion of investigations into proponents of transgender medical care" and subpoenas initiated by the Department of Justice.

113. In *World Professional Association of Transgender Health v. Federal Trade Commission*, No. 26-cv-00532, 2026 WL 1257321, at *2-4 (D.D.C. May 7, 2026), the U.S. District Court for the District of Columbia enjoined the FTC from investigating the plaintiff organization, relying on its findings and conclusions in its *Endocrine Society* opinion.

**C. The Statutes at Issue.**

114. Congress enacted the Female Genital Mutilation Statute (FGM Act) in 1996. Omnibus Consolidated Appropriations Act, 1997, Pub. L. 104–208, § 645, 110 Stat. 3009 (Sep. 30, 1996).

115. In enacting the FGM Act, Congress found that "the practice of female genital mutilation is carried out by members of certain cultural and religious groups within the United States," and that "such mutilation infringes upon the guarantees of rights secured by Federal and State law, both statutory and constitutional." H.R. Conf. Rep. 104-863, § 645(a)(1), (3), 1996 WL 562036 at **725-26 (Sep. 28, 1996).

116. The FGM Act was revised in 2021, when Congress passed the Strengthening Opposition to Female Genital Mutilation Act of 2020 (STOP FGM Act). Pub. L. 116-309, § 3, 134 Stat. 4923 (Jan. 5, 2021).

117. In enacting the STOP FGM Act, Congress found that "[f]emale genital mutilation is recognized internationally as a human rights violation and a form of child abuse, gender discrimination, and violence against women and girls. Female genital mutilation is a global problem whose eradication requires international cooperation and enforcement at the national level. The United States should demonstrate its commitment to the rights of women and girls by leading the way in the international community in banning this abhorrent practice." Pub. L. 116-309, § 2, 134 Stat. 4922 (Jan. 5, 2021).

118. The FGM Act and STOP FGM Act are codified at 18 U.S.C. § 116.

119. Providers in Plaintiff States testified that they have never understood 18 U.S.C. § 116 to prohibit licensed providers from providing medically necessary gender-affirming in clinical settings. Ex. 10 at 10, 12 ¶¶ 33, 38; Ex. 61 at 4-6 ¶¶ 13, 18-20.

120. On May 19, 2025, U.S. Representative Marjorie Taylor-Greene introduced legislation that would amend 18 U.S.C. § 116 to apply to gender-affirming care. *See* Protect Children's Innocence Act, H.R. 3492, 119th Cong. (2025).

121. On September 2, 2025, DOJ transmitted a legislative proposal to Congress that would ban "chemical and surgical mutilation under the guise of 'gender-affirming care,' in line with Executive Order 14187." *See* U.S. Dep't of Justice, Office of the Att'y Gen., Press Release No. 25-901, *The Department of Justice Proposes Legislation to Protect Children from Gender Mutilation* (Sep. 3, 2025) https://www.justice.gov/opa/pr/department-justice-proposes-legislation-protect-children-gender-mutilation ("Yesterday the U.S. Department of Justice transmitted a legislative proposal to Congress that protects and defends children from chemical and surgical mutilation under the guise of 'gender-affirming care,' in line with Executive Order 14187.") (last visited Sep. 13, 2026), Ex. 52.

122. In a press release announcing the introduction of DOJ's proposed legislation, sponsor U.S. Senator Marsha Blackburn stated the legislation would "codify President Trump's executive order ending the United States' support of 'transitioning' children," and cited the Denial of Care EO. *See* Sen. Marsha Blackburn, *Blackburn, Colleagues Introduce 'The Chloe Cole Act' to Ban Chemical and Surgical Mutilation of Children* (Sep. 18, 2025), https://www.blackburn.senate.gov/2025/9/health%20care/blackburn-colleagues-introduce-the-chloe-cole-act-to-ban-chemical-and-surgical-mutilation-of-children (including a link to DOJ

Press Release No. 25-901 when stating that DOJ "transmitted this legislative proposal to Congress earlier this month, and it is endorsed by Attorney General Pam Bondi") (last visited Sep. 13, 2026), Ex. 53.

123. On April 29, 2026, members of congress introduced legislation to "prohibit gender transition on minors" by "authoriz[ing] the Secretary of Health and Human Services to impose civil penalties on person who perform gender transition procedures on minors[.]" STOP Act, H.R. 8573/S. 4426, 119th Cong. (2026).

124. The Food, Drug, and Cosmetic Act (FDCA) was first enacted in 1938. Pub. L. 75-717, 52 Stat. 1040 (June 25, 1938). The FDCA creates protections against deficits in the safety and efficacy of food, drugs, devices, and cosmetics in the United States.

125. The FDCA does not prohibit the off-label use of approved drugs. Doc No. 118 ¶ 156.

126. The Food and Drug Administration (FDA) has made public statements that the prescription and administration of FDA-approved drugs for off-label purposes does not run afoul of the FDCA. FDA, *Communications From Firms to Health Care Providers Regarding Scientific Information on Unapproved Uses of Approved/Cleared Medical Products; Questions and Answers; Guidance for Industry* (Jan. 2025) at 8–9 https://www.fda.gov/media/184871/download (acknowledging various circumstances in which health care providers may validly prescribe drugs for off-label use) Ex. 54.

127. The Department of Justice Office of Legal Counsel (DOJ OLC) has made public statements that the prescription and administration of FDA-approved drugs for off-label purposes does not run afoul of the FDCA. Steven A. Engel, *Whether the Food and Drug Administration*

*Has Jurisdiction over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81, 85 (May 3, 2019), https://www.justice.gov/olc/opinion/file/1162686/dl, Ex. 55.

128. The FDA's public website explains that once the FDA "approves a drug, health care providers generally may prescribe the drug for unapproved use when they judge that it is medically appropriate for their patient." FDA, *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label, Ex. 56.

129. Providers in Plaintiff States testified that they have not understood the FDCA to prohibit providers from purchasing, storing, prescribing, or administering FDA-approved drugs for off-label uses, including in the provision of gender-affirming care. Ex. 57 at ¶¶ 17–18; Ex. 59 at ¶¶ 25–27; Ex. 60 at ¶¶ 26–29; Ex. 61 at ¶¶ 18–20; Ex. 62 at ¶¶ 19–22; Ex. 63 at ¶¶ 23–26; Ex. 64 at ¶¶ 27–28.

130. Providers in Plaintiff States testified that they have not understood the FDCA to prohibit providers from communicating with their patients about FDA-approved drugs for off-label uses, including in the provision of gender-affirming care. Ex. 57 at ¶¶ 17–18; Ex. 59 at ¶¶ 25–27; Ex. 60 ¶ 26; Ex. 61 ¶¶ 18–20; Ex. 62 at ¶¶ 19–22; Ex. 63 at ¶¶ 23–26; Ex. 64 at ¶¶ 27–28.

131. The False Claims Act (FCA) was initially adopted in 1863 in response to fraud in defense contracts during the Civil War. *Kellogg Brown & Root Services, Inc. v. United States*, 575 U.S. 650, 652-53 (2015) (citing S. Rep. No. 99-345, at 8 (1986)); An act to prevent and punish Frauds upon the Government of the United States, 12 Stat. 696, 37 Cong. Ch. 61 (Mar. 2, 1863); *United States v. McNinch*, 356 U.S. 595, 599 (1958) ("The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department.").

132. The FCA prohibits fraudulent billing to the federal government, such as when a provider submits reimbursements for services rendered to patients who do not exist. *See* U.S. Dep't of Justice, Office of Public Affairs, Press Release No. 22-1151, *Doctor Pleads Guilty to Role in $54 Million Medicare Fraud Scheme* (Oct. 25, 2022). Ex. 65.

133. The FCA prohibits fraudulent billing to the federal government, such as where a provider bills for a more expensive service where they have rendered a less expensive service. *See* U.S. Dep't of Justice, Office of Public Affairs, Press Release No. 22-1117, *Carter Healthcare Affiliates and Two Senior Managers to Pay $7.175 Million to Resolve False Claims Act Allegations for False Florida Home Health Billings* (Oct. 18, 2022). Ex.66.

134. Providers in Plaintiff States testified that they have not understood the FCA to prohibit the provision of medically necessary gender-affirming care. *See* Ex. 61 at ¶¶ 18–20; *see also* Ex. 60 ¶¶ 29, 32; Ex. 62 at ¶¶ 22–27; Ex. 63 at ¶¶ 26, 29.

## D. Plaintiff States Provide and Protect Access to Gender-Affirming Care for Patients Under 19.

***Plaintiff States Exercise Their Sovereign Prerogative to Regulate the Practice of Medicine, Including by Protecting Access to Gender-Affirming Care.***

135. Plaintiff States have the authority and exercise the authority to regulate the practice of medicine within their states. *See* Appendix A to Pls.' Mem. of Law in Supp. of Summary Judgment and Opp'n to Defs.' Mot. for Summary Judgment [hereinafter "Pls.' MOL App. A"]; Doc No. 118 ¶ 227–28, 237.

136. Many Plaintiff States have enacted laws, regulations, and constitutional amendments protecting transgender individuals and protecting access to gender-affirming care. Doc No. 118 ¶¶ 65–86; Pls.' MOL App. A.

137. In the States' sovereign judgment, preserving access to this care is critical to ensuring the health, dignity, and autonomy of transgender individuals within their borders. *See, e.g.*, S.B. 4914B, 206th Leg., Reg. Sess. (N.Y. 2025) ("The legislature finds and reaffirms that the state has a paramount interest in protecting access to health care, including reproductive health care and gender-affirming health care, as such health care is fundamental to each person's exercise of bodily autonomy, dignity, and equal citizenship. The state has enshrined the fundamental right to bodily autonomy and reproductive decision-making in its constitution. It has furthered codified in numerous statutes the principle that every individual has the right to privacy and equality with respect to their personal medical decisions, including reproductive and gender-affirming health care.").

138. Some Plaintiff States protect the right to access gender-affirming care. *See* Pls.' MOL App. A.

139. Many Plaintiff States forbid discrimination on the basis of gender identity and/or medical diagnosis in the provision of health care. *See* Pls.' MOL App. A; Doc No. 118 ¶¶ 65–86.

140. Many Plaintiff States mandate insurance coverage for gender-affirming care and/or forbid discrimination under an insurance plan on the basis of gender identity. *See* Pls.' MOL App. A; Doc No. 118 ¶¶ 65–86.

141. Many Plaintiff States have enacted laws intended to protect patients and providers who provide or access gender-affirming care from criminal and civil liability in an out-of-state jurisdiction. *See* Pls.' MOL App. A; Doc No. 118 ¶¶ 65–86.

142. Plaintiff States have laws and regulations that require states to provide transgender and gender-diverse individuals in state custody access to medically necessary gender-affirming care. *See* Pls.' MOL App. A; Doc No. 118 ¶¶ 65–86.

143. All Plaintiff States have boards that oversee the licensing of medical professionals. Doc No. 118 ¶¶ 87, 88; See *Contact a State Medical Board*, Fed'n of State Med. Bds., http://www.fsmb.org/state-medical-boards/contacts (last visited Sep. 14, 2026) (directory of state medical boards in all fifty states) Ex. 67.

144. Plaintiff States set a variety of requirements for obtaining a medical license, most commonly including graduation from an accredited medical school, completing one or more years of residency or fellowship, and passing a licensing examination. *See* Doc No. 118 ¶¶ 87, 88; Pls.' MOL App. A.

145. States, through their legislatures and regulatory boards, also regulate medical practice by disciplining licensees who act illegally or unethically or who violate standards of care and by directly regulating how licensed practitioners may conduct medical practice. *See* Doc No. 118 ¶ 88; Pls.' MOL App. A.

146. Many Plaintiff States have, by law, established 18 as the age of majority. *See* Pls.' MOL App. A.

147. Transgender youth and their families have relied on the accessibility of gender-affirming care in Plaintiff States. *See* Ex. 68 ¶¶ 1, 4, 9, 12, 17–18, 20–22; Ex. 69 ¶¶ 1, 4, 10–11, 14, 16–17.

148. In some instances, the availability of gender-affirming care in the Plaintiff States has caused transgender youth and their families to move to those Plaintiff States. *See* Ex. 10, ¶¶ 24–25; Ex. 62 ¶ 5.

***Plaintiff State Facilities Provide Gender-Affirming Care to Patients Under 19.***

149. Some Plaintiff States own, operate, and/or fund Hospitals ("State Facilities") that provide gender-affirming care to patients under 19. *See* Ex. 10, ¶¶ 1, 4, 6, 21–23; Ex. 57, ¶¶ 3–4, 5–8; Ex. 58 ¶¶ 3, 7, 22–24, 27, 41; Ex. 70, ¶¶ 3, 7; Ex. 61, ¶¶ 1, 5–6, 30; Ex. 71, ¶ 16.

150. Plaintiff States' State Facilities provide gender-affirming care which includes hormone therapy, puberty blockers, and/or surgical treatment. *See* Ex. 10, ¶¶ 1, 6, 21–23; Ex. 57 ¶¶ 3, 5–7; Ex. 58 ¶¶ 3, 7, 22–24.

151. Several State Facilities have been providing gender-affirming care for 10 or more years. *See* Ex. 10 ¶ 22 ("The pediatric gender-affirming care program staffed by faculty physicians at SOSM was established more than 10 years ago . . . ."); Ex. 57, ¶ 6 ("We have a few clinics that provide gender affirming care at our institution, and some of them focus on youth, and others focus more on adults. They all started at different times within the past 15 years."); Ex. 70, ¶ 7 ("In my clinical practice, I provide gender-affirming psychological care for youth, adolescents and adults alongside other clinicians. I have served in a leadership role for an interdisciplinary gender program in a large health system for the last 10 years.").

152. State facilities have invested significant capital establishing medical centers and academic programs devoted to gender-affirming care, hiring staff, admitting students, securing facilities, and purchasing equipment. *See* Ex. 10 ¶¶ 1, 22-23; Ex. 57 ¶¶ 5-6; Ex. 58 ¶¶ 3, 7, 19; Ex. 70 ¶¶ 3, 7.

153. State Facilities in Plaintiff States bill Medicaid for gender-affirming care for patients under 18. *See* Ex. 10 ¶ 29 ("Bills for gender-affirming care submitted for the clinical services that I and other SOSM faculty physician colleagues provide have generally been accepted and paid by Medicaid.").

***Plaintiff State Agencies Are Legally Obligated to Provide Medically Necessary Gender-Affirming Care to Youth in Their Custody.***

154. State Agencies in Plaintiff States are legally obligated to provide gender-affirming care to youth in their custody. See Ex. 72 ¶ 10 ("The Department has a legal obligation to provide adequate/appropriate medical care to all youth in its custody."); Ex. 73 ¶¶ 13 ("OCFS has a constitutional obligation to provide youth incarcerated in its juvenile justice facilities with adequate medical care, including medically necessary gender-affirming care."), 16 ("The agencies that operate the state's foster care programs are required to provide comprehensive physical and mental health services, including medically necessary gender affirming care, to every youth in their care or custody."); *id.* ¶¶ 14–15, 18; Pls.' MOL App. A.

155. Some Plaintiff States are subject to court orders requiring provision of gender-affirming care to youth in state custody. *See, e.g.*, Ex. 74 ¶¶ 11 (IL child welfare agency is bound by a consent decree " . . . to create and maintain a system that provides for (a) the prompt identification of medical, mental health, and developmental needs of youth in its care, and (b) timely access to adequate medical, mental health, and developmental services to meet identified needs," including gender-affirming care), 16–18.

***Plaintiff State Medicaid Programs Cover Medically Necessary Gender-Affirming Care.***

156. The Medicaid program provides health insurance for qualifying low-income individuals. *See* 42 U.S.C. § 1396-1; *Medicaid*, Ctrs. for Medicare & Medicaid Servs., https://www.medicaid.gov/medicaid (last visited Sep. 12, 2026) Ex. 75.

157. Medicaid is jointly financed by states and the federal government but administered by the states, subject to broad federal standards. *See* 42 U.S.C. §§ 1396a, 1396b, 1396c; *Medicaid*, Ctrs. for Medicare & Medicaid Servs., https://www.medicaid.gov/medicaid (last visited Sep. 12, 2026) Ex. 75.

158. States have broad flexibility to determine what populations and services to cover. *See Medicaid State Plan Amendments*, Ctrs. for Medicare & Medicaid Servs., https://www.medicaid.gov/medicaid/medicaid-state-plan-amendments (last visited Sep. 12, 2026) Ex. 76.

159. Most Plaintiff States' Medicaid programs cover medically necessary gender-affirming care for beneficiaries, including beneficiaries under 18. *See* Pls.' MOL App. A.

160. California's Medicaid program, Medi-Cal, has covered medically necessary gender-affirming care since at least 2001. Cal. Dep't of Health Care Servs., All Plan Letter No. 13-011: Ensuring Access to Transgender Services 1 (Sep. 25, 2013), Ex. 77; *Doe v. Bonta*, No. 00CS00954 (Cal. Super. Ct. Jan. 29, 2001).

161. In 1978, a California Court of Appeal twice ordered the state's Department of Health to authorize Medi-Cal claims for beneficiaries' gender-affirming surgeries, finding them medically necessary under the state's Medicaid regulations. See *Doe v. Lackner*, 145 Cal.Rptr. 570 (Ct. App. 1978); *G.B. v. Lackner*, 145 Cal.Rptr. 555 (Ct. App. 1978).

162. New York's Medicaid program has covered medically necessary gender-affirming care since 2015, including for beneficiaries under 18 since 2016. N.Y. Comp. Codes R. & Regs. tit. 18, § 505.2(*l*) (2016); *see Cruz v. Zucker*, 218 F.Supp.3d 246 (S.D.N.Y. 2016) (describing 2016 regulatory changes expanding New York Medicaid coverage for gender-affirming care for minors following class action challenge to program's prior exclusion of gender-affirming care for minors and entering judgment for class plaintiffs).

163. The Massachusetts Medicaid program, MassHealth, has covered medically necessary gender-affirming care since 2015. See Mass. Exec. Off. of Health & Hum. Servs., Off. of Medicaid, MassHealth Transmittal Letter PHY-142: Physician Manual (Updated Gender

Dysphoria and Sterilization Policies) (Jan. 2015), https://www.mass.gov/doc/phy-142-updated-gender-dysphoria-and-sterilization-policies/download. Ex. 78.

164. A Medicaid State Plan is an agreement between a state and the federal government describing the nature and scope of that state's Medicaid program, including the services to be provided, and giving assurance that it will be administered in conformity with specific federal requirements. *Medicaid State Plan Amendments*, Ctrs. for Medicare & Medicaid Servs., https://www.medicaid.gov/medicaid/medicaid-state-plan-amendments (last visited Sep. 12, 2026) Ex. 79 §§ 13025, 13026.

165. The federal government has 90 days to evaluate whether a submitted State Plan Amendment meets the federal requirements and approve or deny it on that basis. Ctrs. for Medicare & Medicaid Servs., Pub. No. 45, The State Medicaid Manual § 13026(E) Ex. 79 (State Medicaid Manual).

166. Some Plaintiff States' Medicaid State Plans explicitly include coverage of gender-affirming care for beneficiaries under 18. *See, e.g.*, Ex. 80 at 3 ¶ 2 ("In 2015, Connecticut amended its regulations and its State Plan to cover gender affirming care. Previously, several provisions in DSS's regulations had excluded coverage for gender affirming care. The Centers for Medicare & Medicaid Services ('CMS') approved Connecticut's State Plan amendment in April of 2015.").

167. Plaintiff State Plans explicitly covering gender-affirming care have been approved by the federal government. *See* Div. of Medicaid & Child.'s Health Ops., Ctr. for Medicare & Medicaid Servs., Approval Letter (Apr. 29, 2015), https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/CT/CT-15-007.pdf (approving Connecticut Medicaid State Plan Amendment No. 15-007 to "allow for coverage of gender

reassignment surgery and related services for the treatment of gender dysphoria") Ex. 81; Div. of Medicaid & Child.'s Health Ops., Ctr. for Medicare & Medicaid Servs., Approval Letter (June 6, 2018), https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/NV/NV-18-0006.pdf (approving Nevada Medicaid State Plan Amendment No. 18-006 to "include . . . transgender . . . services") Ex. 82; *see also* Ex. 80 ¶ 2.

168. The federal government has reimbursed Medicaid claims submitted by both State Facilities and private providers in Plaintiff States for gender-affirming care provided to patients under 18. *See* Ex. 10 ¶ 29 (State Facility reimbursed for federal claims); Ex. 61 ¶ 20 (members of medical professional association have "routinely billed Medicaid for the provision of medically necessary gender-affirming care, and such care has been reimbursed by state Medicaid programs using state and federal funds for years"); *see also* Doc No. 118 ¶¶ 2, 147 (admitting federal government may have reimbursed providers for gender-affirming care claims).

169. States are responsible for paying Medicaid providers for covered services rendered, after which the federal government reimburses states for a percentage of covered expenditures. *See* 42 C.F.R. § 430.0 (2026) ("Payments for services are made directly by the State to the individuals or entities that furnish the services."); 42 C.F.R. § 435.1002 (2026) (explaining that federal financial participation (FFP) is "available in expenditures for Medicaid services for all beneficiaries whose coverage is required or allowed under this part" and outlining criteria and exceptions); *see also Financial Management*, Ctrs. for Medicare & Medicaid Servs., https://www.medicaid.gov/medicaid/financial-management (last visited Sep. 13, 2026) Ex. 83 ("The Medicaid program is jointly funded by the federal government and states. The federal government pays states for a specified percentage of program expenditures, called the Federal Medical Assistance Percentage (FMAP).").

170. Because Plaintiff States' Medicaid programs cover gender-affirming care for beneficiaries under 18, Plaintiff States, in their function as Medicaid administrators, have submitted reimbursement claims to the federal government when their Medicaid programs paid for such care. *See* 42 C.F.R. § 430.0 (2026); 42 C.F.R. § 435.1002 (2026); Ex. 80 ¶ 7.

171. The federal government has reimbursed States for those claims. *See id.*

**E. Consequences of the EO and Directives**

***The Health care Industry Understood the EO and Directives As Clear Threats to Prosecute Providers of Gender-Affirming Care.***

172. Medical professional associations understood the EO and Directives to announce novel interpretations of the FCA, FDCA, and FGM statute that prohibit providing and billing the federal government for medically necessary gender-affirming care. Ex. 61 ¶¶ 13, 15, 17 ("The novel theories of liability articulated in the DOJ Directives are of grave concern to [American Academy of Pediatrics] members . . . [that] expose providers to enormous legal, financial, and professional risks."), 18 ("AAP members have never understood federal law to prohibit or penalize the provision of lawful gender-affirming care."), 19–20, 24; Ex. 71 ¶¶ 30 (describing "the unprecedented understanding of the FGM statute, the FDCA, and the FCA set forth on the DOJ Directives and the Care Denial Order"), 32–33; Ex. 71 at ¶ 30 (Executive Director of GLMA noted the "unprecedented understanding of the FGM statute, the FDCA, and the FCA" in the DOJ Directives).

173. Health care providers in Plaintiff States understood the EO and Directives to announce novel interpretations of the FCA, FDCA, and FGM statute that prohibit medically necessary gender-affirming care. Ex. 10 ¶¶ 41–42 ("I and other SOSM physicians fear that the Bondi and Shumate Directives' interpretation of federal law such as the FGM and/or FCA statutes may apply retroactively and subject our institution and/or our providers to criminal

and/or civil liability for care that was provided months or years ago, even at a time when the federal government formally discouraged discrimination against patients on the basis of gender identity."); Ex. 62 ¶¶ 17 ("In my experience, it would be unprecedented to view [keeping a drug at a hospital pharmacy or dispensing it to patients] as 'marketing' under the FDCA."), 18; Ex. 84 ¶ 15 ("I understand that although the FDCA prohibits off-label marketing, it does not prohibit medical professionals from prescribing drugs for 'off-label' uses, which is a common and necessary part of medical practice."); Ex. 59 ¶¶ 25–26 (explaining that "keeping [a] drug at a hospital pharmacy or dispensing it to patients as part of an office visit" are "indispensable to [her] medical practice" and that "it would be unprecedented to view these acts as 'marketing' under the FDCA"); Ex. 60 ¶¶ 26–28; Ex. 62 ¶¶ 19–22.

***Providers Across the Country Abruptly Terminated Care.***

174. The EO and Directives caused chaos, confusion, and fear across health care systems that provided gender-affirming care to patients under 19 in the Plaintiff States. Ex. 71 ¶¶ 29, 45 ("Our members have expressed mass confusion and fear across a multitude of medical institutions across the country, including public health institutions."); Ex. 85 ¶¶ 34, 36, 40 ("The Executive Order caused immediate confusion and turmoil, and hospital systems and providers scrambled . . . . The confusion and turmoil regarding medically necessary gender-affirming care has continued as the DOJ Directives came out, which make clear that the federal government plans to prosecute health care providers that offer medically necessary gender-affirming care."); Ex. 86 ¶ 10 ("[California community health centers] have expressed confusion and concern about these federal actions. . . . This confusion has led health centers to feel apprehension over continuing to provide gender-affirming care for both adolescents and adults in some clinical settings."); Ex. 61 ¶¶ 12 ("The Executive Order, the DOJ Directives, and related federal agency

actions have created a pervasive climate of fear."), 17 ("These actions have shocked, terrified, and outraged [American Academy of Pediatrics] members."), 28 ("The DOJ Directives have created a climate of panic and confusion among our members . . . ."); Ex. 84 ¶ 19 ("The Executive Order and DOJ Directives create an overwhelming sense of fear and uncertainty."); Ex. 87 ¶ 10 ("[California Medical Association]'s members have expressed confusion and concern about these federal actions."); Ex. 58 ¶ 39 ("Since the Executive Orders were issued, my clinic has received an overwhelming number of messages and phone calls from families who are terrified at the prospect of losing access to this care, or who have lost access to care elsewhere and need a new care location.").

175. As a result of the EO and Directives, health care providers in Plaintiff States believed they faced risk of both civil and criminal liability for providing or having provided gender-affirming care to patients under 19. See Ex. 10 ¶¶ 43, 53, 54; Ex. 57 ¶¶ 23, 24, 31; Ex. 59 ¶¶ 30, 48; Ex. 64 ¶ 37; Ex. 62 ¶¶ 25, 38; Ex. 70 ¶ 35; Ex. 88 ¶ 69; Ex. 84 ¶¶ 19, 20; Ex. 63 ¶ 29; Ex. 60 ¶¶ 32–34; Ex. 58 ¶ 40; Ex. 86 ¶ 9; Ex. 87 ¶¶ 9–10; Ex. 61 ¶ 24; Ex71 ¶ 33; Ex. 64 ¶ 29.

176. The EO and Directives left providers in Plaintiff States confused about how to both comply with the Directives and meet their legal and professional obligations to their transgender youth patients. See Ex. 10 ¶ 53 (providers experienced "distress and confusion about how to navigate our legal and professional obligations to provide medically necessary treatments free from discrimination to patients in need."); Ex. 71 ¶¶ 29, 40, 45 ("If [providers] choose to comply with the Care Denial Order and DOJ Directives, they endanger the health and wellbeing of their transgender adolescent and young adult patients. If they follow their duty to their patients by providing their transgender adolescent and young adult patients with the best care and the care they need, health professional and medical institutions risk prosecution.").

177. The EO and Directives have had a chilling effect on providers in Plaintiff States. See Ex. 71 ¶ 31; Ex. 72 ¶ 27; Ex. 73 ¶ 40; Ex. 84 ¶ 14; Ex. 80 ¶ 10.

178. Numerous health care providers in Plaintiff States stopped providing gender-affirming care to transgender youth due to the Executive Order and Directives. Doc No. 118 ¶¶ 4, 175 (admitting "that some providers have announced that they will no longer offer gender-related care"); Ex. 59 ¶¶ 34, 40; Ex. 89 ¶¶ 28-30, 36; Ex. 85 ¶ 38; Ex. 61 ¶¶ 29-30 (CEO of AAP testified that "[a]s a direct result of the DOJ Directives and the threats therein, gender-affirming care clinics at institutions that employ some of our members have shut down"); Ex. 60 ¶¶ 17–18, 21, 39–40, 42–43, 48–49, 58; Ex. 71 ¶ 46; Ex.84 ¶¶ 23–24; Ex. 64 ¶ 30; Ex. 62 ¶¶ 28–29; Ex. 87 ¶¶ 13–14; Ex. 88 ¶¶ 59–62; Ex. 73 ¶ 40; Ex. 60 ¶ 50.

179. Following the issuance of the EO and Directives, medical malpractice insurers operating in some Plaintiff States informed medical providers that the insurers would not cover physicians sued or subject to legal action by the federal government for providing gender-affirming care. *See* Ex. 87 ¶ 11; Ex. 86 ¶ 11.

180. Patients affected by these providers' cessation of care experienced confusion as well as interruptions in continuity of care. Ex. 85 ¶¶ 35, 38; Ex. 62 ¶¶ 28-30.

***Transgender Youth Have Been Denied Access to Care and Suffered Serious Physical and Mental Health Consequences.***

181. When transgender youth are denied access to medically necessary gender-affirming care, or their ongoing course of care is abruptly terminated or interrupted, it can cause serious health consequences. *See* Ex. 10 ¶ 46; Ex. 57 ¶¶ 4, 26; Ex. 58 ¶¶ 37-38; Ex. 70 ¶ 33; Ex. 71 ¶ 47; Ex. 72 ¶ 31; Ex. 59 ¶ 37; Ex. 60 ¶ 41; Ex. 88 ¶ 65; Ex. 95 ¶ 17; Ex. 61 ¶¶ 32, 46; Ex. 62 ¶ 30; Ex. 84 ¶¶ 29-30; Ex. 64 ¶ 33.

182. A primary care physician at a State Facility testified, "[s]topping gender affirming care for youth would be similar to stopping access to insulin for diabetic children in terms of the negative health impacts and in how much evidence we have that it is helpful to avoid expensive and deadly complications." Ex. 57 ¶ 4.

183. Transgender youth in Plaintiff States whose gender-affirming care was suspended, interrupted, or terminated because of the EO and Directives have suffered serious, worsened medical and mental health consequences as a result. Ex. 60 ¶ 41; Ex. 59 ¶ 37; Ex. 62 ¶ 30; Ex. 59 ¶ 41; Ex. 10 ¶ 46; Ex. 61 ¶ 32 (AAP); 72at ¶ 32.

184. Transgender adolescents who are denied medically necessary gender-affirming care are likely to have more expensive care needs in both the short- and long-term due to the denial of such care. Ex. 62 ¶ 30(d); Ex. 10 ¶ 46; Ex. 64 ¶ 33; Ex. 59 ¶ 37; Ex. 60 ¶ 41.

185. Transgender youth in Plaintiff States whose gender-affirming care was suspended, interrupted, or terminated because of the EO and Directives have already suffered from more expensive care needs that could have been treated earlier for less money as a result. Ex. 10 ¶ 46 (pediatrician at State Facility); Ex. 64 ¶ 33(d); Ex. 59 ¶ 37; Ex. 60 ¶ 41.

186. A gender-affirming care provider in a Plaintiff State testified that patients turned away by their previous providers have presented to their clinic with "psychological distress, the result of lacking medical care," and that, "[o]ne teenager ended up in the emergency department with acute suicidal ideation after learning that he would no longer be able to get health care at his prior practice; he felt abandoned and that nobody cared about him. Another received a letter that his prior program was shutting down and, in despair, cut his wrists as a result." Ex. 62 ¶ 30.

187. A physician who provides gender-affirming care in a Plaintiff State testified: "We have already witnessed significant deterioration in our gender diverse patient population's

mental health as these vulnerable young people try to cope with these extreme federal attacks and their consequences. The most severe example of this was a clinic patient dying by suicide in August 2025." Ex. 59 ¶ 41.

***State Agencies and Facilities Have Suffered Significant Increased Costs and Operational Impacts.***

188. States will bear the costs of paying through their Medicaid programs and other state funding streams designated to pay for medically necessary care for the increased, and more costly health care needs of transgender patients who were denied care as a result of the Directives. *See* Pls.' MOL App. A; Ex. 32 ¶¶ 10–13.

189. State agencies have faced increased costs and strained resources because of the EO and the Directives. Ex. 10 ¶ 44; Ex. 72 ¶ 32; Ex. 73 ¶ 41, 43; Ex. 74 ¶ 23; Ex. 80 ¶¶ 10–12.

190. In Plaintiff States, demand for mental health and other support services for transgender youth has risen due to the cessation of care, straining agency resources and resulting in long wait times. Ex. 72 ¶ 27–28, 32; Ex. 73 at ¶ 43; Ex. 74 ¶ 23.

191. As a result of the EO and Directives, gender-affirming care providers in Plaintiff States received an overwhelming volume of messages, calls, and appointment requests from transgender youth patients and their families who were terrified of losing care. *See* Ex. 58 ¶ 39; Ex. 70 ¶ 34.

192. State Facilities in Plaintiff States have expended significant resources responding to these inquiries and addressing current patients' questions and concerns regarding their ability to maintain necessary medical care. *See* Ex. 10 ¶¶ 45, 48; 70 ¶ 34; Ex. 57 ¶ 28; Ex. 61 ¶¶ 25, 27.

193. State providers and state facilities in Plaintiff States have incurred significant compliance and training costs associated with interpreting the EO and Directives, which has taken time away from providing care to patients. *See* Ex. 10 ¶ 44, 48–49; Ex. 57 ¶ 28; Ex. 58 ¶

41 ("The time spent in these responses is taken from our usual activities; for me, this impacts my availability for direct patient care, research and education. For my institution, these resources are pulled away from our overarching goal of providing outstanding, science driven and patient-centered care for our entire community.").

194. Following the EO and Directives, State Facilities in Plaintiff States that continued to provide gender-affirming care were inundated with new patients seeking care, straining resources and operations. See Ex. 57 ¶ 25 (appointment wait time at state facility more than doubled); Ex. 58 ¶ 41; Ex. 61 ¶ 31; Ex. 87¶ 15; Ex. 10 ¶ 45.

***State Agencies Are Unable to Meet Their Legal Obligations.***

195. State Agencies in Plaintiff States have a legal duty to provide medically necessary health care to youth in their custody, including gender-affirming care. *Supra* at 30; Pls.' MOL App. A.

196. By chilling the provision of gender-affirming care, the EO and Directives have made it difficult or impossible for state agencies in Plaintiff States to meet their legal obligation to provide medically necessary health care to youth in state custody. 72 ¶¶ 26, 28, 33; Ex. 73 ¶¶ 41, 48; Ex. 80 ¶ 13; Ex. 74 ¶¶ 22, 25; Ex. 90 ¶ 12.

197. Under state antidiscrimination requirements, state agencies in Plaintiff States have a legal duty to ensure individuals in custody are treated equally regardless of sex, gender identity, or gender expression. Ex. 73 ¶¶ 20, 22; Ex. 72 ¶¶ 12–13, 16; Ex. 74 ¶ 19; Ex. 90 ¶ 7.

198. State agencies in Plaintiff States understand these state antidiscrimination requirements to mean that state agencies "may not discriminate against transgender adolescents and must therefore treat an individual seeking medical care for gender dysphoria in the same way

it would treat an individual seeking medical care for any other diagnosis." Ex. 73 ¶ 22; *see also* Ex. 72 ¶¶ 12–13, 16; Ex. 74 ¶ 19; Ex. 90 ¶ 7.

199. By chilling the provision of gender-affirming care, the EO and Directives make it difficult or impossible for state agencies in Plaintiff States with custody of transgender minors to comply with their antidiscrimination requirements. *See, e.g.*, Ex. 73 ¶¶ 46–47 ("If the Executive Order and DOJ Directives are enforced, OCFS will be unable to comply with the antidiscrimination requirements enshrined in New York's constitution and reinforced in state statutes and regulations, because OCFS will be unable to provide transgender adolescents and/or adolescents seeking treatment for gender dysphoria with access to medical care in the same manner as it does for similarly situated cisgender adolescents and/or adolescents seeking treatment for other diagnoses.").

200. By interfering with Plaintiff State agencies' ability to fulfill their legal duties, the EO and Directives expose state agencies to increased litigation risk. Ex. 73 ¶¶ 44–46.

***The EO and Directives Interfere with Providers' Ability to Satisfy Legal and Ethical Obligations.***

201. Providers in Plaintiff States testified that they feel trapped between risking prosecution under the Directives should they continue to provide gender-affirming care and facing increased liability for failing to meet their legal and ethical obligations should they terminate care. *See e.g.*, Ex. 62 ¶ 35; Ex. 10 ¶ 50 ("Complying with the DOJ Directives… would violate our obligations as health care providers to avoid unprofessional conduct as defined in our state's regulations."); Ex. 58 ¶ 42 ("There is no way to discontinue this care without violating nondiscrimination laws, as one's gender identity must be considered in determining access to this care."); Ex. 61 ¶¶ 29–31, 34, 35 ("Between the threat of federal prosecution on one hand and state antidiscrimination liability on the other, our members are in an impossible position."); Ex.

59 ¶ 44; Ex. 57 ¶ 29; Ex. 60 ¶ 62 ("I am concerned that complying with the Executive Order and DOJ Directives has forced me to violate my institution's antidiscrimination standards and Pennsylvania's antidiscrimination law"); Ex. 84 ¶ 31; Ex. 62 ¶ 35.

202. Providers in Plaintiff States testified that they feel trapped between facing liability under the Directives and meeting their ethical obligations as health care providers. See Ex. 57 ¶ 30 ("Complying with the DOJ Directives and denying adolescents medically necessary gender-affirming care would violate my ethical obligations as a health care provider and cause moral injury."); Ex. 64 ¶ 36 (We can choose to continue supporting and offering medically necessary, lifesaving care to our transgender patients and risk federal prosecution. Or we can comply with the DOJ Directives, violating our professional obligations and endangering our patients); Ex. 61 ¶ 33 ("In order to comply with the DOJ Directives and deny adolescents medically necessary gender-affirming care, AAP members are being asked to violate their ethical obligations as physicians and have reported moral injury resulting in significant distress."); Ex. 10 ¶ 51; Ex. 57 ¶ 30; Ex. 59 ¶ 45; Ex. 71 ¶ 39; Ex. 60 ¶ 38; Ex. 62 ¶ 36.

***Providers Who Terminated Care Are Facing Lawsuits Under State Anti-Discrimination Laws.***

203. Several hospitals that ceased offering gender-affirming care following the EO, Directives, and other federal actions targeting providers of the care, including hospitals in the Plaintiff States, are now facing investigations, lawsuits, and other legal actions under state anti-discrimination laws. *See, e.g.*, *Boe v. Child.'s Hosp. Colo.*, 589 P.3d 478, 488 (Colo. 2026) (Colorado Supreme Court held that hospital discriminated against patients when it stopped providing gender-affirming care for adolescents in the wake of federal threats); *A.A. v. Rady Child.'s Health*, No. 26CU014680C (Cal. Super. Ct. Feb. 25, 2026); Press Release, Women's Law Project, Complaint Filed Against UPMC Children's Hospital for Unlawfully Denying

Gender-Affirming Care to Patients Under 19 (Sep. 23, 2025), https://www.womenslawproject.org/wp-content/uploads/2025/09/UPMC-Complaint-PR-9-23-25-B.pdf, Ex. 91; Press Release, GLAD Law, Families Challenge Abrupt End to Medical Care for Transgender Adolescents and Young Adults at Two Connecticut Hospitals (Dec. 17, 2025), https://www.gladlaw.org/connecticut-families-challenge-end-to-medical-care-for-transgender-youth, Ex. 92.

204. On May 18, 2026, the Colorado Supreme Court held that Children's Hospital of Colorado's "policy to suspend providing medical gender-affirming care explicitly discriminates against patients because of their gender identity." *Boe v. Child.'s Hosp. Colo.*, 589 P.3d 478, 490 (Colo. 2026).

205. The Court remanded to the trial court to grant plaintiffs a preliminary injunction requiring the hospital to resume offering the gender-affirming care services it had terminated in the wake of federal threats. *Boe v. Child.'s Hosp. Colo.*, 589 P.3d at 491.

206. The hospital is currently facing contempt proceedings for allegedly failing to resume offering gender-affirming care services for minors. *See* Plaintiffs' Contempt Hearing Brief, *Boe v. Child.'s Hosp. Colo.*, No. 2026-CV-30232 (Colo. Dist. Ct. Sep. 8, 2026) Ex. 93.

207. In those proceedings, the hospital informed the court that its physicians are refusing to resume providing the services because they fear prosecution under "the current unprecedented attack by the federal government on the transgender community and their caregivers." Defendants' Hearing Brief at 8–9, *Boe v. Child.'s Hosp. Colo.*, No. 2026-CV-30232 (Colo. Dist. Ct. Sep. 8, 2026); *see also id.* at 3. Ex. 94.

208. The hospital cited DOJ's recent settlement with Mount Sinai as evidence that "the federal government's campaign against providers of medical gender-affirming care has grown in

both intensity and vitriol." Defendants' Hearing Brief at 8, *Boe v. Child.'s Hosp. Colo.*, No. 2026-CV-30232 (Colo. Dist. Ct. Sep. 8, 2026) Ex. 94.

209. The hospital's providers issued a letter to their adolescent gender-affirming care patients regarding their decision not to resume care, stating: "Ultimately, each of our decisions is driven by the serious risk of federal action that could result in the inability to continue serving and caring for any patients for years into the future." Defendants' Hearing Brief at 8–9, *Boe v. Child.'s Hosp. Colo.*, No. 2026-CV-30232 (Colo. Dist. Ct. Sep. 8, 2026) Ex. 94.

Dated: September 14, 2026

By: /s/ Zoe Ridolfi-Starr
Zoe Ridolfi-Starr
Assistant Attorney General
Office of the Attorney General of the State of New York
28 Liberty Street, 16th Fl.
New York, NY 10005
Zoe.ridolfi-starr@ag.ny.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed this Statement of Material Facts in Support of Cross Motion for Summary Judgment with the Court's Electronic Court Filing system and it will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

September 14, 2026 /s/ ***Zoe Ridolfi-Starr***
Zoe Ridolfi-Starr