**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,<br><br>Defendants. | ) | Civil Action No. 1:25-CV-12162-AK |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................. 1

I. Threshold Grounds Continue to Require Judgment for Defendants ............................... 1

II. Plaintiffs' Claims Lack Merit. ........................................................................... 5

A. The Guidance is within the Department's authority and consistent with law (Count II). ........................................................................................... 5

B. The Department's enforcement priorities are not arbitrary and capricious (Count I). ........................................................................................... 8

C. The Tenth Amendment does not allow States to veto federal enforcement priorities (Counts III-IV) ........................................................................ 10

III. The Scope of Relief, If Any, Should Be Limited to Vacatur and Tailored To The Parties Before the Court. ........................................................................................ 11

CONCLUSION ........................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ... 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... 2

*Dalton v. Specter*,
511 U.S. 462 (1994) ... 11

*Diamond Alt. Energy, LLC v. E.P.A.*,
606 U.S. 100 (2025) ... 3

*Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*,
682 F.2d 12 (1st Cir. 1982) ... 12

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ... 13

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ... 8

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ... 15

*Garcia v. S.A. Metro. Transit Auth.*,
469 U.S. 528 (1985) ... 10

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ... 10

*Mass. Delivery Ass'n v. Coakley*,
671 F.3d 33 (1st Cir. 2012) ... 12

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
682 F.3d 1 (1st Cir. 2012) ... 10

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ... 13

*N.H. Lottery Comm'n v. Barr*,
386 F. Supp. 3d 132 (D.N.H. 2019) ... 12

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) ... 12

*New York v. United States*,
505 U.S. 144 (1992) ........ 10

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
187 F.4th 1112 (9th Cir. 2026) ........ 7, 9

*Samia v. United States*,
599 U.S. 635 (2023) ........ 14

*Town of Johnston v. Fed. Housing Fin. Agency*,
765 F.3d 80 (1st Cir. 2014) ........ 10

*Trump v. California*,
2026 WL 2473573 (Aug. 24, 2026) ........ *passim*

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 12, 15

*United States v. Bacto-Unidisk*,
394 U.S. 784 (1969) ........ 10

*United States v. Harris*,
128 F.3d 850 (4th Cir. 1997) ........ 8

*United States v. Johnson*,
114 F.3d 476 (4th Cir. 1997) ........ 11

*United States v. Skrmetti*,
605 U.S. 495 (2025) ........ 1

*Verosol B.V. v. Hunter Douglas, Inc.*,
806 F. Supp. 582 (E.D. Va. 1992) ........ 12

**Statutes**

28 U.S.C. § 2201(a) ........ 12

**Other Authorities**

Executive Order 14,075, Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, 87 Fed. Reg. 37189 (June 15, 2022) ........ 9

Executive Order 14,187, Protecting Children From Chemical and Surgical Mutilation, 90 Fed. Reg. 8771 (January 28, 2025) ........ 3, 4

## INTRODUCTION

Plaintiffs' opposition confirms that they seek an extraordinary judgment that would effectively immunize gender-related medical interventions from all federal scrutiny. Their search for a legal silver bullet is understandable given the "fierce scientific and policy debates about the safety, efficacy, and propriety of" administering these experimental treatments to children. *United States v. Skrmetti*, 605 U.S. 495, 525 (2025). The problem for Plaintiffs is that federal court is not the venue to try to win that ongoing debate. Whether wrapped in APA or Tenth Amendment garb, Plaintiffs cannot disguise that this suit is little more than an attempt to dictate how the Executive Branch prioritizes its resources to investigate potential violations of federal law.

Recent Supreme Court precedent forecloses Plaintiffs' standing. But even if this case presented a real case or controversy, Plaintiffs would lose on the merits. The contrary-to-law claim is based on the demonstrably false premise that the Department has somehow transformed the provision of all gender-related care into a federal offense through guidance memos. The arbitrary-and-capricious claim fares no better, as the Department identified the Executive Order it was implementing and reasonably explained its articulation of enforcement priorities. And the Tenth Amendment claim manages to fare worse, as it ignores federal supremacy as well as on-point Supreme Court and First Circuit precedent.

The Court should grant summary judgment to Defendants on all counts.

## ARGUMENT

### I. Threshold Grounds Continue to Require Judgment for Defendants

After Defendants moved for summary judgment, the Supreme Court decided *Trump v. California*, 2026 WL 2473573 (Aug. 24, 2026) (per curiam). That intervening decision confirms that Plaintiffs lack Article III standing. In *California*, a coalition of states sued in Massachusetts to challenge an Executive Order that, among other things, (1) directs the Department of Homeland

Security (DHS) to "take appropriate action to" create and send State Citizenship Lists; and (2) instructs the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State and local officials" who violate existing federal laws by issuing ballots to ineligible voters. Granting a stay, the Court held that the plaintiff states lacked Article III standing to challenge any part of the order.

Starting with the Citizenship List provision, the Court explained that it is merely "an internal directive from the President to a subordinate," *i.e.*, DHS. 2026 WL 2473573, at *2. Such a directive "imposes no obligations on the States, so they suffer no concrete harm from it." *Id.* Nor could the states "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"—the "costs they incurred in response to a speculative threat" do not count for Article III. *Id.* at *3 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)). The Court then rejected the states' argument that the provision "infringes the States' sovereign authority to create election rules." *Id*. A provision that "simply directs" an official "to take certain actions if appropriate, feasible, and lawful" "does *not* regulate the States[]." *Id.* (emphasis in original). Nor does it "impinge on the States' authority to create and enforce and a legal code." *Id.*

Next, addressing the EO's directive to the Attorney General, the Supreme Court held that "[t]he States lack standing to challenge [it] for much the same reason: It does nothing to them." *Id.* "Setting prosecutorial priorities lies within the President's Article II power. And his decision to prioritize the prosecution of certain offenses does not inflict a traditionally recognized harm on the States." *Id.* Nor could the States "avoid this straightforward analysis by misreading the Order." *Id.* The states "insist[ed]" that the order "credibly threatens them with prosecution," including if they did not use the Citizenship Lists, *id.*—arguing that the directives were "thinly veiled threat[s]

to institute criminal proceedings." Stay Opp. at 22. But that view was "inconsistent with the text of" the order. 2026 WL 2473573, at *3. The order merely "provides an array of *existing statutes* for the Attorney General to enforce." *Id.* (emphasis in original). "Without a textual basis for their concerns," "the States lack a 'well-founded fear' that they will be prosecuted." *Id*. The states' other alleged threat—that state officials may face prosecution for delivering ballots to 17-year olds—was also a "red herring." *Id.* The order required it to "be implemented consistent with applicable law," and, "on top of that," was limited "to only 'appropriate' prosecutions.'" *Id.* Finally, the government "disavowed any intention to prosecute state officials for lawfully providing ballots to 17-year-olds." *Id.*

This case is even easier than *California*, which named "State and local officials" as specific prosecutorial priorities. *Cf. Diamond Alt. Energy, LLC v. E.P.A.*, 606 U.S. 100, 114 (2025) ("When a plaintiff is the object of a government regulation, there should ordinarily be little question that the regulation causes injury to the plaintiff."). The EO merely directs the Department to "prioritize investigations and take appropriate action" against "any entity" that "may" have violated certain existing federal laws. EO § 8(c). As in *California*, the EO requires that its implementation be "consistent with applicable law." *Id.* § 11(b). And the same is true of the Guidance. The Bondi Memo—which was issued "[p]ursuant to" the Protecting Children EO, Doc No. 1-6 at 5—directs "appropriate investigations" of suspected FDCA violations by "manufacturers and distributors"; "investigations under the [FCA] of false claims submitted to" the government; and prosecutions of female genital mutilation "to the fullest extent possible," *id*. The Shumate Memo, in turn, simply "prioritize[s] investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with" the EO and Bondi Memo. Doc No. 1-7 at 3. And Defendants have said from the start that they have no intention of prosecuting entities that provide gender-

related medical treatments consistent with existing federal law. *E.g,*, Doc No. 82 at 8 ("Nor does the EO or the Guidance assert that providing gender-related care is inherently illegal under federal law, or that state laws protecting such care are invalid.").

Indeed, Plaintiffs concede that *California* forecloses their standing to challenge the EO.[1] They no longer seek any "relief as to the EO" given the Supreme Court's determination that "plaintiff states likely did not have standing to challenge specific provisions of an Executive order directing the Attorney General to 'prioritize' investigation and prosecution of violations of existing federal election law." Doc No. 133 at 9 & n.1. That reasoning necessarily dooms Plaintiffs' challenge to the Guidance, too.

Plaintiffs lack standing because "[s]etting prosecutorial priorities" is the constitutional prerogative of the Executive Branch and "does not inflict a traditionally recognized harm on the States." *California*, 2026 WL 2473573 at *3. Plaintiffs lack standing because the threat of prosecution they allege "is inconsistent with the text" of the Guidance, which merely "provides an array of *existing statutes* for the Attorney General" and his subordinates "to enforce." *Id.* (emphasis in original). Plaintiffs lack standing because the Guidance is required to "be implemented consistent with applicable law" and, moreover, limits itself to "appropriate prosecutions." *Id.* Plaintiffs lack standing because the federal government has "unsurprisingly disavowed any intention to prosecute state officials" or instrumentalities "for lawfully providing" gender-related medical interventions. *Id.* Plaintiffs lack standing as sovereigns because the Guidance is an "internal directive [that] does *not* regulate the States'" provision of healthcare nor

---

[1] Specifically, Plaintiffs say they abandon their challenge to the EO "[t]o the extent" it is "construed as being limited to 'appropriate' prosecutions consistent with applicable law." Doc No. 133 at 9 & n.1. No construing is needed: the EO states it "shall be implemented consistent with applicable law." EO § 11(b).

"impinge on the States' authority to create and enforce a legal code for" healthcare. *Id.* (emphasis in original). And Plaintiffs lack standing because the "propriety harms" they allege are attenuated and self-inflicted, and "States cannot manufacture standing merely by inflicting harm on themselves." *Id.*

In short, Plaintiffs lack standing to challenge the Guidance because it "does nothing to them." *California*, 2026 WL 2473573 at *3. Plaintiffs would of course be free to challenge "any measure taken by the Government to implement" the Guidance against them, *id.* at *5—but the only alleged implementing actions that Plaintiffs identify are subpoenas issued and allegedly issued to third parties—not them—and which those third parties may independently challenge in separate quashal actions. In the meantime, Plaintiffs remain free to submit amicus filings in related matters that present an actual case or controversy. *See, e.g.*, Br. of Amici Curiae States In. Supp. of Appellee QueerDoc, No. 25-7384. But the Guidance "itself does not harm the States." *Id.*

Defendants respectfully preserve and incorporate by reference the other threshold arguments raised in their motion to dismiss and reply. *See* Doc No. 82 at 6-19; Doc No. 90 at 2-13. As before, Defendants recognize that the Court rejected those arguments at the motion to dismiss stage and do not seek to relitigate them here.

## II. Plaintiffs' Claims Lack Merit.

Even if Plaintiffs' policy disagreement with the Guidance presented a justiciable case or controversy, their claims would still fail.

### A. The Guidance is within the Department's authority and consistent with law (Count II).

As in *California*, Plaintiffs' contrary-to-law claim rests on a brazen "misreading" of the Guidance that is "inconsistent with [its] text." 2026 WL 2473573 at *3.

Start with the FCA. As the government has explained, the Guidance targets only "false claims submitted to federal health care programs." Doc No. 124 at 13 (quoting Bondi Memo, Doc No. CITE). Plaintiffs nonetheless insist that the Guidance "adopt[s] a novel theory of 'falsity' under the FCA that would render billing the federal government for gender-affirming care *per se* fraudulent." Doc No. 133 at 23. Plaintiffs' failure to provide a citation for that assertion is almost understandable, because it is simply incorrect. No matter how much Plaintiffs wish it to be true, the Guidance says no such thing. And because Plaintiffs seemingly cannot dispute that "inaccurate billing" can violate the FCA, Plaintiffs' pivot to arguing that this a "post hoc recharacterization" of the Guidance that is not "supported . . . by the text." Doc No. 133 at 24. This is not a good argument. In instructing the Civil Division to investigate "false claims submitted to federal health care programs," the Bondi Memo specifically offers as examples a physician who prescribes puberty blockers for one purpose but falsely reports a different diagnosis to CMS, as well as a hospital that performs one procedure while billing Medicaid for "an entirely different procedure." Doc No. 1-6. The Shumate Memo likewise prioritizes FCA enforcement against providers who "knowingly submit[] claims to Medicaid with false diagnosis codes." Doc No. 1-7 at 4. Plaintiffs' FCA argument truly blinks reality.

Plaintiffs' FDCA argument rests on a similarly bad distortion. The Guidance simply does not "threaten liability . . . when providers communicate with their patients about gender-affirming treatments." Doc No. 133 at 21. Instead, it directs "appropriate investigations" of suspected FDCA violations by "manufacturers and distributors engaged in misbranding" through "the promotion of off-label uses of" certain drugs, including through "informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses." Doc No. 1-6 at 5. And the Shumate Memo emphasizes suspected FDCA violations by manufacturers and dealers

suspected of illegal sales—not off-label use by a patient. Doc No. 1-7 at 3-4. Plaintiffs also say that Defendants "identify no case on point supporting their novel theory of FDCA liability." Doc No. 133 at 23. This statement would be misleading were it not so obviously false. As discussed on the first page of the government's memorandum, the Ninth Circuit's decision in *QueerDoc, PLLC v. U.S. Dep't of Just.*, 187 F.4th 1112, 1139 (9th Cir. 2026), *petition for reh'g pending* (filed Sept. 30, 2026)—a case that Plaintiffs know well given their participation in it as amici—reversed quashal of a Department subpoena issued to an online gender-medicine provider to investigate FDCA offenses. After describing the investigation—starting with the President's Executive Orders, then moving on to the same Guidance at issue here, and then to the issuance of the subpoena to QueerDoc—the Ninth Circuit held that "QueerDoc may itself be misbranding drugs in violation of the FDCA," and further, "may possess information relevant to DOJ's broader investigation of manufacturers and distributors." *Id.* at 1134. More specifically, "drug manufacturers and distributors may violate the FDCA by shipping drugs into interstate commerce with the intent that they be used for an off-label purpose." *Id.* at 1135. That is materially indistinguishable from the theory of FDCA liability laid out in the Guidance.

Plaintiffs' argument on the FGM Act is just another "red herring." *California*, 2026 WL 2473573 at *3. They insist that "providing medically necessary gender-affirming care to people under 19 does not fall within the 'core prohibition of the [FGM] statute.'" Doc No. 133 at 19 (quoting Doc No. 124 at 15). But Defendants never said otherwise. As Defendants have explained, "[t]he Bondi Memo merely restates the core prohibition of the statute: 'it is a felony to perform, attempt to perform, or conspire to perform female genital mutilation ('FGM') on any person under the age of 18.'" Doc No. 124 at 15 (quoting Doc No. 1-6 at 4). And setting Plaintiffs' mischaracterizations of the Guidance and Defendants' briefing to one side, the Bondi Memo is

quite clear that only "legitimate lead[s]" should be pursued, and it only prioritizes prosecution of "FGM offenses to the fullest extent possible." Doc No. 1-6 at 5.

### B. The Department's enforcement priorities are not arbitrary and capricious (Count I).

Plaintiffs challenge an agency's choice of investigative priorities. To the extent the APA requires an agency to explain such discretionary decisions, the Guidance is more than sufficient. The Bondi Memo identifies serious adverse effects associated with gender-related medical interventions in children, including infertility. Doc No. 1-6 at 2 ("patients were left permanently disfigured, scarred, and sterilized"). The Memo also canvasses the lack of evidence supporting such interventions in children, citing, for example, "[National Institute of Health]-funded studies admit[ting] that little to no empirical data support[s] the long-term safety of puberty blockers and hormones, let alone sex-reassignment surgery." Doc No. 1-6 at 4. The Administration's commonsense policy judgment that "life-altering chemical and surgical intervention[s]" are not appropriate treatments for pediatric gender dysphoria is therefore fully consistent with APA standards, Doc No. 1-6 at 2, as the Guidance was "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Plaintiffs argue the Guidance is arbitrary because it "rel[ies] on policy objectives that Congress neither enacted nor identified as relevant." Doc No. 133 at 28 (citation omitted). This argument is difficult to understand. The FDCA and FGM Act are criminal statutes. A criminal law "consist[s] of the essential elements of the crime." *United States v. Harris*, 128 F.3d 850, 854 (4th Cir. 1997). A criminal statute does not identify "policy objectives" that the United States must consider before investigating or charging an offense. Nor does the FCA. Plaintiffs also err by arguing that the Guidance reflects an "improper purpose." Doc No. 133 at 28. That answer

"improperly disregard[s] the presumption of regularity" applicable to Department actions. *QueerDoc*, 187 F.4th at 1139.

More fundamentally, this argument misunderstands how our system of representative government works. "Every President has law enforcement priorities, just as every President has signature policies (often, the former are components of the latter)." *Id.* at 1142. And "if a President's stated policy views are evidence of improper purpose, . . . the administration of the federal government would crumble." *Id.* at 1142. Such an approach would "enable[] the federal judiciary to intrude on some of the President's fundamental prerogatives: his decisions about which policies to advance, how to allocate scare law-enforcement resources, and how to articulate his policies to the public. That approach is clearly wrong." *Id.* It cannot be that an administration's policy views—such as a desire to ban sports gambling—effectively immunizes affected industries or practices from federal investigation for compliance with existing federal law. *Cf.* Executive Order 14,075, Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, 87 Fed. Reg. 37189 (June 15, 2022) (directing Federal Trade Commission to "consider whether so-called conversion therapy constitutes an unfair or deceptive act or practice").

Plaintiffs' reliance argument also lacks merit. Doc No. 133 at 22-25. Like much of the rest of this case, this argument is also based on the demonstrably false premise that the Guidance "categori[cally]" "prohibit[s] providing or billing" for gender-related medical treatments for children. Doc No. 133 at 29. If that were true, the Department would have nothing to investigate. And Plaintiffs still identify no prior Department guidance or settled enforcement policy stating that the statutes identified in the Memos are categorically inapplicable to misconduct in this space. It is unclear what "established and undisputed enforcement precedent" Plaintiffs are referring to. Doc No. 133 at 31. It is also unclear how the Department could have implicitly "foster[ed] decades

of industry reliance" given that using puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria in children in a relatively new phenomenon.

### C. The Tenth Amendment does not allow States to veto federal enforcement priorities (Counts III-IV).

Plaintiffs' Tenth Amendment theory is foreclosed by precedent. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992). Courts simply have "no license to employ freestanding conceptions of state sovereignty when measuring congressional authority under the Commerce Clause." *Garcia v. S.A. Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). Plaintiffs' concession that the FCA, FDCA, and FGM Act are valid exercises of Congress's enumerated powers therefore dooms this claim. *See id.*; *accord, e.g.*, *Town of Johnston v. Fed. Housing Fin. Agency*, 765 F.3d 80, 86 (1st Cir. 2014) ("Having concluded that the [challenged statutory exemptions] are a constitutional exercise of Congress' power under the Commerce Clause, we necessarily must also conclude that the municipalities' efforts to invoke abstract principles of federalism through the Tenth Amendment fail."); *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 12 (1st Cir. 2012).

Plaintiffs' apparent theory is that the FCA, FDCA, and FGM Act have no application to healthcare-related violations (or at least "gender-affirming" healthcare-related violations). That is clearly wrong. As *Gonzales* itself acknowledges, "[e]ven though regulation of health and safety is primarily, and historically, a matter of local concern," there is "no question that the Federal Government can set uniform national standards in these areas." *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006). Indeed, the FDCA's "overriding purpose [is] to protect the public health." *United States v. Bacto-Unidisk*, 394 U.S. 784, 798 (1969). And "[f]ederal laws criminalizing conduct within traditional areas of state law. . . are of course commonplace under the dual-sovereign

concept"—and "involve no infringement per se of states' sovereignty in the administration of their" state laws. *United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997). In any event, the more basic problem with Plaintiffs' Tenth Amendment theory is that speculative concerns about how a statute may be applied in a hypothetical enforcement scenario cannot be converted into a Tenth Amendment claim. Even if a concrete dispute over the application of these statutes were before the court, claims alleging that an official has "exceeded his statutory authority are not 'constitutional'" claims that can be asserted through a direct cause of action—even by states. *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

## III. The Scope of Relief, If Any, Should Be Limited to Vacatur and Tailored To The Parties Before the Court.

Even if the Court concludes that any part of the Guidance is unlawful, consistent with Article III and traditional equitable principles, the Court should do no more than set the Guidance aside as to any party that has demonstrated standing. Plaintiffs fall well short of their burden to show entitlement to injunctive relief, as they cannot establish that the traditional equitable factors favor judicial interference with the Executive's core enforcement discretion.

It is a bedrock principle of equity that "relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Yet in addition to complete vacatur of the Guidance, Plaintiffs seek a series of declaratory judgments about abstract propositions of law that "apply to all licensed health care providers operating within Plaintiff States." Doc No. 132-1 at 3. What's more, Plaintiff seek a sweeping prospective injunction prohibiting Defendants from "enforc[ing] the FCA, FDCA, or FGM statute in the Plaintiff States in violation of the declaratory relief" they request. Doc No. 132-1 at 4. The Court should decline these invitations.

*First*, there is no need for any relief beyond "setting aside" the Guidance as to Plaintiffs who have shown standing. And because tailored vacatur would provide complete relief, there is no need to consider Plaintiffs' injunctive and declaratory requests. Defendants' maintain that § 706(2) does not authorize a remedial order extending vacatur to nonparties, a "distinct question" that *CASA* left unresolved. *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025). A narrow remedy limited to the parties before the Court aligns with the APA's structure, respects Article III limitations, and prevents sweeping judicial interference in administrative governance. Vacatur, if warranted, should therefore apply only to the parties with standing in this case.

*Second*, this Court lacks authority to enter declaratory judgments that "apply to" non-parties, whether in Plaintiff states or elsewhere. As the First Circuit has acknowledged, the Declaratory Judgment Act "does not contain any provisions indicating that declaratory judgments are authoritative vis-à-vis nonparties to the litigation. In fact, the Act indicates it may only declare the rights of 'interested parties seeking [the] declaration.'" *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 48 n.12 (1st Cir. 2012) (quoting 28 U.S.C. § 2201(a)); *N.H. Lottery Comm'n v. Barr*, 386 F. Supp. 3d 132, 158 (D.N.H. 2019), *reversed on other grounds sub. nom.*, *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021) ("The idea that a declaration necessarily binds non-parties finds no support in the statute or in caselaw."); *Verosol B.V. v. Hunter Douglas, Inc.*, 806 F. Supp. 582, 587 (E.D. Va. 1992) ("nonparties are not bound by declaratory judgments" (citing *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 16 n.1 (1st Cir. 1982)).

*Third*, Plaintiffs have not satisfied the independent requirements for a permanent injunction. "[B]efore a court may grant such relief," a prevailing plaintiff must show "(1) that is has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, consider the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

None of those factors support the relief Plaintiffs seek. While the Department maintains that Plaintiffs have not even shown an injury sufficient to establish their standing to sue, if the Court disagrees, Plaintiffs still cannot establish imminent irreparable injury requiring a prospective injunction, especially if the challenged Guidance is set aside. The speculative possibility that the Department might thereafter undertake some different, future enforcement action that independently violates federal law is not a present irreparable injury warranting an injunction today. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162-63 (2010) (permanent injunction unnecessary where plaintiffs could challenge any future unlawful action and "seek[] appropriate preliminary relief"). For substantially the same reason, Plaintiffs cannot show that vacatur would be an inadequate remedy.

The balance of hardships and public interest also cut sharply against Plaintiffs' requested injunction. An order requiring the Department to enforce federal law consistent with a series of vague declarations would represent an unprecedented judicial intrusion into the affairs of the Executive Branch. Consider Plaintiffs' request for a declaration that claims made "in accordance with industry-standard practices at the time of care" are "not . . . 'false' or 'fraudulent" under the FCA. Doc No. 132-1 at 3. To start, that legal rule is totally divorced from the FCA. The statute contains no safe harbor for industries that habitually defraud the government as a matter of standard practice. In any event, an injunction keyed to undefined "industry-standard practices" would be hopelessly vague—both for the United States and the entities subject to potential enforcement actions. Plaintiffs' other proposed declarations suffer from similar flaws. Take

Plaintiffs' request for declaration that "a health care provider that purchases, stores, prescribes, dispenses, or administers FDA-approved drugs as part of providing gender-affirming care does not thereby violate the mislabeling or misbranding provisions of the FDCA." Doc No. 132-1 at 3. Does this gloss on the FDCA mean that doctors may prescribe puberty blockers and cross-sex hormones bearing an inaccurate or missing label—so long as the drugs are prescribed or administered "as part of providing gender-affirming care"? Whatever Plaintiffs think the answer to this question is, intolerable uncertainty would remain.

No principle of law or equity supports placing future exercises of prosecutorial and investigative discretion under the continuing supervision of a federal court, backed by the threat of contempt. Equity does not require—and separation of powers principles strongly counsel against—such judicial superintendence, especially where narrower relief would fully redress any violation found. And the public has a substantial interest in the lawful enforcement of federal statutes, *Samia v. United States*, 599 U.S. 635, 655 (2023) (emphasizing "society's compelling interest in finding, convicting, and punishing those who violate the law"), while Plaintiffs have no legitimate interest in preventing federal enforcement that complies with whatever legal rules this Court announces. Indeed, during the last administration, nearly every plaintiff involved in this case elsewhere asserted its "strong interest in supporting the executive authority to set law enforcement priorities, in order to deploy limited government resources to promote the fairness, effectiveness, and integrity of criminal and civil enforcement systems."[2] And those plaintiffs rightly recognized that the Executive's prosecutorial discretion "has deep roots in the constitutional separation of powers, as well as the President's constitutional authority to (among other things)

[2] *See* Br. for States of N.Y., Cal., Conn., Del., Ill., Me., Md., Mass., Minn., Nev., N.J., N.M., Or., R.I., Vt., Wash., & D.C., as Amici Curiae in Supp. of Pet., at 1, No. 22-58, *United States v. Texas*, ECF No. 21 (Sep. 19, 2022).

'take Care that the Laws be faithfully executed.'"[3] Those principles continue to apply regardless of who occupies the White House.

*Fourth*, any injunction must be no broader than needed to afford relief to Plaintiffs themselves. The Supreme Court in *CASA* addressed injunctions against implementation of an Executive Order and held that federal courts may not issue equitable remedies "broader than necessary to provide complete relief to each plaintiff with standing to sue." 606 U.S. at 861. "Complete relief" is "not synonymous with 'universal relief'"; it means "complete relief between the parties." *Id.* at 851. It is "not a guarantee—it is the maximum a court can provide." *Id.* at 854. And *CASA* specifically rejected any assumption that the presence of State plaintiffs automatically warrants universal relief, instead requiring courts to determine whether narrower relief will remedy the states' own injuries. *Id.* at 852-54. Plaintiffs therefore cannot obtain an injunction (or declaration) on behalf of the pharmaceutical companies, distributors, and healthcare providers in their jurisdictions merely because States wish to immunize such nonparties from federal law.

Finally, judgment should be entered for President Trump because Plaintiffs have conceded they lack standing to challenge the EO. At a minimum, Plaintiffs may not obtain an injunction that runs against the President himself. A court may not "enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

## CONCLUSION

For these reasons, the Court should grant summary judgment in favor of Defendants.

DATED: October 5, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

---

[3] *Id.* at 12.

ERIC HAMILTON
Deputy Assistant Attorney General

*/s/ John Bailey*
JOHN BAILEY
Counsel to the Assistant Attorney General
LINDSEY GILMAN
Trial Attorney
United States Department of Justice
Civil Division
950 Constitution Ave. NW
Washington, DC 20005
Phone: (202) 514-6993
Email: john.bailey@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed this Memorandum of Law with the Court's Electronic Court Filing system and it will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

October 5, 2026

*/s/ **John Bailey***
John Bailey